Gregory J. Yu (State Bar No. 133955)
GLOBAL LAW GROUP
2015 Pioneer Court, Suite P-1
San Mateo, CA  94403
Telephone: (650) 570-4140
Facsimile:  (650) 570-4142
E-mail:  glgroup [at] inreach [dot] com
Attorney for Plaintiffs and Proposed Class and Subclasses

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| KINDERSTART.COM LLC, a California limited liability company, on behalf of itself and all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>GOOGLE, INC., a Delaware corporation,<br><br>     Defendant. | Case No. C 06-2057 JF<br><br>**NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AGAINST FURTHER FREE SPEECH VIOLATIONS**<br><br>Date:      June 30, 2006<br>Time:     9:00 a.m.<br>Courtroom: No. 3, 5th Floor<br>Judge:    Hon. Jeremy Fogel |

## <u>NOTICE OF MOTION AND MOTION</u>

Plaintiff KinderStart.com LLC ("KSC") hereby moves this Court for a preliminary

injunction, under Fed.R.Civ.P. Rule 65(a), to be heard at the above time and place.  The Court is

asked to enjoin Defendant Google, its officer, agents, employees, and attorneys, and all those in

active concert or participation with the foregoing persons, to (A) affirmatively re-include

Plaintiff KinderStart.com LLC's Website www.kinderstart.com ("KS.com") within Defendant's

full-access search index, and (B) discontinue a practice to artificially or manually lower the

PageRank ("derank") of KS.com, Plaintiff's Website, from an algorithmically generated number

down to as low as '0', until a final hearing and determination of the merits in this action.  This

Dockets.Justia.com

1  injunction, as may be ordered by this Court, will properly and equitably lay the foundation to

2  secure and preserve the rights of, and suspend the ongoing harm to, the lead Plaintiff and all

3  other similarly situated persons, companies and entities ("Class Members") (KSC and Class

4  Members together are the "Class" or "Plaintiffs").

5        This preliminary injunction is sought because Defendant violates Plaintiffs' free speech

6  rights under the First Amendment of the United States Constitution and under California

7  Constitution Article 1, Section 2.  Without this relief to both affirmatively and prohibitively

8  enjoin Defendant Google, KSC and other Class Members will suffer immediate and irreparable

9  injury, loss, and damage to their respective Websites, businesses, and freedoms, as more fully

10  described in the First Amended Complaint on file herein (the "1st Complaint"), and in the

11  affidavits and declarations of various parties, counsel and witnesses attached hereto.[1]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  ---
[1] Prior to the issuance of the injunction sought herein, Plaintiff KSC is ready, willing, and able to execute a bond
27  payable to Defendant, or to provide other security in such sum as this Court may deem proper for such costs and
damages, if any, for an improperly granted injunction.  However, Plaintiff requests that based on the equities, the
type of injunctive relief against Defendant sought, and the nominal burden therefrom, this Court should properly not
28  require an injunction bond of KSC for the duration of this case.

# TABLE OF CONTENTS

I.     INTRODUCTION AND FOUNDATION.............................................................9

       A.     Relevant Facts.................................................................................9

       B.     This Court is Empowered to Hear and Grant this Motion for Injunctive Relief...12

       C.     The Grounds for Preliminary Injunctive Relief in the Ninth Circuit....................12

II.    FIRST ELEMENT:  THE ONGOING BAN OF PLAINTIFF'S WEBSITE CAUSES IRREPARABLE HARM TO PLAINTIFF.........................................................13

III.   SECOND ELEMENT:  THE BALANCE OF HARDSHIPS EVEN IN THE MOST FAVORABLE LIGHT FOR DEFENDANT WARRANTS THIS INJUNCTION...........14

IV.    THIRD ELEMENT:  THERE EXISTS A REASONABLE LIKELIHOOD THAT DEFENDANT COMMITTED FREE SPEECH VIOLATIONS.......................................15

       A.     The U.S. Supreme Court has Acknowledged that Public Forum Analysis Applies to the Internet ...............................................................17

              1.     Privately Owned Space or Property, When Dedicated for Public Use, Houses State Action..................................................25

              2.     State Action is Present because of Public Entwinement between Google and Government......................................................28

              3.     Google Utilizes Search Engine Functionality, Indexes and Content Review to Restrict Free Speech. ...............................36

V.     FOURTH ELEMENT:  THE PUBLIC INTEREST IS SERVED WHEN PLAINTIFF'S SITE IS RE-INDEXED, NATURALLY PAGERANKED, AND TRULY ACCESSIBLE ON THE WORLD WIDE WEB ...............................................44

VI.    AN INJUNCTION CAN ULTIMATELY LEAD TO REASONABLE NOTICE AND GUIDELINES FOR BANNING WEBSITES BY GOOGLE ...........................................46

VII.   CONCLUSION................................................................47

# TABLE OF AUTHORITIES

## CASES

*Aguirre v. Chula Vista Sanitary Service*, 542 F.2d 779, 781 (9th Cir. 1976)................................. 12

*Allen, Allen, Allen & Allen v. Williams*, 254  F.Supp.2d 614 (D.C.Va. 2003) ............................ 45

*Altmann v. Television Signal Corp.*, 849 F. Supp. 1335 (N.D. Cal. 1994).................................... 47

*Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S. Ct. 1601, 20 L. Ed. 2d 603 (1968) ......................................................................................................................... 27

*Arkansas Educ. Television Commission v. Forbes*, 523 U.S. 666, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998)................................................................................................................................ 17

*Ashcroft v. ACLU*, 542 U.S. 656, 661, 124 S. Ct. 2783. 159 L. Ed. 2d 690 (1998) ...................... 9

*Bally Total Fitness Holding Corporation v. Faber*, 29 F. Supp. 2d 1161, 1165 (C.D. Cal. 1998) ....................................................................................................................................................... 24

*Bates v. State of Arizona*, 433 U.S. 350, 380-81, 97 S. Ct. 269, 153 L. Ed. 2d 810 (1977) ......... 39

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001)................................................................................................. 29

*Brunette v. Humane Society*, 294 F.3d 1205, 1213 (9th Cir. 2002), *cert. denied*, 537 U.S. 1112, 123 S. Ct. 902, 154 L. Ed. 2d 786 (2003) ........................................................................... 34

*City of Ladue v. Gilleo*, 512 U.S. 43, 60, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994) (O'Connor, J., concurring)........................................................................................................................... 37

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982)........................................................................................................................................ 14

*Compuserve, Inc. v. Cyber Promotion, Inc.*, 962 F.Supp. 1015 (E.D. Ohio 1997) ...................... 21

*Cornelius v. NAACP*, 473 U.S. 788, 800; 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)................... 19

*Currier v. Potter,* 379 F.3d 716, 727 (9th Cir. 2004) ................................................................. 19

*Cyber Promotions, Inc. v. American Online, Inc.*, 948 F.Supp.436 (E.D. Pa. 1996) ................... 30

*Dahl v. HEM Pharms. Corp.* 7 F.3d 1399, 1404-05 (9th Cir. 1993)............................................ 42

*Denver Area Ed. Telecommunications Consortium Inc. v. FCC*, 518 U.S. 727, 749, 135 L.Ed.2d 888, 116 S. Ct. 2374 (1996)................................................................................................... 16

*Dombrowski [v. Pfister]*, 380 U.S. 479, 486-87, 85 S. Ct. 1116, 14 L. Ed. 2d 22 (1965) ........... 39

*Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) ............................... 9

*Ex parte Jackson*, 96 U.S. 727, 733, 24 L. Ed. 877 (1878) ....................................................... 40

*Faculty Rights Coalition v. Shahrokhi*, 2005 U.S. Dist. LEXIS 16227 (S.D. Tex. Jul 13, 2005), *recons. denied,* 2005 U.S. Dist. 16293 (S.D. Tex Aug. 10, 2005) ................................................ 19

*George v. Pacific CSC Work Furlough*, 91 F.3d 1227, 1230 ( 9th Cir. 1990) (per curiam) ........ 31

*Glendale Associates, Ltd., v. N.L.R.B.*, 347 F.3d 1145 (9th Cir. 2003) ...................................... 43

*Golden Gateway Center v. Golden Gateway Tenants Association*, 26 Cal.4th 1013, 1025-31, 29 P.3d 797, 111 Cal.Rptr.2d 336 (2001) ......................................................................................... 43

*Gresham v. Chambers*, 501 F.2d 687, 691 (2nd Cir. 1974) .......................................................... 13

*Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2nd Cir. 1953) ......................... 13

*Hollenbaugh v. Carnegie Free Library, of Connellsville, Pa.*, 545 F.2d 382, 283 (3rd Cir. 1976) .............................................................................................................................................. 33

*Horvath v. Westport Library Association*, 362 F.3d 147 (2nd Cir. 2004) .................................... 33

*Hudgens v. NLRB*, 424 U.S. 507, 86 S. Ct. 1029, 47 L. Ed. 2d 196 (1975) .......................... 26, 27

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566, 115 S. Ct.2338, 132 L. Ed. 2d 487 (1995) ................................................................................... 41

*International Jensen, Inc. v. Metrosound, U.S.A., Inc.,* 4 F.3d 819 (9th Cir. 1993)..................... 13

*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 769, 108 S. Ct. 2138, 100 L. Ed. 2d. 771 (1981) ............................................................................................................................................. 40

*Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002) ................................................................................... 30

*Lloyd Corp. v. Tanner*, 407 U.S. 551, 581-82, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972) (majority; Marshall, J., dissenting ....................................................................................................... 22, 26

*Marsh v. Alabama*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946) ...................................... 26

*Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-57, 104 S. Ct. 2839, 81 L. Ed. 2d. 786 (1984) ...................................................................................................................................... 45

*Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984) ..................................................................................................... 39

*Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637 (9th Cir. 1993)...................... 13

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974).............................................................................................................................................. 41

*N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988).............................................................................................................................................. 39

*National A-1 Advertising, Inc. v. Network Solutions, Inc.*, 121 F.Supp.2d 156, 178 (D. NH 2000) ...................................................................................................................................................... 19

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 8, 20-21, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986) (plurality opinion) ..................................................... 22, 40

*Panavision International, L.P. v. Dennis Toeppen, Network Solutions, Inc.*, 141 F. 3d 1316, 1327 (9th Cir. 1998) ................................................................................................................................ 20

*Papachristou v. City of Jacksonville*, 405 U.S. 156, 168, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972) ............................................................................................................................................................ 39

*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 851 (C.D. Ca. 2006) ........................................ 35

*Perry Educ. Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 48-49, 103 S. Ct. 949, 74 L. Ed. 2d 744 (1983) ................................................................................................................................ 19

*Prometheus Radio Project v. FCC*, 373 F.2d 372, 448 (3rd Cir. 2004) ...................................... 22

*Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980). 28

*Qwest Corp. v. City of Surprise*, 434 F.3d 1176 (9th Cir. 2006) ................................................ 14

*Red Lion Broadcasting, Co., Inc.  v. FCC*, 395 U.S. 367, 369, 400-01, 89 S. Ct. 1794, 23 L. Ed. 2d  371 (1969) ................................................................................................................................ 47

*Reno v. ACLU*, 929 F.Supp  824, 830-49*, aff'd*, 521 U.S. 844, 849, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997) ........................................................................................................................ *passim*

*Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908, 910, 153 Cal. Rptr. 854, 592 P.2d 341 (1979), ...................................................................................................................................... 43

*Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987) ............................ 13

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, *515 U.S. 819, 830,* 115 S. Ct. 2510,132 L. Ed. 2d 700 (1995) ...................................................................................................................... 16

*Rumsfeld v. Forum for Acad. and Inst. Rights*,___ U.S. ___, 126 S. Ct. 1297, 1309, 164 L. Ed. 2d 156, 2006 U.S. LEXIS 2025 (2006) ............................................................................................ 41

*San Diego Committee v. Governing Board*, 790 F.2d 1471 (9th Cir. 1986) .............................. 13

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994). .................................................. 13

*TeleTech Customer Care Mgmt. (Cal.), Inc. v. Tele-Tech Co.*, 977 F.Supp. 1407, 1410 (CD Cal. 1997) ............................................................................................................................................ 21

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 117 S. Ct. 1174 137 L. Ed. 2d 369 (1997) ............................................................................................................................................ 47

*United States v. American Library Association, Inc.*, 539 U.S. 194, 123 S. Ct. 2297, 156 L.Ed.2d 221 (2003) .................................................................................................................................... 32

*United States v. Brown*, 381 U.S. 437, 85 S. Ct. 1707, 14 L. Ed. 2d 484 (1965) ........................ 37

*Viacom International, Inc. v. Federal Communications Commission*, 828 F.Supp. 741, 744 (N.D.Cal. 1993) ............................................................................................................................ 13

*Virginia v. Hicks*, 539 U.S. 113, 119, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003) ...................... 39

*Wickersham v. City of Columbia, MO*, 371 F.Supp.2d 1061 (W.D. Mo. 2005) .......................... 31

*Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977) ............................ 29

*Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169 F. Supp. 2d 1181, 1183 n.1 (N.D. Cal. 2001), *rev'd* 379 F.3d 1120 (9th Cir. 2004), *vacated and reh'g granted* 399 F.3d 1010 (9th 2005), *rev'd and remanded* 433 F.3d 1199 (9th Cir. 2006) .................................................. 16

