Gregory J. Yu (State Bar No. 133955)
GLOBAL LAW GROUP
2015 Pioneer Court, Suite P-1
San Mateo, CA  94403
Telephone: (650) 570-4140
Facsimile:  (650) 570-4142
E-mail:  glgroup [at] inreach [dot] com

Attorney for Plaintiffs and Proposed Class and Subclasses

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| KINDERSTART.COM LLC, a California limited liability company, on behalf of itself and all others similarly situated, | Case No. C 06-2057 JF |
| | **OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
|      Plaintiffs, | |
|      v. | Judge:     Hon. Jeremy Fogel |
| GOOGLE, INC., a Delaware corporation, | Date:      June 30, 2006<br>Time:      9:00 a.m. |
|      Defendant. | Courtoom: 5th Floor, Room 3 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

I.  INTRODUCTION .................................................................................... - 1 -

II.  UNDERLYING FACTS ........................................................................... - 2 -

III.  ARGUMENT IN OPPOSITION TO THE MOTION ................................... - 3 -

    A.  Count One Properly States a Claim under the First Amendment and the California Constitution ..................................................................... - 3 -

        1.  Private Space for Dedicated Public Use Can House State Action.......... - 3 -

        2.  Search Engines Dedicated to Public Use is an Essential Public Service and is a Dedicated Public Speech Forum. ................................ - 7 -

        3.  Google's PageRank is Commercial Speech subject to Challenge........ - 10 -

        4.  Violation of Free Speech Rights in California is Properly Pleaded ..... - 11 -

    B.  Count Eight, Defamation and Libel, Properly States a Claim for Relief ......... - 13 -

    C.  Count Nine, Negligent Interference Claim, Properly States a Claim for Relief. ........................................................................................ - 14 -

    D.  Counts Two and Three Properly Claim Sherman Act Section 2 Violations. ... - 16 -

    E.  Count Six, BPC § 17045, Properly States a Claim for Relief. ......................... - 19 -

    F.  Count Four, Communications Act Violations, Properly States a Claim for Relief. ........................................................................................ - 20 -

    G.  Count Five, BPC §§ 17200 *et seq*., Properly States a Claim for Relief ........... - 22 -

    H.  Count Seven, Implied Covenant, Properly States a Claim for Relief............... - 25 -

IV.  CONCLUSION. ..................................................................................... - 25 -

**TABLE OF AUTHORITIES**

**CASES**

*ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.,* 14 Cal. 4th 1247, 1257, 1271, 61 Cal. Rptr. 2d 112, 931 P.2d 290 (1997) ......................................- 24 -

*Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432 (1988) ..............- 24 -

*Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S. Ct. 1601, 20 L. Ed. 2d 603 (1968) ....................................................- 3 -

*American Philatelic Soc.* v. *Claibourne,* 3 Cal.2d 689, 698 (1935) .........................- 24 -

*Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992) ...............- 17 -

*Ashcroft v. ACLU*, 542 U.S. 656, 159 L. Ed. 2d 690, 2004 U.S. LEXIS 4762 (2004)............- 21 -

*Aspen Skiing Co., v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985) ..............................................- 18 -

*Badie v. Bank of America*, 67 Cal. App. 4th 779, 796, 79 Cal. Rptr. 273, 284 (1998) ...........- 25 -

*Board of Trustees, State Univ. of N. Y. v. Fox,* 492 U.S. 469, 474, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989) ...............................................- 10 -

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) ...........................................- 4 -

*Brunette v. Humane Society*, 294 F.3d 1205, 1213 (9th Cir. 2002), *cert. denied*, 537 U.S. 1112, 123 S. Ct. 902, 154 L. Ed. 2d 786 (2003) ....................................- 6 -

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003) .............- 21 -

*Cel-Tech Communications Inc. v. Los Angeles Cellular Phone Co.*, 20 Cal. 4th 163, 187, 973 P.2d 527, 83 Cal. Rptr. 2d 548 (1999) .....................................- 24 -

*City & County of San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1143 (N.D. Cal. 1997) ...........................................................- 14 -

*Concord v. Boston Edison Co.*, 915 F. 2d 17, 22 (1st Cir. 1990) ...........................- 18 -

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802, 473 U.S. 788; 105 S. Ct. 3439; 87 L. Ed. 2d 56 (1985) ..............................................- 7 -

*Cyber Promotions, Inc. v. American Online, Inc.*, 948 F.Supp.436 (E.D. Pa. 1996) ................- 5 -

*Decker v. Advantage Fund Ltd.*, 362 F.3d 593, 595-596 (9th Cir. 2004)...............................- 1 -

*Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) ...............................- 25 -

*E. & J. Gallo Winery v. Encana Energy Services*, 388 F. Supp. 2d 1148, 1156 (E.D. Cal. 2005) ...........................................................- 1 -

*FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 n.10, 59 L. Ed. 2d 692, 99 S. Ct. 1435 (1979)..................................................................................................................- 20 -

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988) ...................................................................................................................- 17 -

*First Nationwide Savings v. Perry*, 11 Cal.App.4th 1657, 1662 (1992)...................- 23 -

*George v. Pacific CSC Work Furlough*, 91 F.3d 1227, 1230 ( 9th Cir. 1990) (per curiam) ...........................................................................................................- 6 -

*Ghirardo v. Antonioli*, 14 Cal.4th 39, 51, 57 Cal. Rptr. 2d 687, 924 P.2d 996 (1996) ............- 23 -

*Glendale Associates, Ltd., v. N.L.R.B.*, 347 F.3d 1145 (9th Cir. 2003)...................- 11 -

*Golden Gateway Center v. Golden Gateway Tenants Association*, 26 Cal.4th 1013, 1025-31, 29 P.3d 797, 111 Cal.Rptr.2d 336 (2001) ...............................................- 11 -

*Hirsch v. Bank of America*, 107 Cal.App.4th 708, 722 (2003)................................- 23 -

*Hollenbaugh v. Carnegie Free Library, of Connellsville, Pa.*, 545 F.2d 382, 283 (3rd Cir. 1976) ...................................................................................................................- 9 -

*Horvath v. Westport Library Association*, 362 F.3d 147 (2nd Cir. 2004)..................- 8 -

*Hudgens v. NLRB*, 424 U.S. 507, 86 S. Ct. 1029, 47 L. Ed. 2d 196 (1975) ..............- 3 -

*International Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 680, 112 S. Ct. 2649; 120 L. Ed. 2d 467 (1992).....................................................................................- 7 -

*Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003)...........................................- 1 -

*Kasky v. Nike, Inc.*, 27 Cal 4th 939, 960-61, 45 P.3d 243, 119 Cal.Rptr.2d 296 (2002)...........- 10 -

*La Sala v. American Sav. & Loan Ass'n*, 5 C.3d 864, 97 Cal. Rptr. 849, 489 P.2d 1113 (1971)...................................................................................................................- 23 -

*Lange v. TIG Ins. Co*., 68 Cal. App. 4th 1179, 1187 (1998) ..................................- 16 -

*Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002) ..........................................................- 5 -

*Lee v. Life Ins. Co.*, 23 F.3d 14, 18-19 (1st Cir. 1994) .........................................- 16 -

*Lloyd Corp. v. Tanner*, 407 U.S. 551, 563, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972) ........... *passim*

*Marsh v. Alabama*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946) ....................- 3 -

*MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124  (9th Cir. 2004), *cert. denied*, 2005 U.S. LEXIS 4202 (U.S., May 23, 2005)........................................................- 17 -

*Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980). ....................- 24 -

*National Ass'n of Regulatory Utility Comm'rs v. FCC*, 174 U.S. App. D.C. 374, 533 F.2d 601, 608 (D.C. Cir. 1976) ......................................................................................- 20 -

*Official Airline Guides, Inc. v. FTC ("OAG")*, 630 F.2d 920 (2nd Cir. 1980), *cert. denied*, 450 U.S. 917, 101 S. Ct. 1362, 67 L. Ed. 2d 343 (1981)..........................................- 19 -

*Panavision International, L.P. v. Dennis Toeppen, Network Solutions, Inc.*, 141 F. 3d 1316, 1327 (9th Cir. 1998) ................................................................................................- 9 -

*Parker v. Google, Inc.*, 422 F. Supp. 2d 492 , ___ (E.D. Pa. 2006) ............................- 21 -

*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 851 (C.D. Ca. 2006) ........................- 7 -

*Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980) ................................................................................................................- 3 -

*Riley v. National Federation of the Blind*, 487 U.S. 781, 108 S. Cut. 2667, 101 L. Ed. 2d 669 (1988) ........................................................................................................- 10 -

*Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908, 910, 153 Cal. Rptr. 854, 592 P.2d 341 (1979), ......................................................................................................- 11 -

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, *515 U.S. 819, 830,* 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) ..............................................................................- 3 -

*Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481-82; 115 S. Ct. 1585; 131 L. Ed. 2d 532 (1995) ..............................................................................................................- 11 -

*Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) ...........- 16 -

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974) ............- 1 -

*Search King, Inc. v. Google Tech., Inc.* No. CIV-02-1457, 2003 WL 21464568 (W.D. Okla. 2003) *(unreported decision cited by defendant in its motion)* ...................................- 13 -

