1

2                                                          **E-Filed 7/13/06**

3

4

5

6

7
                          NOT FOR CITATION
8
            IN THE UNITED STATES DISTRICT COURT
9
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN JOSE DIVISION
11

12
KINDERSTART.COM LLC, a California limited          Case Number C 06-2057 JF (RS)
13   liability company, on behalf of itself and all others
     similarly situated,                                ORDER[1] (1) GRANTING
14                                                      DEFENDANT'S MOTION TO
                          Plaintiff,                   DISMISS WITH LEAVE TO AMEND,
15                                                      AND (2) DEFERRING
               v.                                      CONSIDERATION OF
16                                                      DEFENDANT'S SPECIAL MOTION
     GOOGLE, INC., a Delaware corporation,             TO STRIKE
17
                          Defendant.                   [re: docket nos. 11, 12]
18

19

20        Defendant Google, Inc. ("Google") moves to dismiss the First Amended Complaint

21   ("FAC") of Plaintiff Kinderstart.com LLC ("Kinderstart") pursuant to Rule 12(b)(1) and Rule

22   12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the motion will

23   be granted with leave to amend.  Consideration of Google's special motion to strike pursuant to

24   California Code of Civil Procedure § 425.16 will be deferred pending further amendment of

25   Kinderstart's complaint.

26

27   ──────────────

28        [1] This disposition is not designated for publication and may not be cited.

Case No. C 06-2057 JF (RS)
ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND, AND (2)
DEFERRING CONSIDERATION OF DEFENDANT'S SPECIAL MOTION TO STRIKE
(JFEX2)

Dockets.Justia.com

# I. BACKGROUND

Kinderstart filed the instant action, on behalf of itself and others similarly situated, on March 17, 2006. On April 12, 2006, Kinderstart filed the operative FAC, alleging nine claims for relief: (1) Violation of Right to Free Speech under the U.S. Constitution and the California Constitution, (2) Attempted Monopolization under Section 2 of the Sherman Act, (3) Monopolization under Section 2 of the Sherman Act, (4) Violations of the Communications Act, 47 U.S.C. §§ 201, *et seq*., (5) Unfair Competition under California Business and Professional Code §§ 17200, *et seq*., (6) Price Discrimination under California Business and Professional Code § 17045, (7) Breach of the Implied Covenant of Good Faith and Fair Dealing, (8) Defamation and Libel, and (9) Negligent Interference with Prospective Economic Advantage.

Kinderstart alleges the following facts. Kinderstart operates a website, www.kinderstart.com, which is a directory and search engine for links to information and resources on subjects related to young children. At one point, Kinderstart was "one of the choicest Internet destinations for thousands of parents, caregivers, educators, nonprofit and advocacy representatives, and federal, state and local organizations and officials in the United States and worldwide to access vital information about infants and toddlers." FAC ¶ 19. It launched in May 2000 and at its peak was "presenting in excess of 10,000 page views to visitors on a monthly basis." *Id*. ¶ 20.

Google is the world's most widely used search engine. *Id*. ¶ 2. Google "actively invites to 'anyone with an Internet connection' worldwide to perform searches for Websites and Webpages" and presents results of its searches on a "Search Engine Results Page" or "Results Page." *Id*. ¶ 2. According to the FAC, Google "induces users, the public, and the cyberspace community at large to expect and believe that Results Pages generated from a search every single time will be objective and neutral, untrammeled by human intervention or preference and free of any arbitrariness." *Id*. ¶ 31. Google states on its "Technology Overview" page: "'There is no human involvement or manipulation of results, which is why users have come to trust Google as a source of objective information untainted by paid placement.'" *Id*. ¶ 27. Google states on its

1   "Information for Webmasters" page: "'We're committed to providing thorough and unbiased

2   search results for our users.  We stop indexing pages of a site **only at the request of the**

3   **webmaster who's responsible for those pages**, when it's spamming our index, or as required by

4   law.'"  FAC ¶ 38 (emphasis in original).

5        Google also "has ownership and control over a computer process known as

6   'PageRank™', an automated, computer algorithm that generates a score as a whole number up to

7   '10'.  PageRank reflects the extent and nature of hyperlinking within the Internet to a particular

8   Website and its web pages."  *Id*. ¶ 32.  Google explains: "'Wondering whether a new website is

9   worth your time? Use the Toolbar's format PageRank™ display to tell you how Google's

10  algorithms assess the importance of the page you're viewing.'"  *Id*.  Kinderstart alleges that

11  "PageRank is not a mere statement of opinion of the innate value or human appeal of a given

12  Website and its web pages," but instead is "a mathematically-generated product of measuring and

13  assessing the quantity and depth of all the hyperlinks on the Web that tie into PageRanked

14  Website, under programmatic determination by Defendant Google."  *Id*. ¶ 33.  "On information

15  and belief, PageRank as promulgated and propagated by Defendant Google throughout the

16  Internet, has become the most widely accepted relative measure of the appeal, popularity and

17  relevance of a Website on the Internet. As such, Defendant Google has created and now manages

18  and controls the de facto and prevailing standard of PageRank for rating Websites throughout the

19  United States."  *Id*. ¶ 56.

20       Google also has commenced programs to make digital copies and archives of university

21  libraries and "to create a digital, searchable archive of published books, which has the potential

22  to be the functional equivalent and scale of the U.S. Library of Congress."  *Id*. ¶¶ 23, 24.  In

23  addition, Google has provided $3 million and promises of equipment and expertise to the Library

24  of Congress's "World Digital Library" project.  *Id.* ¶ 25.

25       Kinderstart alleges that Google "is a common carrier that makes a public offer to provide

26  communications facilities for subscribers to freely use its facilities to link to and connect with

27  one or more Websites that are hosted on the Internet."  *Id*. ¶ 41.  Kinderstart provides the

28

3

following quotation from Google's Form 10-K for the fiscal year ending December 31, 2005:

> We maintain the largest, most comprehensive index of web sites and other content, and we make this information *freely available to anyone with an Internet connection.*

*Id*. ¶ 22 (emphasis in FAC).

