DAVID H. KRAMER, State Bar No. 168452
COLLEEN BAL, State Bar No. 167637
LISA A. DAVIS, State Bar No. 179854
BART E. VOLKMER, State Bar No. 223732
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
DKramer@wsgr.com

JONATHAN M. JACOBSON, N.Y. State Bar No. 1350495
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
12 East 49th Street, 30th Floor
New York, NY 10017-8203
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
JJacobson@wsgr.com

Attorneys for Defendant
Google, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| KINDERSTART.COM, LLC, a California limited liability company, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE, Inc., a Delaware corporation,<br><br>Defendant. | CASE NO.: C 06-2057 JF (RS)<br><br>**DEFENDANT GOOGLE INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Before: Hon. Jeremy Fogel<br>Date: October 27, 2006<br>Time: 9:00 a.m.<br>Courtroom: 3 |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ......................................................................................1

MEMORANDUM OF POINTS & AUTHORITIES ...............................................................1

INTRODUCTION...........................................................................................................................1

PRODEDURAL HISTORY ...........................................................................................................1

ARGUMENT ...................................................................................................................................2

I.  GOOGLE IS IMMUNE FROM LIABILITY FOR ITS SEARCH RESULTS AND
    PAGERANKS ...........................................................................................................................2

    A.  Google's Search Results and PageRanks are Entitled to Full First
        Amendment Protection.....................................................................................................2

    B.  Google is Immune from Liability for Restricting Access to the KinderStart
        Website Under the Communications Decency Act.....................................................5

II. THE COURT SHOULD DISMISS KINDERSTART'S SHERMAN ACT CLAIMS
    WITH PREJUDICE .................................................................................................................8

    A.  Attempted Monopolization ............................................................................................9

    B.  Monopolization ...............................................................................................................16

III. THE COURT SHOULD DISMISS KINDERSTART'S FREE SPEECH CLAIMS
     WITH PREJUDICE ...............................................................................................................18

    A.  Google Is Not a State Actor Under the First Amendment ...................................18

    B.  KinderStart's California Free Speech Claim Also Fails .......................................22

IV. THE COURT SHOULD DISMISS KINDERSTART'S DEFAMATION CLAIM
    WITH PREJUDICE ...............................................................................................................23

    A.  KinderStart Has Failed to Identify a Provably False Statement...........................23

    B.  KinderStart Fails to Identify Injury from Actionable Defamation.......................26

    C.  KinderStart Fails to Allege Actual Malice ...............................................................26

        1.  Malice................................................................................................................26

        2.  The Common Interest Privilege Bars KinderStart's Defamation
            Claim ...............................................................................................................27

        3.  The Fair Comment Privilege Bars KinderStart's Defamation Claim .......28

V.    THE COURT SHOULD DISMISS KINDERSTART'S LANHAM ACT CLAIM
      WITH PREJUDICE .......................................................................................... 28

      A.    Google's Representations About Search Results ................................... 29

      B.    Google's Assignment of PageRank ....................................................... 31

VI.   THE COURT SHOULD DISMISS KINDERSTART'S 17200 CLAIM WITH
      PREJUDICE .................................................................................................... 32

      A.    KinderStart's Vague AdSense Allegation Fails to State a Claim ......... 32

      B.    KinderStart's Section 17200 Claim Fails Under Proposition 64 .......... 33

      C.    KinderStart Lacks Article III Standing to Bring a Section 17200 Claim .............. 34

## TABLE OF AUTHORITIES

**CASES**                                                                    Page(s)

*AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*,
    705 F.2d 1203 (10th Cir. 1982)......................................................................15

*ARP Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.*,
    138 Cal. App. 4th 1307 (2006)......................................................................5

*Action Repair, Inc. v. American Broad. Cos.*, 776 F.2d 143 (7th Cir. 1985)...............26

*Agarwal v. Johnson*, 25 Cal. 3d 932, 944 (1979)........................................................27

*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991).................17

*Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106 (2003) .........................................22

*Almeida v. Amazon.com, Inc*, 456 F.3d 1316 (11th Cir. 2006) ....................................6

*America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851 (E.D. Va. 1999) ...............6, 7, 10

*American Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072
    (N.D. Ill.1993)..............................................................................................26

*American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
    Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997) ..............................................12

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990).......................15, 16

*Baker v. Los Angeles Herald Examiner*, 42 Cal. 3d 254 (1986) ................................3, 4

*Barrus v. Sylvania*, 55 F.3d 468 (9th Cir. 1995) .....................................................29, 31

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ..........................................................5, 6

*Bayou Bottling, Inc. v. Dr Pepper Co.*, 725 F.2d 300 (5th Cir. 1984) ..........................11

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999)..............9

*Blatty v. N.Y. Times Co.*, 42 Cal. 3d 1033 (1986) .........................................................3

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.C. Cir. 1998)..............................................6

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ..........................................32

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) .............................4

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) .......15

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999)...........3, 4

*Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711 (1989) ...................................................27, 28

1  *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205 (9th Cir. 2002)....................18, 20

2  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)............................................16

3  *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) ........................................................20

4  *California Computer Prods., Inc. v. IBM*, 613 F.2d 727 (9th Cir. 1979).....................................11

5  *Carafano v. Metrosplash.Com. Inc.*, 339 F.3d 1119 (9th Cir. 2003) .............................................6

6  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ..................33

7  *Chip-Mender Inc. v. Sherwin-Williams Co.*, No. C 05-3465,
      2006 WL 13058 (N.D. Cal. Jan. 03, 2006) ...............................................................................34

8  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999)...........31, 32

9  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663 (2006) ....................................35

10  *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163 (2000) ......................................35

11  *Doe v. Texaco, Inc.*, No. 06-02820, 2006 WL 2053504 (N.D. Cal. Jul. 21, 2006)....................34

12  *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
13      848 F.2d 976 (9th Cir. 1988)....................................................................................................13

14  *Forsher v. Bugliosi*, 26 Cal. 3d 792 (1980) ..............................................................................26

15  *Fowler v. Curtis Pub. Co.*, 182 F.2d 377 (D.C. Cir.1950) ........................................................26

16  *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227 (9th Cir. 1996) ................................19, 20

17  *Golden Gateway Center v. Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013 (2001) ..........21, 22

18  *Gonzales v. Google, Inc.*, 234 F.R.D. 674 (N.D. Cal. 2006) ......................................................19

19  *Green v. America Online, Inc.*, 318 F.3d 465 (3d Cir. 2003)....................................................6, 7

20  *Green v. Uccelli*, 207 Cal. App. 3d 1112 (1989) ......................................................................27

21  *Groden v. Random House, Inc.*, 61 F.3d 1045 (2nd Cir. 1995) ...................................................31

22  *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993).......................................................4

23  *Hejmadi v. Amfac, Inc.*, 202 Cal. App. 3d 525 (1988)................................................................23

24  *Hudgens v. NLRB*, 424 U.S. 507 (1975) ......................................................................................21

25  *Hughes v. Hughes*, 122 Cal. App. 4th 931 (2004) .................................................................23, 24

26  *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
27      515 U.S. 557 (1995) ...............................................................................................................4, 5

28  *Institute of Athletic Motivation v. Univ. of Ill.*, 114 Cal. App. 3d 1 (1980) ................................28

1  *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999) ................................. 13

2  *Jack Russell Terrier Network of N. Cal. v. American Kennel Club, Inc.*,
       407 F.3d 1027 (9th Cir. 2005) ........................................................................ 29

3
   *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) ................................. 18, 19
4
   *Jefferson County Sch. Dist. v. Moody's Inv. Servs., Inc.*,
5       175 F.3d 848 (10th Cir. 1999) ..................................................................... 3, 17

6  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (2002) ........................................................ 32

7  *Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003) ........................................... 18, 19

8  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ......................... 35

9  *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181 (S.D. Cal. 2005) ......................... 34

10  *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002) ..................................................... 19, 21

11  *Locke v. Mitchell*, 7 Cal. 2d 599 (1936) ............................................................ 27

12  *Lowe v. S.E.C.*, 472 U.S. 181 (1985) .................................................................. 4

13  *Lundquist v. Reusser*, 7 Cal. 4th 1193 (1994) .................................................... 27

14  *Maidman v. Jewish Publ'ns, Inc.*, 54 Cal. 2d 643 (1960) ...................................... 28

15  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..................... 14

16  *MetroNet Serv. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004) ...................... 11

17  *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) ....................................... 5

18  *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir. 1989) ............ 15

19  *Morningstar, Inc. v. Superior Court*, 23 Cal. App. 4th 676 (1994) ........................... 24

20  *Moyer v. Amador Valley Joint Union High Sch. Dist.*, 225 Cal. App. 3d 720 (1990) ........ 3

21  *Newcal Indus., Inc. v. Ikon Office Solutions, Inc.*, No. C04-2776,
22       2004 WL 3017002 (N.D. Cal. Dec. 23, 2004) ................................................... 9

   *New.Net, Inc.* v. *Lavasoft*, 356 F. Supp. 2d 1090 (C.D. Cal. 2004) ......................... 32
23
   *Nike, Inc. v. Kasky*, 539 U.S. 654 (2003) ....................................................... 34
24
   *Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446 (E.D.N.Y. 2004) ........................ 6
25
   *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*,
26       797 F.2d 370 (7th Cir. 1986) ...................................................................... 13

27  *Oxycal Labs., Inc. v. Jeffers*, 909 F. Supp. 719 (C.D. Cal. 1995) ........................... 32

28

1    *Paradise Hills Assocs. v. Procel*, 235 Cal. App. 3d 1528 (1991) ................................. 17

2    *Parker v. Google Inc.*, 422 F. Supp. 2d 492 (E.D. Pa. 2006)........................................ 6

3    *Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995) ................................................... 4

4    *Pavlovsky v. Board of Trade*, 171 Cal. App. 2d 110 (1959) ........................................ 28

5    *Pfizer Inc. v. Superior Court*, 141 Cal. App. 4th 290 (2006)....................................... 34

6    *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024 (9th Cir. 2001)................................. 16

7    *Price v. State of Hawaii*, 939 F. 2d 702 (9th Cir. 1991) .............................................. 18

8    *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997)............... 9

9    *Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003) ......................................... 30, 32

10   *Ringler Assocs., Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165 (2000) ................ 24

11   *Robins v. Pruneyard Shopping Center*, 23 Cal. 3d 899 (1979),
12           *aff'd*, 447 U.S. 74 (1980)........................................................................... 22, 23

13   *Rodas v. Spiegel*, 87 Cal. App. 4th 513 (2001) ....................................................... 28

14   *Rutman Wine Co. v. E&J Gallo Winery*, 829 F.2d 729 (9th Cir. 1987)....................... 16

15   *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958 (10th Cir. 1994) .............................. 14

16   *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620 (7th Cir. 2005)................................... 11

17   *Schachar v. American Academy of Ophthalmology, Inc.*,
             870 F.2d 397 (7th Cir. 1989)............................................................................ 12

18   *Search King Inc. v. Google Tech., Inc.*, No. 02-1457,
19           2003 WL 21464568 (W.D. Okla. May 27, 2003) ................................................ 3, 4

20   *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (1992)................................................... 20

21   *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848 (9th Cir. 1994) .............................................. 6

22   *Soap Opera Now, Inc. v. Network Publ'g Corp.*,
             737 F. Supp. 1338 (S.D.N.Y. 1990)............................................................. 13, 15

23   *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) ......................................... 9

24   *Trader Joe's Co. v. Progressive Campaigns, Inc.*, 73 Cal. App. 4th 425 (1999) ...... 22, 23

25   *Tschirky v. Superior Court*, 124 Cal. App. 3d 534 (1981) ......................................... 27

26   *United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003) ......................... 23

27   *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984) ............................................... 7

28   *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ............................... 10

*United States v. Visa USA*, 344 F.3d 229 (2d Cir. 2003) ............................................. 16

*Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249 (10th Cir. 2005) ........................... 21

*Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.*,
    995 F. Supp. 1060 (D. Ariz. 1997) ............................................................................ 7

*Venetian Casino Resort, LLC v. Local Joint Executive Bd.*,
    257 F.3d 937 (9th Cir. 2001) ................................................................................... 21

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................... 11, 14, 15, 17

*Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) ........................... 34

*Vincent v. Trend Western Tech. Corp.*, 828 F.2d 563 (9th Cir. 1987) ................................... 20

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ....................................................... 34

*Wojnarowicz v. American Family Ass'n*, 745 F. Supp. 130 (S.D.N.Y. 1990) ........................... 32

*Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870 (9th Cir. 1982) ..................................... 15

**STATUTES**

15 U.S.C. §1125(a)(1)(B) ........................................................................................... 31

47 U.S.C. § 230 *et seq.* ..................................................................................... 5, 6

Cal. Bus. & Prof. Code § 17204 ............................................................................... 34

Cal. Civ. Code § 45a ............................................................................................. 26

Cal. Civ. Code § 47(c) ............................................................................................ 27

Cal. Civ. Code § 48a ............................................................................................. 26

**RULES**

Fed. R. Civ. P. 9(g) .......................................................................................... 26, 27

**MISCELLANEOUS**

Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*,
    8 Yale J.L. & Tech. 188 (Spring 2006) ............................................................. 25

Erwin Chemerinsky, *Constitutional Law: Principles and Policies* (2d ed. 2002) ..................... 21

*Splog, How to Stop a New Menace on the Internet*,
    19 Harv. J.L. & Tech., No. 2 (Spring 2006) ....................................................... 7

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 27, 2006 at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 280 South First Street, Courtroom 3, 5th Floor, San Jose, California, 95113, in the courtroom of the Honorable Jeremy Fogel, defendant Google Inc. ("Google") will and hereby does move the Court, pursuant to Rule 12(b)(6) and Rule 12(b)(1) of the Federal Rules of Civil Procedure, for an order dismissing the Second Amended Complaint of Kinderstart.com LLC ("KinderStart") in its entirety. This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the Declaration of Bart E. Volkmer ("Volkmer Decl."), the accompanying Request for Judicial Notice and the materials referenced therein, the pleadings and papers on file in the action, and upon such other matters as may be presented to the Court at the time of the hearing.

**MEMORANDUM OF POINTS & AUTHORITIES**

**INTRODUCTION**

On July 13, 2006, this Court entered a detailed 23-page order dismissing KinderStart's extensive First Amended Complaint ("FAC") in its entirety. The Court found each of the FAC's many counts legally deficient, often on multiple grounds. The Court, however, granted KinderStart leave to replead – providing KinderStart an opportunity to correct the FAC's numerous flaws. The Second Amended Complaint ("SAC"), however, does no such thing. Instead, KinderStart has filed an astonishingly prolix 62-page SAC, containing 282 paragraphs of largely incomprehensible allegations, that does not even attempt to cure the legal deficiencies this Court had found. Adding length, confusion, as well as an entirely new (and untenable) claim does nothing to support KinderStart's case. But that is all the SAC does. The SAC should be dismissed – this time with prejudice.

**PROCEDURAL HISTORY**

KinderStart filed its original complaint, containing seven claims for relief and spanning 116 paragraphs, on March 17, 2006, but never served it. After nearly a month, KinderStart filed and served the nine-claim, 175 paragraph FAC on April 12, 2006. Google moved to dismiss the FAC for failure to state a claim, and filed a special motion to strike several of the claims pursuant

1   to California's anti-SLAPP statute.  In an Order dated July 13, 2006, the Court granted Google's

2   motion to dismiss with leave to amend, and deferred ruling on Google's motion to strike.  Six

3   weeks later, KinderStart filed its bloated SAC.  KinderStart continues to style the case as a

4   putative class action brought on behalf of various classes and subclasses of website operators who

5   wish to have the Court instruct Google on whether and how to recommend their sites in Google

6   search results and to have the Court determine the PageRank rating that Google should assign to

7   their sites.  *Id.* ¶¶ 187-195.

8                                              **ARGUMENT**

9   **I.        GOOGLE IS IMMUNE FROM LIABILITY FOR ITS SEARCH RESULTS AND
               PAGERANKS**

10

11          While buried in the morass of KinderStart's SAC, the heart of this case remains

12  KinderStart's unhappiness with Google's search results and PageRanks.  At bottom, KinderStart

13  continues to believe it is entitled to override Google's decision to exclude KinderStart's site from

14  its search results, and its choice to assign KinderStart's site a rating of "PageRank 0"  ("0-PR").

15  KinderStart's specific claims for relief suffer from numerous substantive flaws discussed below.

16  But to the extent KinderStart attacks Google's editorial decisions themselves, KinderStart cannot

17  state a claim no matter what theory it advances because Google is shielded from all liability both

18  by the First Amendment and by 47 U.S.C § 230(c)(2), a federal statutory immunity granted to

19  online service providers.

20          **A.      Google's Search Results and PageRanks are Entitled to Full First Amendment
                    Protection**

21

22          Central to KinderStart's action is the premise that what Google says about the KinderStart

23  site has great significance.  Nevertheless, KinderStart unabashedly claims the right to force

24  Google to say things about KinderStart's site that KinderStart would like Google to say, and to

25  prevent Google from saying things that KinderStart does not like.  To the extent the action rests on

26  what Google is saying or not saying in its search results and PageRanks themselves, however,

27  Google's free speech rights function as an absolute bar.

28

1    When a user submits a query to Google's search engine, Google responds with search

2    results that are the equivalent of a suggested reading list.[1] Google's search results express

3    Google's views on what websites Google believes are most likely to be of interest to users for a

4    particular topic.  SAC ¶¶ 123, 125.  Similarly, Google's PageRanks provide users with Google's

5    view of the "importance" of websites.  FAC ¶ 56 (PageRank provides a "relative measure of the

6    appeal, popularity and relevance of a web site.").  They are, in KinderStart's own words, Google's

7    "ratings" for websites.  SAC ¶ 46 ("PageRank … is now the de facto and prevailing standard for

8    rating Websites throughout the United States.").

9    Recommendations and ratings such as Google's are plainly opinions, entitled to the

10    protections of both the First Amendment and the California Constitution.  *Baker v. Los Angeles*

11    *Herald Examiner*, 42 Cal. 3d 254, 268 (1986) (dismissing action against newspaper for allegedly

12    defamatory statements in newspaper's review of television show because statements and review as

13    a whole constitute constitutionally-protected expressions of opinion); *Blatty v. N.Y. Times Co.*, 42

14    Cal. 3d 1033, 1048 (1986) (holding that a newspaper cannot be held liable for failing to include a

15    book on its "Best Sellers" list because the paper's speech in choosing whom to include on the list

16    is absolutely protected by the First Amendment); *Moyer v. Amador Valley Joint Union High Sch.*

17    *Dist.*, 225 Cal. App. 3d 720, 724-26 (1990) (dismissing various claims arising from newspaper

18    article labeling plaintiff as "the worst teacher" at the school based on free speech protections

19    afforded to the opinion); *Jefferson County Sch. Dist. v. Moody's Inv. Servs., Inc.*, 175 F.3d 848

20    (10th Cir. 1999) (dismissing claims based on defendant's rating of plaintiff's bonds in light of free

21    speech protections afforded to the rating); *Search King Inc. v. Google Tech., Inc.*, No. 02-1457,

22    2003 WL 21464568, at *4 (W.D. Okla. May 27, 2003) (dismissing claim based on Google's

23    search results and PageRanks in light of Google's free speech rights because Google's opinions

24

25 _____

26    [1] The Ninth Circuit generally has described a search engine as follows: "When a keyword is
entered, the search engine processes it through a self-created index of web sites to generate a
27    (sometimes long) list relating to the entered keyword. Each search engine uses its own algorithm
to arrange indexed materials in sequence, so the list of web sites that any particular set of
28    keywords will bring up may differ depending on the search engine used." *Brookfield Commc'ns,
Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999).

are "entitled to 'full constitutional protection.'").  As the California Supreme Court explained in *Baker*:

> The point of any review – whether it be of a book, a movie, a play, a television program, or some other event – is to convey the reviewer's opinion and professional evaluation of the thing being reviewed.  People read reviews expressly to find out the reviewer's opinion.  Readers use that opinion to help them decide whether it is worth spending their time and/or money to attend a particular event, go to a particular place or read a particular book.

*Baker*, 42 Cal. 3d at 268.  Google's search results and PageRanks are no different.  Millions of people rely on Google for Google's opinions about the relevance and importance of websites.  As KinderStart itself explains, other search engines express different views about which sites will be of interest to users on a particular topic.  *See* SAC ¶¶ 34, 42 (noting Microsoft and Yahoo rank sites differently than Google does); *See also Brookfield*, 174 F.3d at 1045 (explaining how different search engines yield different results); *Search King*, 2003 WL 21464568, at **4-5. ("PageRanks are opinions" and "do not contain provably false connotations. …  Other search engines express different opinions, as each search engine's method of determining relative significance is unique.").  KinderStart also expressly acknowledges that PageRanks are opinions containing at least some subjective elements.  SAC ¶ 7 (a "PageRank … it is a figure *not* simply reflecting an opinion of *a solely subjective value* of a Website by Google, but *an opinion* based upon a rigorous, objective calculation . …") (emphasis added).

These opinions are absolutely protected under the First Amendment, and KinderStart cannot impose liability upon Google for expressing them.  *Lowe v. S.E.C.*, 472 U.S. 181, 210  n.58 (1985) ("we have squarely held that the expression of opinion about a commercial product … is protected by the First Amendment"), *citing Bose Corp. v. Consumers Union of U.S., Inc*., 466 U.S. 485, 513 (1984); *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995) ("if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."), *quoting Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993).  For the same reason, KinderStart cannot force Google to include the KinderStart site in Google's search results or to assign it a particular PageRank.  *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) (requiring defendants to alter the expressive

content of their parade violated the First Amendment); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (striking down a law that required newspapers to conspicuously publish replies to attacks on an election candidate's character); *ARP Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 138 Cal. App. 4th 1307, 1314 (2006) (statute requiring prescription drug claims processors to submit drug processing costs to their clients was unconstitutional because it improperly compelled speech; "[t]he prohibition against compelled speech encompasses compelled access, where a speaker is required to disseminate the speech of another, even if not required to endorse the content."). Thus, in considering KinderStart's claims, the Court should reject any effort to impose liability on Google, whether directly or indirectly, for removing KinderStart's website from its search results or for assigning it a 0-PR.

### B.    Google is Immune from Liability for Restricting Access to the KinderStart Website Under the Communications Decency Act

KinderStart's refrain in this case has been that by excluding KinderStart's site from Google's search results, and by assigning the site a 0-PR, Google has engaged in "Blockage" and censorship. *See*, *e.g.*, SAC ¶ 11. But any such claims against an interactive computer service like Google are barred as a matter of federal law.

Section 230 of the Communications Decency Act ("CDA"), entitled "Protection for private blocking and screening of offensive material," states in relevant part:

> No provider … of an interactive computer service shall be held liable on account of … any action taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable, whether or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2)(A). Congress enacted this protection to encourage service providers to exercise control over the material presented to its users. *See* 47 U.S.C. § 230(b)(1) & (4) (reciting Congress's intention to encourage to "promote the continued development of the Internet and other interactive computer services" and "the development and utilization of blocking and filtering technologies"). As the Ninth Circuit has explained, the protections of Section 230 were intended to be broad, "protecting service providers and users from liability for claims arising out of the removal of potentially 'objectionable' material from their services." *Batzel v. Smith*, 333

1    F.3d 1018, 1030 n.14 (9th Cir. 2003); *Almeida v. Amazon.com, Inc*, 456 F.3d 1316, 1321 n.3 (11th

2    Cir. 2006) ("The language of section 230(c)(2) is clearly inconsistent with state law that makes

3    interactive service providers liable based on their efforts to screen content.").  And in accordance

4    with the plain language of the statute, courts have deferred to service providers' determinations as

5    to what is "objectionable" content, applying Section 230(c)(2), for example, to shield a provider

6    from liability for restricting access to email that the provider determined was undesirable "spam."