## STATUTES

An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, 42 U.S.C. § 1983 ......................................................................................................... 30

California Constitution Article 1, Section 2 ..................................................................................... 2

Child Online Protection Act ("COPA"), 47 U.S.C. § 23 .............................................................. 22

Child Online Protection Act of 1998, 47 U.S.C. § 230 .................................................................. 9

Children's Internet Protection Act ("CIPA"), 20 U.S.C. § 9134(f); 47 U.S.C. § 254(h)(6)......... 32

Communications Act, 47 U.S.C. §§ 201 *et seq.* ........................................................................... 12

Communications Decency Act of 1996 ("CDA"), 42 U.S.C. § 231 ............................................ 11

First Amendment to the U.S. Constitution ...................................................................................... 9

Sherman Act, 15 U.S.C. §§ 1 *et seq.* ........................................................................................... 12

## OTHER AUTHORITIES

"The Federal Government Information Environment of the 21st Century: Toward a Vision Statement and Plan of Action for Federal Depository Libraries," prepared by the Depository Library Council, Sept. 2005, at http://www.access.gpo.gov/su_docs/fdlp/pubs/dlc_vision_09_02_2005.pdf.............................. 37

Balkin, Jack "Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society," 79 N.Y.U L. Rev. 1, 46 (2004).......................................................... 17

Gey, Steven G., "Reopening the Public Forum – From Sidewalks to Cyberspace," ("Gey Forum Article"), 58 Ohio St. L. J. 1539, 1619 (1998) ....................................................... 16, 20, 24 n.14

Hafner, K. & Lyon, M, "Where Wizards Stay up Late: The Origins of the Internet," 103 36 (1996)............................................................................................................................................ 15

Kelly, K., "What Will Happen to Books", *The New York Times Magazine*, May 14, 2006, p. 42, 48........................................................................................................................................... 37

Newman, Nathan S., "Net Loss: The Political Economy of Community in the Age of the Internet", Ph.D. Dissertation in Sociology from UC-Berkeley 1998, ch. 2. at http://www.nathannewman.org/diss/index.html ...................................................................... 16

Note, "Neutral Rules of General Applicability: Incidental Burdens on Religion, Speech, and Property, 115 Harv. L. Rev. 1713 (Apr. 2002) .......................................................................... 40

Note, "The Impermeable Life: Unsolicited Communications in the Marketplace of Ideas," 118 Harv. L. Rev. 1314 (Feb. 2005) ............................................................................................... 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*The Wall Street Journal*, October 18, 2005 ................................................................. 11

*www.house.gov/international_relations/aphear.htm* (109th Cong. 2d Sess., Feb. 15, 2006), p1  24

1

## I. __INTRODUCTION AND FOUNDATION__

2

The First Amendment to the U.S. Constitution provides, "Congress shall make no law . . .

3

abridging the freedom of speech." The U.S. Supreme Court has declared, "The loss of First

4

Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable

5

injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).

6

Accordingly, plaintiff KSC requests this Court to allow KS.com to freely and faithfully appear

7

unblocked and PageRanked on the Internet through Google's search engine for the pendency of

8

this action. In recognition of the monumental shift of dialogue and speech over to the Internet

9

even in just the past five years, this Court should consider and grant injunctive relief in this vital

10

public speech forum. Defendant Google's suspension of Plaintiff's speech over the Internet is a

11

gravity of high importance and requires the utmost deliberation.

12

### A. __Relevant Facts.__

13

The core function of Google's search engine is speech from millions of Websites on the

14

Internet. There ancillary commercial purpose to present online advertising using

15

sponsored links merely engenders even more speech, albeit as paid commercial speech. Since

16

Defendant's entire business and technical platform is essentially speech, this motion centers on

17

unhindered access to free speech. Naturally, the Internet has constitutional limitations in

18

content, most notably, congressional and judicial efforts to protect certain harmful online content

19

to minors.[2]

20

Plaintiff's site, KS.com was and remains a crucial resource on the Internet as an index

21

and directory for and about all things children, ages 0 to 7.[3] KS.com focuses on one of the most

22

valued and crucial audiences in all of society – those vested with the duty and privilege of

23

raising and nurturing infants, toddlers and young kids into their pre-adolescent years. Like

24

25

[2] *See* Child Online Protection Act of 1998, 47 U.S.C. § 230; *Ashcroft v. ACLU*, 542 U.S. 656, 661, 124 S. Ct. 2783.

26

159 L. Ed. 2d 690 (1998).

[3] Plaintiffs ask this Court to take judicial notice of selected commentary about the value of content and links on the

27

Internet through KS.com): Under the Yahoo! Parenting Web Directory, KS.com is ranked as the *most popular* site among nine sites listed. *See* http://dir.yahoo.com/Society_and_Culture/Families/Parenting/Web_Directories/,

28

visited on May 4, 2006. For more evidence of the importance of KS.com to parents, schools and organizations, Plaintiffs refer to the accompanying *Declaration of Sara Lewis* ("Lewis Dec.") attached as Exhibit 1 hereto.

millions of other U.S. organizations and businesses, KSC operates without a brick and mortar

presence.  The power of the Internet allows plaintiffs the open channel to reach millions in

cyberspace.  <u>KS.com</u> is seen and heard through the Web through search results, which

constitutes the key gateway for almost any Web-based firm.

      The chronology demonstrates clear equities in Plaintiff's favor.  In August 2000, over

one year before Google became authorized to do business in this state, KSC launched <u>KS.com</u>

with this announcement:

> KinderStart.com isn't for everybody, but it is for mothers, fathers, grandparents, siblings,
> expectant parents, teachers, health care practitioners, caregivers and anyone else
> interested in infants, toddlers, and children. KinderStart.com is the largest user-friendly
> index-directory of children's resources (prenatal to kinder-age) on the Internet.

Over the ensuing five years, Plaintiff built out a robust research resource using a high six-figure

internal investment to create vital, relevant categories for parents and caregivers of young

children.  In all, <u>KS.com</u> has about 1,600 categories and subcategories to present to visiting

audiences.  *See Declaration of Victor Goodman* ("Goodman Dec."), attached as <u>Exhibit 2</u>.

Monthly during early 2005, an estimated 100,000 parents, teachers, educators, and caregivers

would view perhaps 10,000,000 Web pages, all brought through the <u>KS.com</u> channel.

[*Goodman Dec.* ¶ 4.]   <u>KS.com</u> is not an e-commerce site where memberships, services or goods

are offered and sold to the public.  Nor does <u>KS.com</u> make any attempt to solicit personal

information or data-mine such information.  [*Lewis Dec.* ¶ 4.]

      The parties' relative resources are equally compelling in balancing the equities in KSC's

favor.  Defendant's purpose, function and mission is to index all Websites around the United

States and world to afford access for search users actively seeking out published speech content,

such as that available on <u>KS.com</u>.  Defendant Google, as a publicly traded entity, has an

estimated market capitalization of over $100 billion; KSC's investment of under $1 million is

one ten-thousandth (1/10,000) of Google's market value.  Google has over 6,000 employees;

KinderStart.com LLC has two.  [*Goodman Dec.* ¶ 3.]  Google's 150,000 servers index upwards

of 10 billion Web pages, of which an infinitesimal fraction is attributable to <u>KS.com</u>.  Google

perpetually promises to offer search users the most "relevant" results.  Its Chief Executive

1    Officer stated in *The Wall Street Journal* on October 18, 2005: "In order to guide users to the

2    information they're looking for, we copy and <u>index all the Web sites we find</u>. If we didn't, a

3    useful search engine would be impossible." (Emphasis added.) Defendant's swath in banishing

4    a multitude of Websites, including <u>KS.com</u>, out of the index belies this public statement.

5        One day in March 2005, Defendant Google incredulously determined that <u>KS.com</u> was

6    no longer "relevant" on the Internet and removed from Google's index. No colorable reason or

7    explanation of any sort was delivered or communicated from Defendant to Plaintiff. [*Lewis Dec.*

8    ¶ 5.] Almost simultaneously, <u>KS.com</u>'s PageRank was sent to the cellar at '0'. [*Goodman Dec.*

9    ¶ 5.] Defendant never made any attempt to explain or revive that PageRank. Quite inexplicably,

10   it rose to '7' *after* the filing of this class action. [*Goodman Dec.* ¶ 7.] At the hand of and with

11   the devices of Defendant, Google employed one or more actors with full authority and direction

12   and decided it was an opportune time to remove <u>KS.com</u> from Google's index. That happened

13   instantly with the exercise of human will – to the detriment of thousands of parents, teachers,

14   caregivers and the like. [*Id.* ¶ 8.] The key word search of "kinderstart" produces nearly non-

15   existent search results on Google that list KSC's URL. For all practical intents and purposes,

16   search users now have little means to even discover <u>KS.com</u> because, by Defendant counsel's

17   own admission, <u>KS.com</u>, has been forcibly de-indexed by Defendant Google. [*Declaration of*

18   *Gregory J. Yu* ("Yu Dec.") ¶ 3, attached as <u>Exhibit 3</u>]

19       Google itself is trafficking in speech and communication and essentially does not

20   generate its own speech on results pages.[4] By serving as the driver of in excess of 60% of all

21

22   ─────────────────────
     [4] Plaintiffs request this Court to take notice of Defendant's statements on an entry on the Google Blog of Andrew
23   McGlaughlin, Senior Policy Counsel, on October 6, 2005: "As a search engine, Google crawls the Internet,
     gathering information everywhere we can find it. We're a neutral tool that allows users to find information posted
24   by others – like a continuously updated table of contents for the Internet. Not surprisingly, we don't believe the
     Internet works well if intermediaries and ISPs are held liable for things created by others but made searchable
25   through us. That's why Google will continue to oppose efforts to force us to block or limit lawful speech." This
     reveals two truths: *First*, Google surely depends on treatment as an "intermediary" to insulate from liability caused
26   by inappropriate content presented by other Websites through the search results. At the same token, Google
     vigorously defends its property right to "block and limit" other's lawful speech on search results. *Second*, even
27   though it enjoys full immunity under the Communications Decency Act of 1996 ("CDA"), 42 U.S.C. § 231 in
     delivering search results, Google does not hesitate to assume credit for such search results of Websites presented to
28   the user and treat such ranked results as some form of synthesized speech or opinions of Google itself. This defies
     reason and fundamental fairness.

search queries to the tune of 200 million searches executed per day, Google is truly a speech intermediary. [*1st Complaint* ¶ 66.] Rather ironically and conveniently, Defendant wants full command of free speech rights over the Internet to trump all other speech rights in this "public forum". [*Defendant's Special Motion to Strike Pursuant to CCP § 425.16*, on file herein, § III.C.] Those results are relevant and presented only if, when and because the native output and creativity of millions of other sites, such as <u>KS.com</u>, are indexed and objectively presented by Defendant Google.

**B. This Court is Empowered to Hear and Grant this Motion for Injunctive Relief.**

The 1st Complaint clearly lays out no less than three independent Federal causes of action. First, Plaintiffs allege that Defendant has abridged the fundamental First Amendment free speech rights of Plaintiff KSC and others similarly situated. [*1st Complaint* ¶¶ 104-05.] Google operates a freely available public forum, open to any and all with Internet access. It is an open 24-7 invitation to users all over the world to seek out Websites and their content. [*1st Complaint* ¶¶ 22-26.] Second, attempted monopolization and monopolization that violates the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, is alleged. [*1st Complaint* ¶¶ 112-35.] Finally, Plaintiffs alleges that Google violated the Communications Act, 47 U.S.C. §§ 201 *et seq.*, in the role of a common carrier. [*1st Complaint* ¶¶ 136-44.]

Further, venue is unqualifiedly proper in this judicial district. The Northern District of California, San Jose Division, is where the world headquarters of Defendant Google are situated. The various conduct and transactions amounting to federal law violations essentially occurred in this District. Therefore, this Court may entertain this motion for injunctive relief. In its motion to dismiss, Defendant has made no attempt to object to venue.

**C. <u>The Grounds for Preliminary Injunctive Relief in the Ninth Circuit</u>.**

A preliminary injunction should issue "upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Aguirre v. Chula Vista Sanitary*

*Service*, 542 F.2d 779, 781 (9th Cir. 1976) (emphasis in original), *citing Gresham v. Chambers*, 501 F.2d 687, 691 (2nd Cir. 1974).  *See also Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987).  The Ninth Circuit has fully adopted the *Gresham* test.  The Second Circuit originally articulated this secondary ground for a preliminary injunction that when "the balance of hardships tips decidedly toward plaintiff, . . . it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."  *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2nd Cir. 1953).  The Ninth Circuit has soundly adopted this standard as well.  *See, e.g., Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637 (9th Cir. 1993); *International Jensen, Inc. v. Metrosound, U.S.A., Inc.,* 4 F.3d 819 (9th Cir. 1993).  Therefore, if the balance of hardships tips decidedly toward plaintiff and plaintiff has raised questions serious enough to require litigation, the injunction should issue. Where a mandatory injunction is requested by plaintiff, as in the instant case, the Ninth Circuit requires a heightened standard for such relief.  The district court ordinarily would decline such relief unless "the facts and law clearly favor the moving party."  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).