*Smith v. City and County of San Francisco*, 225 Cal. App. 3d 38, 49, 275 Cal. Rptr. 17, 23 (1990) ..............................................................................................................- 25 -

*Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (per curiam), *cert. denied*, 538 U.S. 921, 155 L. Ed. 2d 311, 123 S. Ct. 1570 (2003) ........................................................- 1 -

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 117 S. Ct. 1174 137 L. Ed. 2d 369 (1997) ..............................................................................................................- 10 -

*United States v. American Library Association, Inc.*, 539 U.S. 194, 123 S. Ct. 2297, 156 L.Ed.2d 221 (2003) ..................................................................................................- 8 -

*United States v. Citizens & Southern National Bank*, 422 U.S. 86, 91, 45 L. Ed. 2d 41, 95 S. Ct. 2099 (1975) ..............................................................................................- 18 -

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*, 540, U.S. 398, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004) ...........................................................- 17 -

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763, 48 L. Ed. 2d 346, 96 S. Ct. 1817 (1976) ......................................................- 13 -

*Wyatt v. Terhune*, 315 F. 3d 1108, 1113-14 (9th Cir. 2002) ....................................- 13 -

**STATUTES**

17 U.S.C. § 512(d) ....................................................................................................- 21 -

28 U.S.C. § 1332 ........................................................................................................- 22 -

47 C.F.R. § 64.702(a) ...................................................................- 21 -

47 U.S.C. § 151 ..............................................................................- 22 -

47 U.S.C. § 230(f)(2) .....................................................................- 21 -

47 U.S.C. § 231(e)(4) .....................................................................- 21 -

47 U.S.C. § 231(e)(5) .....................................................................- 21 -

47 U.S.C. §§ 206, 207 ....................................................................- 22 -

BPC § 17045 ..................................................................................- 20 -

California Business and Professions Code ("BPC") Sections 17040 *et seq.* ...........................- 19 -

Child Online Protection Act ("COPA"), 47 U. S. C. § 230(f) .......................- 21 -

Communications Act, 47 U.S.C. §§ 201 *et seq.* ............................- 20 -

Communications Decency Act of 1996 ("CDA") at 47 U.S.C. § 231 ...................- 21 -

Fed.R.Civ.P. 15 ..............................................................................- 25 -

Sherman Act, 15 U.S.C. § 2 ...........................................................- 16 -

Unfair Competition Law ("UCL") under BPC §§ 17200 *et seq.* ...........................- 22 -

## OTHER AUTHORITIES

"The Federal Government Information Environment of the 21st Century:  Towards a Vision Statement and Plan of Action for Federal Depository Libraries, *Discussion Paper*, The Depository Library Council, Sept. 2005 at http://www.access.gpo.gov/su_docs/fdlp/pubs/dlc_vision_09_02_2005.pdf. ...........................- 7 -

Gey, Steven G., "Reopening the Public Forum – From Sidewalks to Cyberspace,", 58 Ohio St. L. J. 1539, 1619 (1998) ...........................................................- 9 -

http://www.infosci.cornell.edu/about/colloquiumSP06/may5.html, *visited May 24, 2006.* ........- 7 -

Note, "*The Impermeable Life:  Unsolicited Communications in the Marketplace of Ideas,*" 118 Harv. L. Rev. 1314, 1331 n.88 (Feb. 2005) (emphasis added) ...........................- 9 -

1

## I.  INTRODUCTION

2          Google repetitively and intentionally blocks and censors a multitude of Websites based

3   on content review, no reason at all, and anticompetitive reasons.  On top of that, it uses its

4   universal PageRank system to degrade and deflate these sites.  Rather than even address the

5   realities or a practical change or restraint of its unbridled practices, Google moves to dismiss all

6   nine counts in the First Amended Class Action Complaint ("FACAC").  Google hopes that

7   Blockage and PageRank devaluation of Websites will remain completely secure from any

8   judicial scrutiny or restriction under law.  The motion (the "Dismissal Motion") cites Rule

9   12(b)(1) and 12(b)(6), but the former relates to subject jurisdiction flaws, and the latter does not

10  consider external evidence. Any factual disputes or affirmative defenses now brought, including

11  those raised by Defendant's Declaration to its motion, should not be considered by the Court.[1]

12         A Rule 12(b)(6) motion proceeds only as all allegations of material fact in the complaint

13  are taken as true and construed in the light most favorable to plaintiff.  Dismissal of any claims

14  in the complaint is suitable only if it is without doubt that plaintiff cannot construe any set of

15  alleged facts to support relief.  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (*per*

16  *curiam*), *cert. denied*, 538 U.S. 921, 155 L. Ed. 2d 311, 123 S. Ct. 1570 (2003); *Decker v.*

17  *Advantage Fund Ltd.*, 362 F.3d 593, 595-596 (9th Cir. 2004).  The Ninth Circuit cautions, in

18  reviewing the sufficiency of a complaint, "the issue is not whether a plaintiff will ultimately

19  prevail but whether the claimant is entitled to offer evidence to support the claims.  Indeed it

20  may appear on the face of the pleadings that a recovery is very remote and unlikely but that is

21  not the test."  *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003) (*quoting Scheuer v. Rhodes*,

22  416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)).  As argued below, dismissal of any

23  one of the nine counts within the amended complaint at this earliest stage is premature and

24  unfounded under all applicable law and regulations.

25

26

27  _____

[1] If Defendant does introduce external evidence as it has done so in this Motion, it can properly notice a separate, summary judgment motion under Fed.R.Civ.P. 56 to allow all parties and the Court to render a suitable decision.

28  *See E. & J. Gallo Winery v. Encana Energy Services*, 388 F. Supp. 2d 1148, 1156 (E.D. Cal. 2005).

OPPOSITION TO DEFENDANT'S MOTION TO                                    Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

## II.  UNDERLYING FACTS

Universally, millions of businesses and Web browsers mutually connect through the world's dominant search engine because of one principle – linking should happen, freely, reliably and without interruption.  Like a phone company, this search engine ought to properly and fairly list and connect Websites each time, without discrimination or denial of service.  Google is that clearinghouse, channel and conduit, 24-7, for millions of Web destinations worldwide.  With an absolutely trusting public, Google wields unprecedented power and authority.  Google claims to index all Websites but that is not reality with its removal practices.

This class action was brought because the Google brand of censorship bans and removes thousands of sites complete from the index, likely not to be found for a long time unless and until Google says so.  The wholesale manipulation and denial of access perpetuates harm, lost goodwill and destruction of small businesses.  With hard work and sacrifice going back to 2000, lead plaintiff KinderStart.com LLC ("KSC") rose from the ranks to become a choice destination for parents and caregivers of kids.  KSC represents all these Blocked[2] and devalued Websites for one reason – this pernicious practice has to come to an end, even if others are unwilling to aid.

Google admits to censorship and Blockage worldwide.  It excuses this behavior due foreign laws.  Yet in the very center of capitalism, democracy and free speech, Google censors and Blocks with total impunity.  Not just particular voices are suffocated, but thousands of ventures and businesses trying to remain within reach in cyberspace of millions of browsers.  Google boasts of the free traffic and referrals to sites and seems to wants them to prosper but refuses sites any notice or means of recovery.  Further, PageRank devaluation is indiscriminate as Google at will uses the monopoly of website ranking to scale down any site it so chooses.

Quite shockingly, Google wants the First Amendment above all other law to sanction pervasive censorship, Blockage and deranking of sites.  Its motion to dismiss all nine counts has one mission – stop any law, federal or California, from touching any of these insidious practices.  But one factual theme must be admitted throughout – Google, dominant in search, search ads

---

[2] "Blockage" is defined as "Google's temporary or permanent blocking of websites" in the First Amended Class Action Complaint ("*FACAC*"), ¶ 3.  Other labels include de-indexing, de-listing and censorship of websites

and site rankings, denies access and flow of commerce, information and speech.  This motion is opposed in its entirety because the law does afford relief and due process.