Kinderstart claims that Google has engaged in "pervasive monopolistic practices," which have led to the denial of free speech rights, prevention and destruction of competition, and predatory pricing. *Id*. ¶ 18. Kinderstart further claims that "[a]ny Website seeking to gain visibility, site traffic and page views must rely upon Defendant Google's Google Engine as an essential facility for receiving search query hits." *Id*. ¶ 49. Although MSN and Yahoo also operate in the search engine market, they "are not focused principally on search technology and search-driven advertising." *Id*. ¶ 54.

According to Kinderstart, Google "does in fact monitor, manipulate and censor the output and content on Results Pages, whether programmatically through a computer or individually through the intervention and discretion of one or more human decision-makers under the employ, direction, supervision and/or oversight of Defendant Google." *Id*. ¶ 70. Google engages in the practice of "Blockage" of websites by "delisting, de-indexing and censoring" websites, including the unacknowledged practice of isolating a website from search queries, either permanently or for an unspecified probationary period. *Id*. ¶¶ 3, 60, 63. Blockage also includes "penalization," by which a site's PageRank is reduced or set to zero "presumably based on either stated or unstated 'quality guidelines.'" *Id*. ¶ 61. Websites may experience "Blockage" at any time and may be unable to receive an explanation from Google as to why it occurred. *Id*. ¶¶ 62, 63. Kinderstart alleges that although Google denies engaging in "Blockage," it has admitted engaging in the "euphemistically" named practices of "'search quality improvement' or anti-Webspamming." *Id*. ¶¶ 64, 65. Kinderstart alleges that the practice of "Blockage" is positively correlated with "the failure and/or the reduction in AdWords advertising." *Id*. ¶ 69.

In 2003, Kinderstart enrolled in Google's AdSense Program and paid for a series of sponsored links from Google. *Id*. ¶ 21. In or about August 2003, Kinderstart began placing

4

1    advertisements from the Google Network onto its site and receiving payments from Google for

2    these placements.  *Id.*  On March 19, 2005, Kinderstart's website "suffered a cataclysmic fall of

3    70% or more in its monthly page views and traffic."  *Id.* ¶ 74.  Kinderstart eventually "realized

4    that common key word searches on Defendant Google's search engine no longer listed KSC.com

5    as a result with any of its past visibility."  *Id.*  With this drop in search engine referrals,

6    Kinderstart's "monthly AdSense revenue suffered an equally precipitous fall by over 80%."  *Id.* ¶

7    75.  Kinderstart concludes that its website "was officially, practically and illegally Blocked by

8    Defendant Google."  *Id.* ¶ 76.  Its website has been assigned a PageRank of "0" by the Google

9    Toolbar.  *Id.* ¶ 87.  Kinderstart was not notified in advance that this would occur and has not been

10   instructed as to how it can cause Google to cease the "Blockage."  *Id.* ¶ 78.  Kinderstart is not

11   aware of any way in which it has violated Google's guidelines.  *Id.* ¶ 85.

12       Kinderstart believes that "over 100 other sites of California and nationwide Websites that

13   participated in AdSense suffered a loss of traffic and referrals as a result of Blockage by

14   Defendant Google."  *Id.* ¶ 77.  Additionally, "a multitude of Websites of Class members

15   consistently receive significantly and relatively high rankings and referrals from other search

16   engines such as MSN and Yahoo, but suffer deflated ratings and rankings from search engine

17   results presented by Defendant Google's Engine."  *Id.* ¶ 80.

18       On May 2, 2006, Google filed a motion to dismiss all of Kinderstart's claims pursuant to

19   Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rule of Civil Procedure, along with a motion to

20   strike Kinderstart's first, eighth, and ninth claims pursuant to California Code of Civil Procedure

21   § 425.16.  Kinderstart opposes both motions.  The Court heard oral argument on June 30, 2006.

22

23                                    **II. LEGAL STANDARD**

24       For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the

25   Court must construe the complaint in the light most favorable to the plaintiff.  *Jenkins v.*

26   *McKeithen*, 395 U.S. 411, 421 (1969).  Leave to amend must be granted unless it is clear that the

27   complaint's deficiencies cannot be cured by amendment.  *Lucas v. Department of Corrections*,

28

1  66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be

2  ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

3      On a motion to dismiss, the Court's review is limited to the face of the complaint and

4  matters judicially noticeable. *North Star International v. Arizona Corporation Commission*, 720

5  F.2d 578, 581 (9th Cir. 1983); *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.

6  1986); *Beliveau v. Caras*, 873 F.Supp. 1393, 1395 (C.D. Cal. 1995). However, under the

7  "incorporation by reference" doctrine, the Court also may consider documents that are referenced

8  extensively in the complaint and accepted by all parties as authentic, even if they are not

9  physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d

10  970 (9th Cir. 1999). "Under the 'incorporation by reference' rule of this Circuit, a court may

11  look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary

12  judgment." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).

13

14                                **III. DISCUSSION**

15  **1.    Violation of Right to Free Speech**

16      Kinderstart first claims that Google's practices violate Kinderstart's right to free speech

17  under both the United States Constitution and the California Constitution.

18      **A.    U.S. Constitution**

19      The Free Speech Clause of the First Amendment to the United States Constitution

20  provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const.

21  amend. I. Google argues that Kinderstart's claim pursuant to the First Amendment must be

22  dismissed because the First Amendment governs state actors, not private parties. *See, e.g.*, *Lugar*

23  *v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) ("Our cases have accordingly insisted that the

24  conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.").

25      The Ninth Circuit has recognized "at least four different criteria, or tests, used to identify

26  state action: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and

27  (4) governmental nexus. Satisfaction of any one test is sufficient to find state action, so long as

28

6

1   no countervailing factor exists." *Kirtley v. Rainey*, 326 F.3d 1088, 1092, (9th Cir. 2003)

2   (citations omitted).  The Ninth Circuit has also used the "symbiotic relationship" test to identify

3   state action. *See, e.g., Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1213 (9th

4   Cir. 2002).  Kinderstart argues that First Amendment protections apply because Google has

5   dedicated its search engine to "public use."  For the reasons discussed below, the Court

6   concludes that Kinderstart's allegations are insufficient under any of these tests.