7    *See Green v. America Online, Inc.*, 318 F.3d 465, 473 (3d Cir. 2003) (relying on § 230(c)(2) to

8    find AOL immune from false advertising claim for restricting user access to email that AOL

9    considered objectionable "spam")*; America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851,

10    864 (E.D. Va. 1999) (relying on § 230(c)(2) to find that "blockage" of spam is "encouraged by

11    federal law" and thus not wrongful); *see also Blumenthal v. Drudge*, 992 F. Supp. 44, 52 n.13

12    (D.C. Cir. 1998) (explaining that while § 230(c)(2) "primarily addresses obscenity and violent

13    material, it also references material that is 'otherwise objectionable,' a broad enough category to

14    cover defamatory statements as well.").

15        There can be no doubt that Google is an interactive computer service under Section

16    230(c)(2).[2]  It is equally clear, given KinderStart's own allegations, that Google's actions

17    regarding the KinderStart website fall squarely within the protections of Section 230(c)(2)(A).

18        With respect to Google's removal of KinderStart's site from its search results, KinderStart

19    has already alleged that Google's "Blockage" is "presumably based on either stated or unstated

20    'quality guidelines.'"  Original Complaint ¶ 23 ("Compl.").[3]  The guidelines, as KinderStart

---

22        [2] "Interactive computer service" is defined broadly as "any information service, system or
    access software provider that provides or enables computer access to by multiple users to a
23    computer server . . .." 47 U.S.C. § 230(f)(2).  Courts have uniformly held that search engines like
    Google are interactive computer services.  *See, e.g., Parker v. Google Inc.*, 422 F. Supp. 2d 492
24    (E.D. Pa. 2006) ("there is no doubt that Google qualifies as an 'interactive computer service'"
    and is subject to the protections of 47 U.S.C. § 230); *Novak v. Overture Servs., Inc.*, 309 F. Supp.
25    2d 446, 452-53 (E.D.N.Y. 2004) (same); *see also Carafano v. Metrosplash.Com. Inc.*, 339 F.3d
    1119 (9th Cir. 2003) (online matchmaking service held to be interactive service provider under
26    Section 230(c)).

27        [3] The allegations of KinderStart's Original Complaint and FAC are judicial admissions.
    *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1994).  That these allegations were dropped
28    from the SAC makes them no less binding, as KinderStart has not asserted that its prior
    allegations were false or a justifiable mistake, or provided some other explanation for why it

(continued...)

1   alleges, state that Google will block sites containing content that appears aimed at creating

2   artificially inflated search results for sites by gaming Google's processes.  FAC ¶¶ 44-45.  That is,

3   KinderStart itself has pled that Google's "Blockage" is based on its determination that sites

4   contain content that Google finds objectionable (and that its users will find objectionable) because

5   it will lead users of the search engine to sites of no interest to them.[4]  Indeed, that is what

6   KinderStart claims happened in its case.  *See* KinderStart's Motion for Preliminary Injunction at

7   11 ("Defendant Google incredulously determined that KS.com was no longer 'relevant' on the

8   Internet and removed it from Google's index.").[5]  Just as AOL had immunity under Section

9   230(c)(2) in the *Green* and *Great Deals* cases for blocking what it thought to be spam, so too is

10  Google immune under all of KinderStart's claims for restricting access to what Google determines

11  to be "web spam."  *See* FAC ¶ 64 (equating "Blockage" with "anti-Webspamming"); SAC ¶ 228.[6]

12       KinderStart likewise supplies the allegations necessary to establish the application of

13  Section 230(c)(2) to Google's assignment of 0-PR to the KinderStart site.  According to

14  KinderStart, Google's purpose in assigning 0-PRs to websites is to "punish Websites for carrying

15

16       (...continued from previous page)
    should not be bound by them.  *Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.*, 995 F. Supp.
17  1060, 1065-66 & n.6 (D. Ariz. 1997); *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984)
    ("A party … cannot advance one version of the facts in its pleadings, conclude that its interests
18  would be better served by a different version, and amend its pleadings to incorporate that
    version, safe in the belief that the trier of fact will never learn of the change in stories.").

19

20  [4] For a detailed discussion of this issue, known as "web spamming," and the harm to both
    search engines and their users that it causes, *see Splog, How to Stop a New Menace on the
21  Internet,* 19 Harv. J.L. & Tech., No. 2 at 479 (Spring 2006) at 479 (describing "link spam" –
    deceptive tactic of manufacturing artificial links to fool users and search engines – as disrupting
    user attempts to search for information of relevance).

22

23  [5] As KinderStart concedes, Google fully discloses this important practice of ensuring its
    search results remain relevant to users.  SAC ¶ 153.  Google clearly states on its site that a page
24  may be "manually removed from our index if it [does not] conform with the quality standards
    necessary to assign accurate PageRank."  *Id.*  It goes on to explain that its quality standards deem
25  content objectionable if it appears intended "for the purposes of fooling search engines."  *Id. See
    also* SAC ¶ 87 (Google represents that removal of sites and content from its index is done to
26  address "spamming" the index).  Google's practice of policing sites containing objectionable
    content is hardly a secret to KinderStart or anyone else.

27  [6] KinderStart leaves no doubt that Google believes its actions are authorized and proper.  *See*
    FAC at ¶¶ 46-48 ("It is the *belief* and practice maintained by Defendant Google that … it is
28  entitled at any time, for any reason or no reason at all, to block or remove referrals, listings and
    indexing of any Website on the Internet.") (emphasis added).

1   content of questionable or irrelevant quality in Google's absolute and internal discretion ('Inferior

2   Page Quality' ('IPQ'))." SAC ¶ 144. KinderStart further alleges that Google "executes the

3   operation of a software filter to programmatically punish a Website with a 0-PR [that] [Google]

4   believes to have IPQ." SAC ¶ 145. Thus, KinderStart itself pleads that Google's assignment of a

5   0-PR is designed to "punish" websites that carry inferior content that Google determines is

6   objectionable. Further, according to KinderStart, this "punishment" functions as a blacklist,

7   causing "hundreds perhaps thousands of other Websites to immediately terminate links to the

8   penalized site" thereby decreasing user visits to the site. SAC ¶ 146 ("The adverse effect is both

9   immediate and viral to an entire network of Websites on the Internet."); SAC ¶ 281 (Because of

10  the 0-PR Google assigns to KS.com and others "prospective … viewers of such deranked sites …

11  refrain from … visiting … such sites"). Under KinderStart's own allegations, therefore, in

12  assigning a 0-PR, Google has taken action to restrict access to material that it determines to be

13  objectionable. Under Section 230(c), KinderStart's claims predicated on that conduct, which

14  appear to be all of the claims in the SAC, fail as a matter of law.

15  **II.     THE COURT SHOULD DISMISS KINDERSTART'S SHERMAN ACT CLAIMS
            WITH PREJUDICE**

16

17        Kinderstart's FAC asserted claims against Google for attempted monopolization and

18  monopolization under Section 2 of the Sherman Act. The essence of both claims was the same. It

19  was that Google's alleged "Blockage" of the KinderStart.com website and its claimed

20  "devaluation" of the PageRank assigned to that website constituted exclusionary conduct,

21  allowing Google to monopolize or to attempt to monopolize markets the FAC defined as the

22  "Search Engine Market," the "Search Ad Market," and the "Website Rating Market." FAC ¶¶

23  112-35, 145-53.

24        This Court dismissed both of KinderStart's antitrust claims, finding the allegations wholly

25  inadequate on multiple grounds. Order at 11-15, 17-18. KinderStart's SAC addresses none of the

26  multiple deficiencies identified in the Court's opinion. The antitrust claims should therefore be

27  dismissed with prejudice.

28

**A.    Attempted Monopolization**

As the Court explained in its opinion, to maintain a claim for attempted monopolization under Section 2 of the Sherman Act, a plaintiff must – among other things – allege sufficiently the following essential elements:  (1) an appropriate definition of the relevant market, Order at 11-12 & n.2; (2) anticompetitive or exclusionary conduct, *id.* at 11-12; and (3) causal antitrust injury, *id.*; *see also* Hearing Trans., June 30, 2006, at 5.  The SAC fails to satisfy any of these requirements.

1.    ***Market definition***.  The Court's opinion explained that KinderStart's FAC did "not sufficiently describ[e] the markets relevant to its claim."  Order at 12 n.2.  In particular, the Court said, it was "unclear how the Search Engine Market … is separable from the Search Ad Market . …"  *Id.*  The SAC does not cure these defects.  Although the SAC's description of the purported markets is a good deal more verbose than that in the FAC, *compare* SAC ¶¶ 34-39 *with* FAC ¶¶ 113-14, it does not even attempt to describe how the two purported markets might be severable from one another.  This failure to articulate any distinction between the purported market is important because KinderStart does not allege that either it or Google derives any revenues from Internet searches.  Rather, the only money to be made – and the only market in which KinderStart asserts any injury – is the advertising market.  In connection with that purported "Search Ad Market," however, KinderStart provides no facts whatsoever to suggest that it is a relevant product market for antitrust purposes.

To allege a relevant market sufficient to withstand dismissal under Rule 12(b)(6), an antitrust plaintiff is required to set forth facts that, if proven, would establish that the product market alleged is not interchangeable with reasonable substitutes; "conclusory assertion[s] … [are] insufficient." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997); *Newcal Indus., Inc. v. Ikon Office Solutions, Inc.*, No. C04-2776, 2004 WL 3017002, at **3-5 (N.D. Cal. Dec. 23, 2004).

In this case, KinderStart has alleged no facts whatsoever to suggest that other forms of advertising are not reasonably interchangeable with search engine advertising.  There is nothing in the SAC that even attempts to explain why advertising on websites other than search engines – or,

1    for that matter, e-mail, direct mail, advertising in magazines, newspapers, radio stations,

2    television, billboards, or public transportation vehicles – is not a commercially acceptable manner

3    of reaching potential  customers.

4          In *GreatDeals.net*, 49 F. Supp. 2d 851, similar antitrust claims were dismissed under Rule

5    12(b)(6) on precisely this basis.  The defendant there asserted that AOL was monopolizing an "e-

6    mail advertising" market and a "distinct sub-market based on the Internet subscribers who are

7    accessed through AOL facilities."  *Id.* at 857.  The court held that it "must reject [GreatDeal's]

8    proposed market."  *Id.* at 858.  Specifically, "the Court rejects [the] attempt to restrict the market

9    to e-mail advertising. …There are numerous substitutes for e-mail advertising, some of which are

10   less expensive, including use of the World Wide Web, direct mail, billboards, television,

11   newspapers, radio, and leaflets, to name a few."  *Id.*  Just as GreatDeal's allegations had to be

12   dismissed for failure to articulate why these alternatives were not reasonably interchangeable,

13   KinderStart's identical failure warrants dismissal here.

14          2.     ***Exclusionary conduct.***  The central failure of KinderStart's FAC antitrust claims,

15   and the focus of most of this Court's analysis, was on the failure to plead facts sufficient to

16   suggest that Google has engaged in any conduct deemed exclusionary under Section 2.  The SAC

17   repeats (with greater length) the FAC allegations concerning PageRank and Blockage; expands

18   upon the FAC's assertions of "false representations" and the use of AdSense; and adds a new set

19   of allegations concerning Google's pricing practices.  Each set of allegations is addressed below.

20   None, whether considered singly or in the aggregate, suffices as a sufficient allegation of

21   exclusionary conduct under applicable law.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 78

22   (D.C. Cir. 2001) (liability cannot be based on the aggregate effect of a series of acts which "are

23   not in themselves unlawful" or exclusionary).

24               a.     ***PageRank and Blockage***.  This Court has previously considered, and

25   rejected, KinderStart's allegations that the claimed PageRank devaluation and "Blockage" of its

26   website constitute exclusionary conduct.  As the Court explained:  "KinderStart's allegations that

27   Google removed KinderStart from search results and lowered its PageRank do not suffice to

28   allege predatory conduct as opposed to legitimate competitive actions.  '[A]s a general matter

1  "there is no duty to aid competitors."'  *MetroNet Serv. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131

2  (9th Cir. 2004)."  Order at 12.  *Accord, e.g.*, *Verizon Commc'ns, Inc. v. Law Offices of Curtis V.*

3  *Trinko, LLP*, 540 U.S. 398, 407-10 (2004); *California Computer Prods., Inc. v. IBM*, 613 F.2d

4  727, 744 (9th Cir. 1979) ("IBM, assuming it was a monopolist, had the right to redesign its

5  products to make them more attractive to buyers whether by reason of lower manufacturing cost

6  and price or improved performance.  It was under no duty to help CalComp or other peripheral

7  equipment manufacturers survive or expand.  IBM need not have … constricted its product

8  development so as to facilitate sales of rival products.  The reasonableness of IBM's conduct in

9  this regard did not present a jury issue."); *Bayou Bottling, Inc. v. Dr Pepper Co.*, 725 F.2d 300,

10  304-05 (5th Cir. 1984) (monopolist soft drink bottler had no obligation to allow rival bottlers

11  space in its coolers or vending machines).  KinderStart's SAC adds length, but nothing new of

12  substance, to its prior allegations.