## II.  <u>FIRST ELEMENT:  THE ONGOING BAN OF PLAINTIFF'S WEBSITE CAUSES IRREPARABLE HARM TO PLAINTIFF.</u>

In the Ninth Circuit, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable harm sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim."  *Viacom International, Inc. v. Federal Communications Commission*, 828 F.Supp. 741, 744 (N.D.Cal. 1993) (citing *San Diego Committee v. Governing Board*, 790 F.2d 1471 (9th Cir. 1986)).  As discussed in Section IV below, KSC's First Amendment claim is grounded in compelling facts that require application of public forum analysis to Internet search results.  KSC's co-founder pointedly articulates the near total loss of Website information flowing through <u>KS.com</u> to multitudes of parents and caregivers.  [*Goodman Dec.* ¶¶ 8-9]

Google must be challenged to identify any patina of hardship or harm, whether financial

1  or otherwise, in the event of injunctive relief to re-index KS.com or reboot its PageRank

2  calculation.  Further, the process of re-inclusion is fully an option at least in theory offered by

3  Google to banned sites.[5]  This is not under any special algorithm or patented practice, to

4  Plaintiff's knowledge.  Indeed, Defendant at least seems capable of reindexing KS.com.  [*Yu*

5  *Dec.* ¶ 4.]  Even if Defendant volunteered to cease the harm upon KS.com, this Court is

6  empowered to enjoin Google from resuming the banishment of KS.com in the future.  In the

7  Ninth Circuit, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice

8  does not deprive a federal court of its power to determine the legality of the practice. *City of*

9  *Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982)."

10 *Qwest Corp. v. City of Surprise*, 434 F.3d 1176 (9th Cir. 2006).  Additionally, harm to the public

11 of reindexing KS.com is equally nominal and even nonexistent.

12 ### III.  SECOND ELEMENT:  THE BALANCE OF HARDSHIPS EVEN IN THE MOST FAVORABLE LIGHT FOR DEFENDANT WARRANTS THIS INJUNCTION

13

14         The burden upon Plaintiff KSC is constant and ongoing because KS.com cannot be found

15 on the Web anymore with basic search terms.  Thousands of visitors and partners to this unique

16 site are unable to locate KS.com with key words about children and parenting.  This isolation has

17 continued for over a year, and it damages the goodwill of Plaintiff KSC.  That lost goodwill and

18 traffic and blocked speech cannot be remedied with money.  [*Goodman Dec.* ¶¶ 4-6.]  As a

19 corporate policy, Google undertakes little truly effective means to re-index banned Websites.

20 [*Declaration of Randall McCarley* ("McCarley Dec."), attached as Exhibit 4, ¶¶ 3-4.]  It is a

21 meaningless and futile effort even for a technically-oriented Website designer.  [*Id.* ¶ 4.]

22         As for Defendant Google, there is almost a negligible effect to index or re-index

23 KS.com on its 200,000-plus servers.  If there are millions and millions of Websites searched,

24 spidered and indexed periodically, the re-inclusion of a *single site* as KS.com cannot be

25 measurably burdensome upon Google.  Google is constantly indexing and adding new sites to its

26 worldwide index.  Likewise, a requirement to fairly and objectively assign a PageRank based on

27

28 ――――――――――――――
   [5] Plaintiff requests judicial notice of Google's public policy on re-inclusion of banned Websites, found at
   http://www.google.com/intl/en/webmasters/2a.html.

1 links and traffic into <u>KS.com</u> would appear to pose only the most nominal technical challenge to

2 Google.  For this reason, the hardship upon Google for these very rudimentary steps cannot

3 under any scenario come close to approaching the burden upon KSC for the past year.  This

4 injunction should therefore proceed.

### IV.  THIRD ELEMENT:  THERE EXISTS A REASONABLE LIKELIHOOD THAT DEFENDANT COMMITTED FREE SPEECH VIOLATIONS.

This Court is now asked whether a dominant search engine as Google can intentionally or

indiscriminately block and derank Websites of persons, businesses and organizations almost

entirely dependent on search engine use, indexing and results.  Constitutional jurisprudence and

First Amendment protection for these millions of Websites rest on three core dimensions of the

Internet – its origin from government, its function today, and its value to democracy.

First, the Internet itself was created by the federal government and developed through

financing from the National Science Foundation.[6]  It began as a U.S. military program called

"ARPANET", or the Advanced Research Project Agency, to enable computers of the military,

defense contractors and universities to use redundancy over a network to communicate in war-

time emergencies.[7]  Over the past 20 years, the government has ceded more authority, control

and responsibility to private enterprises concerning the World Wide Web.  One legal

commentator traces the origins of the Web as follows:

> The reality is that the Internet is no accident but neither was it a technological
> inevitability. It was the product of a US federal government, in association with other
> nation's experts--in guiding its evolution, in demanding that its standards be open and in
> the public domain, and that its reach be extended broadly enough to overwhelm the
> proprietary corporate competitors. This network was the backbone that led to the
> eventual participation of private industry to build the communications infrastructure of
> the Internet.  In a fundamental sense, companies and organizations became part of the
> World Wide Web; it is hard to imagine a single actor can or should dominate the Internet
> or a key component.

---

[6] *See generally*, Hafner, K. & Lyon, M, "Where Wizards Stay up Late:  The Origins of the Internet," 103 36 (1996).

[7] Finding 3 of 410 findings made by the District Court in *Reno v. ACLU*, 929 F.Supp 824, 830-49, as affirmed and adopted by the U.S. Supreme Court, 521 U.S. 844, 849, 117 S. Ct. 2329, 138 L .Ed. 2d 874 (1997)
.

Newman, Nathan S., "Net Loss: The Political Economy of Community in the Age of the Internet",  Ph.D. Dissertation in Sociology from UC-Berkeley 1998, ch. 2. at http://www.nathannewman.org/diss/index.html. That Google as a single actor can indeed dominate and dictate the Internet's speech flow is precisely the impetus for the Complaint and this motion.

Second, the U.S. Supreme Court affirms that the Internet functions as a forum for massive participation and expression.  In citing a lower court's finding of facts, the Court said that it is "no exaggeration to conclude that the content of the Internet is as diverse as human thought."  *Reno*, 521 U.S. at 849 *quoting* 929 F.Supp. at 835 (finding 27).  Justice Kennedy called the Internet a "metaphysical" public forum in *Rosenberger v. Rector and Visitors of the Univ. of Va.*, *515 U.S. 819, 830,* 115 S. Ct. 2510,132 L. Ed. 2d 700 (1995).  Justice Breyer stated "we would hesitate to import 'the public forum doctrine . . . wholesale' in the context of the Internet."  *Denver Area Ed. Telecommunications Consortium Inc. v. FCC*, 518 U.S. 727, 749, 135 L.Ed.2d 888, 116 S. Ct. 2374 (1996).  Following these opinions, one legal commentator made clear the function of the Internet in the context of free speech:

> Private companies have now taken over the government's role in providing funds and the actual communications backbone of the Internet, but the essential public character of the system is the same:  from the perspective of the speakers, listeners and viewers, the privatized Internet remains like a public park – the most traditional of traditional public forums – a place where anyone can enter at any time of day and speak on any subject that comes to mind to anyone willing to listen.  There are no "no trespassing" signs on the Internet."

Gey, Steven G., "Reopening the Public Forum – From Sidewalks to Cyberspace," ("Gey Forum Article"), *58 Ohio St. L. J. 1539, 1619* (1998) (emphasis added).  Therefore, the Internet amasses discrete voices into "the most participatory marketplace of mass speech that this country – and indeed the world – has yet seen." *Reno*, 929 F.Supp. at 842.[8]

Finally, the free speech on the Internet promotes and constitutes democracy because it is

---

[8] This Court itself has recognized that the World Wide Web is a "publishing forum consisting of millions of individual websites that contain a variety of content." *Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169 F. Supp. 2d 1181, 1183 n.1 (N.D. Cal. 2001), *rev'd* 379 F.3d 1120 (9th Cir. 2004), *vacated and reh'g granted* 399 F.3d 1010 (9th 2005), *rev'd and remanded* 433 F.3d 1199 (9th Cir. 2006) .

participatory.  Mr. Gey concludes his commentary with this:  "The great democratic tradition of public discussion and debate cannot be protected adequately unless the image of the public forum is updated to conform with the realities of the new era of communication."  *Id.*, *Gey Forum Article* at 1634.  When a single actor uses its proprietary interest and control over a search engine to block out others, participation of other voices suffers immeasurably as does democracy.  One noted expert on free speech warns:  "The developing capitalist conception of freedom of speech (and its accompanying denial of free speech limitations on the growth of intellectual property) is inconsistent with the growth of democratic culture."  Balkin, Jack "Digital Speech and Democratic Culture:  A Theory of Freedom of Expression for the Information Society,"  *79 N.Y.U L. Rev. 1, 46* (2004).

A.     **The U.S. Supreme Court has Acknowledged that Public Forum Analysis Applies to the Internet.**

A speech forum falls into one of three categories, as articulated by the Supreme Court – "the traditional public forum, the public forum created by government designation, and the nonpublic forum."  *Arkansas Educ. Television Commission v. Forbes*, 523 U.S. 666, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998).  Absent a case of a traditional public forum, in both a designated public forum and a nonpublic forum, there are still restrictions on suppression of speech.  If a speaker is excluded in a designated public forum, strict scrutiny apples; if it is a nonpublic forum, restrictions must nonetheless at least be reasonable.  *Id.*

The Internet continues to exponentially increase speech in the public domain.  The Internet contains extraordinary breadth in the modes, channels and access points to both speak and be heard.  Ten years have passed since Justice Breyer's *dictum* in *Denver Area Ed.* about caution in deeming components of the Internet as public fora. The provisional and ultimate ruling on search indexing and results requires precision on the exact purpose, nature, and locus of this  speech over the Internet as well as prudence and fairness.  Congress likewise has statutorily confirmed that the Internet is "a forum for true diversity of political discourse, unique opportunities for cultural development and myriad avenues for intellectual development."  CDA § 230(a)(3).

1    The Supreme Court has opined that other than for traditional public fora, the

2  classification of a particular forum does not depend on any general view of the property, but

3  upon the exact nature of access sought:

4         Although . . . a speaker must seek access to public property or to private property
          dedicated to public use to evoke First Amendment concerns, forum analysis is not
5         completed merely by identifying the government property at issue. Rather, in defining the
          forum we have focused on the access sought by the speaker. When speakers seek general
6         access to public property, the forum encompasses that property. [Citation omitted.]  In
          cases in which limited access is sought, our cases have taken a more tailored approach to
7         ascertaining the perimeters of a forum within the confines of the government property. . .
          Here, . . . respondents seek access to a particular means of communication.
8

9  *Cornelius v. NAACP*, 473 U.S. 788, 800; 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985).  In

10 *Cornelius*, the Court narrowly tailored the public forum analysis to access sought by the NAACP

11 to be included in an annual federal employee charitable fund drive known as the "Combined

12 Federal Campaign" that lists eligible charities.  The Ninth Circuit follows this analytic

13 framework by focusing on not merely the "nature and function" of the system  or fora, but also

14 the specific "access sought by the speaker".  *Currier v. Potter,* 379 F.3d 716, 727 (9th Cir.

15 2004).

16     Access to a variety of communication channels have been held not to be under First

17 Amendment protection.  These include:  an internal e-mail system (*Perry Educ. Ass'n v. Perry*

18 *Local Educators Ass'n,* 460 U.S. 37, 48-49, 103 S. Ct. 949, 74 L. Ed. 2d 744 (1983); *Faculty*

19 *Rights Coalition v. Shahrokhi*, 2005 U.S. Dist. LEXIS 16227 (S.D. Tex. Jul 13, 2005), *recons.*

20 *denied,* 2005 U.S. Dist. 16293 (S.D. Tex Aug. 10, 2005)); a general mail delivery system for the

21 homeless lacking physical mailing addresses (*Currier, supra,* 379 F.3d at 729-30); and second-

22 level domain name (i.e., human-readable) registration (*National A-1 Advertising, Inc. v. Network*

23 *Solutions, Inc.*, 121 F.Supp.2d 156, 178 (D. NH 2000)).   In *National A-1*, the court found that

24 "[n]o tangible form of expression ha[d] been suppressed by . . . [the] refusal to register . . .

25 second level domain names."  In doing so, the court recognized that Internet speech had

26 alternative avenues to flow, either by extending expressive messages through the plaintiff's

27 URLs or by revealing expression through the return of a "hit" by a search engine.  *Id.* at 179.

28

NOTICE OF MOTION, MOTION AND          -18-          Case No. C 06-2057 JF
MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1    In this case, access to a speech forum by KSC is two-fold.  First, it seeks to have KS.com

2    re-included within Google's search engine index *after* it was first indexed for a long period of

3    time and then suddenly banished and blocked.  Second, it requires an ongoing restoration of its

4    PageRank to its natural level, free of manipulation or artificial depression instigated by Google.

5    The access sought is in no way a general request to manage the search index or to invade the

6    process of how Google controls or calculates the search engine results or PageRank.