## III.   ARGUMENT IN OPPOSITION TO THE MOTION

### A.  Count One Properly States a Claim under the First Amendment and the California Constitution

#### 1.  Private Space for Dedicated Public Use Can House State Action.

The very public search engine in worldwide 24-7 use here reflects state action based on space being a public speech forum.  This question clearly does not turn who owns that space.  State action is present when open space is free, open and dedicated to public use where free speech can and should thrive.  It is now not just private physical space but the Internet subject to public forum analysis.  Justice Kennedy called the Internet a "metaphysical" public forum in *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 830, 115 S. Ct. 2510,132 L. Ed. 2d 700 (1995).  The Court's initial case on public fora within private property was *Marsh v. Alabama*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946).  A private enterprise there exercised semi-official municipal functions as a delegate of the state.  Next, the Court in *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S. Ct. 1601, 20 L. Ed. 2d 603 (1968) held that First Amendment rights must be respected within a privately owned shopping center which is freely accessible and open to people.  Then, the Court in *Lloyd Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972) introduced the notion that free speech in the space depends on the owner's dedicated purpose.  There, the Court noted that the primary purpose of the mall was to promote shopping and goodwill rather than have the public use the mall for any purpose it chose.  407 U.S. at 564-65.  Further, the *Lloyd* majority distinguished the picketers in *Logan Valley* who lacked other "reasonable opportunities" to convey their message.  *Id.*, at 563.  The case of *Hudgens v. NLRB*, 424 U.S. 507, 86 S. Ct. 1029, 47 L. Ed. 2d 196 (1975), confirmed that *Lloyd* overruled *Logan Valley* because speech on  private property is not protected by the First Amendment if the property is not dedicated to "public use".  *Hudgens*, 424 U.S. at 518-20.   Finally, in *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980), the Court confirmed

1   that no First Amendment right generally exists in a shopping mall as private property, but

2   allowed the State of California to expand protection to speakers under its own state constitution.[3]

3          Overall, the key Supreme Court precedents of *Marsh, Lloyd* and *Pruneyard* reduce the

4   query to this:  What is the dedicated purpose of a speech forum where search engine users surf,

5   search, link to, and read Websites?  The sole function and purpose of the search engine is to

6   promote and realize 24-7 speech and communication, openly and freely.  There quite simply is

7   no other possible "dedicated" purpose for Google's search engine.  The private ownership of the

8   *Pruneyard* shopping mall and Google's search engine is undisputed (albeit Google's stock is

9   publicly traded).  But use of the space of the *Pruneyard* mall was to promote sales.  The Google

10  engine simply delivers free information as speech between millions of voices and speakers.

11         State action is present when a private firm as Google is heavily entwined with

12  government in key state-like functions, as alleged in the amended complaint.  The Supreme

13  Court has recently opined on the proper analysis and determination of state action in the context

14  of a 14th Amendment case against a state athletic association as follows:

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid
> simplicity.  From the range of circumstances that could point toward the State behind an
> individual face, no one fact can function as a necessary condition across the board for
> finding state action; nor is any set of circumstances absolutely sufficient, for there may
> be some countervailing reason against attributing activity to the government.  See
> *Tarkanian,* 488 U.S. 193, 196; *Polk County v. Dodson*, 454 U.S. 312 (1981).

19  *Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 121 S. Ct.

20  924, 148 L. Ed. 2d 807 (2001).  *Brentwood* held that the defendant association was engaged in

21  "public entwinement" when it imposed a speech restriction.  The Court noted that "entwinement

22  will support a conclusion that an ostensibly private organization ought to be charged with a

---

[3] *Pruneyard*'s opinion also resolves the issue of the forum owner's <u>own</u> First Amendment right of free speech.  The
Supreme Court refused to find a First Amendment right of the privately owned space to refrain from speaking
because (1) the shopping mall was not personal in use by the owner but was open to the public, (2) the State was in
no way dictating a specific message of the shopping mall owner, and (3) the owner could easily disavow any
message presented by any speaker on the mall premises.  Google's search engine results are the hub of this speech
forum.  Google (1) does not present a "message" of its own expression or opinion through results, (2) does not
adopt an expression or opinion with any particular result, and (3) enjoys the freedom to disavow itself of any results
or content produced by the search engine request.

public character to the degree shown here requires." *Id.* at 302. Here, the Court announced the guiding principle of "public entwinement" for lower courts to evaluate state action: "When . . . the relevant facts show pervasive entwinement . . . , the implication of state action is not affected by pointing out that the facts might not loom large under a different test." *Id.* at 304. Therefore, a finding of state action is almost entirely fact dependent.

Defendant wants ongoing escape of First Amendment restraints when it blocks, censors, and de-indexes other voices on the Internet. Google believers that the issue depends on such cases about Internet service providers (ISPs). In *Cyber Promotions, Inc. v. American Online, Inc.*, 948 F.Supp.436 (E.D. Pa. 1996), the court in relying primarily on a detailed Stipulation of Facts separated AOL, an ISP, from any state action. The three separate tests were considered: (1) the exclusive public function test; (2) actions with the help of or in concert with state officials; and (3) a position of interdependence where the private entity and the state are joint participants. While AOL's e-mail system was open to the public, the court did not find that AOL was performing any "essential public service." *Id.* at 442. Further, plaintiff could turn to "adequate alternative avenues of communication." The sharp 70% drop in its Web traffic for one year shows KSC lacks any "adequate" or reasonable options. KS.com is ranked by one thing on the Web that is recognized in public – PageRank. Moreover, Google runs at least 60% of search and that figure grows daily. (*FACAC* ¶ 53) Real options for KSC are simply nonexistent.

*Cyber* should not steer any result because its key facts are clearly distinguishable from Google. In *Cyber*, the Stipulation did not turn on any funding or cooperation between AOL and government. For this Dismissal Motion, there is *no* stipulation or agreement on essential facts. *Cyber* preceded the Supreme Court's 2001 *Brentwood* test of "public entwinement." AOL was not a monopolist of key markets as Google is, now easily recognized as essential to the public flow of speech and information.

The Ninth Circuit expressly considered the Supreme Court's guideline of "public entwinement" under *Brentwood* for First Amendment purposes in *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002). Under *Brentwood*, all that was required for state action was the application of a

1    single satisfactory test, and here the Ninth Circuit used the public function test.[4]  A crucial

2    aspect of its decision was a footnote stating, "It is important to identify the function at issue

3    because 'an entity may be a State actor for some purposes but not for others.' *George [v. Pacific*

4    *CSC Work Furlough]*, 91 F.3d [1227,] 1230 ( 9th Cir. 1990) (per curiam)."  *Lee*, 276 F.3d at 556

5    n.5.  Moreover, the *Lee* opinion amply relies upon *Marsh* to recognize that a speech forum is

6    "accessible to and freely used by the public in general" and that "[o]wnership does not always

7    mean absolute dominion . . . [Where] facilities are built and operated primarily to benefit the

8    public . . . . their operation is essentially a public function."  *Lee*, 276 F.3d at 556.  Google's

9    engine is assuredly a public function because it operates for public benefit.  *See Perfect 10, infra.*

10       In the Ninth Circuit, a private actor engages in state action when conferring upon a

11   government entity a windfall of benefits.  "For example, if a private entity, . . . , confers

12   significant financial benefits indispensable to the government's "financial success," then a

13   symbiotic relationship [between the entity and the government] may exist."  *Brunette v. Humane*

14   *Society*, 294 F.3d 1205, 1213 (9th Cir. 2002), *cert. denied*, 537 U.S. 1112, 123 S. Ct. 902, 154 L.

15   Ed. 2d 786 (2003).  Public entwinement is a broad, deep exchange of benefits for mutual gain.

16   The exchanged monetary, digital and copyright value between Google, on one hand, and large

17   government and public university libraries, on the other, is staggering.  Both sides of the table

18   will reap enormous benefits from these ongoing collaborative relationships to amass, share and

19   index digital content of unprecedented proportions.

20       Today, the alignment, cooperation and entwinement between Google and the government

21   are deep, pervasive and clearly unprecedented.  Google exudes a burgeoning of cooperation with

22   the public sector, and particularly with the federal government.  for search engine indexing and

23   results.  Google links its www.google.com/unclesam with hundreds of federal and state Websites

24   and has the attention of the Government Printing Office and the Federal Depository Libraries to

25   partner and share information and online content.[5]  Today, Google is massively copying and

---

27   [4] Pursuant to its finding of state action, the Ninth Circuit remanded the case to have the State actor consider imposing reasonable restrictions on the speech on the time, place and manner of speech.  *Id.* at 557.

28   [5] *See* "The Federal Government Information Environment of the 21st Century:  Towards a Vision Statement and Plan of Action for Federal Depository Libraries, *Discussion Paper*, The Depository Library Council, Sept. 2005 at

OPPOSITION TO DEFENDANT'S MOTION TO                    Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

1  digitizing from five major research libraries, all under a formal agreement.[6]  Two of these

2  institutions are public, one of which (Michigan) will surrender 100% of its contents for copying

3  by Google.  Larry Page has been quoted as being a "firm believer in academic libraries being

4  able to 'monetise' the information they hold."  Public benefit of Google's engine are plainly

5  recognized as has the Central District of California.  *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d

6  828, 851 (C.D. Ca. 2006) (confirming the enormous "public benefit" of Google's search engine).

7       The ultimate goal of a universal digital library of all content is a massive project

8  requiring a partnership and collaboration of private actors undertaking state-like functions.

9  Google is the leading force and influence in the search ecosystem which enormously benefits the

10  public sector.[7]  Google is a state actor in a public speech forum on the Internet when it delivers

11  an essential public service with its search engine index and search results. The overlay of

12  information, search and information access shared between government and Google compels a

13  finding of state action.  A motion to dismiss is clearly not in order.