7       *1.    Public Function*

8       "Under the public function test, 'when private individuals or groups are endowed by the

9   State with powers or functions governmental in nature, they become agencies or instrumentalities

10  of the State and subject to its constitutional limitations.' To satisfy the public function test, the

11  function at issue must be both traditionally and exclusively governmental." *Lee v. Katz*, 276 F.3d

12  550, 555 (9th Cir. 2002) (citations omitted).  Kinderstart alleges that "Defendant Google actively

13  performs . . . state-like functions, including . . . the creation, management and stewardship of

14  universal, public, Internet-accessible index, archive and repository of the world's Internet content

15  and information that cover all essential topics and subject matter for use by the general public."

16  FAC ¶ 105.  However, these functions, made possible by new technology, are neither

17  traditionally nor exclusively governmental.  Kinderstart's assertion that Google's digital archive

18  "has the *potential* to be the functional equivalent . . . of the U.S. Library of Congress," *id*. ¶ 24

19  (emphasis added), is no more than speculation that Google may perform a state function at some

20  time in the future, not a viable claim that it does so today.  Nor has Kinderstart alleged that the

21  government has "endowed" Google with the powers or functions in question.

22      *2.    Joint Action*

23      "To be engaged in joint action, a private party must be a 'willful participant' with the

24  State or its agents in an activity which deprives others of constitutional rights." *Dennis v. Sparks*,

25  449 U.S. 24, 27 (1980).  Kinderstart does not allege that the government was a willful participant

26  in the activities that Kinderstart claims violated its free expression rights.

27

28

Case No. C 06-2057 JF (RS)
ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND, AND (2)
DEFERRING CONSIDERATION OF DEFENDANT'S SPECIAL MOTION TO STRIKE
(JFEX2)

1    3.    *Governmental Compulsion/Coercion*

2    Kinderstart makes no allegations of compulsion or coercion by the government.

3    4.    *Nexus/Entwinement*

4    "[T]he nexus test asks whether 'there is a such a close nexus between the State and the

5    challenged action that the seemingly private behavior may be fairly treated as that of the State

6    itself.'" *Kirtley v. Rainey*, 326 F.3d 1088, 1094-95 (9th Cir. 2003) (citing *Brentwood Academy v.*

7    *Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001)).  In *Brentwood*, 84% of

8    an ostensibly private association's members were public schools which "largely provided for the

9    Association's financial support" and whose officials, acting in their official capacity,

10   "overwhelmingly perform[ed] all but the purely ministerial acts by which the Association

11   exist[ed] and function[ed] in practical terms." *Brentwood*, 531 U.S. at 299.  In addition, the state

12   appointed members to the association's governing body, and association employees participated

13   in the state retirement system. *Id.* at 300.  Kinderstart's allegations fall far short of the level of

14   "entwinement" with respect to finances, organization and personnel described in *Brentwood*.

15   5.    *Symbiotic Relationship*

16   "If a private entity . . . confers significant financial benefits indispensable to the

17   government's 'financial success,' then a symbiotic relationship may exist." *Brunette v. Humane*

18   *Society*, 294 F.3d 1205, 1213 (9th Cir. 2002).  Such a relationship may be sufficient to establish

19   state action. *Id*.  While Kinderstart alleges that Google is archiving digitally at least one state-

20   owned university library and is supporting a Library of Congress project, it does not allege that

21   Google is indispensable to the financial success of a government entity. *See* FAC ¶¶ 23, 24.

22   6.    *Private Space Dedicated for Public Use*

23   Kinderstart next argues that "[s]tate action is present when open space is free, open and

24   dedicated to public use where free speech can and should thrive." Opposition, p. 3.  Kinderstart

25   alleges that Google's search engine is "freely available to anyone with an Internet connection."

26   FAC ¶ 22.  The Ninth Circuit held in *Venetian Casino Resort, LLC v. Local Joint Executive Bd.*,

27   257 F.3d 937, 943 (9th Cir. 2001), that a casino owner who had formally dedicated property for

28

8

1   use as public sidewalk could not exclude union demonstrators from the property.  However, the

2   Supreme Court has made clear that merely opening a space to the public does not dedicate the

3   space to public use.  *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81 (1980)

4   ("[P]roperty does not 'lose its private character merely because the public is generally invited to

5   use it for designated purposes.'").  Kinderstart has not alleged facts tending to show that Google

6   has dedicated the operations of its search engine to public use.  Kinderstart's argument that "[t]he

7   sole function and purpose of the [Google] search engine is to promote and realize 24-7 speech

8   and communication, openly and freely," Opposition, p. 4, is inconsistent with its allegation that

9   "Defendant Google derives at least 98% of its total company revenues from [] *search-driven*

10  advertising, which exceeded $3.1 billion for the year ended December 31, 2004." FAC ¶ 57

11  (emphasis added).

12

13          **B.     California Constitution**

14          The California Supreme Court has stated that a "protective provision more definitive and

15  inclusive than the First Amendment is contained in [California's] constitutional guarantee of the

16  right of free speech and press." *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908 (1979),

17  *aff'd sub. nom. PruneYard Shopping Center*, 447 U.S. 74 ("[S]ections 2 and 3 of article I of the

18  California Constitution protect speech and petitioning, reasonably exercised, in shopping centers

19  even when the centers are privately owned."). In *Trader Joe's Co. v. Progressive Campaigns,* 73

20  Cal.App.4th 425 (1999), the California Court of Appeal, applying *Robins*, held that a trial court

21  did not abuse its discretion by concluding that a stand-alone grocery store had the right to

22  exclude petitioners.  The Court noted that:

23          *Pruneyard* did not hold that the free speech and petitioning activity can be
            exercised only at large shopping centers. Nor did it hold that such activities can be
24          exercised on any property except for individual residences and modest retail
            establishments. Rather, in resolving the specific dispute before it, the court
25          developed a balancing test which can be applied to other situations. *Pruneyard*
            instructs us to balance the competing interests of the property owner and of the
26          society with respect to the particular property or type of property at issue to
            determine whether there is a state constitutional right to engage in the challenged
27          activity.