13          b.     ***Alleged "False Statements."***  The SAC adds a number of new – albeit

14  baseless – allegations about "false" statements.  SAC ¶¶ 59, 61.  In brief, these allegations claim

15  that Google represents that its search results are objective and not subject to the exercise of

16  judgment; that these representations are false; and therefore that the lowered KinderStart.com

17  PageRank and omission from Google search results are disparaging and, in some unstated manner,

18  harmful to competition.  The allegations, however, suffer from a number of fatal flaws.

19          First, as the Seventh Circuit recently explained, even where a monopolist's statements

20  about its rivals' products really are material, false, and disparaging, those statements are not

21  anticompetitive or predatory.  On the contrary, "[a]ntitrust law condemns practices that drive up

22  prices by curtailing output.  False statements about a rival's goods do not curtail output in either

23  the short or long run.  They just set the stage for competition in a different venue:  the advertising

24  market." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) (citations omitted).

25  The court added:  "Warfare among suppliers and their different products *is* competition.  Antitrust

26  law does not compel your competitor to praise your product or sponsor your work.  To require

27  cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust

28

1  law." *Id.* (*quoting Schachar v. American Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th

2  Cir.1989)).

3      Second, even under cases that suggest that disparagement might qualify as exclusionary

4  conduct in some circumstances, the hurdles for alleging a viable claim are necessarily steep:

> To prove that [a defendant's] false and misleading advertising constituted exclusionary conduct, the disparagement must overcome a presumption that the effect on competition of the fliers was de minimis. … "[A] plaintiff may overcome de minimis presumption 'by cumulative proof that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals." [The plaintiff] must satisfy *all* six elements to overcome [this] de minimis presumption.

10  *American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,

11  108 F.3d 1147, 1152 (9th Cir. 1997) (citations omitted).

12      KinderStart cannot satisfy these requirements. For starters, the statements on which it

13  relies are not in any way "clearly false" or "clearly likely to induce *reasonable* reliance."

14  KinderStart itself has conceded that Google makes clear that its search results (and therefore its

15  PageRanks) *are* subject to adjustments based on its Quality Guidelines and, in fact, that pages

16  may be "manually removed." FAC ¶¶ 44-45. KinderStart acknowledges that Google has made

17  clear that it does not "comment on the individual reason a page was removed" and does not "offer

18  an exhaustive list of practices that can cause removal," but that Google recommends in any event

19  that websites "avoid 'doorway' pages created just for search engines … with little or no original

20  content" and avoid creating "domains with substantially duplicate content" (*id.*) – features that

21  one necessarily encounters when browsing KinderStart.com.

22      Third, KinderStart has failed to address any of the reasons given previously by this Court

23  for dismissing the prior "false misrepresentations" allegations as legally insufficient. Order at 13-

24  14. KinderStart provides no explanation of how manual adjustment of search results – whether

25  "falsely concealed" or not – could possibly be anticompetitive rather than a process designed to

26  improve the quality of Google's product. If Google is as popular as KinderStart claims, it is

27  beyond dispute that the free market has made a choice to prefer Google searches to those offered

28  by its many competitors. As was explained in a leading case, it is "the free market and not a judge

1  or a jury decides whose products are inferior." *Olympia Equip. Leasing Co. v. Western Union Tel.*

2  *Co.*, 797 F.2d 370, 378 (7th Cir. 1986).  Arguments about techniques that make firms successful

3  in satisfying consumers should be fought in the market, not the courts.

4          c.    ***AdSense***.  This Court dismissed the FAC's allegations about AdSense

5  because the FAC provided no explanation as to how Google was supposed to be "pressuring

6  websites to purchase advertising to avoid decreased PageRank scores, and removal from Results

7  pages," or how such pressure might have harmed KinderStart in an exclusionary way.  Order at

8  13.  The SAC does not address these deficiencies.

9          In paragraph 62, the SAC asserts that Google has terminated AdSense contracts of

10 competitors "arbitrarily" and without justification, and that this has caused a reduction in "vital"

11 revenues to these AdSense partners.  The most these allegations say is that, if Google terminates

12 an AdSense contract, the terminated advertiser must look elsewhere for advertising revenue.  That

13 is not an allegation of exclusionary conduct for at least three reasons.

14         First, KinderStart nowhere explains how a website owner using Google's AdSense to

15 derive advertising revenue might be deemed a *competitor* of Google's in that respect or, perhaps

16 more importantly, how termination of an AdSense contract would in any way enhance Google's

17 purported market power.  A refusal to deal with a non-competitor does not increase the

18 defendant's market share at the expense of its rivals and, therefore, is not actionable.  *See, e.g.*,

19 *Soap Opera Now, Inc. v. Network Publ'g Corp.*, 737 F. Supp. 1338, 1342, 1349 (S.D.N.Y. 1990)

20 (refusal to accept plaintiff's ads not unlawful and complaint dismissed; "[e]ven assuming that

21 defendant is a monopolist in its product market, unless plaintiff and defendant are in competition

22 with one another, defendant has no duty to deal with plaintiff"); *see also Intergraph Corp. v. Intel*

23 *Corp.*, 195 F.3d 1346, 1357 (Fed. Cir. 1999) ("the presence of a competitive relationship is

24 fundamental to invoking the Sherman Act to force access to the property of another"); *Ferguson v.*

25 *Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988) ("[defendant]

26 has not refused to deal with anyone … [plaintiffs] simply failed to outbid *their* competitors").

27         Second, to the extent that Google is alleged to have terminated the AdSense agreements of

28 firms that are, in fact, competitors, the allegation fails equally for the reason – given by the Court

1    (Order at 12) and summarized above – that Google has no duty to help its competitors.  It would

2    be a strange form of competition indeed if Google were required to help its competitors grow by

3    allowing them to participate in the AdSense program.  If a rival wants to compete against Google

4    in this respect, the remedy is to develop its own alternative advertising program, not to free ride

5    on the efforts that Google has made.  *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 969-72

6    (10th Cir. 1994) (prevention of free riding a legitimate efficiency justification warranting denial of

7    access).

8            Third, the entire set of allegations is irrelevant to *this* case in any event because there is no

9    allegation that *KinderStart*'s AdSense agreement was ever terminated.  Whatever may or may not

10   have occurred with the other websites, the question here is whether KinderStart has a claim for

11   relief.  The termination of someone else's agreement gives KinderStart no basis to sue.

12           d.      ***Pricing***.  The only thing relating to the antitrust claims in the SAC that is

13   truly "new" (as opposed to longer-winded) is the series of allegations about Google's pricing

14   practices.  In brief, KinderStart asserts that Google charges high prices for ads, has increased

15   prices, and discriminates among its customers in its pricing.  The "discrimination" alleged is based

16   on Google's Landing Page Quality assessments.  Specifically, the SAC alleges that sites deemed

17   by Google to have a lower quality scores are subject to "minimum price floors" as well as price

18   increases.  SAC ¶ 64.  These false allegations provide no basis for a claim because, even if

19   assumed true, the conduct alleged is not exclusionary as a matter of law.

20           The Supreme Court specifically held in *Trinko*, 540 U.S. at 407, that charging high prices

21   is not illegal.  As the Court said, "[t]he mere possession of monopoly power, and the concomitant

22   charging of monopoly prices, is not only not unlawful; it is an important element of the free-

23   market system.  The opportunity to charge monopoly prices – at least for a short period – is what

24   attracts 'business acumen' in the first place; it induces risk taking that produces innovation and

25   economic growth."  *Id.*  Moreover, rivals have no basis to complain about prices *increases* by

26   their competitors.  As the Supreme Court recognized in *Matsushita Elec. Indus. Co. v. Zenith*

27   *Radio Corp.*, 475 U.S. 574, 595-96 (1986), prices increases do not injure rivals, they operate to

28   their benefit.

1    KinderStart's allegations of discriminatory pricing fare no better.  The charging of

2    discriminatory prices to customers is not an exclusionary act in the absence of evidence that the

3    prices are "predatory," that is, below an appropriate measure of cost.  *See, e.g.*, *Brooke Group Ltd.*

4    *v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993).  The charging of low, but non-

5    predatory, prices is in fact the essence of competition.  As the Supreme Court has stated, "[l]ow

6    prices benefit consumers regardless of how those prices are set, and so long as they are above

7    predatory levels, they do not threaten competition."  *Atlantic Richfield Co. v. USA Petroleum Co.*,

8    495 U.S. 328, 340 (1990).  Absent allegations of below-cost predatory pricing, therefore, attacks

9    on Google's pricing policies as discriminatory necessarily fail.  *See Trinko*, 540 U.S. at 407-08;

10   *Soap Opera Now,* 737 F. Supp. at 1349.

11   The decision in *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir.

12   1989) (Breyer, J.), is on point.  In *Monahan's*, the plaintiff alleged that defendant Boston Whaler,

13   Inc. sold boats to plaintiff's competitors at prices lower than, and terms better than, it offered to

14   plaintiff.  *Id.* at 526.  The court held that "Whaler's actions (which we shall call 'price

15   discrimination') are not, on balance, anticompetitive for Sherman Act purposes."  *Id.* at 527.  In

16   doing so, the court stated, *inter alia*, that "the Sherman Act does not normally forbid a seller from

17   charging a low, nonpredatory price, even though that price may make it harder for a competitor to

18   enter, or to remain in, the market."  *Id.* at 528.  It also noted that there is "nothing anticompetitive

19   in the simple fact that a seller selectively cuts prices, or offers other favorable terms, to some of its

20   dealers, even though such discrimination harms the non-favored dealers."  *Id.* at 529; *accord*, *e.g.*,

21   *AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 705 F.2d 1203, 1207 (10th Cir. 1982) ("We

22   do not think section one of the Sherman Act requires the manufacturer to offer the same price to

23   all its customers"); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 887 (9th Cir. 1982) ("the price

24   discrimination which results where buyers seek competitive advantage from sellers encourages the

25   aims of the Sherman Act.").

26        e.    ***Lack of Antitrust Injury***.  The final deficiency articulated by the Court with

27   regard to KinderStart's antitrust claims was the lack of any "nexus" – the absence of any facts

28   indicating that the injuries KinderStart alleges have any adverse impact on competition.  *See*

1    Order at 11-12; Hearing Trans., June 30, 2006, at 5.  It is an essential element of every antitrust

2    claim that plaintiff allege "antitrust injury" – injury that reflects the adverse effect of the

3    challenged conduct on competition.  *Atlantic Richfield*, 495 U.S. at 338-42.  An adverse effect on

4    the plaintiff, without a showing of harm to consumers and competition, is never enough.  That is

5    because the antitrust laws are for the protection of competition, not individual competitors.

6    *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977); *see, e.g.*, *Pool Water*

7    *Prods. v. Olin Corp.,* 258 F.3d 1024, 1036 (9th Cir. 2001) (plaintiff's falling market share fails to

8    show antitrust injury because a "decrease in one competitor's market share … affects competitors,

9    not competition").

10       A central flaw underlying KinderStart's complaint is the absence of any allegation

11   suggesting that the harm to KinderStart might equate with harm to the market – an increase in

12   market prices, a reduction in market output or quality, or a decline in innovation.  *Cf. United*

13   *States v. Visa USA*, 344 F.3d 229, 240-41 (2d Cir. 2003).  KinderStart does not, and indeed

14   cannot, claim that the devaluation of its PageRank or the "Blockage" of its site will cause any kind

15   of marketwide reduction in total website viewing or Internet advertising – and, indeed, the very

16   concept borders on the preposterous.  In analogous situations, the courts have made clear that even

17   the total elimination of one or more firms as competitors in the market – a circumstance that

18   KinderStart does not even allege – does not give use to antitrust injury absent a showing that the

19   harm to rivals will lead to increased market prices, decreased output, or other harm to the market

20   as a whole.  There are no such allegations here.  *See*, *e.g.*, *Rutman Wine Co. v. E&J Gallo Winery*,

21   829 F.2d 729, 734-35 (9th Cir. 1987).