7    Under the guidelines of the Ninth Circuit in *Currier*, the forum access should be clearly

8    identified for consideration of First Amendment protection.  The holding of *National A-1*,

9    though, not binding here, is quite relevant.  First, a court must study whether expression can and

10   does flow by means of access to the forum in question.  Apparently, no such communication or

11   message would generally be spoken by second level domain names on the Internet.  Second, the

12   court explicitly recognized that speech flows by means of search indexing and results based upon

13   Website content that embeds meta-tags.  *Id.* at 180.  This means that a practical identifier and

14   locator, such as an address, phone number, or domain name, by itself bears no message to be

15   heard.  Search engine usage and indexing, however, do lead a listener to a Website that is both

16   derived from, and communicative of, content on the site itself.

**B.  <u>Search Engine Use and Indexing Uniquely Radiates and Promotes Free Speech in Cyberspace.</u>**

17

18   Websites are located, seen and heard by three basic means:  (1) Entering a site address in

19   the browser window; (2) clicking on a hyperlink on a Webpage or document to a related

20   Website; or (3) Entering a key word or words to access a group of sites produced by a search

21   engine index.  *National A-1*, 121 F. Supp. 2d at 163-64.  Search engines locate and

22   algorithmically value sites for the search engine user by *examining the very content on the site*

23   *itself*.  The site contains meta-tags that are detected and read by the search engine to generate

24   results.  *Id.*  Content relevancy yield listings on results pages.  "Use of a 'search engine' can

25   turn up hundreds of web sites, and there is <u>nothing equivalent to a phone book or director</u>

26   <u>assistance on the Internet</u>."  *Panavision International, L.P. v. Dennis Toeppen, Network*

27   *Solutions, Inc.*, 141 F. 3d 1316, 1327 (9th Cir. 1998) (emphasis added).  Therefore, search

28

1    engines are the only effective way to identify and see content and Websites of millions of

2    persons and businesses.  Further, the Ninth Circuit noted that "use of a search engine can

3    generate as many as 800 to 1000 matches and it is 'likely to deter web browsers from searching

4    for a Plaintiff's particular web site.'" *Id.* at 1327 (*citing TeleTech Customer Care Mgmt. (Cal.),*

5    *Inc. v. Tele-Tech Co.*, 977 F.Supp. 1407, 1410 (CD Cal. 1997)).  The practical reality therefore is

6    that search results fundamentally affect whether, how and how often free speech from a Website

7    as KS.com is found, read and heard, if ever.  The listing of these matches would surely

8    discourage a browser and search engine user from exhausting time and energy to wade through

9    hundreds and thousands of listings when a site is improperly buried deep into the listings or

10   made absent altogether by de-indexing.

11         Given that Google's search indexing and results are the true speech forum in question,

12   this forum should properly be deemed a "designated" public forum among the three types of

13   speech fora.  The Internet's amalgamation of actors include of a variety of private participants.

14   Some are merely Websites that present or provide indigenous content.  Others, such as Cisco,

15   provide hardware and software for the network infrastructure.  Still others are Internet Service

16   Providers (ISPs), which have unique freedom and responsibility.  Private ISPs, though often not

17   engaged in state action, run afoul of the First Amendment when imposing content-driven

18   restrictions on access.  *See Compuserve, Inc. v. Cyber Promotion, Inc.*, 962 F.Supp. 1015 (E.D.

19   Ohio 1997).  On legal commentator argues that a "publicly accessible instrumentality of

20   communication" as the Internet creates obligations for ISPs that restrict access to the Internet.

21   *Gey Forum Article*, at 1617 n. 373.  He reasons:

22              [I]n the case of a private company offering members of the public general access to the
23              Internet, the "property" . . . is not dedicated to a purpose other than speech.  Speech is the
             purpose of this particular type of property, and if . . . speech on the Internet takes place in
24              a public forum, then a private ISP that provides public access to the Internet should be
             obligated to follow the rules that define that forum.  In other words, the private ISP must
25              permit its customers to have access to all speech in the forum, regardless of what the
             operators of the ISP think about the content of that speech.  As compensation for giving
26              up control over what their customers may access over the Internet, this mandatory access
             rule would insulate the ISP's from civil liability for tortious speech distributed over their
27              system.

28

1    *Id.*  The protection against the unhindered harmful flow of content on the Internet first was laid

2    down in CDA.  After successful constitutional objections were raised, the Act was recast and re-

3    enacted as the Child Online Protection Act ("COPA"), 47 U.S.C. § 231, in 1998.  Later in 1998

4    following Gey's article, COPA was written into law and expressly provided Web content

5    immunity not only for persons providing an "Internet access service" (i.e. ISPs), *but also* those

6    providing an "Internet information location tool" (i.e., search engines).  47 U.S.C. § 231(b)(2-3).

7         Search engines or "Internet location tools" uniquely make speech happen between and

8    among speakers and listeners in three key respects.  First, an estimated three-quarters of all

9    American households have Internet access.[9]  Search engine results are incredibly voluminous

10   and almost instantaneous.  For the user, receiving these results is receiving free speech from

11   Websites.  The First Amendment also protects the users or listeners through a search engine

12   operating in the public domain.  The Supreme Court has said, "By protecting those who wish to

13   enter the marketplace of ideas from government attack, the First Amendment protects the

14   public's interest in *receiving* information." *Pacific Gas & Electric Co. v. Public Utilities*

15   *Commission of California*, 475 U.S. 1, 8, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986) (emphasis

16   added).  "The Constitution protects the right to receive information and ideas."  *Reno*, 521 U.S.

17   at 874.  Second, the user actively seeks out concurrent speakers from multiple Websites through

18   the search engine.  There ought to be a logical and legal distinction between unsolicited and

19   *solicited* communications over the Internet.[10]  When the user enters a search request, she is

20   solicits speech from a multitude of Websites in one search cycle.  The policy concerns of harm,

21   inconvenience and invasion of privacy weigh heavily against unsolicited e-mail spam content.

22   To the contrary, Website content, whenever possible, should freely flow to listeners having

23   evinced clear intentions to be spoken to.  This Court should assure that when a hearer uses a

24

25   [9] Back in 2004, the Third Circuit noted that by 2006, over 75% of all households in the U.S. would be online.
*Prometheus Radio Project v. FCC*, 373 F.2d 372, 448 (3rd Cir. 2004).

26   [10] For a detailed treatment of free speech issues affecting unsolicited Internet communications, such as spam, e-mail
blasts, etc., see *Note,* "The Impermeable Life:  Unsolicited Communications in the Marketplace of Ideas," *118*

27   *Harv. L. Rev. 1314 (Feb. 2005)* ("Harvard Note on Communications").  The author plainly observes that when a
person opens a Web browser to view information on her screen, none of that information is "unsolicited." *Id.* at

28   1328.  Likewise, Plaintiffs urge that the Court take notice of the fact that when a person enters in key word searches
on a search engine, information and speech displayed on results pages is not unsolicited either.

NOTICE OF MOTION, MOTION AND          -21-          Case No. C 06-2057 JF
MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

publicly accessible search engine to actively and willfully solicit speech from Websites, those sites should appear and be heard without interference, intrusion or bias.  Third, while Congress under COPA is quite wary of the easy and dynamic Internet access to harmful material by minors, it carved out statutory immunity for search engines as Google when presenting such material.  Google clearly participates and benefits from the public domain of the Internet.  Accordingly, Google should properly allow (as it indeed promises publicly) all Websites to naturally lodge within and freely speak outside of the index, particularly when under a safe harbor created by Congress.

## C.    Inclusion, Not Exclusion, is Favored under the First Amendment.

The First Amendment is defined by inclusion in the very broadest sense.  This means inclusion of listeners who need access and speakers who have *more*, not less content to share.  Justice Thurgood Marshall 35 years ago expressed his growing burden about free speech access for listeners:  "For many persons who do not have easy access to television, radio, the major newspapers, and the other forms of mass media, the only way they can express themselves to a broad range of citizens on issues of general public concern is to picket, or to handbill, or to utilize other *free or relatively inexpensive means of communication*."  *Lloyd Corp. v. Tanner*, 407 U.S. 551, 581-82, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972) (dissenting opinion) (emphasis added).  Today. the Internet emerges as these means of communication.  He closed forcefully with a candid assessment of the future of communications:

> It would not be surprising in the future to see cities rely more and more on private businesses to perform functions once performed by government agencies.  The advantage of reduced expenses and an increased tax base cannot be overstated.  As governments rely on private enterprise, public property decreases in favor of privately owned property.  It becomes harder and harder for citizens to find means to communicate with other citizens. . . . When there are no effective means of communication, free speech is a mere shibboleth.

*Id.* at 586.  In one sense, the Internet has also evolved that way in its ownership -- from its origin within the federal government to management by private participants.  Therefore, the First Amendment should, wherever possible and equitable, afford easy, unhindered access by all listeners.

1    Inclusion is also an overriding concern for content published by speakers entitled to free

2 speech. Censorship or total blockage of Websites is truly abhorrent to any notion of democracy

3 and free speech, including to that held by Google itself.[11]   If the practice or process of Blocking

4 specific sites or content happens here in the United States, that offends not just a vital First

5 Amendment policy but also Google's own policy conviction of a "contribution to the overall

6 expansion of access to information" on the Internet, as aired before the House International

7 Relations Committee on February 15, 2006.[12]  In China, targeted censorship openly occurs on

8 www.google.cn, and surely Google has perfected the technical means to do so to comply with

9 government demands.

10    Inclusion of even offensive content is almost universally protected by federal courts.  The

11 Supreme Court stuck down provisions of the CDA in *Reno*, 521 U.S. at 874, as violating the

12 First Amendment.  This Court in *Yahoo!* ruled that Nazi-oriented material and products should

13 remain accessible on the company's Website, even though it related to the perhaps the gravest of

14 war crimes against humanity.[13]  Even in the face of a trademark infringement suit against

15 defendant's domain name that appended "sucks" to the root domain name of the owner, the

16 Central District of California ruled against the owner and noted that "the average Internet user

17 may want to receive all the information available" on the plaintiff on the Web.  *Bally Total*

18 *Fitness Holding Corporation v. Faber*, 29 F. Supp. 2d 1161, 1165 (C.D. Cal. 1998).

19    Plaintiff KSC sees the District and Ninth Circuit opinions in *Yahoo!* bearing upon the

20 deindexing and reinclusion of Plaintiff's site by Defendant Google.  Two points from this case

21 bolster Plaintiff's claim of First Amendment violations.  First, the open, public nature of Internet

22 access is just that – a stronger free speech right may lie and deserve protection when the

23

24 [11] On February 15, 2006, four companies -- Google, Yahoo!, Microsoft and Cisco – appeared and testified before
the Subcommittee on Asia and the Pacific, Committee on International Relations before the U.S. House of
25 Representatives about the censorship practices executed upon the citizenry of China.  Congress soundly condemned
the practice of Google to censor its content concerning Tiananmen Square and other subjects offensive to the
26 Chinese government.  In the written testimony of its Vice President of Global Communications and Public Affairs,
Google stated:  "The requirements of doing business in China include self-censorship – something that runs counter
27 to Google's most basic values and commitments as a company."
www.house.gov/international_relations/aphear.htm (109th Cong. 2d Sess., Feb. 15, 2006), p. 1.
28 [12] *Id.*
[13] *See n. 8, supra Yahoo!,* 169 F. Supp. 2d at 1194.

1    adjudicating court advances the interest of *including*, rather than excluding, content.  The *Yahoo!*

2    case focused on a foreign court's compulsion to *exclude,* not include, certain Web content.  The

3    fundamental principles behind the First Amendment are advanced with the robust, open

4    exchange of ideas and information in the open and public nature of Internet search as a

5    marketplace of ideas.  Second, KSC seeks the very same goal that Yahoo! sought, that is, the

6    right to speak by being included in the search index of Google.  This Court, at least

7    provisionally, ought to err on the side of *inclusion* rather than continued exclusion.  For over five

8    years, the diverse dialogue, content and speech freely flowed through KS.com.  Then Google

9    stopped that.  Viewers from across the United States and indeed the world no longer read and use

10   content and links through KS.com.  De-indexing of KS.com by Defendant on an ongoing basis is

11   no less than censorship, whether it be arbitrary, malicious or incidental.  As stated above, Google

12   fails, in form and in practice, to offer any practical or effective means for plaintiffs' Websites to

13   be included again for viewing and use by the public once Blockage (as defined in the *1st*

14   *Complaint* ¶ 3) occurs.

15          While a search engine is not on its own terms an ISP, there are strong reasons to expect

16   inclusion of Websites on the search engine's index.  Like an ISP, a search engine carries and

17   invitation for public use.  Indeed, an ISP normally requires some level of membership, sign-up or

18   fee.  Google's search engine only requires Internet access, even from a public access point as a

19   library.  Since a private ISP should not deny access to content within the public forum,[14] neither

20   should a search engine.  Excluding speech, whether by targeting or blocking out certain or all

21   content of a site otherwise viewable by an ISP customer or search engine user, violates the spirit

22   of the First Amendment.