### 2.  Search Engines Dedicated to Public Use is an Essential Public Service and is a Dedicated Public Speech Forum.

15       Google's search engine is open, free and public in nature and dedicated for public use

16  and public speech.  The Supreme Court held that a designated public forum is present with a

17  "decision to designate public property as a public forum must be made 'by intentionally opening

18  a nontraditional forum for public discourse.'" *International Soc'y for Krishna Consciousness v.*

19  *Lee*, 505 U.S. 672, 680, 112 S. Ct. 2649; 120 L. Ed. 2d 467 (1992) (*quoting Cornelius v. NAACP*

20  *Legal Def. & Educ. Fund*, 473 U.S. 788, 802, 473 U.S. 788; 105 S. Ct. 3439; 87 L. Ed. 2d 56

21  (1985)).  Google's search engine indexing and use have pervasive use such that it is now an

22  essential public service by any reasonable standard.  Google's mission is to amass all possible

23  online and offline content in the public domain and connect it to public users, and thereby.

---

26  http://www.access.gpo.gov/su_docs/fdlp/pubs/dlc_vision_09_02_2005.pdf.

[6] A Professor at the School of Information Management and Systems, the Haas School of Business, and the

27  Department of Economics at the University of California, Berkeley, fully endorses the Google Library Digitization Project as a legitimate, fair use of public resources under copyright law.

28  http://www.infosci.cornell.edu/about/colloquiumSP06/may5.html, *visited May 24, 2006.*

[7] One example of the growing partnership is explained in the white paper referred to in note 5 *supra.*

1    activate and promote speech and communication.   Google has become entirely essential to

2    millions of Websites.  Two key functions are under examination in Google's case.  First, Google

3    manages the world's most pervasive search engine, with access to up to 10 billion Web pages.

4    [*FACAC* ¶ 34.]  This engine is open and freely available to the public.  The second function is

5    Google's entanglement or entwinement in a public function of a dynamic, ubiquitous, collection

6    and index of Web content from all over the world, used and refreshed on a daily basis, 24-7.

7         The Internet may bear some attributes to a library, but a search engine as Google's is

8    exponential and dynamic in growth, scope and purpose.  The very public and transnational

9    nature of the Internet has received limited attention of the Supreme Court in the determination of

10   what constitutes a "public forum" for First Amendment protection.  In *United States v. American*

11   *Library Association, Inc.*, 539 U.S. 194, 123 S. Ct. 2297, 156 L.Ed.2d 221 (2003) ("*ALA*"), the

12   Supreme Court held that the Children's Internet Protection Act (CIPA) could constitutionally

13   withhold federal funding of libraries refusing to install filtering software.  "Internet access in

14   public libraries" is neither a traditional public forum nor a designated public forum."  *Id.* at 205-

15   06.  Amid concerns of how overblocking content would otherwise violate First Amendment

16   rights of Web authors, the Court carefully noted the Solicitor General's oral statement that a

17   "library may . . eliminate the filtering with respect to specific sites . . . at the request of a patron."

18   The CIPA further "expressly authorizes library officials to 'disable' a filter altogether."  *Id.* at

19   209.  Thus, the Court found that a non-public forum applying CIPA does not violate the First

20   Amendment where reasonable and viable access to open up the flow of Internet comes upon a

21   *simple request* immediately honored by the librarian.    Google blocks access without any notice

22   or restriction.

23        Google's search engine is far more pervasive than the operation of a physical library that

24   works as a static collection of printed, visual and audio materials.  *ALA* is important precedent,

25   but its public forum analysis was simply Internet *access* at a *local* public library during business

26   hours.  The Second Circuit considered a constitutional claim made by a employee terminated by

27   a city library in *Horvath v. Westport Library Association*, 362 F.3d 147 (2nd Cir. 2004).  There

28   was an absence of state action because the court relied upon a Third Circuit case to conclude that

OPPOSITION TO DEFENDANT'S MOTION TO                          Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

1    it cannot be said that " 'the operation of a library constitutes a function traditionally associated

2    with sovereignty.' " *Hollenbaugh v. Carnegie Free Library, of Connellsville, Pa.*, 545 F.2d 382,

3    283 (3rd Cir. 1976).  Google's worldwide index and engine is not a local physical library, but a

4    massive directory and search tool, equipped with e-commerce or commercial advertising never

5    found at a local library.  "Use of a 'search engine' can turn up hundreds of web sites, and there is

6    nothing equivalent to a phone book or directory assistance on the Internet."  *Panavision*

7    *International, L.P. v. Dennis Toeppen, Network Solutions, Inc.*, 141 F. 3d 1316, 1327 (9th Cir.

8    1998) (emphasis added).   Google's engine has become the key access channel and online

9    storefront and Internet directory for almost every vital U.S. business and organization.

10         Two legal commentators independently argue that the public access within the Internet

11    creates obligations for ISPs refrain from blocking access.  Professor Steven G. Gey focuses

12    precisely on a private player who occupies the center of this speech forum:

13         [I]n the case of a private company offering members of the public general access to the
         Internet, the "property" . . . is not dedicated to a purpose other than speech.  Speech is the
14         purpose of this particular type of property, and if . . . speech on the Internet takes place in
         a public forum, then a private ISP that provides public access to the Internet should be
15         obligated to follow the rules that define that forum.  In other words, the private ISP must
         permit its customers to have access to all speech in the forum, regardless of what the
16         operators of the ISP think about the content of that speech.  As compensation for giving
         up control over what their customers may access over the Internet, this mandatory access
17         rule would insulate the ISP's from civil liability for tortious speech distributed over their
         system.
18
19    Gey, Steven G., "Reopening the Public Forum – From Sidewalks to Cyberspace," 58 Ohio St. L.

20    J. 1539, 1619 (1998).  The Supreme Court required cable  operators to carry broadcast television

21    content against their wishes in *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 117 S.

22    Ct. 1174 137 L. Ed. 2d 369 (1997).  When viewing the *Turner* holding, a second commentator

23    on free speech recently observed, "One could imagine the [Supreme] Court upholding

24    regulations *requiring* ISPs to carry websites."  Note, "*The Impermeable Life:  Unsolicited*

25    *Communications in the Marketplace of Ideas*," 118 Harv. L. Rev. 1314, 1331 n.88 (Feb. 2005)

26    (emphasis added).

27         The cable medium understandingly has limited bandwidth and space, but the Supreme

28

OPPOSITION TO DEFENDANT'S MOTION TO                              Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT
                                    - 9 -

1   Court authorized must-carry provisions to go forward.  But ISPs and search engines as Google

2   deal with almost limitless space and freedom as to sites and content worldwide.  Therefore,

3   requiring an ISP or search engine to preserve access when operating and benefiting from the

4   open public domain of the Internet fulfills First Amendment purposes.  Google is all about

5   speech and serving the public as intermediary and conduit.  A willful act to *remove* pre-existing

6   content and linkages ought to invite judicial intervention on First Amendment grounds that much

7   more.

8        Overall, Google's search engine channels flow of speech among users and speakers

9   linking to each other and to world's largest base of Websites and digital content  Instrumental to

10  this is all the very active participation with and assistance of government and university libraries.

11  *FACAC* ¶¶ 22-26.  All of the information and speech flow in this public forum happens with a

12  search tool dedicated for public use and benefit.  The intent and actions demonstrate a

13  unprecedented mission of Google's search engine to serve and benefit the public.  State action is

14  present in this speech forum of which Google is the steward.  Thus, even as Plaintiffs allege the

15  requisite entwinement and dedicated nature of Google's search engine, state action can be

16  established here under law.  The motion as to Plaintiffs' First Amendment rights being violated

17  should be denied.

18               **3.   Google's PageRank is Commercial Speech subject to Challenge.**

19       Three elements establish commercial speech:  (1) the speaker is engaged in commerce,

20  (2) an intended commercial audience is present; and (3) representations of fact are commercial in

21  nature.  *Kasky v. Nike, Inc.*, 27 Cal 4th 939, 960-61, 45 P.3d 243, 119 Cal.Rptr.2d 296 (2002).

22  The fact that Google harbors some altruistic motive behind PageRank, site indexing, or

23  Blockage is immaterial and does not convert its statements or conduct into noncommercial

24  speech.  Intertwined commercial and noncommercial speech does not make the speech the latter

25  for First Amendment protection.  The U.S. Supreme Court addressed this succinctly in two

26  cases.  *Riley v. National Federation of the Blind*, 487 U.S. 781, 108 S. Cut. 2667, 101 L. Ed. 2d

27  669 (1988) (speech was related only to regulating charitable solicitations); *Board of Trustees,*

28  *State Univ. of N. Y. v. Fox,* 492 U.S. 469, 474, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989) (speech

1   with both commercial and noncommercial elements not intertwined, unless there is legal or

2   practical compulsion to combine them).