28

                                                    9

1  *Id.* at 448.  The *Trader Joe's* court held that the fact that Trader Joe's, unlike the shopping center

2  in *Robins*, neither invited nor provided facilities for the public to meet friends, eat, rest, be

3  entertained or otherwise congregate revealed a stronger interest in maintaining exclusive control,

4  and that the "single structure, single-use store" was "not a public meeting place and society has

5  no special interest in using it as such."  *Id.* at 448.

6        A three-justice plurality of the California Supreme Court has since clarified the

7  relationship between California's free speech clause and private property in ruling that the

8  California Constitution did not guarantee petitioners access to an urban apartment complex:

> [W]e conclude that the actions of a private property owner constitute state action
> for purposes of California's free speech clause only if the property is freely and
> openly accessible to the public. By establishing this threshold requirement for
> establishing state action, we largely follow the Court of Appeal decisions
> construing *Robins*. For example, our Courts of Appeal have consistently held that
> privately owned medical centers and their parking lots are not functionally
> equivalent to a traditional public forum for purposes of California's free speech
> clause because, among other things, they are not freely open to the public.

13 *Golden Gateway Center v. Golden Gateway Tenants Assn.*, 26 Cal.4th 1013, 1033 (2001)

14 (plurality opinion).  Another California Court of Appeal opinion considered the question of what

15 constituted a public forum (though not the question of state action) in light of *Golden Gateway*:

> Nothing in Golden Gateway can be interpreted to support the conclusion that any
> large business establishment is a public forum for expressive activity simply
> because it is 'freely and openly accessible to the public . . . .'
>       Rather, the test appears to remain whether, considering the nature and
> circumstances of the private property, it has become the 'functional equivalent of
> a traditional public forum.'

20 *Albertson's, Inc. v. Young*, 107 Cal.App.4th 106, 117-18 (2003) (holding that the privately-

21 owned sidewalk outside a grocery store at a shopping center was not a public forum).

22       While Kinderstart has alleged that Google has made its site "freely accessible," it has not

23 alleged that users' freedom extends to the realm of speech.  Nowhere does Kinderstart allege that

24 Google has invited the public to speak through Google's search engine, either by enabling public

25 editing of results/rankings or by promising that every website created by the public will be

26 indexed, ranked, and displayed.  Rather, Kinderstart alleges only that Google publicly states that

27 it stops indexing pages in at least three specific circumstances.  FAC ¶ 38.  Kinderstart has not

28

Case No. C 06-2057 JF (RS)
ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND, AND (2)
DEFERRING CONSIDERATION OF DEFENDANT'S SPECIAL MOTION TO STRIKE
(JFEX2)

1  alleged facts tending to show that Google's search engine, encompassing its index, web search

2  form, Results Pages and PageRank scores, is the "functional equivalent of a traditional public

3  forum." *See Albertson's*, 107 Cal.App.4th at 117-18. While Kinderstart's counsel emphasized

4  Google's size at oral argument, *Albertson's* makes clear that size is not dispositive, but "simply a

5  factor to be weighed" when considering the interests of the property owner against those of

6  society. *Id*. at 119. Accordingly, the Court concludes that the allegations of the FAC are

7  insufficient to support a claim that Google's search engine is a public forum in which California

8  Constitution grants Kinderstart a right to speak.

9

10  **2.    Attempted Monopolization Under Section 2 of the Sherman Act**

11      Kinderstart next alleges a claim for attempted monopolization under Section 2 of the

12  Sherman Act, 15 U.S.C. § 2, the elements of which are: (1) specific intent to control prices or

13  destroy competition, (2) predatory or anticompetitive conduct directed toward accomplishing that

14  purpose, (3) a dangerous probability of success and (4) causal antitrust injury. *Forsyth v.

15  Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997). In order to make out a claim of attempted

16  monopolization, the plaintiff first must define the relevant market. *Id*. at 1475. The relevant

17  market is "the field in which meaningful competition is said to exist . . . ." *Image Technical

18  Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). A private party has

19  standing to sue only if "'adversely affected by an *anticompetitive* aspect of the defendant's

20  conduct.'" *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 868 (9th Cir. 1991) (quoting

21  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990)).

22      Kinderstart alleges that it and Google are competitors in the "Search Engine Market" and

23  the "Search Ad Market," but that Google has a dominant position in a third market, the "Website

24  Ranking Market." Kinderstart claims that through its "statements, behavior, conduct, acts and

25  omissions, . . . [Google] harbors and evinces specific intent to destroy competition in the Search

26  Engine Market and the Search Ad Market," and to "control prices in the Search Ad Market."

27  FAC ¶¶ 113-18. Kinderstart further claims that "Google has sufficient intent, power, and

28

Case No. C 06-2057 JF (RS)
ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND, AND (2)
DEFERRING CONSIDERATION OF DEFENDANT'S SPECIAL MOTION TO STRIKE
(JFEX2)

1    resources to create a dangerous probability" of success.  FAC ¶ 119.  Kinderstart alleges injury in

2    the form of lost revenue, loss of returning and new web traffic, and loss of goodwill.  FAC ¶¶

3    121-22.

4         The Court concludes that Kinderstart has failed to allege facts sufficient to support a

5    claim of anti-competitive conduct, such as denial of access to an essential facility or refusal-to-

6    deal.  Kinderstart does not identify any specific acts by Google that would evince an intent either

7    to control prices in the Search Ad Market or to destroy competition in the Search Engine Market,

8    nor has Kinderstart made clear what prices Google allegedly is attempting to control.

9    Additionally, Kinderstart does not explain how the alleged conduct demonstrates the requisite

10   intent.  Although Kinderstart alleges that Blockage and PageRank devaluation have caused injury

11   to Kinderstart in the form of lost traffic and revenue, the facts alleged are insufficient to show

12   that Kinderstart has suffered an antitrust injury—the result of anti-competitive conduct.  FAC ¶¶

13   121, 122.