22       The Court's ruling made clear that any further amended complaint would have to

23   articulate, in some fashion, the manner in which KinderStart is alleging that *competition itself* has

24   been harmed.  KinderStart had ample opportunity – including 282 paragraphs in over 62 pages –

25   to do so.  That failure warrants dismissal with prejudice.

26       **B.    Monopolization**

27       As the Court ruled, a claim for monopolization, as with a claim for attempted

28   monopolization, requires sufficient allegations to establish a relevant market, exclusionary

1    conduct, and causal antitrust injury.  Order at 13.  For the reasons set forth in subsection A above,

2    KinderStart's allegations in each of those three respects are entirely deficient.  Dismissal of

3    KinderStart's claims for monopolization, therefore, is equally appropriate.

4           KinderStart continues to maintain a purported "essential facilities" claim.  As Google

5    argued previously, it is doubtful that any such separate claim survived the Supreme Court's 2004

6    decision in *Trinko*.  *See* 540 U.S. at 410-11.  Even assuming otherwise, however, this Court's

7    order dismissed the claim on the basis that KinderStart failed to meet the requirements of the pre-

8    *Trinko* decision in *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) –

9    namely, that "[a] facility that is controlled by a single firm will be considered 'essential' only if

10   control of the facility carries with it the power to *eliminate* competition in the downstream

11   market."  *Id.* at 544.  As this Court explained:  "While Kinderstart alleges that its Web traffic

12   dropped 70%, and its ad revenue dropped 80%, it does not allege that it or similarly situated class

13   members face elimination as a result of Google's conduct.  FAC ¶¶ 74, 75.  Instead it alleges that

14   'in spite of Defendant Google's wrongful conduct as alleged above, [Kinderstart] continues to

15   generate *sustainable* level of traffic and PageViews from visitors.'  FAC ¶ 168 (emphasis added)."

16   Order at 14.  The Court added:  "Kinderstart alleges that class members 'consistently receive

17   significantly and relatively high rankings and referrals from other search engines such as MSN

18   and Yahoo.'  FAC ¶ 80."  Accordingly, Kinderstart has not alleged adequately that Google, or its

19   search engine, is an 'essential facility' within the Search Engine Market."  *Id.*  Nothing in the SAC

20   even attempts to cure these defects.  The monopolization claim should therefore be dismissed with

21   prejudice.[7]

22

------------------------------------------------

23   [7] KinderStart's antitrust claims are barred by the First Amendment for the reasons stated in
     Google's original motion to dismiss.  *See Jefferson County*, 175 F.3d 848.  Although the Court
24   declined to reach the issue in its opinion, Order at 15 n.6, the Court's opinion suggests that
     *Jefferson County* might be distinguishable if Google were not a media defendant and its search
25   results and PageRanks were not matters of public concern.  The decision in *Jefferson County*,
     however, did not turn on those distinctions.  Instead, the Tenth Circuit held that Moody's ratings
26   were expressions of opinion that were entitled to full First Amendment protection.  *Id.* at 859-60.
     In any event, Google is indeed a "media defendant," albeit in a different media, and its search
27   results – if the SAC's allegations are accepted as true – are of significant public concern in that
     they "influence millions of users, business and organizations regarding the evaluation … of
28   Websites across the Internet."  SAC ¶¶ 51, 91.  *Paradise Hills Assocs. v. Procel*, 235 Cal. App.
     3d 1528, 1545 (1991) (public's access to consumer information is a matter of public interest
                                                                                    (continued...)

1    **III.    THE COURT SHOULD DISMISS KINDERSTART'S FREE SPEECH CLAIMS**
2            **WITH PREJUDICE**

3            KinderStart's free speech claim remains frivolous because Google is not a state actor.

4    Google is a corporation owned by its shareholders that operates a popular search engine for profit.

5    In undertaking this endeavor, Google does not engage in any activity from which a Court could

6    infer that its actions are remotely that of the government.  While KinderStart devotes numerous

7    paragraphs in the SAC chronicling various mundane ties Google has with the government, none of

8    those allegations comes close to satisfying the established tests for determining whether state

9    action is present, or that Google's actions challenged in this case have anything to do with the

10   government.  Indeed, courts have held that companies with far more substantial ties to the

11   government are not state actors.  *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352-3

12   (1974) (monopolist utility company was not a state actor).  Because the free speech claims were

13   baseless when asserted in the FAC and remain baseless in the SAC, they should be dismissed with

14   prejudice.  *See Price v. State of Hawaii*, 939 F. 2d 702, 709 (9th Cir. 1991) (affirming award of

15   attorney's fees "because the complaint so patently failed to state a claim" that private party was

16   acting under color of state law).

17           **A.    Google Is Not a State Actor Under the First Amendment**

18           The Court's Order dismissing KinderStart's FAC noted five tests for determining the

19   presence of state action.  The first four are: "(1) public function; (2) joint action; (3) governmental

20   compulsion or coercion; and (4) governmental nexus."  *Kirtley v. Rainey*, 326 F.3d 1088, 1092

21   (9th Cir. 2003).  The fifth test, seemingly a species of the joint action test, examines whether there

22   is a symbiotic relationship between the private actor and the government with respect to the

23   challenged actions.  *See Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1213 (9th

24   Cir. 2002).  None of these tests could possibly apply here.

25

26

27           (...continued from previous page)

28   deserving of highest constitutional protection).  This point thus remains an alternative ground for
     dismissal of the antitrust claims.

GOOGLE'S MOTION TO DISMISS SAC                    -18-                                    2955747_2.DOC
CASE NO. C 06-2057 JF (RS)

1     As the Court previously noted, the public function test is inapplicable because "the

2  function at issue must be both traditionally and exclusively governmental." *See Lee v. Katz*, 276

3  F.3d 550, 555 (9th Cir. 2002).  KinderStart alleges that Google performs a state function by "the

4  creation, management and stewardship of a universal, public search engine reaching a dynamic

5  archive and repository of the world's Website content on all essential topics and subject matter for

6  viewing and use by members of the general public." SAC ¶ 253.  The Court rejected this identical

7  allegation when dismissing the FAC: "these functions, made possible by new technology, are

8  neither traditionally nor exclusively governmental." Order at 7.  The Court was assuredly correct

9  in ruling that governments have not been the traditional and exclusive source of providing search

10 engines to the public. *See*, *e.g.*, *Jackson*, 419 U.S. at 352.

11    With respect to the joint action test, KinderStart does not allege that the government was

12 involved in *the actions that allegedly violated its free speech rights*.  *See* SAC ¶ 255 (alleging

13 joint participation between Google and university libraries regarding a project to archive library

14 books).  This test is thus inapplicable.  Likewise, as the Court previously ruled, the government

15 compulsion/coercion test is not implicated by KinderStart's complaint.  Order at 8.

16    The government nexus/entwinement test does not apply because that test asks "whether

17 there is such a close nexus between the State and the *challenged action* that the seemingly private

18 behavior may be fairly treated as that of the State itself." *Kirtley*, 326 F.3d at 1094-95 (emphasis

19 added) (quotations and citation omitted).  KinderStart points to Google's performance under

20 contracts with public libraries and other tangential relationships between the government and

21 Google as providing the required nexus.  *See*, *e.g.*, SAC ¶¶ 92-95, 254-55.  KinderStart is

22 mistaken. The *challenged action* in this case is that Google allegedly has not included KinderStart

23 in the index of its search engine.  The government is not alleged to have played any role in that

24 action.  *See George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1231 (9th Cir. 1996) (affirming

25 dismissal of complaint based on the First Amendment which failed to "plead a nexus between the

26 government and the complained-of action"); *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679 (N.D.

27 Cal. 2006) (describing Google challenge to a subpoena by the U.S. Department of Justice seeking

28 data related to the content of Google's index and queries from Google's users).  Indeed,

1    KinderStart has specifically pled that the government does *not* participate in the operation of

2    Google's search engine.  SAC ¶ 114.  The nexus that is required to treat the actions of a private

3    party as that of the state is plainly absent here.  KinderStart's implicit suggestion that a company

4    who contracts with the government becomes a state actor subject to First Amendment scrutiny for

5    all purposes is absurd.  *See George*, 91 F.3d at 1230 (rejecting claim that an official of a privately-

6    owned prison was a state actor in employment matters and noting that "[a]n entity may be a state

7    actor for some purposes but not for others.").

8          The fifth test – the symbiotic relationship test – only applies in the narrowest of

9    circumstances, where a private actor "confers significant financial benefits indispensable to the

10   government's 'financial success.'"  *Brunette*, 294 F.3d at 1213.  This test was articulated by the

11   Supreme Court in *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722 (1961).  In *Burton*, the

12   court found state action where the government "so far insinuated itself into a position of

13   interdependence (with a private entity) that it must be recognized as a joint participant in the

14   challenged activity."  *Id.* at 725.  By its terms, this test is so rare that the Ninth Circuit has

15   repeatedly and uniformly rejected its application.  *See Vincent v. Trend Western Tech. Corp.*, 828

16   F.2d 563, 569 (9th Cir. 1987) (no state action found where contractor "was most certainly not an

17   indispensable element in the Air Force's financial success" and "the government did not profit

18   from [contractor's] alleged unconstitutional conduct"); *Sever v. Alaska Pulp Corp.*, 978 F.2d

19   1529, 1538 (1992) ("The fact that defendants rely heavily on government contracts does not, by

20   itself, transform their action into state action."); *Brunette*, 294 F.3d at 1214 (no state action found

21   where private actor and government were not "financially integrated.").  Naturally, KinderStart

22   has not pled any facts to remotely support the contention that Google has conferred benefits which

23   are "indispensable" to the success of a government, and indeed, KinderStart has not even

24   identified the government upon whom Google has allegedly bestowed such indispensable benefits.

25   Google is, without question, not symbiotically related to the government in the operation of its

26   search engine.[8]

27   _____

28        [8] KinderStart's intentionally vague legal conclusion regarding financial benefits is properly
     disregarded.  *See* SAC ¶ 254 ("The financial and other benefits provided means of Defendant's
                                                                              (continued...)

1    Google also cannot be deemed a state actor by virtue of allegedly having dedicated private

2  property for public use.  Under federal law a private actor does not have a First Amendment

3  obligation to safeguard the speech of others because it has opened its private property to the

4  public.  *See Hudgens v. NLRB*, 424 U.S. 507 (1975) (where a party claimed the right to speak in a

5  publicly accessible, but privately owned shopping center, "the constitutional guarantee of free

6  expression has no part to play"); *Golden Gateway Center v. Golden Gateway Tenants Ass'n*, 26

7  Cal. 4th 1013, 1019-20 (2001) (noting that the *Pruneyard* decision "declined to follow the First

8  Amendment jurisprudence of the United States Supreme Court"); Erwin Chemerinsky,

9  *Constitutional Law: Principles and Policies* at 1103 (2d ed. 2002)  ("There is no right to use

10  private property owned by others for speech.  Because it is private property, the Constitution does

11  not apply.").[9]

12    Even if there were an exception for property open to the public as a general matter,

13  KinderStart's claim would still fail because Google's "property" (*i.e.*, its search results), is not

14  open to the public at all.  Google alone speaks through its search results and has complete

_____

16    (...continued from previous page)

17  actions are material to such institutions and make them essential to the ongoing viability and
value of such institutions and their services to the public in the public domain.").  KinderStart
has an obligation to plead facts, not conclusions.