23          Google's actual practices violate the principle on inclusion of Website content, even as it

24   at least verbally believes in its value.  On the search end of the pipeline, millions of search

25   engine users are invited to use the freely open channel to solicit and seek information from

26   millions of sources on the Internet.  Google's securities filings state:  "We maintain the largest,

27

28   ---
     [14] *See Section IV.B, supra*, and more particularly, the *Gey Forum Article* regarding commentary and analysis on
     inclusion of content by ISPs.

1  most comprehensive index of web sites and other content, and we make this information *freely*

2  *available to anyone with an Internet connection*." *1st Complaint*, ¶ 22 (emphasis added).  On the

3  other end are the millions of Websites that are freely included in the index, searched and located

4  by users across cyberspace.  Google's Website states:

5  
6      Inclusion in Google's search results is free and easy; you don't even need to submit your
       site to Google. Google is a fully automated search engine that uses software known as
7      "spiders" to crawl the web on a regular basis and find sites to add to our index. In fact,
       the vast majority of sites listed in our results aren't manually submitted for inclusion, but
8      found and added automatically when our spiders crawl the web.

9  http://www.google.com/support/webmasters/bin/answer.py?answer=34397&topic=8523

10  (emphasis added).  Google's Chief Executive Officer pronounced:  "In order to guide users to

11  the information they're looking for, we copy and index all the Web sites we find.  If we didn't, a

12  useful search engine would be impossible." *Section I.A., Relevant Facts, supra*.  Google's

13  control and domination of indexing and searching of sites is without question.  Regrettably,

14  Google, through the blockage and derank of Websites, denies inclusion of their content to

15  millions in this speech forum affording eminently easy access to such content.[15]

16      **D.  Google and Its Dominant Search Engine Demonstrate State Action.**

17          For First Amendment free speech purposes, a threshold test is whether there is action that

18  can be attributable to the state or a state actor.  State action does not turn on a cursory

19  understanding of the Internet or the ownership of the speech forum, but upon the conduct and

20  mission of the actor as well as the nature and openness of the forum.

21      **1.  Privately Owned Space or Property, When Dedicated for Public Use,
           Houses State Action.**

22
23          The private ownership of the speech forum in question has never been the single

24  determinative factor as to whether the First Amendment rights within the speech forum qualify

25  for protection.  The state action requirement is met where the public space witnesses the free

26  exchange of ideas.  In the line of four cases, the U.S. Supreme Court ruled that private physical

27
28  _____

[15] For several more examples of Websites being de-indexed by Google, *see Declaration of Mary Purkiss* ("Purkiss Dec."), attached as Exhibit 6, ¶ 6; *Declaration of Glenn Canady*, attached as Exhibit 7, ¶ 3; *Declaration of Gary F. Blades* ("Blades Dec."), attached a Exhibit 8, ¶ 3.

1    spaces, when used in and dedicated to the public domain, must allow free speech.  As one

2    commentator noted, "The privatization of traditionally public space is a straightforward threat to

3    the marketplace of ideas."[16]  In *Marsh v. Alabama*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265

4    (1946), a private enterprise had assumed all of the attributes of a state-created municipality and

5    the exercise by that enterprise of semi-official municipal functions as a delegate of the State.

6    Therefore, the fact of private ownership of the space in question for the exercise of free speech

7    was not a controlling factor in the decision.  Then, the Court in *Amalgamated Food Employees*

8    *Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S. Ct. 1601, 20 L. Ed. 2d 603 (1968) held that

9    First Amendment rights must be respected within a privately owned shopping center which is

10   freely accessible and open to people in the area and those passing through is the functional

11   equivalent of a business block.  In light of the dimensions and layout of the center as a suitable

12   place for free speech expression, the Court deemed the shopping center as the equivalent of a

13   city block with requiring free speech protection.

14          In *Lloyd*, 407 U.S. at 569, the Court refrained from offering First Amendment protection

15   for the distribution of handbills in a large shopping center.  The Court noted that the primary

16   purpose of the mall was to "bring potential shoppers to the [shopping] Center, to create a

17   favorable impression, and to generate goodwill."  *Id.* at 565.  The speech in *Logan Valley*,

18   however, was " 'directly related in its purpose to the use to which the shopping center property

19   was being put,' 391 U.S. at 320 n. 9."  In *Lloyd*, "[t]here [was] no open ended invitation to the

20   public to use the Center for any and all purposes.  407 U.S. at 564-65.  Further, the *Lloyd*

21   majority recognized that the picketers in *Logan Valley* had 'no other reasonable opportunities" to

22   convey their message.  *Lloyd*, 407 U.S. at 563.

23          Three years after *Lloyd*, the Supreme Court in *Hudgens v. NLRB*, 424 U.S. 507, 86 S. Ct.

24   1029, 47 L. Ed. 2d 196 (1975), confirmed that *Lloyd* overruled *Logan Valley* because speech on

25   private property is not protected by the First Amendment if the property is not dedicated to

26   "public use".  *Hudgens*, 424 U.S. at 518-20.  In the context of a municipality or a large shopping

27

28   _____

[16] *See* n. 5 *supra*.

1    center, the Court noted that speech may be restricted under the First Amendment with reasonable

2    regulations as to time, place and manner of speech, or with a complete ban altogether under the

3    First Amendment.  What is prohibited, though, is a content-based restriction.  *Id.*, at 520.

4         The Court made its last installment to date on shopping mall free speech cases in

5    *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980).

6    Here, the Court confirmed the result of *Lloyd* that no First Amendment right generally exists in a

7    shopping mall as private property, but allowed the State of California to exercise police power

8    and extend the protection to speakers under its own state constitution.  In *Pruneyard*, the Court

9    declared this about its previous *Lloyd* holding:  "We stated that the property does not 'lose its

10   private character merely because the public is generally invited to use it for designated purposes.

11   . . . 407 U.S. at 569."  *Id.*, 447. U.S. at 81.

12        No reported federal or state cases address the issue of whether a search engine can be a

13   state actor and if so in what context.   The three Supreme Court precedents of *Marsh, Lloyd* and

14   *Pruneyard* reduce the query to this:  What is the dedicated purpose of a speech forum where

15   search engine users surf, search and read Websites?  The sole function of the search engine is to

16   promote and realize 24-7 speech and communication.  There quite simply is no other possible

17   "dedicated" purpose for the search engine.  The private ownership of the *Pruneyard* shopping

18   mall and Google's search engine is undisputed (albeit Google's stock is publicly traded).  But the

19   use of the space as designated by the owner is where *Pruneyard* and a search engine diverge.

20   Google is both the master and steward of the search engine, index and results.  The shopping

21   mall's express purpose is to promote sales by tenants.  For Google and its search engine, the sole

22   mission is to indeed deliver information as speech.

23        *Pruneyard*'s opinion also resolves the issue of the forum owner's <u>own</u> First Amendment

24   right of free speech.  The Supreme Court refused to find a First Amendment right of the privately

25   owned space to refrain from speaking because (1) the shopping mall was not personal in use by

26   the owner but was open to the public, (2) the State was in no way dictating a specific message of

27   the shopping mall owner, and (3) the owner could easily disavow any message presented by any

28   speaker on the mall premises.  Google's search engine results are the hub of this speech forum.

Google (1) does not present a "message" of its own expression or opinion through results, (2) does not adopt an expression or opinion with any particular result, and (3) enjoys the freedom to disavow itself of any results or content produced by the search engine request.  Therefore, if this Court orders, whether provisionally or permanently, to have the content of Plaintiff's Website included in Defendant's index and presented on various search results pages through Defendant's search engine, Google's own First Amendment rights are not violated.  A Court order can be clear that no specific message is forced upon Google when indexing sites and presenting search results that include <u>KS.com</u> (or to the Websites of any other Class member for that matter).[17]

### 2.  State Action is Present because of Public Entwinement between Google and Government.

The Supreme Court has recently opined on the proper analysis and determination of state action in the context of a 14th Amendment case against a state athletic association as follows:

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity.  From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.  See *Tarkanian,* 488 U.S. 193, 196; *Polk County v. Dodson*, 454 U.S. 312 1981).

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001).  *Brentwood* held that the defendant association was engaged in "public entwinement" when it imposed a speech restriction.  The Court noted that "entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character to the degree shown here requires." *Id.* at 302.  The Supreme Court announced the guiding principle of "public entwinement" for lower courts to evaluate state action:  "When .

---

[17] Defendant would be hard pressed to claim that the appearance of KS.com on search results appearing on the results pages compels Google to affirm a belief or statement he does not hold.  Justice Powell's concurrence in *Pruneyard*, found this principle appearing in *Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977), had no application in *Pruneyard*.  Newspapers have a fundamental right to decide on content   All the content that appears on the results page of Google's engine cannot possible be considered as media content.  Instead the results are supposedly objective and produced by Google's algorithm and Website index of Webpages across the Internet.  Indeed, there is absolutely no evidence to show that Google may have voiced anything publicly, whether affirmatively or negatively, on its search results, Google's own Website or its own blog that it takes a position on the content covered by KS.com about children ages 0 to 7.

1  . . the relevant facts show pervasive entwinement . . . , the implication of state action is not

2  affected by pointing out that the facts might not loom large under a different test." *Id.* at 304.

3  Therefore, a finding of state action is almost entirely fact dependent.

4      A 1996 District Court case, *Cyber Promotions, Inc. v. American Online, Inc.*, 948

5  F.Supp.436 (E.D. Pa. 1996), is relevant because it addressed the state actor issue under the First

6  Amendment for a major Internet firm.  AOL, a leading digital content provider and an ISP, was

7  sued for free speech violations.  Relying primarily on a detailed Stipulation of Facts, the court

8  found a clear separation between AOL as a private entity and the presence, if any, of State

9  involvement.  The three separate tests for state action as applied were:  (1) the exclusive public

10  function test, (2) actions with the help of or in concert with state officials, and (3) a position of

11  interdependence where the private entity and the state are joint participants.  The *Cyber* court

12  methodically distinguished the facts of two key Supreme Court shopping mall cases that

13  restricted private entities on free speech.  As to *Marsh*, the court noted that while AOL's e-mail

14  system was open to the public, AOL was not performing any "essential public service." *Id.* at

15  442.  Regarding *Lloyd*, the court noted that plaintiff could turn to "adequate alternative avenues

16  of communication." [quoting *Lloyd*, 407 U.S. at 567]." *Id.* at 443.  Cyber had other means to

17  send out its advertising to AOL members besides leveraging the e-mail system of AOL.

18      *Cyber*'s holding is noteworthy but not binding here.  The key facts are clearly

19  distinguishable from Google's case.  In *Cyber*, the Stipulation had no need to look for any

20  funding or cooperation between AOL and the federal or a state government.  The Stipulation

21  furnished the exclusive factual foundation for the court's decision..  AOL's forum in question

22  was an e-mail list and plaintiff required the full e-mail database of AOL for its intended speech.

23  Google has control and releases information through its own gate to the largest worldwide

24  compilation of online content and speech.  Still, the District Court's holding preceded the

25  Supreme Court's 2001 opinion in *Brentwood* that multiple mechanistic tests are most suitable for

26  state action analysis, and that state action turns on an analysis of "public entwinement."

27      The Ninth Circuit expressly adopted and followed the Supreme Court's guidelines of

28  *Brentwood* for First and Fourteenth Amendment purposes and 42 U.S.C. § 1983  purposes in its

1   holding that state action was present in *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002).  The speech

2   was exercised in a common area committed for public use, even though the property was leased

3   and managed by a private corporation.  Under *Brentwood*, all that was required for state action

4   was the application of a single satisfactory test, and in this instance, the Ninth Circuit used the

5   public function test.[18]  A crucial aspect of its decision was a footnote stating, "It is important to

6   identify the function at issue because 'an entity may be a State actor for some purposes but not

7   for others.' *George [v. Pacific CSC Work Furlough]*, 91 F.3d [1227,] 1230 ( 9th Cir. 1990) (per

8   curiam)."  *Lee*, 276 F.3d at 556 n.5.

9       Moreover, the Ninth Circuit's *Lee* opinion amply relies upon the seminal Supreme Court

10  First Amendment case of *Marsh* to recognize that a speech forum is "accessible to and freely

11  used by the public in general" and that "[o]wnership does not always mean absolute dominion . .

12  . [Where] facilities are built and operated primarily to benefit the public . . . . their operation is

13  essentially a public function."  *Lee*, 276 F.3d at 556.

14      A recent District Court case held that the First Amendment was violated with a total, yet

15  content-neutral, ban against protests and petitions on property managed and regulated by a

16  private corporation used for an air show.  *Wickersham v. City of Columbia, MO*, 371 F.Supp.2d

17  1061 (W.D. Mo. 2005).  The court acknowledged the *Brentwood* precedent and also cited the

18  Ninth Circuit's decision in *Lee*, that found that no one test applies for state action under the First

19  Amendment.  When finding that a designated public forum was not present, the court stated, "the

20  decision to designate public property as a public forum must be made 'by intentionally opening a

21  nontraditional forum for public discourse.'" *Lee*, 505 U.S. at 680 (quoting *Cornelius*, 473 U.S. at

22  802).  Ultimately, the tarmac used for the air show was deemed a nonpublic forum, but the City

23  was required to develop reasonable restrictions rather than a complete ban on speech.