3        The highest court in California stated, "[s]peech is commercial in its content if it is likely

4   to influence consumers in their commercial decisions." *Kasky, supra*, 27 Cal.4th at 969.  Google

5   has a belief that its results and PageRank are not commercial.  The Court needs to look no

6   further than Google's publicly filed Form 10-K in 2004:  "The search for information often

7   involves an interest in commercial information – researching a purchase, comparing products

8   and services or actively shopping.  *We help people find commercial information through our*

9   *search services and advertising products.* (Emphasis added.)  With over $3.3 billion in search-

10  led advertising revenues in the U.S. during fiscal 2005, Google is in commerce, not merely

11  gratuitous speech.  The search engine as a public forum is intimately linked to the existence and

12  value of Websites on the Internet that are subjected to the presumably automated PageRank from

13  Google.  Commercial speech as in the case of PageRank is only entitled to limited First

14  Amendment protection.  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481-82; 115 S. Ct. 1585;

15  131 L. Ed. 2d 532 (1995).  As explained in section III.B below, when that commercial speech is

16  defamatory, there is no possibility that such speech should shroud or supersede the First

17  Amendment rights of a Website devalued or Blocked at the behest of Google.

18        **4.  Violation of Free Speech Rights in California is Properly Pleaded**

19        The California Supreme Court has carefully construed grounds on which Plaintiff can

20  assert its right to free speech and do so through a preliminary injunction.  Recently, the Ninth

21  Circuit has opined, "The California Constitution is 'more protective, definitive and inclusive of

22  rights to expression and speech' that the First Amendment to the United States Constitution.

23  *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908, 910, 153 Cal. Rptr. 854, 592 P.2d 341

24  (1979), *aff'd*, 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980)." *Glendale Associates, Ltd.,*

25  *v. N.L.R.B.*, 347 F.3d 1145 (9th Cir. 2003).  After *Pruneyard*, the California Supreme Court

26  found a state action requirement under the California constitutional free speech clause in *Golden*

27  *Gateway Center v. Golden Gateway Tenants Association*, 26 Cal.4th 1013, 1025-31, 29 P.3d

28  797, 111 Cal.Rptr.2d 336 (2001),   While this seems to run contrary to the precedent that

1    privately-owned, but publicly open shopping centers must offer free speech to visitors, the

2    analysis of free speech does not stop at state action.  That is, the absence of a state actor *does not*

3    resolve the case.  Under *Golden Gateway*, California law requires a court to assess the

4    importance of the public character (not ownership) of the property where speech takes place.

5    "[P]rivate property must be public in character before California's free speech clause may apply."

6    *Id.* at 1033.  After considering *Marsh* and *Logan Plaza*, the California Supreme Court

7    concluded:

8           [W]e conclude that the actions of a private property owner constitute state action for
           purposes of California's free speech clause only if the property is *freely and openly*
9          *accessible to the public.*  By establishing this threshold requirement for establishing state
           action, we largely follow the Court of Appeal decisions construing *Robins.*  For example,
10         our Courts of Appeal have consistently held that privately owned medical centers and
           their parking lots are not functionally equivalent to a traditional public forum for
11         purposes of California's free speech clause because, among other things, they are *not*
           *freely open to the public.*  [Citations omitted.]
12

13   *Golden Gateway*, 26 Cal.4th at 1033 (emphasis added).  The court then found that the defendant

14   tenants' association could not distribute leaflets in the area in question because "Golden

15   Gateway carefully limits access to residential tenants and their invitees."  *Id.*

16          Defendant Google's search engine shows very strong indicia of a public forum or at least

17   a dedicated public forum.  It cannot now argue or claim that its engine is not public in character

18   or not "freely open to the public", given all of Google's media coverage, blogs, public

19   statements, and securities disclosures.  In its very own words within such disclosures, Google's

20   search engine and index of websites are "freely available to anyone with Internet access."

21   [*FACAC*, ¶ 22.]  Internet access for users is widely available all over cyberspace, including

22   public, government maintained locations as public libraries.  *ALA*, 539 U.S. at 205.  Quite

23   literally, any person from any location can use the search engine of Google.  There are no fees,

24   qualifications or membership.  Google never dictates to the public what how to use or select key

25   words for search.  It is without restriction and limits in use or purpose.  At the other end of the

26   channel, Google indexes all Websites on the Web, without request or fees with Googlebot.  Once

27   a site goes up in the public domain, Google seeks to index it for search engine use.  Therefore,

28   the holding of *Golden Gateway* in California should afford free speech protection under the

OPPOSITION TO DEFENDANT'S MOTION TO                         Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT
                                    - 12 -

1  California constitution of <u>KS.com</u> to be included in Google's index and viewable and heard by

2  the public.

3  ### B.  Count Eight, Defamation and Libel, Properly States a Claim for Relief

4          Defamation occurs when a statement made is provably false.  In a key commercial

5  speech case, the Supreme Court held that alcoholic content of a beverage was indeed commercial

6  speech entitled to limited First Amendment protection.  *Rubin,* 514 U.S. at 481-82.  The Court

7  recognizes a "particular consumer's interest in the free flow of commercial information . . . may

8  be as keen, if not keener by far, than his interest in the day's most urgent political debate."

9  *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763, 48 L.

10  Ed. 2d 346, 96 S. Ct. 1817 (1976).

11          Despite Google's generous use of the unreported decision of *Search King*[8] and its claim

12  of PageRank as subjective, PageRank is, and always has been, an "automatically generated"

13  number between '0' and '10' based on an algorithm.   In the motion, Google seeks to cast

14  PageRank a mere subjective human opinion but that completely belies PageRank's eight-year

15  history.  The original U.S. patent (No. 6,285,999 issued on September 4, 2001) behind PageRank

16  states in the claim 1 that it is a "computer implemented method of scoring a plurality of linked

17  documents."  The fact that the computation may be complex does not, as a matter of law, make

18  PageRank as to <u>KS.com</u> or any other Website of the Class, according to U.S. Patent No.

19  incapable of factual or mathematical verification.  Therefore, the statement by the *Search King*

20  judge that "PageRanks are opinions"[9] falls short of stating that it is impossible to verify accurate

21  PageRank for a given Website.  If PageRank was conceived as an patented invention to calculate

22

23  [8] *Search King, Inc. v. Google Tech., Inc.* No. CIV-02-1457, 2003 WL 21464568 (W.D. Okla. 2003) bears only
nominal relevance, if any, here.  First it is an unreported and unpublished decision of another court outside the

24  Ninth Circuit, which cannot serve as precedent here.  Any findings of fact made from the Western District of
Oklahoma in *Search King* regarding PageRank do not bind this Court's assessment of speech concerning Blockage

25  of Websites or the '0' PageRank here.  The Ninth Circuit under *Wyatt v. Terhune*, 315 F. 3d 1108, 1113-14 (9th
Cir. 2002) held that one court may not accept as true the factual findings of another court.  Here, the veracity of

26  PageRank is surely in dispute between the parties as a factual matter, and should not lead this Court to simply adopt
a factual finding, at least in a Rule 12(b)(6) motion.

27  [9] PageRank, in operation, is the output of a series of computational steps.  If the PageRank algorithm yields, for
example, a '5', Google should not somehow override that computation by placing a '0' in the PageRank Toolbar for

28  display.  As to what a browser or user may think of a '0' or '5' PageRank – that is when and where the "opinion" of
relative significance of the site emerges.

OPPOSITION TO DEFENDANT'S MOTION TO                              Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

1   the number of hyperlinks among Websites, it is conceivable to verify whether a '0' PageRank

2   for KS.com is indeed the proper result of the PageRank algorithm.  That is far different when the

3   *Search King* judge said that it is not "conceivable" to prove the falsity of "relative significance"

4   of a Website.  The judge did not address the calculation of PageRank itself as whole number.

5        When a site has 20,000-plus back links as KS.com has, a PageRank of '0' seems, and

6   indeed is, mathematically impossible.  With a declaration disputing Google's factual assertion

7   here on file in the concurrent opposition to Defendant's Anti-SLAPP Motion,[10] the motion to

8   dismiss is inappropriate on this count.  Nonetheless, even to the uninformed or layperson, with

9   the content appearing on KS.com and the amount of Web traffic earned up to March 2005, a

10  "relative significance" of nothing.  A PageRank of '0' for KS.com seems false under any

11  sensible interpretation.  Accordingly, the motion cannot as a matter of law establish that plaintiff

12  KSC fails to claim a '0' PageRank for KS.com is both defamatory and libelous.

13        **C.  Count Nine, Negligent Interference Claim, Properly States a Claim for Relief.**

14        Negligent interference is based on the existence of a special duty from Google to Plaintiff

15  KSC and California Subclass II members: (1) the extent to which the transaction was intended to

16  affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty the

17  plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and

18  the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of

19  preventing future harm.  *City & County of San Francisco v. Philip Morris, Inc.*, 957 F. Supp.

20  1130, 1143 (N.D. Cal. 1997).  "Purely economic loss is recoverable in California, even if there is

21  no privity of contract between the parties," where this "special duty" exists.  *Id.*  The key

22  elements for Count Nine here are:  "(1) that the defendant undertook to act for the benefit or

23  protection of the plaintiff; (2) that the defendant failed to do so; and (3) that the defendant's

24  breach of the assumed duty either increased the risk of harm to the plaintiff or the plaintiff

25  suffered injury because of reliance on the defendant's undertaking."  *Id.*

26        Plaintiffs' negligent interference claim relates to Blockage of a multitude of Websites.

27

28  _____

[10] *Declaration of Randall McCarley*, attached as Exhibit 2, ¶ 4, to Plaintiff's Opposition to Defendant's Special
Motion to Strike Pursuant to CCP § 425.16 on file June 9, 2006.