14        Moreover, Kinderstart's allegations that Google removed Kinderstart from search results

15   and lowered its PageRank do not suffice to allege predatory conduct as opposed to legitimate

16   competitive actions.  "[A]s a general matter 'there is no duty to aid competitors.'"  *MetroNet*

17   *Services Corp. v. Qwest Corp.,* 383 F.3d 1124, 1131 (9th Cir. 2004).  Finally, Kinderstart alleged

18   no facts sufficient to support its claim that Google has a dangerous probability of success in

19   attempting to monopolize the Search Engine Market and Search Ad Market, or to show a causal

20   antitrust injury.[2]

21

22   _____

23        [2] A related problem is that Kinderstart has not sufficiently described the markets relevant
     to its claim.  It is unclear how the Search Engine Market (described as the "market of search
24   engine design, implementation and usage") is separable from the Search Ad Market (described as
     the "market of search-driven Internet advertising"), *see* FAC ¶¶ 113, 114, and Kinderstart does
25   not describe the characteristics of the Website Ranking Market.  *See* FAC ¶ 115.  In the absence
     of an adequate description of the Website Ranking Market, Kinderstart has not alleged facts that
26   would establish Google's monopoly power in such a market.  "Monopoly power, for the purpose
     of section 2 of the Sherman Act, is 'the power to control prices or exclude competition.'"
27   *Forsyth*, 114 F.3d at 1475.  Kinderstart has identified neither prices nor potential competitors in
     the Website Ranking Market.
28

12

1    **3.    Monopolization under Section 2 of the Sherman Act**

2    Kinderstart also asserts a claim for monopolization under Section 2 of the Sherman Act,

3    15 U.S.C. § 2, the elements of which are: (1) possession of monopoly power in the relevant

4    market, (2) willful acquisition or maintenance of that power, and (3) causal antitrust injury.

5    *Forsyth*, 114 F.3d at 1475.  As with attempted monopolization, a plaintiff claiming

6    monopolization must first define the relevant market.  *Id*.  Kinderstart alleges monopolization of

7    three markets: the Website Ranking Market, the Search Ad Market, and the Search Engine

8    Market.

9    First, Kinderstart alleges that Google maintains monopoly power in the Website Ranking

10    Market by "assign[ing] PageRanks of various commercial Websites and competitive Websites to

11    induce certain behaviors or to penalize certain behaviors of such sites, all to Google's ill-

12    conceived gain and advantage."  FAC ¶ 132.  In its present form, this allegation is too vague to

13    state a claim under the Sherman Act.  Kinderstart does not allege what behaviors are induced or

14    discouraged, or how they affect the market.

15    Second, Kinderstart alleges that Google maintains monopoly power in the Search Ad

16    Market by pressuring websites to purchase advertising in order to avoid decreased PageRank

17    scores, and removal from Results Pages.  FAC ¶ 130.  However, because Kinderstart provides no

18    specifics as to how Google creates this pressure, this allegation also is insufficient to state a

19    claim under the Sherman Act.

20    Finally, Kinderstart alleges that Google maintains monopoly power in the Search Engine

21    Market through false representations that its search engine Results Pages are automated and

22    objective, when in fact they are subject to human intervention and subjective.  FAC ¶ 128.

23    Kinderstart argues that Google is an "essential facility" within the market, and that by

24    manipulating its Results Pages, Google excludes competitors from this facility.[3]  Kinderstart

25

26    ───────────────

    [3] Although the Supreme Court has declined either to endorse or repudiate the "essential
27    facilities" doctrine, see *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398, the Ninth Circuit has recently applied it in *MetroNet Servs. Corp. v. Qwest Corp.*,
28    383 F.3d 1124 (9th Cir. 2004).

1    concludes that Google is an "essential facility or essential medium" because "the indexing,

2    linking and referrals to such content afforded by Kinderstart over the Internet are essential to the

3    operations, Web traffic, commerce, communications, and expression of speech by Class

4    members." FAC ¶ 125.  However, the threshold for finding a facility "essential" in the Ninth

5    Circuit is high:  "A facility that is controlled by a single firm will be considered 'essential' only if

6    control of the facility carries with it the power to eliminate competition in the downstream

7    market." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991); *see*

8    *also*, *Olympia Equipment Leasing v. Western Union Telephone Co.*, 797 F.2d 370 (7th Cir. 1986)

9    (finding no Sherman act violation where defendant obstructed plaintiff's sales efforts but did not

10    eliminate the potential for competition).

11         While Kinderstart alleges that its Web traffic dropped 70%, and its ad revenue dropped

12    80%, it does not allege that it or similarly situated class members face elimination as a result of

13    Google's conduct.  FAC ¶ 74, 75.  Instead it alleges that "in spite of Defendant Google's

14    wrongful conduct as alleged above, [Kinderstart] maintains extensive Website Content and links

15    within its directory and index that are fully and remain actively hyperlinked throughout the

16    Internet, and continues to generate *sustainable* level of traffic and PageViews from visitors."

17    FAC ¶ 168 (emphasis added).  Additionally, Kinderstart alleges that class members "consistently

18    receive significantly and relatively high rankings and referrals from other search engines such as

19    MSN and Yahoo."  FAC ¶ 80.  Accordingly, Kinderstart has not alleged adequately that Google,

20    or its search engine, is an "essential facility" within the Search Engine Market.

21         Kinderstart argues that by refusing to remedy the alleged "Blockage" of Kinderstart's

22    website, Google has violated Section 2 under the "refusal to deal" doctrine as set forth in *Aspen*

23    *Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  In *Aspen*, the larger of two ski

24    resorts with a long-standing, bilateral, cooperative and profitable arrangement to market joint ski

25    passes later refused to deal with the smaller resort—not even allowing it to buy tickets at listed

26    retail prices.  *Id.*  However, as the Supreme Court has noted, "*Aspen* is at or near the outer

27    boundary of § 2 liability."  *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko,*

28

1   *LLP*, 540 U.S. 398, 399 (2004).  Moreover, the facts alleged by Kinderstart are distinguishable

2   from those in *Aspen*. Kinderstart has alleged neither that Google sold PageRanks or Results Page

3   listings to Kinderstart or others nor that Google refused to sell these at listed prices.  In fact,

4   Kinderstart itself notes that Google denies ever selling PageRanks or listings at all.  FAC ¶ 27.

5   Additionally, there is no allegation that the only written agreement between the parties, the

6   AdSense agreement, is no longer in place.[4]

7        Accordingly, Kinderstart's monopolization claims under the Sherman Act will be

8   dismissed with leave to amend.  In light of this disposition, the Court need not reach Google's