18    [9] The case of *Venetian Casino Resort, LLC v. Local Joint Executive Bd.*, 257 F.3d 937, 943

19  (9th Cir. 2001) is consistent with this principle because in that case the property owner, the
Venetian casino, had contracted with the State of Nevada to permit pedestrian traffic on a

20  sidewalk that was built to replace a public sidewalk eliminated at the casino's behest.  A
servitude on the Venetian property was recorded and required "unobstructed public use of the

21  sidewalk."  *Id.*  That case is viewed properly under the rubric of the traditional state action tests
noted above instead of a separate test stemming from public access to private property because

22  its outcome turned on the property owner's connection with the government.  *See also Lee*, 276
F.3d 550 (9th Cir. 2002) (lessee of a town commons that agreed to regulate speech in the

23  commons was deemed a state actor under the public function test).  Indeed, in the absence of the
agreement with the state to provide unobstructed pedestrian access, the Venetian's sidewalks

24  would not have been subject to First Amendment restrictions.  *See, e.g.*, *Utah Gospel Mission v.
Salt Lake City Corp.*, 425 F.3d 1249, 1255 (10th Cir. 2005) (holding that a block-long section of

25  a Main Street in Salt Lake City which was sold to a church to promote pedestrian traffic was not
subject to First Amendment obligations where deed did not require purchaser to accommodate

26  expressive conduct and noting that "property does not become a public forum simply because a
private owner generally opens his property to the public").  Regardless, whether viewed

27  analytically as a state action case or a public forum case, the facts of *Venetian* are entirely
dissimilar to the present one.  Google has not contracted with the government to provide

28  unobstructed public access to its search results and a search engine itself is not a traditional
public forum like a public sidewalk.

1    dominion over them.  SAC ¶¶ 2, 128.  Google indexes the web; ranks websites using proprietary

2    algorithms; and provides its view of the most relevant web pages in response to user queries.

3    Google's private search engine has become popular precisely because Google makes editorial

4    decisions about the relevance of websites in relation to search queries.  The fact that Google's

5    speech is freely *accessible* to the public does not transform its private search engine into a forum

6    that has been dedicated to the public any more than a freely distributed newspaper must

7    accommodate the speech of others simply because it is made available to the public at large.

8    Indeed, as the Court has correctly noted, far from dedicating the operation of its search engine to

9    the public for speech, Google alone runs its search engine on behalf of its shareholders as an

10   integral part of a for-profit corporation.  Order at 9.

11        **B.        KinderStart's California Free Speech Claim Also Fails**

12        KinderStart's claim for alleged violation of its free speech rights under California's

13   Constitution fares no better.  Under *Robins v. Pruneyard Shopping Center*, 23 Cal. 3d 899, 910

14   (1979), *aff'd*, 447 U.S. 74 (1980), the actions of a private owner of a publicly-accessible shopping

15   center may constitute state action for purpose of California's free speech clause.  However,

16   Google's search engine plainly does not fall within this very limited exception which is applicable

17   only where private property serves as the functional equivalent of a traditional public forum.  *See*,

18   *e.g.*, *Golden Gateway*, 26 Cal. 4th at 1033 ("private property must be public in character before

19   California's free speech clause may apply"); *Trader Joe's Co. v. Progressive Campaigns, Inc.*, 73

20   Cal. App. 4th 425, 434 (1999) (grocery store not subject to California free speech clause because

21   it "opens its property to the public so the public can buy goods.  It does not offer its property for

22   any other use"); *Albertson's, Inc. v. Young*, 107 Cal. App. 4th 106 (2003) (same; private property

23   must function as equivalent to traditional public forum).  As noted, Google has not opened up its

24   search results or index to the public and therefore cannot be subject to the free speech clause of

25   the California constitution as a traditional public forum.[10]

26

27        [10] In dismissing KinderStart's California free speech claims in the FAC, the Court stated that
     "[n]owhere does Kinderstart allege that Google has invited the public to speak through Google's
28   search engine, either by enabling public editing of results/rankings or by promising that every
     website created by the public will be indexed, ranked, and displayed."  Order at 10.  The SAC is
                                                                                        (continued...)

1    **IV.    THE COURT SHOULD DISMISS KINDERSTART'S DEFAMATION CLAIM**
2    **WITH PREJUDICE**

3    **A.    KinderStart Has Failed to Identify a Provably False Statement**

4    KinderStart continues to claim that Google has defamed it by informing users of Google's

5    toolbar that Google rates the KinderStart site a 0-PR.  *See* SAC ¶¶ 271, 275.  But on its face, there

6    is nothing about that statement that is false.  KinderStart's site truly is a 0-PR as that is the rating

7    that Google currently assigns to it.  Because the statement is literally true, no defamation claim

8    can be based on the 0-PR designation alone.  *Hejmadi v. Amfac, Inc.*, 202 Cal. App. 3d 525, 552-

9    53 (1988) ("Truth is an absolute defense to an action for defamation"); *Hughes v. Hughes*, 122

10   Cal. App. 4th 931, 938-9 (2004).

11   To supply the requisite element of falsity for its defamation claim, KinderStart appears to

12   contend that the 0-PR statement for its site falsely *implies* that the site is not relevant and falsely

13   *implies* that the site has no content or links to it.  *See* SAC ¶¶ 271, 275.  Neither supposed

14   implication states a claim for defamation.  The supposed implication from Google's 0-PR rating

15   that KinderStart's site is "irrelevant," is a statement of non-actionable opinion.  Google is merely

16   stating its view that the KinderStart site is relatively unimportant or unappealing to users.  *See*

17   SAC ¶¶ 7, 140, 272, 276.  But what Google deems relatively unimportant, unappealing or

18

19   ────────────────────

          (...continued from previous page)
20   likewise deficient for these reasons.  However, Google disagrees that such allegations would be
     sufficient to state a claim under the free speech clause of the California Constitution because the
21   holding of the *Pruneyard* case – that owners of private, real property functioning as the
     equivalent of a traditional public forum can be subject to free speech obligations – does not apply
22   to online websites.  A privately owned and operated website is simply not a traditional forum for
     speech.  *See United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 206 (2003) (rejecting
23   the contention that the Internet was a traditional public forum and noting that "[t]he doctrines
     surrounding traditional public forums may not be extended to situations where such history is
24   lacking.").  This is the case even if the public is invited to collaborate regarding the website's
     content.  Indeed, Wiki-based websites and open source projects depend upon collaboration from
25   the public, but their owners must be permitted to edit and remove contributions that they find
     unhelpful, harmful or contrary to their mission.  When "balanc[ing] the competing interests of
26   the property owner and of the society with respect to the particular property or type of property
     at issue" in the online context, *Trader Joe's*, 73 Cal. App. 4th at 433, the proper conclusion is
27   that privately owned websites have the *per se* freedom to operate as they see fit without
     accounting for the free speech rights of California's residents because websites have never been
28   deemed a traditional public forum.  The holding of *Pruneyard*, which has been limited to its facts
     by subsequent cases, should not be radically extended to the online context.

1    irrelevant may be of significant relevance, appeal or importance to a user.  A claim for defamation

2    cannot be based on the vagaries of such opinions.  *See* Section I(A), *supra*, at 2-5.

3        As for the supposed implication that there is not content on, nor links to, KinderStart's site,

4    there is absolutely nothing in any of KinderStart's complaints to suggest that such implied

5    assertions are properly drawn from a 0-PR.  KinderStart points to no statements by Google to that

6    effect and does not otherwise allege any facts showing that users would reasonably draw that

7    implication.[11]  Simply put, the average user of the Google toolbar would not reasonably conclude

8    that a 0-PR rating for a website means that the site has no content or links to it.  Accordingly, no

9    claim for defamation can be based upon that supposed implication either.  *See Morningstar, Inc. v.*

10   *Superior Court*, 23 Cal. App. 4th 676, 688 (1994) ("the publication is to be measured not so much

11   by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural

12   and probable effect upon the mind of the average reader"); *Ringler Assocs., Inc. v. Maryland Cas.*

13   *Co.*, 80 Cal. App. 4th 1165, 1179 (2000).

14       Finally, seizing on comments in the Court's Order, KinderStart includes in its defamation

15   count an allegation regarding Google's use of algorithms in assessing PageRanks.  *See* SAC ¶¶

16   276-77.  Remarkably, KinderStart claims that Google "holds out in public PageRank as an opinion

17   of the value of a given website," thereby conceding Google's First Amendment defense for

18   matters of opinion.  It follows this bizarre concession with the conclusory assertion that despite

19   Google's public description of PageRank as its opinion, users understand it as something objective

20   based on "one or more computer algorithms."  SAC ¶ 276.  KinderStart offers no factual

21   allegations to support this assertion.

22

23

---

24   [11] When a user "mouses over" the PageRank display on the Google toolbar, the toolbar
displays the message:  "PageRank is Google's measure of the importance of the page."  Compl. ¶

25   5.  There is certainly nothing in that message to imply that a page has no content or links to it.
Further, in a "help" section for toolbar users on its website, Google describes PageRank as:  "The

26   importance Google assigns to a page based on which other webpages link to it and many other
variables."  Volkmer Decl., Ex. A.  Accordingly, users are told PageRank depends in part on

27   *which* sites link to a page as well a "many other variables."  Nowhere does Google state that
PageRank is simply a count of the number of links to a particular page.  Given that, it is simply

28   not possible to draw the implied representation that KinderStart apparently maintains is present
here.

1    As Google explained in the last round of briefing, the fact that Google says that it uses

2  algorithms in its PageRank determination does not transform its inherently subjective assessment

3  of a website's "value" or "importance" into something "objective." To the contrary, the

4  determinations of what factors to include in assessing the importance of a website and how to

5  weigh those factors are necessarily subjective. *See*, *e.g.*, Motion to Dismiss FAC at 10, Reply in

6  Support of Defendant's Special Motion to Strike at 9–10. As one leading law professor recently

7  explained in a Yale law journal:

> Ranking algorithms obviate the need for humans to make individualized ranking decisions for
> the millions of search terms used by searchers, but they do not lessen the role of human
> editorial judgment in the process. Instead, the choice of which factors to include in the
> ranking algorithm, and how to weight them, reflects the search engine operator's editorial
> judgments about what makes content valuable.

11  Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*, 8 Yale J.L. &

12  Tech. 188 (Spring 2006). It is neither objectively correct nor incorrect, for example, for Google to

13  use the number and quality of links to a site in assessing the site's importance; it is simply

14  Google's subjective view of some of the factors that should bear on the question of importance.

15  Others search engines may use algorithms to rate sites' importance based on the number of

16  visitors to a page in a given period, based on the number of times a particular search term appears

17  on the page, or take some altogether different approach. Ultimately, individual users decide

18  which search engine's opinion of importance to credit.

19    As if to drive home the point that Google's use of algorithms does not make PageRank

20  objective, KinderStart offers the allegation that Google uses *algorithms* to "*programmatically*

21  punish" with a 0-PR, sites that Google believes to have "inferior page quality." *See* SAC ¶ 145

22  (emphasis added). Thus, according to KinderStart, human beings at Google decide what

23  constitutes inferior page quality and write algorithms to implement their subjective views rather

24  than having to assess sites, one at a time. The fact that an algorithm is used and "mathematically"

25  yield a 0-PR does not make the inherently subjective determination of "page quality" objective or

26  provably false. Likewise, it does not make the 0-PR that Google assigned to the KinderStart site

27  any less of an opinion, or enable KinderStart to overcome the First Amendment's protection

28  afforded to Google's expression. *See* Section I(A), *supra*, at 2-5.

1    **B.    KinderStart Fails to Identify Injury from Actionable Defamation**

2         KinderStart's failure to identify a provably false statement of fact leads KinderStart back

3    to the same deficiency the Court identified in its Order dismissing KinderStart's FAC.  The Court

4    specifically instructed KinderStart to identify alleged injury from a provably false statement of

5    fact, as opposed to harm caused merely by Google opining that the KinderStart site rated a 0-PR.

6    Order at 21-22.  KinderStart has failed to cure that deficiency.  Its SAC again pleads only that

7    KinderStart was harmed by the 0-PR for its site (*i.e*, by Google opining that the site is not worth

8    users' time).  *Id.*; *see* ¶¶ 281-82 (generally alleging injury from alleged defamation).  How Google

9    allegedly arrived at its opinion simply does not figure into KinderStart's allegations of supposed

10   injury.  *Id.*[12]  For this reason as well, the defamation claim fails.