24      Google's search engine indexing and use draw serious concerns.  Internet search engine

25  use is not exclusive to the government.  However, Google's search engine has indeed become an

26  essential public service by any reasonable standard.  Google's mission is to amass all possible

27

28  _____

[18] Pursuant to its finding of state action, the Ninth Circuit remanded the case to have the State actor consider imposing reasonable restrictions on the speech on the time, place and manner of speech.  *Id.* at 557.

1   online and offline content in the public domain and connect it to public users, and thereby.

2   activate and promote speech and communication.   Google has become entirely essential to

3   millions of Websites.  Two key functions are under examination in Google's case.  First, Google

4   manages the world's most pervasive search engine, with access to up to 10 billion Web pages.

5   [*1st Complaint* ¶ 34.]  This engine is open and freely available to the public.  The second

6   function is Google's entanglement or entwinement in a public function of a library, or more aptly

7   described as "information science."[19]

8       A public library has essential traits of a public function.  Public libraries make both

9   printed and online content available to the public at large.  The very public and transnational

10  nature of the Internet has received limited attention of the Supreme Court in the determination of

11  what constitutes a "public forum" for First Amendment protection.  In *United States v. American*

12  *Library Association, Inc.*, 539 U.S. 194, 123 S. Ct. 2297, 156 L.Ed.2d 221 (2003) ("ALA"), the

13  Supreme Court addressed whether Congress, through the Children's Internet Protection Act

14  ("CIPA"), 20 U.S.C. § 9134(f); 47 U.S.C. § 254(h)(6), could constitutionally withhold federal

15  funding of libraries for failure to install pornographic filtering software.  In answering this in the

16  affirmative, the Court noted that a local library having limited resources and space typically uses

17  discretion to carry books and printed materials and to exclude others.  At the same token, the

18  Court held that "Internet access in public libraries" is neither a traditional public forum nor a

19  designated public forum.  *Id.* at 205-06.  *ALA* focuses on the nature of public libraries which is to

20  "facilitate research, learning and recreational pursuits by furnishing materials of requisite and

21  appropriate quality."  *Id.*  Amid concerns of overblockage of pornographic-filtering software that

22  would otherwise violate First Amendment rights of authors of Web content, the Court carefully

23  noted the Solicitor General's statement during the Oral Argument that a "library may . .

24  eliminate the filtering with respect to specific sites . . . at the request of a patron.  The CIPA

25  further "expressly authorizes library officials to 'disable' a filter altogether.  *Id.* at 209.  Thus,

26

27  [19] Google has an executive whose primary function is to now partner with schools of library science throughout the
    United States to assist in recasting and reformulating these programs as schools of information science.  The first
28  such effort known to plaintiffs is the newly formulated UC Berkeley program known as School of Information
    Science.

1  even under the treatment of the site as a non-public forum, CIPA would pass constitutional

2  muster with a reasonable and viable means to open up the flow of Internet content *upon a simple*

3  *request* so that the browser and web publisher could communicate.

4        The role of a library was considered by the Second Circuit adjudicating a constitutional

5  claim made by a employee terminated by a city library in *Horvath v. Westport Library*

6  *Association*, 362 F.3d 147 (2nd Cir. 2004).  The test for state action was performed for purposes

7  of a due process claim under the Fourteenth Amendment 42 U.S.C. § 1983, which requires that a

8  defendant be actually acting under color of statute.[20][21]  In finding that there was no state action,

9  the court  turned to a Third Circuit case and concluded that it cannot be said that " 'the operation

10 of a library constitutes a function traditionally associated with sovereignty.' " *Hollenbaugh v.*

11 *Carnegie Free Library, of Connellsville, Pa.*, 545 F.2d 382, 283 (3rd Cir. 1976).

12       Google's search engine is far more pervasive than the operation of a physical library that

13 works as a static collection of printed, visual and audio materials.  *ALA* is important precedent,

14 but its public forum analysis concerned simply Internet access at a local public library during

15 business hours.  A library contains fiction and non-fiction as well as certain government

16 information.  Certainly no ubiquitous e-commerce or commercial advertising occurs regularly at

17 a local library.  In contrast, Google has become the searchable and online shopping mall and

18 storefront for almost every vital U.S. business and organization, large or small.  It furnishes

19 intelligent access to 10 billion Webpages worldwide and exposes 20 million businesses and

20 organizations through an estimated 200 million searches daily, and all these figures expand

21 daily.  Google maintains undoubtedly the world's largest Web index and is assembling the

22 largest digital content of resources and information with the very active participation and

23 assistance of government and university libraries.  Google's proportions and functionality are

24 staggering as no other private or government entity is undertaking this mission.  However,

25

26 [20] "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States", 42 U.S.C. § 1983

27 [21] "Every person who, <u>under color of any statute, ordinance, regulation, custom, or usage, of any State</u> or Territory . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,

28 privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  (Emphasis added.)

1  Google's search engine and results would not at all be meaningful *without* the online presence

2  and content of some 70 million Websites on the Internet in the public domain.  Truly, Google sits

3  atop an essential public function for both the public and private sectors of the information

4  economy and e-commerce.

5       Search engines have become not merely vital for Websites, but essentially a lifeline for

6  persons, businesses and organizations seeking to speak, participate, engage in interstate

7  commerce, and donate in the public domain.  For example, certain Websites generate visibility,

8  sales and charitable donations only through a presence on the World Wide Web and through

9  search results.  [*See e.g., Purkiss Dec.* ¶¶ 4-5.]  Other sites are businesses that rely on a search

10 engine as Google to produce traffic to sell products and yield revenues. .[*Declaration of Gary F.*

11 *Blades*, attached as <u>Exhibit 8</u>.]  Without question, this site, this speech and these charitable

12 donations do not exist or happen without search engine access.  "Soliciting funds involves

13 interests protected by the First Amendment's guarantee of freedom of speech."  *Cornelius*, 473

14 U.S. at 797.  While search engine use is not under the exclusive purview of the federal

15 government, there is clearly an essential public service being served with search engine indexing

16 and access to sites as these.

17      The Ninth Circuit is mindful of how a private actor can engage in state action when

18 conferring upon a government entity a windfall of benefits.  "For example, if a private entity,

19 like the restaurant in *Burton*, confers significant financial benefits indispensable to the

20 government's "financial success," then a symbiotic relationship [between the entity and the

21 government] may exist."  *Brunette v. Humane Society*, 294 F.3d 1205, 1213 (9th Cir. 2002), *cert.*

22 *denied*, 537 U.S. 1112, 123 S. Ct. 902, 154 L. Ed. 2d 786 (2003) .  Provost Paul Courant at

23 Michigan states that the Google digitization project is worth "hundreds of millions" of dollars to

24 his University alone.[22]  This assessment is merely indicative of how other large government or

25 public university libraries expect to reap enormous benefits from collaborative relationships with

26 Google.

27

28 _____
   [22] Total Operating Revenues of this University for the year ended June 30, 2005 were slightly over $3.5 billion.
   http://www.finops.umich.edu/FormsReports/Reports/2005/index.html.  Google's contribution would be significant.

The alignment, cooperation and entwinement between Defendant Google and government are deep, pervasive and clearly unprecedented.  Google exudes a growing burgeoning of cooperation with the public sector, and particularly with the federal government. None of the strategy, plans and actions of Google can be ignored or trivialized.  The cadence of Google's march toward digitizing all content in the world is deliberate and persistent. Entwinement here has become strikingly apparent.

The overlay of information and information access shared between the federal and state government, on one hand, and Google, on the other, further compels a finding of state action for search engine indexing and results.  Google links its www.google.com/unclesam with hundreds of federal and state Websites and has the attention of the Government Printing Office and the Federal Depository Libraries to partner and share  information and online content.[23]  Today, Google is massively copying and digitizing from five research libraries – the University of Michigan (alma mater of Google founder Larry Page), Harvard, Stanford, Oxford, and the New York Public Library, all under a formal agreement.[24]  Two of these institutions are public, one of which (Michigan) will surrender 100% of its contents for copying by Google.  Larry Page has been quoted as being a "firm believer in academic libraries being able to 'monetise' the information they hold."  One could assume that Google will not sit idly by, while providing free digitization services, servers, and data storage and access services without some type of revenue sharing arrangement.  One person on a notable online blog on libraries stated as follows:

> There is something mind-boggling about the ability of a single, for-profit company being able to shape the future of a whole sphere of life.  Even more so when it enlists the cooperation of the public stewards of the sphere in what amounts to a relinquishment of key elements of responsibility to a[sic] unabashedly profit-driven mega-corporation.

Rosenzweig, M., http://libr.org/juice/issues/vol17/LJ_7.26.html#3, visited 04/21/2006.  Without any doubt whatsoever, Google has established and become the complete master index of all

---

[23] *See* "The Federal Government Information Environment of the 21st Century:  Towards a Vision Statement and Plan of Action for Federal Depository Libraries, *Discussion Paper*, The Depository Library Council, Sept. 2005.
[24] A Professor at the School of Information Management and Systems, the Haas School of Business, and the Department of Economics at the University of California, Berkeley, fully endorses the Google Library Digitization Project as a legitimate, fair use of public resources under copyright law.
http://www.infosci.cornell.edu/about/colloquiumSP06/may5.html, *visited May 24, 2006.*

public, online information over the World Wide Web.  The Central District of California court

recently confirmed the enormous "public benefit" of a search engine as Google.  *Perfect 10 v.*

*Google, Inc.*, 416 F. Supp. 2d 828, 851 (C.D. Ca. 2006).  All this happens within nothing less

than system and company that acts as and serves the public good and interest as a 24-7

ubiquitous speech hub with monopolistic shares of key relevant markets in search engine use and

search-driven advertising.

Recently, Google commenced its massive content digitization project with the U.S.

Library of Congress.  The size of this collection is staggering, but Google is surely up to the task.

Google donated $3,000,000 to commence the project and now partners with the Library of

Congress to build the "World Digital Library", by contributing cash, technology and time to this

effort.  Plaintiffs ask this Court to take judicial notice of this effort through a link to the Website

of the LOC directly through the Northern District's own Website.

http://www.loc.gov/today/pr/2005/05-250.html.  Google at this time stands alone as the only

private entity to partner with the Federal Government in this manner.[25]  In August 2003, the

Librarian to the Library of Congress stated that the Library "under its 2004-2008 strategic plan

will continue to build on its historic mission,. . . to make its resources available and useful to the

Congress and the American people and to sustain and preserve a universal collection of

knowledge and creativity for future generations."  Further goals of the plan are:  "B. Objectives

of Library Services, National Library Program: . . . 3.  Provide multiple search and access

methods to support the needs of a diverse and distributed customer population.  4. Develop and

sustain collaborative partnerships with other libraries, public and nonprofit organizations, and

the private sector to extend access to the collections and reference services."  The U.S. Library

of Congress, instead of choosing to secure hardware, software, databases, archiving software,

and search technology on an open-bid, vendor-neutral basis, appears to have accepted the

---

[25] Librarian of Congress James H. Billington made a joint announcement with Google on November 22, 2005 as
follows:  "A World Digital Library would make these collections available free of charge to anyone accessing the
Internet, and it could well have the salutary effect of bringing people together by celebrating the depth and
uniqueness of different cultures in a single global undertaking.  We are grateful for Google's contribution to this
important initiative." Plaintiffs introduce this growing partnership only as further indicia of Google's state-like
efforts in digital information and do not offer an opinion of this collaboration on its own technical merits.

1    "donated" technology and services of Google.

2         Therefore, Google has deliberately and necessarily entwined itself with federal and state

3    governments on compiling, managing and monetizing digital content that resides in the public

4    domain.  This stretches well beyond online content of upwards of 70 million Websites.  Google

5    is now amassing and amalgamating both current digital Internet content as well as preexisting

6    printed content.  Google is actively digitizing copyrighted books and materials throughout the

7    public domain, notwithstanding a myriad of legal challenges of copyright violations.  The

8    ultimate goal of a universal digital library of all content is a massive project requiring a

9    partnership and collaboration of private actors undertaking state-like functions.  Copyright law

10   of the federal government as adjudicated by federal courts may well end up sanctioning and

11   promoting "fair use" of printed content by Google.[26]   Google is the leading force and influence

12   in the search ecosystem which enormously benefits the public sector.[27]   Google is a state actor in

13   a public speech forum on the Internet.  It delivers an essential public service with its search

14   engine index and search results processed at least 200 million times daily.

### 3. Google Utilizes Search Engine Functionality, Indexes and Content Review to Restrict Free Speech.

16         It is a core requirement that regulations of free speech exercise should be content-neutral

17   *See e.g., United States v. Brown*, 381 U.S. 437, 85 S. Ct. 1707, 14 L. Ed. 2d 484 (1965).

18   Content-based regulations are subject to strict scrutiny because "content-based restrictions are

19   especially likely to be improper attempts to value some forms of speech over others, or are

20   particularly susceptible to being used by the government to distort public debate." *City of Ladue*

21   *v. Gilleo*, 512 U.S. 43, 60, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994) (O'Connor, J., concurring) .

22   Certain unlawful and improper encroachments are on their face to be content-neutral but fail in

23   interpretation and application.  In the three shopping mall cases of *Lloyd*, *Hudgens*, and

---

[26] Consider the trends and growth of digital content in Kelly, K., "What Will Happen to Books", *The New York Times Magazine*, May 14, 2006, p. 42, 48.