*FACAC* ¶ 174.  Naturally, Blockage and censorship of other sites are normally outside of a contract between any given AdSense site and Google.  As traffic to certain sites falls or completely drops by the acts of Google, this count properly alleges KSC and Plaintiffs as Class members experienced sudden and ongoing Blockage of their sites.  *FACAC* ¶ 66.  Google publicly acknowledges Blockage [*FACAC* ¶ 64], and is attempting to explore and deal with the problem of Blockage of undeserving Websites [FACAC ¶ 65; *Attachment of Matt Cutts Blog* to *Declaration of Randall McCarley* attached as <u>Exhibit 4</u>, to the Preliminary Injunction Motion on file herein.]   The purported value of AdSense to a particular site is directly tied to the amount of search engine use and traffic of other sites that refer to and that are back-linked to the AdSense advertising site.

> "Every day we serve millions of users who know our no-paid-inclusions policy means they're getting totally unbiased results. And the better user experience that Google search offers means your visitors will spend more time on your site and return more often. Google AdSense combines Google's search technology with thousands of keyword advertisers to deliver targeted text-based ads to search result pages.

<u>https://www.google.com/adsense/ws-overview</u> (visited June 7, 2006).

Negligent interference by Google, then, refers to all of the sites that should regularly and organically lead users, either with Google's search engine, or with click-throughs through a site's link partners.  Blockage by Google affecting hundreds of Websites that may not necessarily have a contractual relationship through Websites with AdWords.  It is the collective Blockage of sites that link to those sites carrying AdSense ads from Google that constitutes the alleged negligent interference by Google.  Affected Websites on the Internet, including those of Class members, are link partners by agreement.  Blockage to arbitrarily cut off traffic to these sites is indeed interference.  Traffic and referrals through the search engine build up steadily for thousands of sites, and Google and all its advertisers using sponsored links know that. Discovery and proof and harm on Blockage by Google will confirm its interference and harm brought among hundreds of interdependent, linked sites of California Subclass II Class members.

For negligent interference, a defendant's conduct is blameworthy if "it was *independently*

---

OPPOSITION TO DEFENDANT'S MOTION TO                                Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

1    *wrongful* apart from the interference itself." *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1187

2    (1998). Prior to Count Nine, the Amended Complaint alleges eight other counts that Blockage

3    and/or PageRank constitute Federal and state law violations against Plaintiffs. For example, in

4    the factual allegations, Plaintiffs allege that with PageRank and Blockage, Google acted as a

5    monopolist and hurts competitors. *FACAC* ¶¶ 3, 58. It is therefore unmistakable that

6    "independently wrongful" conduct is present. With the success of any of the eight other counts

7    (including Count One *supra* and Count Eight *infra*), then Count Nine should remain intact.

8        **D. Counts Two and Three Properly Claim Sherman Act Section 2 Violations.**

9        Under the Sherman Act, Plaintiffs have alleged three separate relevant markets for

10   antitrust purposes – Search Engine Market, Search Ad Market, and Website Rating Market.

11   Another Federal Circuit has noted that an antitrust plaintiff must sufficiently allege a relevant

12   market with interchangeable substitutes to avoid a 12(b)(6) dismissal. *Lee v. Life Ins. Co.*, 23

13   F.3d 14, 18-19 (1st Cir. 1994). As to the Search Engine Market and the Search Ad Market,

14   plaintiffs do so. [*FACAC* ¶¶ 54, 55, 58.] Likewise, for the Website Rating Market, Google's

15   Page Rank is alleged as the most dominant among the methods for ranking a Website. [*FACAC*

16   ¶ 56.]

17       Count Two of the FACAC asserts attempted monopolization by Google under Section 2

18   of the Sherman Act, 15 U.S.C. § 2. Three elements are required: (1) specific intent to control

19   prices or destroy competition, (2) predatory or anticompetitive conduct directed to

20   accomplishing the unlawful purpose, and (3) a dangerous probability of success. *Rutman Wine*

21   *Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987). Element (1) is satisfied --

22   Plaintiff KSC claims that Google, by its "statements, behavior, conduct, acts, and omissions,"

23   demonstrates "specific intent to destroy competition in the Search Engine Market and the Search

24   Ad Market." *FACAC* ¶ 115. Element (2) is met in that the amended Complaint alleges that

25   Google has engaged in conduct to harm and destroy competition. *Id.*, ¶¶ 118, 121-22. Element

26   (3) is properly alleged – Google has the world's largest library of Web content (*Id.*, ¶¶ 26, 34), it

27   has growing market shares and revenues that are unrivalled by competitors (*Id.*, ¶¶ 50-57); and

28   Google is likely to succeed in its goal of a monopolist (*Id.*, ¶ 120).

1    In Count Three, Plaintiffs allege that Google as an essential facility violates Section 2 of

2 the Sherman Act.  Under this doctrine, the monopolist owns a facility that "cannot reasonably be

3 duplicated and which is essential to competition in a given market a duty to make that facility

4 available to its competitors on a nondiscriminatory basis." *Ferguson v. Greater Pocatello*

5 *Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988).  *See also Anaheim v. Southern*

6 *California Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992).  The elements are (1) the

7 monopolist is in control of an essential facility, (2) the monopolist's competitor is unable

8 reasonably or practically to duplicate the facility, (3) the monopolist has refused to provide the

9 competitor access to the facility and (4) that it is feasible for the monopolist to provide such

10 access. n10 *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992).

11    Google is concerned about the viability of the "essential facilities" doctrine used to allege

12 a Section 2 violation.  *FACAC* ¶ 125.  But a careful reading of the Supreme Court's opinion in

13 *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*, 540, U.S. 398, 124 S. Ct.

14 872, 157 L. Ed. 2d 823 (2004), suggests otherwise.  The "essential facilities" doctrine was

15 presented to the Court dealing with a federal antitrust claim against a telecommunications carrier

16 subject to the Telecommunications Act of 1996 .  Although the Court said, "we have never

17 recognized such a doctrine, [citations omitted]," Justice Scalia writing for the majority

18 continued, "and we find *no need to recognize it or to repudiate here*." *Id.* at 411 (emphasis

19 added).  Indeed, the Court noted that where "essential facilities" is applied, the key requirement

20 is the "unavailability of access" to a channel.  The doctrine was not needed to protect

21 competition in *Trinko* because the petitioner-defendant was in the telecommunications industry,

22 for which Congress provided "forced access" under the 1996 Act. *Id.*

23    The doctrine of "essential facilities" as a doctrine to bring Sherman Section 2 claims

24 against monopolists is quite alive and well in the Ninth Circuit.  After *Trinko* and having its

25 original opinion vacated by the Supreme Court, the Ninth Circuit in *MetroNet Servs. Corp. v.*

26 *Qwest Corp.*, 383 F.3d 1124  (9th Cir. 2004), *cert. denied,* 2005 U.S. LEXIS 4202 (U.S., May

27 23, 2005), considered the doctrine intact and once again applied it to the case.

28    Aside from this doctrine, the U.S. Supreme Court has historically used the concept of a

OPPOSITION TO DEFENDANT'S MOTION TO                     Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

1    unilateral refusal to deal to find Section 2 liability.  In *Aspen Skiing Co., v. Aspen Highlands*

2    *Skiing Corp*., 472 U.S. 585, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985), two competing ski lift

3    companies shared common passes to skiers for a period of tie.  However, when terminating the

4    relationship, the larger company was properly challenged for a Sherman Section 2 violation.

5    Three key facts produced this result:  (1) the unilateral termination of a profitable course of

6    dealing; (2) the refusal to deal with the competitor even at a reasonable price; and (3) the

7    monopolist had already been delivering the good or service to the competitor.  Plaintiffs allege

8    that (1) Google Blocked KS.com (*FACAC* ¶¶ 74, 76), (2) Google refused to remedy the

9    Blockage of KS.com over the Internet (*FACAC* ¶¶ 78), and (3) Google had been regularly

10   delivering traffic and visitors to KS.com without incident or interruption (*FACAC* ¶¶ 74-76)

11   which Google as a practice does for many Websites as a routine business practice to help them

12   make money (*FACAC* ¶ 30).  The Ninth Circuit has no serious qualms about judicial supervision

13   of the market with an antitrust remedy where delivery of goods or services by the monopolist to

14   competitors is *already happening in the market.  MetroNet,* 383 F.3d at 1133.

15        The Supreme Court in *Trinko* urges judicious use of the antitrust remedy in regulated

16   markets.  The *Trinko* Court has recognized regulatory controls to monitor competition in *United*

17   *States v. Citizens & Southern National Bank*, 422 U.S. 86, 91, 45 L. Ed. 2d 41, 95 S. Ct. 2099

18   (1975) (banking industry); and *Concord v. Boston Edison Co.*, 915 F. 2d 17, 22 (1st Cir. 1990)

19   (electric utility industry).  *Trinko* was decided on Section 2 applies to a controlling competitor

20   refusing to deal with a competitor were access to a channel of commerce was already protected

21   by Congress.  Therefore, *Aspen* and *Trinko* do warrant an antitrust remedy in cases where the

22   unilateral refusal to deal has the impact of elimination of competition downstream.  Search

23   engines, search advertising, and website ranking are almost entirely devoid of any regulation at

24   the federal level.  Accordingly, Plaintiffs here properly turn to judicial enforcement of antitrust

25   remedies where key access points are blocked and harm competition.