9   argument that Kinderstart's claims are precluded by the holding of *Official Airlines Guides, Inc.*

10  *v. FTC*, 630 F.2d 920,[5] or because the conduct in question is protected expression.[6]

11

12  **4.    Violations of the Communications Act (47 U.S.C. §§ 201)**

13       Kinderstart claims that Google is a common carrier and, as such, has violated the

14  Communications Act, 47 U.S.C. §§ 201, *et seq*.  A common carrier "makes a public offering to

15  provide communications facilities whereby all members of the public who choose to employ

16  ──────────────────────

17       [4] Insofar as Kinderstart alleges that the AdSense agreement encompasses PageRanks and
    Results Page listings, such allegations would tend to support a breach of contract claim rather
18  than an anti-trust claim.

19       [5] *See Official Airline Guides, Inc. v. F. T. C.*, 630 F.2d 920 (2d Cir. 1980) (upholding
    right of monopolist publisher of airline guides to discriminate without justification between large
20  air carriers and commuter airlines in production of flight guide).  However, in that case, the
    monopolist (as a publisher, rather than an airline) was not alleged to be in direct competition with
21  the parties harmed by the conduct.  *Id.*  In the instant case, Kinderstart has alleged that it directly
22  competes with Google in the Search Ad Market and the Search Engine Market.

23       [6] *See Jefferson County School Dist. No. R-1 v. Moody's Investor's Services, Inc.*, 175
    F.3d 848 (10th Cir. 1999).  In *Jefferson*, a financial services company's published article stating a
24  "negative outlook" for school district bonds was found to be protected expression.  *Id.*  *Jefferson*
    followed the Supreme Court's holding in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)
25  that, regarding media defendants, "a statement of opinion relating to matters of public concern
    which does not contain a provably false factual connotation will receive full constitutional
26  protection."  *Id.* at 20.  Without deciding the merits of Google's argument, the Court notes that
27  *Jefferson County* may be distinguishable because (a) Google is not a media defendant and (b)
28  website ranking may be of little or no public concern in comparison with municipal bond ratings.

1  such facilities may communicate or transmit intelligence of their own design and choosing."

2  *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979). As discussed above, while Kinderstart

3  has alleged that Google invites the public to *search* using its search engine, it has not alleged

4  facts that would show Google invites the public to *speak* using its search engine. Thus,

5  Kinderstart has not alleged that Google provides facilities of the type covered by the

6  Communications Act.

7         The Ninth Circuit's holding in *Howard v. America Online, Inc.,* 208 F.3d 741, 753 (9th

8  Cir. 2000) is instructive. In that case, the court held that America Online ("AOL"), an Internet

9  Service Provider, "is not a common carrier under the Communications Act," noting that the

10  plaintiff in that case had failed to show that AOL provided discrete "basic services" rather than

11  "enhanced services" as defined by the Federal Communications Commission.[7] Kinderstart

12  alleges that Google's search results are generated using computer algorithms based on user input,

13  that sites are listed on Results Pages based on Google's index and that PageRank is generated by

14  a computer algorithm. *See* FAC ¶¶ 2, 27, 32, 34, 43, 56. In short, Kinderstart alleges that

15  Google's search engine acts based on the content of user's queries and provides the user with

16  additional, different, restructured search results—thus meeting the definition of "enhanced

17  services."

18         Accordingly, Kinderstart's claim under the Communications Act will be dismissed with

19  leave to amend.

20

21

22    [7] The Federal Communications Commission has defined "enhanced service" as follows:

23     "[E]nhanced service" shall refer to services, offered over common carrier
24     transmission facilities used in interstate communications, which employ computer
       processing applications that act on the format, content, code, protocol or similar
25     aspects of the subscriber's transmitted information; provide the subscriber
       additional, different, or restructured information; or involve subscriber interaction
26     with stored information.

27  47 C.F.R. 64.702(a).

28

Case No. C 06-2057 JF (RS)
ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND, AND (2)
DEFERRING CONSIDERATION OF DEFENDANT'S SPECIAL MOTION TO STRIKE
(JFEX2)

1    **5.    Violations of California Business and Professions Code § 17200, *et seq*.**

2        Kinderstart claims that Google has violated California Business and Professions Code §

3    17200, which prohibits "any unlawful, unfair or fraudulent business act or practice and unfair,

4    deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  According to

5    Kinderstart, "Defendant Google's conduct . . . is unlawful, unfair, and deceptive, and violate [sic]

6    BPC §§ 17200, *et seq*. and constitute [sic], *inter alia*, breach of contract and unjust enrichment."

7    FAC ¶ 150.  Kinderstart alleges that unlawful business practices include the "denial of automated

8    search engine referrals to websites of Kinderstart," "falsely and artificially calculating and

9    presenting a deflated PageRank below the actual, correctly computed figure or all the way down

10   to '0'. . . ."  FAC ¶ 148.

11       Kinderstart alleges that the AdSense agreement deceives the public into expecting that it

12   can benefit by participating in the program.  FAC ¶ 149.  However, this conclusory allegation

13   neither identifies specific terms of the agreement that are deceptive nor indicates how the

14   agreement as a whole is deceptive.  Nor has Kinderstart alleged facts suggesting that the public

15   would expect that participation in the program would prevent a participant's removal from

16   Results Pages or devaluation of PageRank.  Accordingly, Kinderstart has failed to allege a

17   deceptive business practice.

18       Both sides acknowledge that, "[w]hen a plaintiff who claims to have suffered injury from

19   a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that

20   section means conduct that threatens an incipient violation of an antitrust law, or violates the

21   policy of spirit of one of those laws because its effects are comparable to or the same as a

22   violation of the law, or otherwise significantly threatens or harms competition."  *Cel-Tech*

23   *Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999).  As discussed

24   above in the context of Kinderstart's antitrust claims, the Court concludes that Kinderstart has

25   failed to allege any conduct on the part of Google that significantly threatens or harms

26   competition.