11   **C.    KinderStart Fails to Allege Actual Malice**

12        KinderStart's defamation claim is deficient for yet another reason – KinderStart has failed

13   to allege that Google acted with actual malice in presenting a 0-PR for KinderStart's site. In the

14   absence of factual allegations of malice, any statement by Google, even if provably false, is

15   subject to California's "common interest" and "fair comment" privileges.

16            **1.    Malice**

17        California law defines malice as "that state of mind arising from hatred or ill will toward

18   the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the

19

---

20        [12] Because a 0-PR is not defamatory on its face, KinderStart is obligated to allege special
     damages.  Cal. Civ. Code § 45a (a libel is only defamatory on its face if it is defamatory "without
21   the necessity of explanatory matter"); *Forsher v. Bugliosi*, 26 Cal. 3d 792, 807 (1980).  Special
     damages are those to property and business that are exclusively attributable to the alleged
22   defamation, and to no other cause.  Cal. Civ. Code § 48a(4).  Under the Federal Rules, special
     damages allegations must be "specifically stated."  Fed. R. Civ. P. 9(g).  That means KinderStart
23   must allege facts "showing an established business, the amount of sales for a substantial period
     preceding the publication, the amount of sales subsequent to the publication, [and] facts showing
24   that such loss in sales were the natural and probable result of such publication."  *Fowler v. Curtis
     Pub. Co.*, 182 F.2d 377, 379 (D.C. Cir. 1950); *American Needle & Novelty, Inc. v. Drew Pearson
25   Mktg., Inc.*, 820 F. Supp. 1072, 1076 (N.D. Ill.1993); *see also Action Repair, Inc. v. American
     Broad. Cos.*, 776 F.2d 143, 149-50 (7th Cir. 1985).  KinderStart does not plead special damages,
26   state them with the requisite specificity or attribute them exclusively to supposed defamation.
     Throughout its complaint, KinderStart generally alleges harm to its reputation, goodwill and
27   some unspecified drop in business, but makes no attempt to tie those injuries exclusively to its
     0-PR rating.  *See*, *e.g.*, SAC ¶¶ 213, 246, 267-68, 281-82.  Again, KinderStart's defamation
28   allegations are not sufficient to state a claim.

1  part of the defendant in the truth of the libelous publication or broadcast at the time it is published

2  or broadcast shall not constitute actual malice."  Cal. Civ. Code § 48a.  *See Brown v. Kelly Broad.*

3  *Co.*, 48 Cal. 3d 711, 745 (1989), *quoting Agarwal v. Johnson*, 25 Cal. 3d 932, 944 (1979) ("The

4  malice referred to by [section 47(3)] is actual malice or malice in fact, that is, a state of mind

5  arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.").

6  "Mere allegations of malice are not sufficient … actual facts must be alleged, unless they are

7  apparent from the statement itself."  *Tschirky v. Superior Court*, 124 Cal. App. 3d 534, 539

8  (1981).  As discussed, *supra*, KinderStart has not identified a provably false statement of fact by

9  Google.  It certainly has not pled facts showing that Google acted with hatred or ill will toward

10  KinderStart in rating its site a 0-PR.  Indeed, if anything, KinderStart has pled that Google

11  believes it is engaged in fully protected speech when it expresses its PageRank opinions.  *See*

12  SAC ¶ 169; FAC ¶¶ 44-48 (Google believes its expression of PR is absolutely protected speech).

13        **2.**      **The Common Interest Privilege Bars KinderStart's Defamation Claim**

14        California Civil Code Section 47(c) provides that an allegedly defamatory statement is

15  privileged if it is made "without malice, to a person interested therein … who is requested by the

16  person interested to give the information."  Cal. Civ. Code § 47(c).  If the privilege is established

17  and the complaint lacks factual allegations of actual malice, a claim of defamation cannot survive

18  a motion to dismiss.  *Locke v. Mitchell*, 7 Cal. 2d 599, 602 (1936) ("In such a case malice

19  becomes the gist of the action and it must exist as a fact before the cause of action will lie.");

20  *Green v. Uccelli*, 207 Cal. App. 3d 1112, 1124 (1989) (existence of 47(c) privilege may be raised

21  at pleading stage); *Lundquist v. Reusser*, 7 Cal. 4th 1193, 1204 (1994).

22        Here, it is clear the common interest privilege applies.  KinderStart itself alleges that to

23  view a website's PR, users must first visit Google.com and download the Google Toolbar. SAC ¶

24  78.  Users must also affirmatively choose to enable the "PageRank" feature of the toolbar.  *See*

25  Volkmer Decl. Ex. B ("users who download the Google Toolbar choose whether they want

26  PageRank enabled or disabled before installation is completed").  Finally, users must visit the

27  particular website (e.g., Kinderstart.com) and navigate their cursor over the PR icon on the

28  Toolbar.  FAC ¶ 165 (PR is displayed when ks.com "is visited and viewed by the public").   Thus,

1   there is no question that those who receive Google's PR rating for the KinderStart site are

2   interested in and request that information.  Because the elements of the common interest privilege

3   are met here and KinderStart has failed to allege actual malice, Google's 0-PR rating of the

4   KinderStart site is privileged under Section 47(c)(3).  *Rodas v. Spiegel*, 87 Cal. App. 4th 513, 519

5   (2001) (section 47(c)(3) applies to preparation of inspection report requested by third parties);

6   *Pavlovsky v. Board of Trade*, 171 Cal. App. 2d 110 (1959) (where association members requested

7   names of debtors, distribution of the names of persons who were delinquent in the payment of

8   their accounts was privileged).

9        **3. The Fair Comment Privilege Bars KinderStart's Defamation Claim**

10      Google's 0-PR rating is also protected by California's common law "right of fair

11   comment" privilege.  The fair comment privilege protects statements about "public officials,

12   scientists, artists, composers, performers, authors, and other persons who place themselves or their

13   work in the public eye" unless the statements are made with actual malice.  *Brown*, 48 Cal. 3d at

14   732; *Institute of Athletic Motivation v. Univ. of Ill.*, 114 Cal. App. 3d 1, 8-9, n.4 (1980).  In

15   California, the fair comment privilege applies not only to opinions but to false statements of fact

16   as well.  *Id.*; *Maidman v. Jewish Publ'ns, Inc.*, 54 Cal. 2d 643 (1960) (editorial implicating that a

17   prominent member of the Jewish community misled a court as to the nature of a religious holiday

18   is privileged).

19      Here, there can be no doubt that KinderStart has placed itself and its site in the public eye.

20   SAC ¶¶ 28-32.  It is therefore subject to public comment and criticism.  Accordingly, where, as

21   here, KinderStart has failed to allege actual malice, Google's 0-PR rating for KinderStart's site is

22   again privileged and cannot support a defamation claim.

23   **V. THE COURT SHOULD DISMISS KINDERSTART'S LANHAM ACT CLAIM
     WITH PREJUDICE**

24

25      KinderStart's Lanham Act claim appears for the first time in the SAC.  But the Court did

26   not grant KinderStart leave to inject new causes of action into the lawsuit, and instead merely

27   allowed it to try to fix the defects in its previously-pled claims.  *See* Google's Motion to Dismiss

28   and/or Strike Second Amended Complaint at 6-7 ("Dismiss/Strike Motion"), filed concurrently.

1  For this reason, and for Kinderstart's failure to plead the substantive elements of a Lanham Act

2  claim discussed below, the claim should be dismissed.

3  **A.    Google's Representations About Search Results**

4  KinderStart lacks standing to pursue a Lanham Act claim based on statements that Google

5  allegedly made about the objectivity of its search results.  SAC ¶ 238.[13]  To show standing,

6  KinderStart must plead facts demonstrating:  "(1) a commercial injury based upon a

7  misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the

8  plaintiff's ability to compete with the defendant."  *Jack Russell Terrier Network of N. Cal. v.*

9  *American Kennel Club, Inc.*, 407 F.3d 1027 (9th Cir. 2005) (affirming dismissal

10  where plaintiff did not suffer competitive injuries); *see Barrus v. Sylvania*, 55 F.3d 468 (9th Cir.

11  1995) (same).  To the extent Google can even identify in the SAC the specific statements at issue

12  here, KinderStart has not alleged that those statements harmed it in any way.  Rather, the SAC

13  makes quite clear that the harm about which KinderStart complains – its "cataclysmic fall" in

14  monthly page views and its "precipitous fall" in AdSense revenue – is blamed on "Blockage," *i.e.*,

15  the absence of KinderStart's site from Google's search results.  *See generally* ¶¶ 174-186 (under

16  heading titled "Specific Harms to the Class Representative").

17  While Kinderstart alleges that Google's representations regarding the objectivity and

18  fairness of its results cause users to choose Google over others, the allegation is hopelessly vague

19  and the alleged injury hopelessly speculative.  SAC ¶ 138; *see also* ¶ 241.  More importantly,

20  Kinderstart does not allege that it lost users because of statements by Google, only that it lost

21  users due to "Blockage."  *See, e.g.*, ¶¶ 174-176.  Thus, KinderStart has no standing.[14]

22

23

---

24  [13] KinderStart also has the audacity to bring a Lanham Act claim based on a "guarantee"
allegedly made by Google that it would disclose all instances in which it removed a site from its
search results.  SAC ¶ 243.  However, Google never made any such guarantee and KinderStart

25  has employed the use of misleading ellipses to manufacture this claim.  *See* Dismiss/Strike
Motion at 5-6.  This allegation, which reflects sanctionable misconduct, should be rejected out of

26  hand.

27  [14] As discussed *supra* at Section I, the First Amendment and § 230(c)(2) immunize Google

28  from any liability for restricting access to material that Google finds objectionable.  To the extent
the Lanham Act claim is predicated on such actions, it fails to state a claim.

In addition to its standing problem, KinderStart cannot base a Lanham Act claim on Google's statements about its search results because it cannot identify the *false* representation of fact required to state a claim. *See Rice v. Fox Broad. Co*., 330 F.3d 1170, 1180 (9th Cir. 2003) (reversing denial of summary judgment for defendant where no false statements made in advertising). According to KinderStart, Google falsely represents that its search results are "objective and free from manipulation." KinderStart is mistaken. Google does not purport to provide a web index untouched by human hands, as KinderStart simplistically suggests. Rather, as KinderStart itself acknowledges, Google publicly discloses that it manually removes from its index those websites that fail to meet its quality standards, such as those that engage in practices to deliberately fool search engines. SAC ¶ 153. And when Google refers to its search results as "objective," it makes clear that it means that inclusion in its results is not for sale:

> *Objectivity*   We believe it is very important that the results users get from Google are produced with only their interests in mind. We do not accept money for search result ranking or inclusion. We do accept fees for advertising, but it does not influence how we generate our search results. SAC ¶ 121.[15]

That is the objectivity that Google offers; it has never promised not to scrutinize a computer-generated search index to address quality concerns. Indeed, Google explicitly advises users that "[w]e won't comment on the individual reasons a page was removed, and we don't offer an exhaustive list of practices that can cause removal." SAC ¶ 153. Google's representations about the objectivity of search results are simply not false and thus cannot form the predicate for a Lanham Act claim.[16]

---

[15] Without any factual support or explanation, Kinderstart contends that Google "has intentionally offered and delivered top positions in search results on Google's Search Results to companies, firms, advertisers and advertising agencies … in exchange for certain conditions and consideration as accepted by Google." SAC ¶ 130; *see also* ¶ 131. If this vague and barely intelligible allegation is intended to suggest that Google accepts money for placement, it is false and irresponsible. Google has prepared, and if necessary will file a Rule 11 motion to address it. In any event, KinderStart lacks standing to pursue a false advertising claim against Google based on any alleged misrepresentation about its refusal to accept payment for search placement for the same reasons it lacks standing to pursue a claim based on Google's statements regarding its objectivity.

[16] KinderStart's allegations concerning Google's purported illicit reasons for removing websites (such as religious and political) are entirely conclusory, false, and likewise will be the subject of a forthcoming Rule 11 motion against KinderStart. Regardless, KinderStart has not

(continued...)