[27] One example of the growing partnership is explained in a white paper, "The Federal Government Information Environment of the 21st Century:  Toward a Vision Statement and Plan of Action for Federal Depository Libraries," prepared by the Depository Library Council, Sept. 2005, at
http://www.access.gpo.gov/su_docs/fdlp/pubs/dlc_vision_09_02_2005.pdf.

1    *Pruneyard* decided by the Supreme Court, all involved outright bans against picketing and

2    leaflets within physical spaces owned by private persons or businesses.  The Court carried an

3    overriding concern to preserve open, robust communicative activity where private property,

4    dedicated for a public purpose, had an overtly public nature to it.

5           The Internet is, as other forms of communication, a channel for freedom of expression.

6    The Supreme Court has described the Internet as a "vast democratic" medium and the World

7    Wide Web, in part, as "comparable, from the readers' viewpoint, to . . . a vast library." *Reno,* 521

8    U.S. at 874.  While it is a library in one sense, the Court in *ALA* noted that authors of books are

9    not exercising their voices as they seek inclusion within the library collection, which faces

10   limited resources and space.  There was in that instance a reasonable basis for the librarian to

11   exercise editorial discretion in selecting books for inclusion in the collection.

12          The fundamental issue for First Amendment jurisprudence is this – just as blocking or

13   filtering pornographic Website content to protect children is a content-based restriction, so is the

14   blocking, de-indexing and penalizing of Websites that allegedly falter in the way their content

15   "appears" to Google and the Googlebot engine.  [*McCarley Dec.* ¶¶ 3-4].  When Google's

16   machine-driven content profiling is mixed with human participation on content review, this

17   practice is not immune from any and all scrutiny as a content-based restriction upon Websites.

18   Content-driven bans as applied to Websites within the public domain of search engine indices

19   should be barred by the First Amendment, particularly where the forum is open for public use

20   and the speakers have no effective alternatives for expression.

21          Google's own Webmaster guidelines make clear that content on a Website can lead to

22   removal and de-indexing of a Webpage or Website.  It warns the sites of Plaintiff KSC and all

23   other webmasters on the World Wide Web as follows:

24          We won't comment on the individual reasons a page was removed, and we don't offer an
             exhaustive list of practices that can cause removal. . . . You may want to review our
25           Quality Guidelines for more guidance. If you think your site may fall into this category,
             you might try "cleaning up" the page and contacting us with a re-inclusion request. We
26           don't make any guarantees about if or when we'll re-include your site.

27

28

1  www.google.com/support/webmasters/, *visited on March 15 , 2006.*[28]  In KSC's case, its site

2  KS.com was blocked beginning on or about March 19, 2005.  [*Goodman Dec.* ¶ 5.]  Indeed,

3  Defendant's own legal counsel stated after the filing of this action that Google would merely

4  "consider" reindexing KS.com.  [*Yu Dec.* ¶ 4].  Obviously, this is an admission on behalf of

5  Defendant that KS.com was and is de-indexed and not searchable or locatable through key word

6  searches that previously produced the existence of KS.com on the Web to the public.  It is

7  unconfirmed to Plaintiff KSC which, if any, of such guidelines were not followed, leading to

8  Blockage of KS.com.  These guidelines of Google, released in the public domain on its Website,

9  very obviously impose restrictions on viewing of the site on the Web based on content

10  interpreted and reviewed on the site by Google.  That violates content-neutrality required under

11  the First Amendment.

12  **E.  Alternatively, Google's Vague, Overbroad Arbitrary Guidelines and their Indiscriminate Application Violate First Amendment Rights.**

13  The U.S. Supreme Court has observed that the First Amendment bar against overbreadth

14  is "an exception to our normal rule regarding the standards for facial challenges" against a law or

15  statute.  *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796,

16  104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984).  The danger of this type of restriction is that it actually

17  can and will "chill" constitutionally protected speech.  The result is quite plain:

18  Many persons, rather than undertake the considerable burden (and sometimes risk) of
19  vindicating their rights through case-by-case litigation, will choose simply to abstain
20  from protected speech, *Dombrowski [v. Pfister]*, 380 U.S. 479, 486-87, 85 S. Ct. 1116,
21  14 L. Ed. 2d 22 (1965) – harming not only themselves but society as a whole, which is
    deprived of an uninhibited market place of ideas.

22  *Virginia v. Hicks*, 539 U.S. 113, 119, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003).  To succeed,

23  "[t]o overbreadth claimant bears the burden of demonstrating, 'from the text of the [law] and

24  from actual fact,' that substantial overbreadth exists. *N.Y. State Club Ass'n v. City of New York*,

25  487 U.S. 1, 14, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988)."  *Virginia*, 539 U.S. at 122.  Where the

26

27

28

---

[28] This page has since been modified to read, in relevant part, "If your site has violated Webmaster guidelines and you've made changes to it that meets our guidelines, you can request reinclusion and we'll evaluate your site." http://www.google.com/support/webmasters/bin/answer.py?answer=35843, visited May 5, 2006.

speech constrained is commercial speech, such as advertising that is to be published, then it is less likely that overbreadth applies. *Bates v. State of Arizona*, 433 U.S. 350, 380-81, 97 S. Ct. 269, 153 L. Ed. 2d 810 (1977).

Additionally, regulations and practices that are void-for-vagueness violate the First Amendment. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 168, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972). That is, a particular law or regulation may not block speech based on specific content, but it allows uneven or arbitrary application that is unfair to the speaker.[29] Content released according to the discretion of a single actor raises very serious First Amendment concerns. In *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 769, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1981), the Supreme Court found offensive the discretion of the city mayor to place news racks around the city according to "such other terms and conditions deemed necessary and reasonable by the Mayor." Indeed, he could "require the news rack to be placed in an inaccessible location without providing any explanation whatever." *Id.* The Court recognized that " 'liberty of circulating is as essential to [freedom of expression] as liberty of publishing; indeed, without the circulation, the publication would be of little value.' [quoting *Ex parte Jackson*, 96 U.S. 727, 733, 24 L. Ed. 877 (1878).

In the instant case, two strong indicia of overbreadth should trouble this Court. First, as stated on Google's own website, it refuses to list all of the reasons that can trigger website "removal". This catch-all provision is vagueness at perhaps its worst. In fact, there is no guarantee about "if or when" a re-inclusion request would ever be honored, should Plaintiff submit one. In fact, such a re-inclusion might be rather futile. [*Randall Dec.* ¶ 4]. Second, Google imposed and continues to enforce upon Plaintiff KSC a near total ban of its Website. [*Goodman Dec.* ¶ 6]. There is no effort, signal, or notice as to whether <u>any</u> of the Website content and links are salvageable in the eyes of Google. <u>KS.com</u> has at least 40,000 pages of content among hundreds of referring and linked Websites of other firms, agencies, schools and community organizations interested in kids aged 0 to 7. Simply put, valuable, speaking, and

---

[29] For a more detailed analysis of neutrality of laws that may affect free speech rights, see Note, "Neutral Rules of General Applicability:  Incidental Burdens on Religion, Speech, and Property, 115 Harv. L. Rev. 1713 (Apr. 2002).

1  informative Web content of all these other sites cannot be found through KS.com within

2  Google's search engine results.  [*Goodman Dec.* ¶ 9; *Lewis Dec.* ¶ 4.]  Left to their own devices,

3  the person or persons at Google vested with unbridled authority to apply the "Webmaster

4  Guidelines" leave no recourse or remedy for Websites.[30]  As the Supreme Court did so in

5  *Lakewood*, this Court should clearly recognize the urgency and need for timeliness in the release

6  of information to the public through  KS.com.

7          Defendant Google raises an objection in its anti-SLAPP motion that its own First

8  Amendment free speech rights could be compromised.  This relates to a requirement that a

9  speaker carry or present the speech of another.  The U.S. Supreme Court recently noted that,

10  "We have also in a number of instances limited the government's ability to force one speaker to

11  host or accommodate another speaker's message.  See *Hurley v. Irish-American Gay, Lesbian*

12  *and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566, 115 S. Ct.2338, 132 L. Ed. 2d 487

13  (1995) . . . ; *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 20-21, 106 S.

14  Ct. 903, 90 L. Ed. 2d 1 (1986) (plurality opinion) . . .; *Miami Herald Publishing Co. v. Tornillo*,

15  418 U.S. 241, 258, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974) . . . ."  *Rumsfeld v. Forum for Acad.*

16  *and Inst. Rights*, ___ U.S. ___, 126 S. Ct. 1297, 1309, 164 L. Ed. 2d 156, 2006 U.S. LEXIS 2025

17  (2006).  In all these cases, the "complaining speaker's own message was affected by the speech

18  it was forced to accommodate."  *Id.*, at 1309.  *Rumsfeld* was a constitutional challenge of a group

19  of law schools to federal law (the "Solomon Amendment") that required law schools to allow

20  military recruiters access to recruiting in order to receive federal funding.  The Supreme Court

21  held that the Solomon Amendment did not burden the so-called speech of law schools in the act

22  of recruiting because "the schools are not speaking when they host interviews and recruiting

23  receptions."  Further, "the accommodation [of recruiting services] does not sufficiently interfere

24  with any message of the school."  *Id.*  Further, the Court cited for support for its holding with the

25  shopping mall case of *Pruneyard, supra*, where there was little likelihood that the protesters'

26

27  ───────────────

28  [30]   For example, a Website can ask online for Google to assist in an indexing or results problem but there is
absolutely no certainty if Google will resolve, if ever, a condition where a Website has been completely removed
from Google's search index.  [*Blade Dec.* ¶¶ 3, 7].

1   views would be associated with the mall owner. *Id.* at 1310.

2       The flaw in Google's free speech position is plain because there is no message to be

3   published or heard. When the engine automatically presents search results that list <u>KS.com</u>

4   among thousands of Websites by Google when it omits <u>KS.com</u> from its index or search results,

5   or is compelled to include and present <u>KS.com</u>. A search engine user will not confuse the

6   content of <u>KS.com</u> with Google as a would-be speaker. Therefore, requiring Google to index the

7   Web content of Plaintiff on <u>KS.com</u> is highly unlikely to fall within the ambit of a "compelled

8   speech" restriction under any fair reading of the law. There simply is a lack of any tangible

9   expression by Google when <u>KS.com</u> appears in the search results completely unrelated to the

10  business of Google or any official or unofficial content on <u>www.google.com</u>.[31]

### F.   Defendant's Argument of a Lack of Contractual Privity with KinderStart is Unlikely to Prevail on the Merits.

12      There is a theory that if one party offers and delivers something free, there arises no

13  obligation upon the performing party. However, the Ninth Circuit addressed this question in the

14  context of whether this instance can lead to enforcement of a mandatory injunction against the

15  performing party. In *Dahl v. HEM Pharms. Corp.* 7 F.3d 1399, 1404-05 (9th Cir. 1993) a

16  defendant pharmaceutical company offering experimental medication to patients were required

17  to provide medication in trial so long as certain conditions were met. Defendant argued that no

18  binding contract existed between the company and the patients in the trial, but failed. Once the

19  patient complied with basic conditions for the trial and defendant began to deliver the free drugs,

20  the district court concluded that a contract existed, and the Ninth Circuit affirmed.

21      Here, Defendant Google prides itself in offering free search services to users. In the

22  same vein, millions of referrals appear in the search results, all without fee paid by Websites,

23  such as KSC. As stated above, Google knows, acknowledges, and embraces this fact and this

24  practice. Indeed, Google in its "Webmaster Guidelines" provides guidance for indexing of

25  Websites and Website format and design. Defendant cannot now argue that its anti-free speech

---

[31] Prior to Google's unlawful Blockage in March 2005, a variety of key words and subjects searched on Google's engine placed <u>KS.com</u> with high page results. Selected key words appear in the *Goodman Dec.* ¶5.

conduct is sanctioned because a contract does not exist between Google and KSC. This would be akin to requiring a contract between an invitee and a shopping center as a public forum to be a condition for the First Amendment protection.

G. **Aside from the First Amendment, Google has Likely Violated the Free Speech Rights of KSC under the California Constitution.**

Even if this Court at this juncture is reluctant to find a likelihood of success under the First Amendment, the California Supreme Court has carefully construed grounds on which Plaintiff can assert its right to free speech and do so through a preliminary injunction. Recently, the Ninth Circuit has opined, "The California Constitution is 'more protective, definitive and inclusive of rights to expression and speech' that the First Amendment to the United States Constitution. *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908, 910, 153 Cal. Rptr. 854, 592 P.2d 341 (1979), *aff'd*, 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980)." *Glendale Associates, Ltd., v. N.L.R.B.*, 347 F.3d 1145 (9th Cir. 2003).