26        In distinguishing the facts of *Aspen* from the competition among the "independent

27   service organizations" for copiers, the Ninth Circuit in *Image Technical Services, Inc. v. Kodak*

28   *Co.*, 125 F.3d 1195, 1211 (9th Cir. 1997) noted the competing ski company in *Aspen* lost 50% of

OPPOSITION TO DEFENDANT'S MOTION TO                     Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

1   its profits following the defendant's ongoing refusal to deal.  In the case at bar, Plaintiff KSC

2   adequately pleads Google's capability to eliminate downstream competition in the Search

3   Engine or Search Ad markets because of a 70% or more fall in Web traffic to KS.com and an

4   80% drop-off in its revenues after Blockage by Google commenced.  *FACAC* ¶¶ 74, 75.

5          Google claims that the existence of alternative search engines do not restrict KSC from

6   reaching out to visitors on the Internet.  However, the mere existence of an alternative channel or

7   medium does not defeat a Section 2 claim as alleged by KSC.  Whether the Ninth Circuit's

8   "essential facilities" doctrine or the Supreme Court's "refusal to deal" precedent applies, the

9   Amended Complaint alleges that unilateral PageRank devaluation and Blockage of Websites of

10  the Class, including KS.com, amounts to predatory, even exclusionary conduct against these

11  Websites.  Google's acts against the Class are alleged to have substantially stopped the flow of

12  revenues, commerce and traffic without notice, explanation or justification to Plaintiffs.  *FACAC*

13  ¶¶ 60, 78, 121-22, 135.

14         Finally, Google refers to *Official Airline Guides, Inc. v. FTC ("OAG")*, 630 F.2d 920

15  (2nd Cir. 1980), *cert. denied*, 450 U.S. 917, 101 S. Ct. 1362, 67 L. Ed. 2d 343 (1981) to argue

16  that if a monopolist airline guide refuses to include the listings of commuter flights is free from

17  antitrust liability, Google should be free to list or delist any Website it chooses.  The Second

18  Circuit in *OAG* specifically noted that the FTC in its administrative record did not make an

19  factual finding of "any purpose to create or maintain a monopoly."  *Id.* at 925.  Plaintiff KSC

20  alleges that Google uses illicit means and has "willfully acquired or maintained its monopoly

21  power" in the three relevant markets of Search Engine Market, Search Ad Market and Website

22  Rating Market.  FACAC ¶¶ 127-32.

23              **E.  Count Six, BPC § 17045, Properly States a Claim for Relief.**

24         California Business and Professions Code ("BPC") Sections 17040 *et seq.* provides

25  broad avenues for unfair practices and devices against companies and persons.  Plaintiffs allege

26  in essence that paid placement of sponsored links through the AdWords program can yield

27  higher listings in the search results.  [*FACAC* ¶¶ 68-69.]  That evidence can assuredly be

28  produced with further discovery and evidence produced by the Class.  Google may believe that

OPPOSITION TO DEFENDANT'S MOTION TO                          Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

1    this is not legally a claim, but the essential requirement to survive this 12(b)(6) motion is that

2    defendant be placed on notice of the factual allegations that support a violation of BPC § 17045.

3        Again, Google asks the Court to rely on findings of fact in *Search King*, an unreported

4    case in Oklahoma.  This motion is inappropriate to begin contesting the factual allegations made

5    of surreptitious payments or benefits offered in exchange for higher or more favorable listings on

6    Google's search results.  In fact, the allegation is made on behalf of the entire Class of plaintiffs

7    who have suffered Blockage.  The purchases made from Google are simply the paid placement

8    of sponsored links within the AdWords program.

9        **F.  Count Four, Communications Act Violations, Properly States a Claim for Relief.**

10       Google stresses labels and statements to summarily conclude that it cannot possibly be a

11   common carrier under the Communications Act, 47 U.S.C. §§ 201 *et seq.*  However, common

12   carrier treatment is a *functional* test, not one of entities, labels or nomenclature.  The D.C.

13   Circuit stated that "since it is clearly possible for a given entity to carry on many types of

14   activities, it is at least logical to conclude that one can be a common carrier with regard to some

15   activities but not others." *National Ass'n of Regulatory Utility Comm'rs v. FCC*, 174 U.S. App.

16   D.C. 374, 533 F.2d 601, 608 (D.C. Cir. 1976).  The U.S. Supreme Court held that a carrier is one

17   that "makes a public offering to provide [communications facilities] whereby all members of the

18   public who choose to employ such facilities may communicate or transmit intelligence of their

19   own design and choosing." *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 n.10, 59 L. Ed. 2d

20   692, 99 S. Ct. 1435 (1979).  The Ninth Circuit notes a clear dichotomy between "basic"

21   information transport and one that provides "enhanced" services; a carrier function is being a

22   "mere conduit for information."  *Howard v. AOL*, 208 F. 3d 741, 752 (9th Cir. 2000).  It is only

23   "basic" services here subject to regulation, and *not the entity as a whole*.  Regardless of its other

24   ventures and services, it would be Google's *search engine* function alone subject to common

25   carrier treatment.

26       Google cannot prevail on its motion as to the Communications Act unless search engines

27   are, as a matter of law, "enhanced services", defined in the Federal Regulations as follows:

28

1

2

3

> Enhanced services shall refer to services . . . which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different or restructured information; or involve subscriber interaction with the stored information. Enhanced services are not regulated under Title II of the [Communications] Act.

4  47 C.F.R. § 64.702(a).  None of these cases would appear to apply to a search engine.

5  The only apparent reference to a search engine function within Title 47 to the United

6  States Code ("USC") is within the Communications Decency Act of 1996 ("CDA") at 47 U.S.C.

7  § 231.  The Ninth Circuit in *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir.

8  2003) noted that "Congress enacted this provision [§ 231] as part of the Communications

9  Decency Act of 1996 for two basic policy reasons: to promote the free exchange of information

10  and ideas over the Internet. . . ."[11]  Congress at least intended two *separate* Internet categories to

11  qualify for immunity when transferring content – "interactive computer service" in subsection 47

12  U.S.C. § 231(e)(4) and "Internet information location tool" ("IILT"), which means "a service

13  that refers or links users to an online location on the World Wide Web."  47 U.S.C. § 231(e)(5).

14  No has any court interpreted or applied this latter term in any cases related to federal

15  telecommunications law affecting a search engine.[12]

16  In a law related to CDA, a court recently granted immunity for Google as a search engine

17  by enlarging the scope of "interactive computer service" found in the Child Online Protection

18  Act ("COPA"), 47 U.S. C. § 230(f).  *Parker v. Google, Inc.*, 422 F. Supp. 2d 492 (E.D. Pa. 2006)

19  ("there is no doubt that Google qualifies as an 'interactive computer service' [ICS] and not an

20  'information content provider'").  However, here the relevant statutory language provides that an

21  ICS only covers a firm that "provides or enables computer access" or "access to the Internet".

22  47 U.S.C. § 230(f)(2).[13]  Google's search engine, or any search engine for that matter, does not

23

24  [11] The CDA was ruled unconstitutional by the Supreme Court in *Ashcroft v. ACLU*, 542 U.S. 656, 159 L. Ed. 2d 690, 2004 U.S. LEXIS 4762 (2004), but the congressional intent is worthy of recognition.  Google's alleged

25  Blockage is actually a reversal of the policy goal and interest of promoting the "free exchange of information and ideas over the Internet."

26  [12] Again, given that the CDA was ruled unconstitutional in *Ashcroft* 2004, the IILT term has questionable viability. However, the Digital Millennium Copyright Act does provide immunity from liability for various Internet firms,

27  including "information location tools" which would presumably include search engines. 17 U.S.C. § 512(d).

[13] Once CDA was ruled unconstitutional under *Ashcroft, supra*, the immunity provision in 47 U.S.C. § 231(a) for an

28  "Internet information location tool" under § 231(e)(5) was no longer available for statutory construction as a safe harbor from liability.  This may explain why in *Parker* the definition of interactive computer service was expanded

1    perform such a function on the Internet.  In all, it appears that neither Congress in United States

2    Code Title 47, the FCC, nor any court has decided whether a search engine is a common carrier.

3        Fundamentally, a search engine creates a link or a conduit to connect the user to a

4    Website.  Google wishes to align with internet service providers (ISPs) like AOL to avoid

5    treatment as a common carrier.  The *Howard* court held that "AOL does not act as a mere

6    conduit for information."  But the similarity ends there by simply viewing and using Google's

7    search engine.  No creation of content appears on the results pages (as the *Parker* court easily

8    found that Google is *not* an information content provider).  Google merely shows a URL that

9    refers or links the user to a destination on the Internet.  As the Supreme Court has noted for

10   carriers in *Midwest Video*, millions of Websites completely control content of "their own design

11   and choosing."  Google's search engine as an Internet information location tool simply links and

12   connects users directly to any and all possible Websites whose content is not changed or affected

13   in the least by Google. This function is precisely and plainly that of a communications conduit.

14       Accordingly, Plaintiffs have properly pleaded that discriminatory conduct by Google

15   occurred [*FACAC* ¶¶ 143-44] in violation of 47 U.S.C. § 151 and is entitled to damages as a

16   private party under 47 U.S.C. §§ 206, 207.

17       **G.  Count Five, BPC §§ 17200 *et seq*., Properly States a Claim for Relief**

18       The Unfair Competition Law ("UCL") under BPC §§ 17200 *et seq.* now provides a class

19   action may proceed if the representative has been injured in fact.  Initially, the fundamental

20   problem with Google's motion here is that it seeks dismissal even prior to Plaintiff KSC's

21   motion for certification of this action and questions KSC's own standing to seek complete

22   dismissal of the UCL claim.  Inasmuch as UCL action seeking restitution after Proposition 64

23   now must be brought by a representative, KSC has done just that in this claim brought as a

24   Federal class action under 28 U.S.C. § 1332.

25       Somehow, Google contends that that KSC as the Class representative cannot bring a

26   class action under UCL § 17200.[14]  Accordingly, it believes that under Article III of the

27

28   to allow immunity for Google as a search engine in that case.
     [14] Even if KSC as a class representative for the UCL action for some reason is not an appropriate class

OPPOSITION TO DEFENDANT'S MOTION TO                              Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

- 22 -

1    Constitution, Plaintiff lacks standing to proceed with Count Five because it has no redressable

2    relief of either restitution or injunctive relief..  Both of Google's reasons, however, are not

3    supported by law to warrant a dismissal here.  First, restitution is warranted if there is unjustly

4    enrichment, or some type of benefit, that is, an advantage, from another. *First Nationwide*

5    *Savings v. Perry*, 11 Cal.App.4th 1657, 1662 (1992).  That "benefit" can be "*any* type of

6    advantage."  *Ghirardo v. Antonioli*, 14 Cal.4th 39, 51, 57 Cal. Rptr. 2d 687, 924 P.2d 996

7    (1996).  To confer a "benefit", it is not essential that money be paid directly to the recipient by

8    the party seeking restitution. *Hirsch v. Bank of America*, 107 Cal.App.4th 708, 722 (2003).

9       Google believes KSC's standing evaporates because it never "directly paid Google any

10   money", but the UCL is not so narrowly drawn here as demonstrated by the *Hirsch* holding.

11   KSC participates in Google's AdSense program.  *FACAC* ¶ 21.  Then KSC witnessed a sharp

12   loss in its traffic and revenue began the very month that Google commenced Blockage of

13   KS.com.  *FACAC* ¶ 75.  Revenues from AdSense first freely flow from members of the "Google

14   Network" into Google.  Then Google states that it shares such revenues with AdSense partners

15   who show ads own their own sites.  *FACAC* ¶ 30.  Plaintiff as the class representative of both

16   California Subclass I (Blocked Websites) and Subclass II (AdSense Partners), properly alleges

17   that AdSense revenue is lost from Google's unfair practice of Blockage.  *FACAC* ¶ 91.

18   Accordingly, Count Five properly alleges a UCL violation in that financial benefits accruing to

19   Google that have been wrongfully denied to California Subclass I members [*FACAC* ¶ 149] and

20   siphoned off by Google to other sources [*FACAC* ¶ 162].

21       Second, injunctive relief for UCL violations is proper when there has been harm that has

22   been dealt to the representative plaintiff.  Plaintiff KSC has already filed its Injunction Motion as

23   grounds to suspend Blockage and PageRank devaluation that it has directly experienced.

24   *FACAC* ¶¶ 148-49.  Plaintiffs are free to allege and pursue under UCL both injunctive relief and

25   restitution.  *See ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.,* 14 Cal. 4th 1247, 1257,

26   _____

27   representative, the Court under California law should allow the substitution of a qualifying lead plaintiff in a further
     amended class action complaint.  *La Sala v. American Sav. & Loan Ass'n,* 5 C.3d 864, 97 Cal. Rptr. 849, 489 P.2d

28   1113 (1971) (trial court abused its discretion when denying plaintiffs opportunity to amend their pleadings to
     correct defect of the lack of representative plaintiff in class action suit).

OPPOSITION TO DEFENDANT'S MOTION TO                          Case No. C 06-2057 JF
DISMISS FIRST AMENDED COMPLAINT

1   1271, 61 Cal. Rptr. 2d 112, 931 P.2d 290 (1997).

2          Turning to UCL unfair acts and practices of Google, the test of whether a business

3   practice is unfair "involves an examination of [that practice's] impact on its alleged victim,

4   balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the

5   court must weigh the utility of the defendant's conduct against the gravity of the harm to the

6   alleged victim . . . . [Citations omitted.]"  *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d

7   735, 740 (1980).  The California Supreme Court in construing the statutory predecessor to

8   section 17200, stated that it serves to enable courts to deal with the innumerable "'new schemes

9   which the fertility of man's invention would contrive." *American Philatelic Soc.* v. *Claibourne,* 3

10  Cal.2d 689, 698 (1935).  "Nothing in the section [17200] requires that there be a reported case in

11  advance of an unfair practice holding the practice to be unfair."  *Allied Grape Growers v.*

12  *Bronco Wine Co.*, 203 Cal. App. 3d 432 (1988).  As to unfair actions in the form of

13  anticompetitive actions, the California Supreme Court stated the following:

14          We thus adopt the following test: When a plaintiff who claims to have suffered injury
15          from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair"
             in that section means conduct that threatens an incipient violation of an antitrust law, or
16          violates the policy or spirit of one of those laws because its effects are comparable to or
             the same as a violation of the law, or otherwise significantly threatens or harms
17          competition.

18  *Cel-Tech Communications Inc. v. Los Angeles Cellular Phone Co.*, 20 Cal. 4th 163, 187, 973

19  P.2d 527, 83 Cal. Rptr. 2d 548 (1999).

20          Denial of Web traffic that has flowed (as in the case of KS.com) by means of a dominant

21  search engine has presumably not been brought as a UCL claim before any court to date.

22  However, the anticompetitive harm to the Class and to Plaintiff KSC as the lead plaintiff is

23  clearly set forth.  KSC is a search engine and index, similar to Google.  [*FACAC* ¶ 20].  Google

24  itself recognizes that removal from its index or Blockage of a Website can be inappropriate [*Id.* ¶

25  38], and may occur for a wide variety of reasons, some of which are not even disclosed [*Id.* ¶¶

26  44-45].  Both the AdWords program as practiced by Google causes harm to Websites [*Id.* ¶¶

27  140-50] as does the AdSense program [*Id.* ¶¶ 148, 151-52].  All these allegations specifically

28  point to unfair competitive acts warranting relief for the class of plaintiffs.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### H.  Count Seven, Implied Covenant, Properly States a Claim for Relief.

Plaintiff KSC on behalf of itself and all participants in AdSense allege that this is a *reciprocal* covenant that accompanies the contractual relationship.  *Smith v. City and County of San Francisco*, 225 Cal. App. 3d 38, 49, 275 Cal. Rptr. 17, 23 (1990).  The covenant requires all parties to the contract to exercise objectively reasonable conduct to fulfill the reasonable commercial standards behind the contract, which is the AdSense program.  *Badie v. Bank of America*, 67 Cal. App. 4th 779, 796, 79 Cal. Rptr. 273, 284 (1998).  Count Seven is proper in that it alleges (a) the existence of a contract between the parties (which Google now confirms in its motion), (b) the mutual covenant of good faith and fair dealing exists between them, and (c) Google's Blockage to a multitude of Websites breached the covenant and caused damages to members of California Subclass II.  Google's objection uses its attorney's declaration of an affirmative defense.  If the covenant is believed not to exist at all between the parties in Google's view, a 12(b)(6) motion does not resolve the merits at this time.  An affirmative defense is generally not fodder for a Rule 12(b)(6) motion.  *See Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003).  In support of its affirmative defense, Google now introduces evidence that is external to the face of amended complaint.  Insofar as Google urges the Court to find the implied covenant does not exist using extrinsic evidence, such a finding is premature.

### IV.  <u>CONCLUSION.</u>

Based on the foregoing argument of Plaintiffs and the entire file herein, Plaintiff urges that this Motion to Dismiss under Fed.R.Civ.P. 12(b)(1) and (b)(6) be denied in its entirety, and that Defendant proceed to answer all allegations in the complaint.  To the extent that the Court finds any pleading defects to warrant dismissal of any of the Nine Count in the First Amended Class Action Complaint, Plaintiffs request that the Court in view of liberal pleading practices in Federal court allow a suitable second amendment to the complaint pursuant to Fed.R.Civ.P. 15.

Dated:  June 9, 2006                           GLOBAL LAW GROUP

                                              By:_____/s/ Gregory J. Yu_____
                                                    Gregory J. Yu, Esq.
                                              Attorney for Plaintiff KinderStart.com LLC and
                                                    for the proposed Class and Subclasses