27       In light of this conclusion, the Court does not reach Google's alternative argument that

28

Case No. C 06-2057 JF (RS)
ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND, AND (2)
DEFERRING CONSIDERATION OF DEFENDANT'S SPECIAL MOTION TO STRIKE
(JFEX2)

1  Kinderstart has failed to identify a redressable injury.

2

3  **6.    Violations of California Business and Professions Code § 17045**

4      Kinderstart alleges that Google's conduct violates California Business and Professions

5  Code § 17045[8] because it "engage[s] in surreptitious price discrimination" by "secretly offering

6  to other sites favored and special benefits, services and privileges" including higher placement in

7  Results Pages while harming www.kinderstart.com and other sites "subjected to Blockage and

8  PageRank devaluation."  FAC ¶¶ 156-57.

9      Section 17045 addresses price discrimination "between competing purchasers." *ABC*

10 *International Traders, Inc. v. Matsushita Electric Corp.* 14 Cal.4th 1247, 1255 (1997).  While

11 California courts have held that "'purchasing upon like terms and conditions' does not apply to

12 or otherwise qualify secret allowances of unearned discounts," these courts have reiterated that

13 the phrase does apply "to secret extensions of 'special services or privileges not extended to all

14 purchasers.'"  *Eddins v. Redstone*, 134 Cal.App.4th 290, 333 (2005) (quoting *Diesel Electric*, 16

15 Cal.App.4th 202, 216 n.5 (1993).  As Google points out, Kinderstart has not alleged that it

16 purchased anything from Google, nor has it alleged that others made purchases on like terms and

17 conditions.[9]  It is not enough to allege, as Kinderstart has done, that Google falsely represents

18 that purchasing ads does not affect a site's ranking.  FAC ¶¶ 68, 69.  Accordingly, the Court will

19 dismiss Kinderstart's § 17045 claim with leave to amend.

20

21      [8] California Business and Professions Code § 17045 states:

22

23      The secret payment or allowance of rebates, refunds, commissions, or unearned
        discounts, whether in the form of money or otherwise, or secretly extending to
24      certain purchasers special services or privileges not extended to all purchasers
        purchasing upon like terms and conditions, to the injury of a competitor and
25      where such payment or allowance tends to destroy competition, is unlawful.

26 Cal. Bus. & Prof. Code § 17045.

27      [9] Kinderstart alleges only that it is a member of Google's AdSense program, through

28 which it shares revenue from Google ads placed on Kinderstart's site.  FAC ¶ 21.

1

**7.      Breach of Implied Covenant of Good Faith and Fair Dealing**

2          Kinderstart next claims that Google has violated the implied covenant of good faith and

3    fair dealing implicit in the AdSense agreement between Kinderstart and Google.  Kinderstart

4    alleges that "[a] principal benefit for which [Kinderstart] contracted into the AdSense Program

5    was [the] opportunity and ability to increase the appeal and traffic volume to their respective

6    Websites and thereby generate advertising revenue with each additional page view and visitor . .

7    ."  FAC ¶ 162.  By not including www.kinderstart.com in Google's search results, Google

8    allegedly acted in bad faith because advertising revenues that would have gone to Kinderstart

9    instead went to other websites.  FAC ¶ 162.

10          Under California law, every contract contains an implied covenant of good faith and fair

11    dealing.  *See, e.g.*, *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 400

12    (2000).  This implied covenant requires that neither party do anything that will deprive the other

13    of the benefits of the contract.  *Id.*  Google argues correctly that a covenant of good faith and fair

14    dealing may be implied only to protect the express terms of the contract.  "The implied covenant

15    protects only the parties' right to receive the benefit of their agreement."  *Foley v. Interactive*

16    *Data Corp*, 47 Cal.3d 654, 699 n.39 (1988).  "The covenant of good faith is read into contracts in

17    order to protect the express covenants or promises of the contract, not to protect some general

18    public policy interest not directly tied to the contract's purposes."  *Id.* at 690; *see also Carma*

19    *Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 373-74 (1992) (rejecting

20    interpretation of covenant of good faith contrary to express language of contract).

21          Kinderstart points out that, "[t]he courts have recognized that the implied covenant

22    imposes reciprocal duties of good faith and fair dealing on both parties to a contract."  *Smith v.*

23    *City and County of San Francisco*, 225 Cal.App.3d 38, 49 (1990).  However, reciprocity does not

24    extend the covenant beyond the express terms.  Likewise, while Kinderstart is correct that the

25    implied covenant of good faith requires "objectively reasonable conduct," *Badie v. Bank of*

26    *America*, 67 Cal.App.4th 779, 796 (1998), this does not extend the covenant to conduct expressly

27    disclaimed by the express terms of the contract.

28

The AdSense agreement contains no express promises that serving ads will increase either the traffic or appeal of any website, though it does provide for payment based both on ad impressions (display of an ad when a page is viewed) and clicks (users clicking on an ad).[10]  The contract expressly makes no guarantee regarding the amount of ad impressions, or the amount of revenue generated:

> **No Guarantee.**  Google makes no guarantee regarding the level of impression of Ads or clicks on any Ad or Referral Button, the timing of delivery of such impressions and/or clicks, the completion of Referral Events, or the amount of any payment to be made to You under this Agreement.

Declaration of Bart E. Volkmer in Support of Defendant's Motion to Dismiss the First Amended Complaint and Defendant's Special Motion to Strike Pursuant to CCP § 425.16, Ex. A ¶ 8. Additionally, Google argues that any covenant not to remove Kinderstart's site from Results Pages would be inconsistent with the express terms of the agreement, which also disclaims all warranties with respect to "ADVERTISING, LINKS, SEARCH, REFERRALS, AND OTHER SERVICES . . . ." *Id*. ¶ 9.  In light of these contract terms, the Court concludes that Kinderstart has not alleged that Google deprived Kinderstart of a benefit it could reasonably expect under the agreement, and which the implied covenant of good faith and fair dealing would protect. Accordingly, the Court will dismiss this claim with leave to amend.

**8.    Defamation and Libel**

Kinderstart alleges claims for defamation and libel against Google based on Google's public presentation of a PageRank of '0' for Kinderstart.com.  "The tort of defamation exists whenever a false and unprivileged statement which has a natural tendency to injure or which

---

[10] The AdSense agreement is properly before this court under the Ninth Circuit's "incorporation by reference" doctrine because Kinderstart makes reference to the "AdSense Program Agreement" and its terms in ¶ 87 of its FAC, makes reference to the existence of such an agreement in ¶¶ 21, 75, 83, 86, 172, and 174 of the FAC, and has not disputed the authenticity of the agreement.  *See In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999).  "Under the 'incorporation by reference' rule of this Circuit, a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).

1   causes special damage is communicated to one or more persons who understand its defamatory

2   meaning and its application to the injured party." *Jackson v. Paramount Pictures Corp.*, 68

3   Cal.App.4th 10, 26 (1998). To prevail on these claims, Kinderstart must allege a provably false

4   statement. *See Edwards v. Hall*, 234 Cal.App.3d 886, 902 (1991).

5          Google argues that a PageRank is an opinion and not a factual statement. Google also

6   contends that even if PageRank is entirely generated by an algorithm, the weights assigned to

7   variables in programming the algorithm reflect Google's subjective opinion about the relative

8   importance of websites such that PageRank cannot be anything *but* subjective.[11] Both parties

9   point to Google's statement promoting PageRank: "Wondering whether a new website is worth

10  your time? Use the Toolbar's PageRank™ display to tell you how Google's algorithms assess the

11  importance of the page you're viewing." FAC ¶ 32.

12         As the parties' arguments suggest, whether Kinderstart can maintain a claim for

13  defamation may turn on facts outside the pleadings. Google's statement as to whether a

14  particular website is "worth your time" necessarily reflects its subjective judgment as to what

15  factors make a website important. Viewed in this way, a PageRank reflects Google's opinion.

16  However, it is possible a PageRank reasonably could be interpreted as a factual statement insofar

17  as it purports to tell a user "how Google's *algorithms* assess the importance of the page you're

18  viewing." This interpretation would be bolstered by evidence supporting Google's alleged

19  representations that PageRank is "objective," and that a reasonable person thus might understand

20  Google's display of a '0' PageRank for Kinderstart.com to be a statement that '0' is the

21  (unmodified) output of Google's algorithm. If it could be shown, as Kinderstart alleges, that

22  Google is changing that output by manual intervention, then such a statement might be provably

23  false.

24         However, Kinderstart's complaint as presently framed does not explain how it is a false

25  statement about the output of Google's algorithm regarding Kinderstart.com, as distinguished

26  _____

27         [11] Google suggested at oral argument that an average viewer of a PageRank would
     understand it to be a matter of opinion, rather than a statement of fact, and thus would not
28  understand it to be defamatory.

1   from an unfavorable opinion about Kinderstart.com's importance, that has caused injury to

2   Kinderstart.  Rather, Kinderstart makes only the conclusory assertion that Google's actions have

3   "cause[d] irreparable harm and damage to the goodwill, value and revenue-generating

4   capabilities of Kinderstart KSC's Website . . . ."  FAC ¶ 170.

5          Accordingly, this claim will be dismissed with leave granted to amend.

6

7   **9.     Negligent Interference with Prospective Economic Advantage**

8          Finally, Kinderstart claims that Google has negligently interfered with Kinderstart's

9   prospective economic advantage.  "The tort of negligent interference with prospective economic

10  advantage is established where a plaintiff demonstrates that (1) an economic relationship existed

11  between the plaintiff and a third party which contained a reasonably probable future economic

12  benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and

13  was aware or should have been aware that if it did not act with due care its actions would

14  interfere with this relationship and cause plaintiff to lose in whole or in part the probable future

15  economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such

16  negligence caused damage to plaintiff in that the relationship was actually interfered with or

17  disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably

18  expected from the relationship."  *North American Chemical Co. v. Superior Court*, 59

19  Cal.App.4th 764, 786 (1997).

20         Kinderstart fails to allege the required elements of this tort.  The only economic

21  relationship alleged is the AdSense contract between Kinderstart and Google; no economic

22  relationship with a third party is alleged.  Kinderstart does not allege that Google knew of any

23  third-party contract or business relationship, or that Google negligently disrupted any such

24  relationship.  Accordingly, the claim will be dismissed with leave to amend.

25

26  **10.    Motion to Strike**

27         Google moves to strike Kinderstart's first, eighth, and ninth claims pursuant to California

28

Case No. C 06-2057 JF (RS)
ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND, AND (2)
DEFERRING CONSIDERATION OF DEFENDANT'S SPECIAL MOTION TO STRIKE
(JFEX2)

1    Code of Civil Procedure § 425.16.  Having dismissed these claims for failure to state a claim

2    upon which relief can be granted, the Court will defer ruling on Google's special motion to strike

3    under § 425.16.  The Court may, in its discretion, allow Plaintiffs an opportunity to amend their

4    complaint before addressing a motion brought pursuant to § 425.16.  *Verizon Delaware, Inc. v.*

5    *Covad Communications Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004).

6

7                                        **III. ORDER**

8            Good cause therefore appearing, IT IS HEREBY ORDERED that Google's motion to

9    dismiss Kinderstart's First Amended Complaint is GRANTED with leave to amend.  IT IS

10   FURTHER ORDERED that consideration of Google's special motion to strike is deferred

11   pending further amendment of Kinderstart's complaint.

12

13

14   DATED: July 13, 2006

15

16

17

18                                        _____
                                          JEREMY FOGEL
19                                        United States District Judge

20

21

22

23

24

25

26

27

28

                                          23

1    This Order has been served upon the following persons:

2    Colleen Bal                              cbal@wsgr.com, eminjarez@wsgr.com

3    David H. Kramer                          dkramer@wsgr.com, dgrubbs@wsgr.com

4    Bart Edward Volkmer , Esq                bvolkmer@wsgr.com

5    Gregory John Yu                          glgroup@inreach.com, gjy@abcye.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 06-2057 JF (RS)
ORDER (1) GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND, AND (2)
DEFERRING CONSIDERATION OF DEFENDANT'S SPECIAL MOTION TO STRIKE
(JFEX2)