1

**B.    Google's Assignment of PageRank**

2      KinderStart also contends that Google's assignment of a 0-PR to the KinderStart site

3  "misrepresent[s] the qualities, value and importance" of the site.  SAC ¶ 242.  The Lanham Act,

4  however, applies solely to false representations of *fact*.  *Coastal Abstract Serv., Inc. v. First Am.*

5  *Title Ins. Co.*, 173 F.3d 725, 730-31 (9th Cir. 1999) (reversing jury verdict where alleged false

6  statement "was not a specific and measurable claim, capable of being provided false or of being

7  reasonably interpreted as a statement of objective fact."); *Groden v. Random House, Inc*., 61 F.3d

8  1045, 1051 (2d Cir. 1995) (affirming summary judgment for defendant with respect to statement

9  "GUILTY OF MISLEADING THE AMERICAN PUBLIC" applied to Kennedy assassination

10  conspiracy theorist; "the statement … is obviously a statement of opinion that could not

11  reasonably be seen as stating or implying provable facts about Groden's work").  Because

12  PageRank constitutes Google's opinion of the importance and likely relevance of KinderStart's

13  website, it is not actionable.[17]  *See supra* at Section I(A), IV(A).

14      Google's assignment of 0-PR to Kinderstart is not cognizable under the Lanham Act for

15  another reason: the Lanham Act only governs misrepresentations made in "commercial

16  advertising and promotion."  15 U.S.C. § 1125(a)(1)(B).  In the Ninth Circuit, to constitute

17  commercial advertising and promotion, a representation must be:

18      (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff;
        (3) for the purpose of influencing consumers to buy defendant's goods or services.  While the

19      representations need not be made in a "classic advertising campaign," but may consist instead
        of more informal types of "promotion," the representations (4) must be disseminated

20      sufficiently to the relevant purchasing public to constitute '"advertising" or "promotion"
        within that industry.

21

22  _____

23      (...continued from previous page)
    pled any *facts* suggesting that any website, much less KinderStart's site, has suffered any injury

24  due to Google's representations concerning its reasons for removing websites from its results.
    Accordingly, KinderStart lacks standing to pursue these fabricated claims.

25
    [17] Because customers, as opposed to competitors, cannot demonstrate competitive injury,

26  they do not have standing to bring claims for false advertising under the Lanham Act.  *Barrus*,
    55 F.3d at 469-470 (affirming motion to dismiss claims brought by class of consumer plaintiffs).

27  Accordingly, to the extent Plaintiff seeks to bring a Lanham Act claim on behalf of a class of
    AdSense participants who allegedly lost revenue based on decreased PageRanks (*see* ¶¶ 265-

28  266), those claims fail for the additional reason that the AdSense participants are customers, not
    competitors, of Google and therefore lack standing.

1    *Coastal Abstract*, 173 F.3d at 735.  Google's PageRank is neither commercial speech,[18] nor

2    offered to influence consumers to buy Google's services.[19]  For this reason as well, no Lanham

3    Act claim can be based upon it.

## VI.    THE COURT SHOULD DISMISS KINDERSTART'S 17200 CLAIM WITH PREJUDICE

### A.    KinderStart's Vague AdSense Allegation Fails to State a Claim

KinderStart's Section 17200 claim first alleges that "[m]embers of the public are likely to

be deceived by Defendant Google's AdSense Program Agreement in believing and anticipating

---

[18] The "core notion" of commercial speech is "'speech which does no more than propose a commercial transaction.'"  *Rice*, 330 F.3d at 1181; *see also Oxycal Labs., Inc. v. Jeffers*, 909 F. Supp. 719, 725 (C.D. Cal. 1995) ("The key seems to be a determination of whether the speech is primarily motivated by commercial concerns, or whether there is sufficient non-commercial motivations.").  The Supreme Court has developed a three pronged test to evaluate whether speech can properly be characterized as commercial.  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983).  Typically, all of the *Bolger* factors must be present for the possibility of commercial speech (*id.* at 68 n.14), but PageRank does not meet a single one:  (1) A PageRank is not in an advertising format, as it is not "speech about a product or service by a person who is offering that product or service at a price, directed to persons who may want, and be willing to pay for, that product or service."  *Bolger*, 463 U.S. at 66-67; *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 960-61 (2002).  Rather, a PageRank is the type of editorial comment that Congress explicitly intended to exempt from liability under the Lanham Act.  *See New.net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1118 (C.D. Cal. 2004)(quoting legislative history of 1998 amendments to 43(a) explicitly exempting Consumer Reports ratings and similar material); *Wojnarowicz v. American Family Ass'n*, 745 F. Supp. 130 (S.D.N.Y. 1990) ("[43(a)] has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service"); (2) A PageRank does not refer to a specific *Google* product or service to promote their sales, but instead reflects Google's rating of others' websites.  *Bolger*, 463 U.S. at 66-67; *Kasky*, 27 Cal. 4th at 961; and (3) Google does not have a commercial motivation in displaying a PageRank.  *Bolger*, 463 U.S. at 67.  PageRanks are displayed for free to all users. SAC ¶¶ 8, 122.  The fact that Google is a commercial enterprise does not change this analysis.  *See Oxycal*, 909 F. Supp. at 725 (disparaging statements in book not actionable as commercial speech even though defendants had economic motivation for sale of book).

[19] Google's assignment of a 0-PR is not made for the purpose of influencing the purchase of anything from Google because in assigning it, Google is not offering anything for sale. *See New.Net*, 356 F. Supp. 2d at 1111 ("Speech is not advertising speech where it does not promote the speaker's product for sale or encourage a commercial transaction with the user.").  Indeed, 0-PR is not even visible to a user until after the conclusion of a "transaction" with Google, *i.e.*, a free download of the Google toolbar. *See supra* at 24 and n. 11.  Google's after-the-fact communication of a website ranking does not relate to the "sale" of any Google product or service.  *See Rice*, 330 F.3d at 1181 (alleged false statements on videotape jacket not likely to influence purchasing decision where video only accessible after sale made through Internet or mail order); *New.Net*, 356 F. Supp. 2d at 1118 ("Plaintiff has not adequately alleged, and as a matter of law, cannot allege, that the reference to Plaintiff in its software was 'for the purpose of influencing consumers to buy Defendant's goods or services' … because the statements about [Plaintiff] appear only after [Defendant's software] has been downloaded and the scan has been run on the user's hard drive").

1  that through their Website they can realize adequate value and financial benefit by posting linked

2  advertisements as offered by Defendant Google under the program."  SAC ¶ 265.  The Court has

3  already rejected this claim because it "neither identifies specific terms of the agreement that are

4  deceptive nor indicates how the agreement as a whole is deceptive.  Nor has Kinderstart alleged

5  facts suggesting that the public would expect that participation in the program would prevent a

6  participant's removal from Results Pages or devaluation of PageRank."  Order at 17.  The result

7  should be no different the second time around.[20]

8         **B.**     **KinderStart's Section 17200 Claim Fails Under Proposition 64**

9        KinderStart submits a barrage of other allegations in support of its Section 17200 claim.

10  SAC ¶ 266.[21]  Google would be required to file a separate brief to address the reasons why each of

11  these allegations separately fails under Section 17200 (and they all do).  But such a brief is

12  unnecessary for the overarching reason that the claim fails under California's Proposition 64.  In

13  order to state an unfair competition claim following the passage of Proposition 64, KinderStart

14  must show that it "has suffered injury in fact and has lost money or property *as a result of* [the]

15  unfair competition."  Cal. Bus. & Prof. Code § 17204 (emphasis added).  That is, the alleged acts

16  of unfair competition must have *caused KinderStart* actual injury-in-fact and a loss of money or

17  property.  KinderStart does not even attempt to make such allegations in the SAC.  *See* SAC ¶¶

18  174-186.  At most, KinderStart alleges that is has been harmed because its website no longer

19  appears in Google's search results because Google viewed its website as containing inferior

20  content, not by any of these purported acts of unfair competition it throws out.  Accordingly,

21  KinderStart has not demonstrated that it has suffered injury-in-fact and lost money or property *as*

22  _____

23     [20] This allegation also fails because a plaintiff cannot state a Section 17200 claim by alleging
that "members of the public" are likely to be deceived by a statement.  As discussed below,

24  under Proposition 64, a plaintiff must show that it relied on and was damaged by an allegedly
deceptive statement.

25     [21] If KinderStart offers these allegations to support a claim under the "unfair" prong of

26  Section 17200, it must show "conduct that threatens an incipient violation of an antitrust law, or
that violates the policy or spirit of one of those laws because its effects are comparable to or the

27  same as a violation of the law, or otherwise significantly threatens or harms competition."  *Cel-
Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999).  For the

28  reasons stated *supra*, Section II, these allegations do not demonstrate conduct that significantly
threatens or harms competition.

1  *a result of* the unfair competition allegations asserted.  KinderStart has thus failed to state a claim

2  under Section 17200 in light of Proposition 64.  *See Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d

3  1181, 1194 (S.D. Cal. 2005) (plaintiffs failed to state a claim under Section 17200 where they did

4  not allege that they had relied on false advertisements); *Pfizer Inc. v. Superior Court*, 141 Cal.

5  App. 4th 290, 306 (2006) (after Proposition 64, a plaintiff in a false advertising case must have

6  purchased the product in question in reliance on allegedly false statements and suffered an injury

7  thereby); *Doe v. Texaco, Inc.*, No. 06-02820, 2006 WL 2053504, at *3 (N.D. Cal. Jul. 21, 2006)

8  (dismissing Section 17200 claim where plaintiffs did not allege "that they lost money or property

9  as a result of [defendant's] false statements"); *Chip-Mender Inc. v. Sherwin-Williams Co.*, No. C

10  05-3465, 2006 WL 13058, at *10 (N.D. Cal. Jan. 03, 2006) (dismissing Section 17200 because

11  counterclaimant "must plead both that it suffered an injury in fact and that it lost money or

12  property as a result of unfair competition, neither of which allegations appear in the

13  counterclaim.").  KinderStart's Section 17200 claim should be dismissed with prejudice for failure

14  to state a claim under Rule 12(b)(6).

15  **C.    KinderStart Lacks Article III Standing to Bring a Section 17200 Claim**

16  KinderStart's allegations also do not satisfy the "case or controversy" limitation of Article

17  III requiring that a plaintiff have standing in order to bring any type of claim in federal court.  *See*

18  *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (hereinafter

19  "*Stevens*").  A litigant must specifically set forth facts sufficient to satisfy both the "causation"

20  and "redressability" prongs of Article III's standing requirements by showing that his injury

21  "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable

22  decision."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citations omitted); *see also Nike,*

23  *Inc. v. Kasky*, 539 U.S. 654, 667 (2003).  KinderStart's unfair competition claims are all subject to

24  dismissal because it has not, and cannot, identify any redressable injury.

25  To support a finding of redressability, plaintiff must demonstrate "a 'substantial

26  likelihood' that the requested relief will remedy the alleged injury in fact."  *Stevens*, 529 U.S. at

27  771.  KinderStart's Section 17200 claims establish nothing of the kind because the remedies under

28

1   Section 17200 are limited to restitution and injunctive relief.  *See Korea Supply Co. v. Lockheed*

2   *Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).

3       With respect to restitution, no relief can be granted because KinderStart does not allege

4   that it paid Google anything.  *Korea Supply*, 29 Cal. 4th at 1149 ("object of restitution is to restore

5   the status quo by returning to the plaintiff funds in which he or she has an ownership interest");

6   *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 177 (2000) (restitution award is for

7   "money that had once been in the possession of the person to whom it [is] to be restored"); *Colgan*

8   *v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 697-98 (2006) (same).  The only

9   injunction KinderStart could possibly seek based on the facts alleged – forced inclusion in

10  Google's search engine index or forced assignment of a PageRank– is also unavailable as a matter

11  of law.  The First Amendment bars KinderStart from obtaining an injunction compelling Google

12  to recommend KinderStart in its search results or give its site a particular PR rating.  *See supra* at

13  Section I(A).  Because it has not stated a claim for entitlement to either of the remedies provided

14  by Section 17200, KinderStart's unfair competition claim should be dismissed with prejudice

15  under Rule 12(b)(1).

16  Dated:  September 22, 2006          WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation
17

18                                      By: /s/ David H. Kramer
                                            David H. Kramer
19
                                        Attorneys for Defendant Google Inc.
20

21

22

23

24

25

26

27

28