For a long period after *Pruneyard*, the California Supreme Court did not resolve the very vital issue of a state action requirement under the California constitutional free speech clause. However, in *Golden Gateway Center v. Golden Gateway Tenants Association*, 26 Cal.4th 1013, 1025-31, 29 P.3d 797, 111 Cal.Rptr.2d 336 (2001), the California Supreme Court formally held that the free speech clause in the state constitution does include such a requirement. While this seems to run contrary to the precedent that privately-owned shopping centers must yield to free speech rights of visitors, the court made it clear that the analysis of free speech does not stop at state action. That is, the absence of a state actor *does not* resolve the case. Under *Golden Gateway*, California law requires a court to assess the importance of the public character (not ownership) of the property where speech is taking place. "[P]rivate property must be public in character before California's free speech clause may apply. *Id.* at 1033. After considering the U.S. Supreme Court's precedents in *Marsh* and *Logan Plaza*, the California Supreme Court concluded:

> [W]e conclude that the actions of a private property owner constitute state action for purposes of California's free speech clause only if the property is *freely and openly accessible to the public*. By establishing this threshold requirement for establishing state action, we largely follow the Court of Appeal decisions construing *Robins*. For example,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

our Courts of Appeal have consistently held that privately owned medical centers and their parking lots are not functionally equivalent to a traditional public forum for purposes of California's free speech clause because, among other things, they are *not freely open to the public*. [Citations omitted.]

*Golden Gateway*, 26 Cal.4th at 1033 (emphasis added). The court then found that the defendant tenants' association could not distribute leaflets in the area in question because "Golden Gateway carefully limits access to residential tenants and their invitees." *Id.*

Defendant Google's search engine shows very strong indicia of a public forum or at least a dedicated public forum. It cannot now argue or claim that its engine is not "freely open to the public", given all of Google media coverage, blogs, public statements, and securities disclosures. In its very own words within such disclosures, Google's search engine and index of websites are "freely available to anyone with Internet access." [*1st Complaint* ¶ 22.] Internet access is widely available all over cyberspace, including public, government maintained locations as public libraries. *ALA*, 539 U.S. at 205. Quite literally, any person from any location can use the search engine of Google. There are no fees, qualification, membership, or conditions to use. Google never dictates to any member of the public what Websites to seek out Websites or what key words should be searched. It is open, free, and freely available to all, without restriction. No limits are placed by Google in its use or purpose – it is quite simply designed to be speech and communication that is theoretically unmonitored in any way or manner. In the same vein, Google freely and completely indexes all Websites on the Internet without charge, request or notice, using the Googlebot engine. Once a site goes up in the public domain, Google seeks to index it for search engine use. Therefore, the holding of *Golden Gateway* as binding California law, should afford free speech protection under the California constitution of Plaintiff's site KS.com to be included in Google's index and viewable and heard by the public.[32]

> **H.  Even if the Merits of Plaintiff's Claims are Not Convincingly Resolute, Serious Constitutional Questions Now Raised Require this Injunction.**

---

[32] Under the California constitution, at the same token Defendant Google is not entitled to free speech protection should this Court require the inclusion of KS.com in its search engine index. "Judicial enforcement does not, by itself, constitute state action for purposes of California's free speech clause." *Golden Gateway*, 26 Cal.4th at 1034.

1       Plaintiff has shown that the harm to its business, goodwill and relationships to its linked

2  sites has been and will continue to be severe. Defendant loses little in its quest for unbridled free

3  speech if ordered to re-index <u>KS.com</u> and allow a natural PageRank. Wholesale or

4  indiscriminate blockage of Websites is of utmost concern for the First Amendment right of free

5  speech. At stake are thousands of Websites that publish and effectively speak and get heard

6  through dominant search engines as in the case of Google. When actions of a defendant as

7  Google can effectively "chill" the flow of free speech, this Court should hasten to allow this

8  channel to be re-opened at least provisionally. Certain Websites that have suffered from

9  Google's arbitrary banning are even reluctant to come forward in this litigation. [*Declaration of*

10  *Calvin C. Hoagland* ("Hoagland Dec."), attached as <u>Exhibit 5</u>, ¶¶ 4-5.] Certainly, KSC cannot

11  single-handedly represent and protect the interests of these and all other Websites seeking to

12  remain within Google's search index and be and remain accessible by the public. The Supreme

13  Court in *Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-57, 104 S. Ct. 2839, 81 L.

14  Ed. 2d. 786 (1984), has recognized that First Amendment free speech rights deserve liberal

15  consideration even in cases where the challenge is brought by indirect interests in need of free

16  speech protection by a court. A preliminary injunction here protects both the speakers on

17  Websites such as <u>KS.com</u>, and well as those vital free speech rights of parents and caregivers

18  seeking to find and view content on such sites. As these fundamental rights will ultimately

19  warrant most serious consideration and ultimate resolution by this Court or a higher Court, this

20  preliminary injunction should be granted.

21

    **V.  <u>FOURTH ELEMENT:  THE PUBLIC INTEREST IS SERVED WHEN</u>**
22        **<u>PLAINTIFF'S SITE IS RE-INDEXED, NATURALLY PAGERANKED, AND</u>**
         **<u>TRULY ACCESSIBLE ON THE WORLD WIDE WEB</u>**
23       The public interest is the fourth and final factor in the grant or denial of a request for a

24  preliminary injunction. If a person's First Amendment free speech rights are placed at ongoing

25  risk, a court should intervene with a preliminary injunction and, in the right instance, impose a

26  mandatory injunction. *See, e.g. Allen, Allen, Allen & Allen v. Williams*, 254  F.Supp.2d 614

27  (D.C.Va. 2003) (preliminary injunction granted to compel advertising due to public interest

28

1    served in releasing accurate information about lawyers).  Compelling public and policy interests

2    tilt heavily in favor of including Websites and Web content on and over the Internet, and that

3    includes KS.com.  Intrusive or unsolicited communication is highly unlikely when a search

4    engine user herself seeks information about infants and children through KS.com.  Even where

5    there is indecent and obscene material harmful to children on the Internet, the Supreme Court has

6    found that content-based restrictions can run afoul of the First Amendment.  In striking down

7    provisions of the CDA, Justice Stevens wrote for the majority, "the risk of encountering indecent

8    material by accident is remote because of a series of affirmative steps is required to access

9    specific material."  *Reno*, 521 U.S. at 882.  In this case, Google is blocking the deliberate,

10   intentional use of the search engine by thousands of users who are seeking to access and view

11   the Website content shown by Plaintiff's site KS.com.  This number, and the associated content,

12   published material and indeed speech is easily multiplied into the millions of otherwise viewable

13   Web pages if one were consider the numerosity of Class members who have had, *and continue to*

14   *have*, each of their sites arbitrarily blocked by Defendant Google.[33]  Therefore, any doubts about

15   free speech protection should prefer inclusion over exclusion.

16          The public interest is advanced and protected when Defendant Google is ordered to

17   release child-oriented Internet content through KS.com.  As Plaintiffs expect Defendant

18   Google's spirited, yet driven, resistance against this injunction to resist even the provisional

19   release of KS.com content to thousands of parents and teachers, just one conclusion is possible.

20   Defendant Google's dominion on censorship, even if *accidental*, against precious content as this,

21   cannot be in any sense free speech.  Plainly, this insidious practice violates both First

22   Amendment and California free speech rights and warrants injunctive relief now.

23

24

25

---

26   [33] It is a commonly known reality among Webmasters that once one Website has been tagged by Google for so-
     called violations of its "Guidelines" that site can contaminate, even automatically, all other sites that link to that site

27   and be blacklisted en masse as a "bad neighborhood.  A site owner receives no warning of any type or form that her
     site will be saddled with an entire collection of Websites in that bad neighborhood.  *See McCarley Dec.* ¶ 5.  In

28   addition, owners of Websites are wary and even fearful of exercising their right to join this lawsuit and seek
     protection of free speech.  *See Hoagland Dec.* ¶¶ 4-5.

1  **VI.  AN INJUNCTION CAN ULTIMATELY LEAD TO REASONABLE NOTICE AND GUIDELINES FOR BANNING WEBSITES BY GOOGLE**

2          Plaintiffs allege that Defendant Google imposes no reasonable or fair restraints on the

3  time, place and manner on the free speech of Plaintiff KSC and other class members through

4  their respective Websites.  [*1st Complaint* ¶ 109.]  Plaintiff believes that there are entirely

5  reasonable Webmaster guidelines that could be established, without undue or premature removal

6  of Websites and all the speech content therein.  [*McCarley Dec*. ¶ 6]  However, at least on a

7  provisional basis, this Court can and should allow re-indexing of KS.com by Google, with the

8  eventual opportunity to reformulate Google's Webmaster guidelines so as not to offend the First

9  Amendment.

10          The Northern District in *Altmann v. Television Signal Corp.*, 849 F. Supp. 1335 (N.D.

11  Cal. 1994), determined that the cable television service provider, as a transmitter of speech,

12  could develop and apply a "least restrictive" means of regulating the content on cable access.

13  There, the plaintiff raised constitutional free speech claims against Viacom for content-driven

14  restrictions on leased access of cable, and filed for a preliminary injunction.  The court granted

15  the injunction in part, but noted that the notice to subscribers of cable services provided by

16  Viacom was reasonable.[34]  The court approved this notice as the "least restrictive" method of

17  regulation.  In fact, the dangers of such a lack of adequate notice were that "the broadcasters that

18  have had their programs placed on the segregated channel risk losing their current viewers and

19  are unduly inhibited from gaining a larger viewing audience."  *Id.*  Defendant Google's practices

20  of banishing Websites from its index and from search results cause this very same harm.

21          Even if Defendant Google's Webmaster Guidelines survive a facial challenge for

22  overbreadth, there are important precedent and policy reasons to require Google at least to

23  develop reasonable time, place and manner constraints on speech flowing out of Plaintiffs'

24

25  _____

[34] Those guidelines were as follows:  "(1) It must describe the content of the segregated and scrambled channels in
26  an accurate and fair manner and the language of these descriptions must be carefully tailored to avoid an
unnecessary "stigma" on the segregated channels; (2) it must be provided to all subscribers within a reasonable time
27  upon the creation of the segregated channels; (3) it must be displayed in a prominent manner; and (4) it must inform
subscribers that the channels will be unscrambled at their request at no cost."  *Id.* at 1346. Google rather easily
28  could impose a degree of discipline and self-restraint in its practices to avoid sacrificing fairness or goodwill that
hundreds and thousands of Websites as KS.Com deserve.

Websites on the Internet.  There are essentially no rational business justifications for completely banning in Internet content on Plaintiffs' Websites.  Google is the world's dominant search engine.  It indexes millions of sites programmatically and remotely on a 24-7 basis worldwide. Unlike traditional media like broadcast television, Google faces no practical scarcity of resources to be able to locate and index all Websites for access worldwide by the search user.  The Supreme Court properly requires the carriage of alternative viewpoints when editorializing over broadcast media.  *Red Lion Broadcasting, Co., Inc.  v. FCC*, 395 U.S. 367, 369, 400-01, 89 S. Ct. 1794, 23 L. Ed. 2d  371 (1969); *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 117 S. Ct. 1174 137 L. Ed. 2d 369 (1997).  There are stark differences between a broadcaster in a medium with limited channels and airspace, on the one hand, and Internet Service Providers ("ISPs") and search engines dealing with limitless domain names and site content on a worldwide network, on the other hand.  Must-carry regulations and requirements for at least ISPs are more plausible and could withstand First Amendment scrutiny.   According to one legal commentator, "One could imagine the [Supreme] Court upholding regulations *requiring* ISPs to carry websites."   *Harvard Note on Communications, supra,* at 1331 n. 88 (emphasis added).  If Google is a speech intermediary for channeling Website content out to search engine users, this Court can and should properly require Google to index and carry Websites of all forms and content, including KS.com.

## VII.  **CONCLUSION**

The required four elements for a preliminary injunction are present and are demonstrated. The alternative grounds for an injunction are also established.  Here, the respective hardships of the two parties unquestionably favor KSC, given that its free speech has suffered and an injunction would impose at most a nominal inconvenience to Google.  Since that balance of hardships tips heavily decidedly toward KSC and it has raised questions serious enough to require litigation, the injunction should issue.

Plaintiff KSC, as the lead plaintiff in this class action, separately requests this Court for a special assembly of Defendant and Plaintiff representatives, under supervision of a United States

1   Magistrate or a special master, to evaluate and agree on parameters to select similarly situated

2   Class members who may qualify for preliminary injunctive relief.  These persons would be

3   experiencing ongoing irreparable harm for lost free speech rights to their respective Websites.

4         The equities and urgency warrant provisional relief for KSC against continued

5   suppression of free speech through KS.com.  Behind one side of the wall are thousands of

6   parents and caregivers eagerly and energetically seeking information about infants and young

7   kids.  On the other side of the wall are many, many sites viewable and heard through KS.com

8   that provide perhaps the most dynamic, updated facts information about children aged seven and

9   under.  But Google now stands, rigid as ever, as that wall and, quite ironically, in the name of

10  free speech.  That wall should come done, and that should happen now, not later.

11        Based on the foregoing and the file and evidence before this Court, Plaintiffs urge that a

12  mandatory and prohibitive injunction against Google be ordered and applied.

13  Dated: May 26, 2006                    GLOBAL LAW GROUP

14

15                                         By: _____

16                                         Gregory J. Yu, Esq.
                                           Attorney for Plaintiff KinderStart.com LLC and
17                                            for the proposed Class and Subclasses

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION, MOTION AND            -48-            Case No. C 06-2057 JF
MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION