1  Gregory J. Yu (State Bar No. 133955)
   GLOBAL LAW GROUP
2  2015 Pioneer Court, Suite P-1
   San Mateo, CA  94403
3  Telephone: (650) 570-4140
   Facsimile:  (650) 570-4142
4  E-mail:  glgroup [at] inreach [dot] com

5  Attorney for Plaintiffs and Proposed Class and Subclasses

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11 | KINDERSTART.COM LLC, a California | Case No. C 06-2057 JF
   | limited liability company, on behalf of itself and |
12 | all others similarly situated, | **OPPOSITION TO DEFENDANT'S**
   | | **MOTION TO DISMISS THE SECOND**
13 |         Plaintiffs, | **AMENDED COMPLAINT**
   | |
14 |         v. | Judge:     Hon. Jeremy Fogel
   | | Date:      October 27, 2006
15 | GOOGLE, INC., a Delaware corporation, | Time:      9:00 a.m.
   | | Courtoom: 5th Floor, Room 3
16 |         Defendant. |

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iv

I.      INTRODUCTION ................................................................................................- 1 -

II.     ARGUMENT IN OPPOSITION TO THE MOTION.........................................- 1 -

        A.    The First Amendment Claim Ignores Speakers' and Listeners' Rights. ............- 2 -

        B.    The Communications Decency Act is No Bar to This Action...........................- 3 -

              1.    Google's Conduct Does Not Qualify for CDA Immunity.....................- 3 -

              2.    Google Has No Refuge for Authoring its Own False Statements. .........- 4 -

        C.    Attempted Monopolization is Fully and Properly Pled. ....................................- 4 -

              1.    The Relevant Market Covers Search and Search-Led Advertising.......- 4 -

              2.    All Elements are Fully Pled Against Google.........................................- 7 -

              3.    Antitrust Injury Pervades the Relevant Market. ..................................- 10 -

              4.    Google Harbors the Requisite Intent to Monopolize.........................- 13 -

              5.    Google's Patent and Copyrights Cannot Shield Liability. ..................- 14 -

        D.    Monopolization, as Pled, Stands Against Google. ...........................................- 14 -

              1.    Google Has Refused to Deal with Multitudes of Websites. .................- 15 -

              2.    Google as an Essential Facility Unreasonably Denies Access. ............- 18 -

        E.    False Advertising under the Lanham Act States a Claim. ................................- 18 -

              1.    Plaintiffs Plead Actionable Statements that are False Advertising. ......- 19 -

              2.    Plaintiffs as a Putative Class Incurred Competitive Injury..................- 21 -

              3.    Search Objectivity and PageRank are Commercial Promotions. .........- 22 -

        F.    Free Speech Violations as Claimed are Sustainable.........................................- 22 -

              1.    The Engine is a Public Speech Forum...................................................- 22 -

              2.    Google is a State Actor due to Deep Entwinement. .............................- 25 -

              3.    The Engine Should Protect Both Users and Listeners..........................- 28 -

              4.    The California Constitution Protects Plaintiffs' Speech.......................- 28 -

        G.    Unfair Competition Law ("UCL") Violations are Properly Pled. ....................- 30 -

        H.    Defamation and Libel Properly State a Claim for Relief. ................................- 32 -

1.    PageRanks of '0' Are False and Falsely-Based Opinion......................- 32 -

2.    Defamation as Alleged is Grounded in Malice....................................- 33 -

3.    PageRank Deflation Caused Injury to Plaintiffs.................................- 34 -

4.    California Privileges Do Not Cover False "0-PRs."............................- 34 -

**III.    CONCLUSION.** ........................................................................................**- 35 -**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF AUTHORITIES

## CASES

*Union of Needletrades, etc. Employees v. Superior Court* (1997) 56 Cal.App.4th 996, 1010, fn. 4 [65 Cal. Rptr. 2d 838]..................................................................- 29 -

*ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.,* 14 Cal. 4th 1247, 1257, 1271, 61 Cal. Rptr. 2d 112, 931 P.2d 290 (1997)......................................................- 31 -

*Advanced Health-Care Services v. Radford Community Hospital*, 910 F.2d 139, 145 (4th Cir. 1990) .......................................................................................- 17 -

*Albertson's, Inc. v. Young*, 107 Cal.App.4th 106, 117-18 (3rd App. Dist. 2003), *review denied*, 2003 Cal. LEXIS 3975 (Cal., June 18, 2003)............................- 28 -

*Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432 (1988) ...............- 31 -

*America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 857 (E.D. Va. 1999).........- 6 -

*American Ad Mgmt. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir. 1996) .....................- 10 -

*American Philatelic Soc.* v. *Claibourne,* 3 Cal.2d 689, 698 (1935) ........................- 31 -

*American Professional Testing Service v. Harcourt Brace Jovanovich Legal and Prof'l Publications*, 108 F.3d 1147, 1152 (9th Cir. 1997) .........................................- 9 -

*Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493, 60 S. Ct. 982, 84 L. Ed. 1311 (1940) ..........- 11 -

*Ashcroft v. ACLU*, 535 U.S. 564, 566, 122 S. Ct. 1700, 152 L. Ed. 2d 771, (2002) ................- 23 -

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.39, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985)................................................................- 13 -

*Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004).......- 3 -

*Board of Trustees, State Univ. of N. Y. v. Fox,* 492 U.S. 469, 474, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989)....................................................................- 2 -

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001)..................................................- 25 -

*Brewer v. Second Baptist Church,* 32 Cal. 2d 791, 797, 197 P.2d 713 (1948) ........- 34 -

*Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1044 (9th Cir. 1999) .....................................................................................- 23 -

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)..................................................................................................- 5 -

*Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711, 732, 771 P.2d 406; 257 Cal. Rptr. 708 (1989).....................................................................................- 35 -

*Brunette v. Humane Society*, 294 F.3d 1205, 1213 (9th Cir. 2002), *cert. denied*, 537 U.S. 1112, 123 S. Ct. 902, 154 L. Ed. 2d 786 (2003)..............................- 26 -

*Burnett v. National Enquirer, Inc.* 144 Cal.App.3d 991, 1007-08, 193 Cal. Rptr. 206 (1993) ............................................................................................................................- 33 -

*Burton v. Wilmington Parking Authority et al.*, 365 U.S. 715, 725, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961) ..............................................................................................- 26 -

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972) ......................................................................................- 9 -

*Cel-Tech Communications Inc. v. Los Angeles Cellular Phone Co.*, 20 Cal. 4th 163, 187, 973 P.2d 527, 83 Cal. Rptr. 2d 548 (1999) ....................................................- 31 -

*Ciprofloxacin Hydrochloride Antitrust Litig.*, 166 F. Supp. 2d 740, 749 (E.D.N.Y. 2001).....- 14 -

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) ......................................................................................................................- 9 -

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982), *overruled on other grounds*, *Mayle v. Felix*, 545 U.S. 644 (2005) ................................- 9 -

*Coastal Abstract Services v. First American Title Ins. Co.*, 173 F.3d 725, 730 (9th Cir. 1999) ............................................................................................................................- 20 -

*CollegeNet Inc. v. XAP Corporation*, 2006 U.S. Dist. LEXIS 49684 (Jul. 17, 2006) ..............- 22 -

*Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Servs., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990) ..........................................................................................................- 19 -

*Copp v. Paxton*, 45 Cal.App.4th 829, 845-846, 52 Cal. Rptr. 2d 831 (1996) ........................- 33 -

*Cornelius v. NAACP*, 473 U.S. 788, 800; 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985) ..............- 24 -

*Costco Companies, Inc. v. Gallant*, 96 Cal. App. 4th 740, 754-55, 117 Cal. Rptr. 2d 344 (2002)...........................................................................................................................- 29 -

*Currier v. Potter*, 379 F.3d 716, 727 (9th Cir. 2004) ............................................................- 24 -

*Denver Area Ed. Telecommunications Consortium Inc. v. FCC*, 518 U.S. 727, 749, 116 S. Ct. 2374135 L.Ed.2d 888 (1996) ......................................................................- 23 -

*Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997), *cert. denied*, 522 U.S. 996, 118 S. Ct. 559, 139 L. Ed. 2d 401 (1997) ..................................................................- 7 -

*Gentry v. EBay, Inc.*, 99 Cal. App. 4th 814, 834, 121 Cal. Rptr. 2d 703 (2002).......................- 4 -

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1010 (9th Cir. 2002) ........- 11 -

*Glendale Associates, Ltd., v. N.L.R.B.*, 347 F.3d 1145 (9th Cir. 2003)...................................- 28 -

*Great Western Directories, Inc. v. Southwestern Bell Telephone Company*, 63 F.3d 1378 (5th Cir. 1995), *cert. denied*, 518 U.S. 1048 (1996) ......................................................- 6 -

*Home Placement Service, Inc. v. The Providence Journal Co.*, 682 F. 2d 274 (1st Cir. 1982), *cert. denied*, 460 U.S. 1028 (1983)...........................................................................- 17 -

*Hunt-Wesson Foods, Inc. v. Ragu Foods Inc.*, 627 F.2d 919, 925 (9th Cir. 1980), *cert. denied*, 450 U.S. 921 (1980)....................................................................................- 5 -, - 8 -

OPPOSITION TO DEFENDANT'S MOTION TO                    Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

v

*Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1204 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998)................................................................................- 5 -

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 531-32 (D. N.J. 2004) ..............................- 14 -

*In re Lane* [71 Cal.2d 872, 79 Cal. Rptr. 729, 457 P.2d 561 (1969)] .......................................- 28 -

*International Society for Krishna Consciousness v. City of L.A.*, 966 F. Supp. 956, 964 (C.D. Cal. 1997)....................................................................................................................- 30 -

*Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003) ................................................................- 1 -

*Kuba v. 1A Agricultural Ass'n*, 387 F.3d 850, 858 (9th Cir. 2004) ..........................................- 30 -

*Kuba v. Six Flags Theme Parks Inc. et al.*, 2006 U.S. Dist. 33566 (E.D. Cal. May 17, 2006) - 26 -

*La Sala v. American Sav. & Loan Ass'n*, 5 C.3d 864, 97 Cal. Rptr. 849, 489 P.2d 1113 (1971)............................................................................................................................- 30 -

*Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) ......................................................................- 25 -

*Lloyd Corp. v. Tanner*, 407 U.S. 551, 563, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972) ..............- 23 -

*Lorain Journal Co. v. Milkovich*, 474 U.S. 953, 963-64 (1985) ..............................................- 33 -

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 768 (9th Cir. 2001) ......- 6 -

*Marsh v. Alabama*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946) ...................................- 22 -

*MetroNet Servs. Corp. v. Quest Corp.*, 383 F.3d 1124, 1134 (9th Cir. 2004).........................- 16 -

*Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980). ....................................- 31 -

*National A-1 Advertising, Inc. v. Network Solutions, Inc.*, 121 F.Supp.2d 156, 179 (D. N.H. 2000) ....................................................................................................................- 24 -

*National Services Group, Inc. v. Painting & Decorating Contractors of America, Inc.* 2006 U.S. Dist. LEXIS 52205 (S.D. Cal. Jul. 17, 2006), p. 9 ...................................................- 21 -

*New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1107-08 (C.D. Cal. 2004) .........................- 28 -

*Nobody in Part. Presents ("NIPP") v. Clear Channel Communication*, 311 F. Supp. 2d 1048 (D. Colo. 2004) ..............................................................................................................- 16 -

*NYNEX Corp. v. Discon Inc.*, 525 U.S. 128, 134, 119 S. Ct. 493, 142 L. Ed. 2d 510 (1998)..- 10 -

*Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 368 (9th Cir. 1988) ............- 16 -

*OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 180 (W.D.N.Y. 2000) ................- 23 -

*Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir. 1992), *cert. denied*, 506 U.S. 1034, 113 S. Ct. 814, 121 L. Ed. 2d 686 (1992)..................................- 14 -

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 8, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986)....................................................................................- 28 -

*Panavision International, L.P. v. Dennis Toeppen, Network Solutions, Inc.*, 141 F. 3d 1316, 1327 (9th Cir. 1998) ........................................................................................- 6 -, - 24 -

*Paradise Hills Associates v. Procel*, 235 Cal. App. 3d 1528, 1545 (1991).............................- 12 -

*Parker v. Google Inc., 422 F. Supp. 2d 492, 501-02 (E.D. Pa. 2006)* ............................- 3 -, -25-

*Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995).................................................................- 2 -

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997), *cert. denied*, 118 S. Ct. 1385 (1998).........................................................................................................- 6 -

*Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995), *cert. denied*, 117 S. Ct. 515 (1995).......................................................................................................- 13 -

*Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908, 910, 153 Cal. Rptr. 854, 592 P.2d 341 (1979), ...........................................................................................................- 28 -

*Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 345 (N.D. Ill. 1997) .........................................- 6 -

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 830, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) .......................................................................................................- 23 -

*Ross-Simmons Hardwood Lumber Company, Inc. v. Weyerhaeuser Company*, 41 F.3d 1030, 1041 n. 38 (9th Cir. 2005), *cert. granted on other grounds*, 2006 U.S. LEXIS 4908 (U.S., Jun. 26, 2006) ............................................................................................................- 7 -

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) .......................- 1 -

*Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678-79 (S.D.N.Y. 1987).......................- 7 -

*South Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 1989 U.S. Dist. LEXIS 4639, No. 88 CIV 6243, 1989 WL 48400, at 8-9 (S.D.N.Y. May 2, 1989) .........................................- 7 -

*Spanish Broad. Sys. of Fla. v. Clear Channel Communications.*, 376 F.3d 1065, 1071 n.2 (11th Cir. 2004) .......................................................................................................................- 5 -

*Suzuki Motor Corporation v. Consumers Union*, 330 F.3d 1110 (9th Cir. 2003), *cert. denied*, 540 U.S. 983, 157 L. Ed. 2d 373, 124 S. Ct. 468 (2003).....................................- 33 -

*Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 230 (2nd Cir. 2004)....................................- 26 -

*Tercica, Inc. v. Insmed Incorporated*, 2006 U.S. Dist. LEXIS 41804 (N.D. Cal. Jun. 6, 2006, at 61-62.) ...............................................................................................................- 20 -

*The Authors Guild, et al. v. Google, Inc.*, Case 1:05-cv-08136-JES, filed Sept. 20, 2005 pending in the Southern District of New York .......................................................................- 27 -

*Trader Joe's Co. v. Progressive Campaigns, Inc.*, 73 Cal. App. 4th 425, 86 Cal. Rptr. 2d 442 (1999).................................................................................................................................- 29 -

*U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986 (11th Cir. 1993), *cert. denied*, 512 U.S. 1221 (1994) ............................................................................................................- 13 -

*U.S. v. Grinnell Corp*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 1778 (1966)........- 15 -

*United States v. American Airlines*, 743 F.2d 1114 (5th Cir. 1984).........................................- 13 -

*United States v. American Library Association, Inc.*, 539 U.S. 194, 205-06, 123 S. Ct. 2297, 56 L. Ed. 2d 221 (2003) ........................................................................................ - 26 -

*United States v. Colgate & Co.*, 250 U.S. 300, 307, 29 S. Ct. 465, 63 L. Ed. 992 (1919) ....... - 15 -

*United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S. Ct. 994, 100 L. Ed. 1264, (1956) ............................................................................................................ - 15 -

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 41 (D.D.C. 2000) ............................... - 14 -

*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 765, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) ........................................................................................ - 12 -

*Verizon Communications Inc., Petitioner v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 409, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004) ................................... - 15 -

## STATUTES

15 U.S.C. § 1125(a) ............................................................................................. - 19 -

47 U.S.C. § 230(a)(3) ........................................................................... -23-, - 25 -

California Business and Professions Code ("B&PC") §§ 17200 *et seq.* .................. - 19 -


## OTHER AUTHORITIES

2A Phillip A. Areeda et al., *Antitrust Law* § 530a (rev. ed. 1995) ............................. - 5 -

Gey, Steven G., "Reopening the Public Forum – From Sidewalks to Cyberspace," 58 Ohio St. L. J. 1539, 1619 (1998) ....................................................................- 25 -

Roget's New Millennium™ Thesaurus, *First Edition (v 1.3.1) Copyright © 2006 by Lexico Publishing Group, LLC.* ................................................................... - 34 -

## I.  INTRODUCTION

Google, Inc. ("Google") crafted and harnessed a worldwide message to gain unbending loyalty among users and audiences.   Based on Google's promises in SEC filings and elsewhere, advertisers, customers, and users trust Google's search results and PageRank™ to be objective and free of human tampering.  Regretfully, the stark gap between Google's promises and its practices has harmed multitudes of competitors and customers with websites, including KinderStart.com LLC ("KinderStart").  Many of them have built businesses and operations around Google based on its universal invitation to derive traffic and revenue.  To immunize its suppressive, anticompetitive and unfair actions, Google requires a skewed interpretation of law. Commanding at least 65% of key markets and armed with market power, Google has blocked and destroyed competition.

Google's latest court filings veer away from the function of a motion to dismiss under Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 12(b) (the "12(b) Motion").  Rather than fairly and fully test the claimed facts against the law, Google overlooks key assertions required in the court's calculus in the Second Amended Complaint ("SAC").  It tenuously disputes some of the more serious allegations,[1] but completely ignores content that permits this case to go forward.  Google's conduct and so-called "expression" are not beyond legal restraint because the SAC points in the reverse direction.  The 12(b) Motion should be denied.

## II.   ARGUMENT IN OPPOSITION TO THE MOTION

For a 12(b)(6) motion, the Ninth Circuit explains, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

---

[1] Google emptied out handpicked, stale threads within the history of the lead Plaintiff's Website, www.kinderstart.com to suggest, not so subtly, that Google somehow identified, albeit 18 months after the fact, reasons for punishing KinderStart's site. *Declaration of Matt Cutts in Support of Defendant's Special Motion to Strike* ("*Cutts Decl.*").  His declaration, untested for veracity in any sense, reflects a preemptive step to merely impugn the site.  Plaintiff submits a declaration regarding www.kinderstart.com in opposition to the special motion to strike.

1      **A.      The First Amendment Claim Ignores Speakers' and Listeners' Rights.**

2          For Google, the First Amendment is not merely the right to say something about an issue

3      or person.  Google's wants to validate, above all else, the dismissal of Web content previously

4      open for view in a public forum.  However, Google here tries to safely escape responsibility by

5      labeling the totality of its behavior as an opinion.[2]  Going this far brings two inescapable

6      consequences.  First, website publication would be a blanket license to censor and defame.  Even

7      if Google had political, religious, malicious, unfair or anticompetitive agendas, self-restraint

8      would be the sole protection.  Second, free speech law would exonerate PageRank as

9      commercial speech, even if opinions were based on provably false facts.  This type of speech

10     historically has a less protection, particularly where a competitor's goodwill is at stake.  *Board*

11     *of Trustees, State Univ. of N. Y. v. Fox,* 492 U.S. 469, 475, 109 S. Ct. 3028, 106 L. Ed. 2d 388

12     (1989).  Google is the standards-setting body to value Websites, even with PageRanks as low as

13     '0' ("0-PRs").  Under Google's regime, statements labeled as "opinions" would never be

14     actionable.[3]

15         Google cites *Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995) for the proposition that

16     the expression of a subjective view, rather than "objectively verifiable facts," has First

17     Amendment protection.  The court's position, however, was not so simplistic.  Aside from the

18     invalidity of 0-PRs in the first place,[4] Google is actually rendering opinions that have a factual

19     (and indeed mathematical) basis.  The *Partington* court wrote: "Thus, we join other courts of

20     appeals in concluding *when an author outlines the facts available to him*, thus making it clear

21     that the challenged statements represent his own interpretation of those facts and *leaving the*

22     *reader free to draw his own conclusions*, those statements are *generally* protected by the First

23

---

24     [2] Google wants respite with the First Amendment, but ignores something more fundamental
       here.  The law and the court cannot and should not simply accept Google's own labels or even

25     the parties' stipulation of what is subjective, objective or a fact-based opinion statement.
       [3] Google did just that in the June 30, 2006 hearing.  Google argued that search results and

26     PageRank were "subjective."  In so doing, however, Google at the very least contradicted its
       SEC filings and Website content that search results and listings are objective.  A more alarming

27     reality would be that the representations are false because search results and PageRank are, in
       actuality, subjective.

28     [4] In Section II.G *infra*, Plaintiffs explain how even 0-PRs, in and of themselves, are literally false
       statements of fact.  For purposes of articulating the scope of First Amendment protection here,
       Plaintiffs assume that Google's expressions are opinions with presumably factual foundation.

1    Amendment.  *Id.* at 1156-57 (emphasis added).  The First Amendment should not shield 0-PRs

2    because the algorithms are hidden from view.  Without facts to draw upon to interpret a 0-PR,

3    the user may reasonably conclude, perhaps incorrectly, that the site is completely worthless.

**B.    The Communications Decency Act is No Bar to This Action.**

*1.    Google's Conduct Does Not Qualify for CDA Immunity.*

6    The Communications Decency Act (the "CDA") does not, by definition, preempt federal

7    antitrust, false advertising or First Amendment law.  A provider of an interactive computer

8    service gets immunity only for carrying content of a third party or for removing content from

9    access or availability.  47 U.S.C. § 230.  Nevertheless, Google demands blanket immunity

10   covering all six alleged counts.  The CDA dispels liability only arising under conflicting state or

11   local law.  Accordingly, Google's defense is facially invalid as to First Amendment, Sherman

12   Act and Lanham Act claims.[5]  An actor is still subject to Lanham Act proscriptions against false

13   advertising.  *Parker v. Google Inc.*, 422 F. Supp. 2d 492, 501-02 (E.D. Pa. 2006).  An interactive

14   computer service remains subject to the First Amendment if it is a state actor.  *Green v. America*

15   *Online*, 318 F.3d 465, 472 (3rd Cir. 2003) (CDA led to dismissal of only state tort claims).

16   Further, no court would rule that the CDA immunizes an actor from the Sherman Act because

17   that is contrary to the plain language to the CDA's provisions.

18   The Ninth Circuit applies the CDA to editorializing content taken from another source.

19   *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004) ("a

20   central purpose of the Act was to protect from liability service providers and users who take

21   some affirmative steps to edit the material posted").  Since wholesale Blockage (defined in *SAC*

22   ¶ 11) of sites takes Google far beyond the role of editor, immunity simply does not apply.

23   Google admits that there are a hundred "good" sites that should not be Blocked.  *SAC* ¶ 158.

24   Blockage is not editing but censorship – many sites are never found again.  Moreover, Google

25   cannot meet the express statutory standard for immunity.  Section 230(c)(2)(A) protects an

26   interactive computer service (ICS) for "*any action taken in good faith* to restrict access to or

27

28

---

[5] Section 230 states "no cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

availability of material" that the provider considers to objectionable (emphasis added).  Google

lacks good faith when using punishment and retaliation.  *SAC* ¶¶ 58, 60(g), 186.  Even if its own

PageRank system that imposed 0-PRs was considered editorializing, the specter of defamation

based on Google's *own* content puts the CDA out of reach.  Google repeatedly cites allegations

about the reasons for Blockage and PageRank Deflation (*MTD* at 8), but they are qualified as

"purported" reasons exercised in "absolute and internal discretion."  *SAC* ¶ 144.  Google

knowingly punishes thousands of Websites and Webpages that do not in actuality have Inferior

Page Quality."  *SAC* ¶ 145.  Devoid of good faith, Google is undeserving of CDA immunity.

### 2.    *Google Has No Refuge for Authoring its Own False Statements.*

PageRanks of '0' pose a greater problem for Google's view of CDA immunity because

Google alone created and developed this offending content.  *See Batzel, supra*; *Ben Ezra,*

*Weinstein, & Co. v. America Online, Inc.*, 206 F.3d 980, 984-85 n.4 (10th Cir. 2000) (AOL

conceded and the court acknowledged that § 230 does not immunize an interactive computer

service or an information content provider that develops the information).  Google alone, and no

other party, licenses, develops and uses PageRank and publishes 0-PRs against target sites.  *SAC*

¶¶ 6, 274.  Nowhere is Google charged with defamation for publishing *third party* content.

Google chose to invent a '0' floor for PageRank as its own statements.[6]  *SAC* ¶¶ 279-82.

Clearly, the CDA does not cover defamatory statements of the ICS *itself*.

### C.    <u>Attempted Monopolization is Fully and Properly Pled.</u>

### 1.    *The Relevant Market Covers Search and Search-Led Advertising.*

Google's monopoly position arises in two separate but related relevant markets -- the

Search Market and the Search Ad Market.  *SAC* ¶¶ 34, 38.  The markets are related because the

traffic from widespread use of search engines and directories stimulates page views and

advertisements paid for and sponsored by Websites.  *SAC* ¶ 9-10, 65.  Similar to broadcast media

---

[6] The closest case where the CDA might possibly afford Google immunity for defamation based on PageRank Deflation under California law is *Gentry v. EBay, Inc.*, 99 Cal. App. 4th 814, 834, 121 Cal. Rptr. 2d 703 (2002).  EBay's Feedback Forum and "Power Sellers" designation were simply collections of other statements, reviews and ratings provided by *third party* users of the e-commerce site.  Gentry's negligence claim against EBay was barred by the CDA for that reason.

1   or newspapers, advertisers will not participate unless readership or viewership is secured. *SAC* ¶

2   53. Search advertisers buy ads on the search engine's site knowing there is specific behavior

3   and intent behind a search user. *SAC* ¶ 57. An Eleventh Circuit case offers guidance here. In

4   *Spanish Broad. Sys. of Fla. v. Clear Channel Communications.*, 376 F.3d 1065, 1071 n.2 (11th

5   Cir. 2004), the court used advertising revenue for a media firm to test for market share of a

6   monopolist, not its readership or viewership. Google has at least 75% of U.S. revenues in the

7   Search Ad Market. *SAC* ¶ 39. The Ninth Circuit deems a 65% market share sufficient to infer

8   market power for a monopolist. *Hunt-Wesson Foods, Inc. v. Ragu Foods Inc.*, 627 F.2d 919,

9   925 (9th Cir. 1980), *cert. denied*, 450 U.S. 921 (1980).

10      As the Class representative, KinderStart is a search engine and directory and competes

11  against Google in the Search Market (*SAC* ¶¶ 30, 33), and places on its own sponsored link

12  advertisements as Google does (*SAC* ¶ 32). KinderStart and Class I Plaintiffs are in the same

13  market as Google for search services. Like Google, Class II Plaintiffs earn revenue with

14  sponsored links on their respective Websites. *SAC* ¶ 65. KinderStart, with other Class II

15  members, are also customers of Web advertising placement services offered by Google. *SAC* ¶¶

16  32, 175. Thus, KinderStart can represent the Class and Subclasses. *SAC* ¶¶ 187-95.

17      Google for the first time questions the outer boundaries of the relevant markets as alleged

18  by Plaintiffs.[7] The Ninth Circuit in *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195,

19  1204 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998), stated in quoting *Brown Shoe Co. v.*

20  *United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962), "the outer boundaries

21  of a product market are determined by the reasonable interchangeability of use or the cross-

22  elasticity of demand between the product itself and substitutes for it." A market is "an arena

23  within which significant substitution in consumption or production occurs." 2A Phillip A.

24  Areeda et al., *Antitrust Law* § 530a (rev. ed. 1995) . As a general rule, courts are reluctant to

25

26  ─────────────────────
    [7] This factual issue requires expert economic analysis and jury resolution. *Menasha Corp. v.*
27  *News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) (requiring economic evidence to
    prove the existence of a distinct market). The boundary of the relevant market is generally a
28  factual issue requiring evidence to be presented to the jury. *See e.g.*, *M.A.P. Oil Co. v. Texaco,*
    *Inc.*, 691 F.2d 1303, 1306 (9th Cir. 1982).

OPPOSITION TO DEFENDANT'S MOTION TO          Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1    dismiss a complaint on the grounds that the relevant market is not yet fully described.  *See e.g.,*

2    *Community Publishers v. DR Partners*, 139 F.3d 1180, 1183-84 (8th Cir. 1998) (finding relevant

3    market required expert analysis but lower court could recognized the bifurcation of readers and

4    advertisers for the newspaper industry).  Further, legitimate inferences may be drawn from

5    specific facts to support a narrow market for antitrust purposes.  *Todd v. Exxon Corp.*, 275 F.3d

6    191, 203 (2001).  In the Ninth Circuit, it is a fact issue to on how customers see differences in

7    the channel and make substitutions.  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275

8    F.3d 762, 768 (9th Cir. 2001).

9         Here, legitimate inferences on the alleged facts suggest an advertiser cannot find any real

10   substitutes for search ads going to search users.  Advertisers "target and reach Internet browsers

11   and users of search engines."  *SAC* ¶ 38.  Advertisers count on quick, targeted mass visibility to

12   search users entering specific key words to view sponsored links surrounding their search

13   results.  *SAC* ¶¶ 3, 8.  In the search advertising market, competitors in this market focus on

14   building advertising revenue based on visitors reading specific search results.  *SAC* ¶ 53.

15        Yellow pages advertising is a natural paradigm for the Search Ad Market as a distinct

16   and relevant market.  In *Great Western Directories, Inc. v. Southwestern Bell Telephone*

17   *Company*, 63 F.3d 1378 (5th Cir. 1995), *cert. denied*, 518 U.S. 1048 (1996), there was no

18   dispute that the relevant market was yellow page ads to reach audiences looking up businesses

19   by category.  According to the Ninth Circuit,"[u]se of a 'search engine' can turn up hundreds of

20   web sites, and there is nothing equivalent to a phone book or directory assistance on the

21   Internet."  *Panavision International, L.P. v. Dennis Toeppen, Network Solutions, Inc.*, 141 F. 3d

22   1316, 1327 (9th Cir. 1998).  Google is valued by advertisers because search engines help

23   browsers to find Websites, persons and businesses.  *SAC* ¶¶ 35, 125.  Online advertisers share

24   this belief as 90% of them turn to Google.  *SAC* ¶ 45.

25        *America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 857 (E.D. Va. 1999) does

26   not bind this court.  There plaintiff tried to unduly narrow the market to the defendant's specific

27   *own* database of subscribers with AOL email addresses.[8]  The court simply stated that e-mail is

28

---

[8] Each key case cited by the *GreatDeals.Net* court rejected relevant market definitions covering

1   another way to reach the universe of customers, but offered no reasoning or precedent. Search

2   advertisements are far different because it is not blind, undirected mass mailing but targeted and

3   dynamic. The impact of search engines for advertisers means reaching browsers looking for

4   businesses and information on the Web. Interchangeability means the "practicable ability to

5   switch from one product or service to another." *Id.* at 858. The relevant market is not Google's

6   own network or products but a one covering *all* search led advertising companies.[9]

### 2. *All Elements are Fully Pled Against Google.*

8   A defendant attempts monopolization if four elements are present: (1) predatory or

9   anticompetitive conduct; (2) specific intent to monopolize; (3) a dangerous probability of

10  achievement of monopoly power in the relevant market; and (4) causal antitrust injury. *Forsyth*

11  *v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997), *cert. denied*, 522 U.S. 996, 118 S. Ct.

12  559, 139 L. Ed. 2d 401 (1997).

13  In the Ninth Circuit, a single genus of anticompetitive conduct suffices for Section 2

14  liability. *Ross-Simmons Hardwood Lumber Company, Inc. v. Weyerhaeuser Company*, 41 F.3d

15  1030, 1041 n. 38 (9th Cir. 2005), *cert. granted on other grounds*, 2006 U.S. LEXIS 4908 (U.S.,

16  Jun. 26, 2006). The key is the composite or synergistic impact of all the elements upon

17  competition. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).[10] The

---

the antitrust defendant's *own* network or products. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997), *cert. denied*, 118 S. Ct. 1385 (1998) (supplies of Domino's own ingredients by contract); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 345 (N.D. Ill. 1997) (services offered within defendant's *own* network) *Deep South Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 1989 U.S. Dist. LEXIS 4639, No. 88 CIV 6243, 1989 WL 48400, at 8-9 (S.D.N.Y. May 2, 1989) (distribution of its *own* product); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678-79 (S.D.N.Y. 1987) (relevant market not just company's *own* trademarked product). Plaintiffs do not so narrowly restrict the market to a single network.

[9] The connection between search, advertising, and consumer purchases is very well recognized, even with a study by ComScore Networks and Google. "The Yahoo and Google studies are part of an effort by the search giants to prove the medium's worth beyond directly measured Internet sales. 'This research helps quantify exactly how influential search is for the overall buying process,' said John McAteer, head of retail at Google, in a statement."

[10] The leading authority on antitrust law stated: "In a monopolization case conduct must always be analyzed 'as a whole.' A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as *de minimus* or as an error in judgment, but the pattern gives increased plausibility to the claim." Areeda and Hovenkamp, *Antitrust Law*, § 310c, p. 147.

OPPOSITION TO DEFENDANT'S MOTION TO          Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1    Supreme Court has weighed in as well:  "[P]laintiffs should be given the full benefit of their

2    proof [and inference] without tightly compartmentalizing the various factual components and

3    wiping the slate clean after scrutiny of each."  *Continental Ore v. Union Carbide & Carbon*

4    *Corp.***,** 370 U.S. 690, 699 (1961).  Google chooses to serially test and reject each alleged

5    anticompetitive act or practice, but this is the approach not of this circuit but a different circuit.

6    *United States v. Microsoft Corp.*, 253 F.3d 34, 78 (D.C. Cir. 2001).

7          Plaintiffs allege Google uses at least six different but related types of anticompetitive

8    tactics and tools in the Search Market and the Search Ad Market.

9          **PageRank Deflation and Blockage.**  Competition suffers from massive widespread

10   PageRank Deflation driving PageRanks all the way down to '0' to retaliate against smaller

11   competitors.  *SAC* ¶ 58.  Somehow, Google reframes the complaint as a competitor's request for

12   traffic from Google.  It is not the absence of aid that is anticompetitive but the intentional,

13   punitive and retaliatory *use* of these devices to exclude and destroy competition in search and

14   search advertising.  In a key Section 2 case, the Ninth Circuit found that a 12(b)(6) motion was

15   improperly denied, given that anticompetitive acts were carried out with specific intent to

16   eliminate competitors by a firm that already had market power.  *Hunt-Wesson Foods, Inc.*, 627

17   F.2d at 926.

18         Google's attempt at a monopoly is far more dangerous to competition because it is

19   alleged to already have market power - 75% of industry revenues for search advertising.  With

20   that, it repeatedly uses, interprets, and violates basic application of webmaster guidelines "as a

21   pretext to inflict Blockage upon Websites of the Class."  *SAC* ¶ 162.  Google executes permanent

22   Website removal from its index, leaving such sites with no reasonable means to regain this

23   visibility.  *SAC* ¶ 165.  Google "harbors and evinces specific intent to destroy competition" in

24   the relevant markets.  *SAC* ¶ 208.

25         **False Statements are Anticompetitive.**  False advertising about the true nature of the

26   Engine, Search Results and PageRanks directly hurts both users and advertisers.  *SAC* ¶¶ 61, 70,

27   73.  All this leads to a harmful loss of goodwill and diversion of revenues of Class members.

28   *SAC* ¶¶ 72, 75-77, 82.  Accordingly, this strain of advertising adversely impacts competition in

1   the relevant markets here because Google's statements are alleged to satisfy the six elements as:

2   (1) clearly false; (2) clearly material; (3) clearly likely to induce unreasonable reliance; (4) made

3   to unsophisticated parties; (5) continued for long periods of time; and (6) not readily cured by

4   rivals. *American Professional Testing Service v. Harcourt Brace Jovanovich Legal and Prof'l*

5   *Publications*, 108 F.3d 1147, 1152 (9th Cir. 1997).  Plaintiffs properly and fully plead all six

6   elements:  (1) clearly false – Search Results are supposedly objective, but Google admits to

7   subjectivity, and manipulation and sale of top listings in Search Results occurs (*SAC* ¶¶ 130-31);

8   (2) clearly material – objectivity means to advertisers that they can target users who can

9   repeatedly trust and return to the Engine for use and information (*SAC* ¶ 71); (3) clearly likely to

10  induce unreasonable reliance – users trust computer programs to be consistent in processing and

11  results, but 0-PRs suggests a very serious problem (*SAC* ¶ 146); (4) unsophisticated users – users

12  do not understand computer algorithms or search methodology, and even experts hold the same

13  trust in Google (*SAC* ¶ 70(b) ); (5) false dissemination and advertising for a long period – 0-PRs

14  emerged in or around 2001 (*SAC* ¶ 144); (6) not readily cured by rivals – competitors not likely

15  to challenge PageRank or the Engine because it is dominant and has massive support (*SAC* ¶¶

16  93-94), all wrapped under an exclusive license and claimed trade secrets. (*SAC* ¶ 51)

17       **False or Misleading Statements to the SEC are Anticompetitive.**  The U.S. Supreme

18  Court stated:  "Misrepresentations, condoned in the political arena, are not immunized when

19  used in the adjudicatory process." *California Motor Transport Co. v. Trucking Unlimited*, 404

20  U.S. 508, 513, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972).  The Ninth Circuit declared in *Clipper*

21  *Express v. Rocky Mountain Motor Tariff Bureau, Inc*., 690 F.2d 1240, 1261 (9th Cir. 1982),

22  *overruled on other grounds*, *Mayle v. Felix*, 545 U.S. 644 (2005), that "the fraudulent furnishing

23  of false information to an agency in connection with an adjudicatory proceeding can be the basis

24  for antitrust liability, if the requisite predatory intent is present and the other elements of an

25  antitrust claim are proven."  Plaintiffs alleged false or misleading statements about the Engine as

26  described in SEC filings.  *SAC* ¶ 59.  There is a special and egregious anticompetitive harm

27  wrought when false, but publicly sworn statements go before a federal agency.  Taken together

28  with generous website claims of objectivity, Google moves users away from competing engines

OPPOSITION TO DEFENDANT'S MOTION TO                          Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1   and advertisers and toward Google.  *SAC* ¶ 138.  By neglecting to address this conduct, Google

2   acknowledges the potential for anticompetitive harm.

3       **Cutting Traffic and Revenue Derived from AdSense is Anticompetitive.**   Arbitrary

4   and retaliatory reductions in Website traffic through Blocking, PageRank Deflation, or

5   unjustified AdSense termination all cause elimination or reduction of AdSense partner revenues

6   that destroys their businesses (*SAC* ¶ 62(a,e)).  At least a thousand Websites had their AdSense

7   revenues terminated or depressed by Defendant (*SAC* ¶ 177).

8       **Redirecting Certain Site Traffic by Degrading Content is Anticompetitive.**  Google

9   willfully (1) redirects what it presumes as spam to major competitors' search engines so that

10  users migrate to the Engine and (2) gain through such tactics large boosts in click-through

11  revenue through AdSense.  *SAC* ¶ 63.  This denigration of content quality serves to shift users,

12  traffic and revenue unfairly to Google.  However, by failing to address this, the MTD concedes

13  this tactic as anticompetitive on its own merit.

14      **Exorbitant, Massive Price Minimums Show Power to Control Prices.**  Google's latest

15  tactic, Landing Page Quality (*SAC* ¶64 (a-b)), unfairly extracts prohibitively high prices with

16  minimum floor bids on AdWords.[11]  Websites buy AdWords within the Google network to

17  promote their goods and services.  As a result, customers in the Search Ad Market discontinue

18  marketing their content, business and services.  *SAC* ¶ 64.  Google defends monopoly prices as

19  being healthy for competition, but the loss of discounts or lower prices to the end user damages

20  competition.  *American Ad Mgmt. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir. 1996).  Furthermore,

21  this demonstrates Google's forceful exercise of its *power* to control prices to its customers in the

22  Search Ad Market.  *SAC* ¶¶ 209, 209(h).  Market power is being leveraged, and supplies the

23  requisite anticompetitive element.

24          *3.   Antitrust Injury Pervades the Relevant Market.*

25

26  [11] Google suggests that each alleged anticompetitive harm must be directly felt by KinderStart itself so as to somehow challenge its standing on this one issue.  However, the plaintiff "must

27  allege and provide harm, not just to a single competitor but to the competitive process, i.e. competition itself."  *NYNEX Corp. v. Discon Inc.*, 525 U.S. 128, 134, 119 S. Ct. 493, 142 L. Ed.

28  2d 510 (1998).  Massive AdWords price increases hurts competition in search ads. AdWords users are Website advertisers who pay Google to gain traffic and visibility that Google depends on.

1    Google causes antitrust harm in the two related markets -- search engines and search

2    advertising.  Economic efficiency is not merely preserving the total quantity of Internet

3    advertisements or Website page views.  However, it is reasonable to infer that when one site

4    loses 70% of its monthly page views (about 7,000,000 views lost), Internet sites and information

5    are not captured by an entire group of users.  *SAC* ¶¶ 31, 174.  Furthermore, Web advertising

6    sites have surrendered their business and gotten destroyed (*SAC* ¶ 229).  This obviously means a

7    bulk of advertisements are never created, presented or viewed.

8        Google harms KinderStart and the Classes as both competitors and customers.  The Ninth

9    Circuit recognizes this.  In *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 343 F.3d 1000,

10   1010 (9th Cir. 2002), the plaintiff "alleged enough to establish factually that it [was] both a

11   customer and a competitor in a slightly different market."  The court reversed the district court's

12   finding that there was no injury to the plaintiff as a distributor, even though it also directly

13   purchased and leased the defendant's equipment.  To explain injury in two related markets, the

14   Ninth Circuit turned to the Supreme Court in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493, 60

15   S. Ct. 982, 84 L. Ed. 1311 (1940):

16       The end sought [by the *Sherman Act*'s prohibition against unreasonable restraints
         of trade] was the prevention of restraints to free competition in business and
17       commercial transactions which tended to restrict production, raise prices *or*
         *otherwise control the market to the detriment of purchasers or consumers of goods*
18       *and services*, all of which had come to be regarded as a special form of public
19       injury.

20   *Glen Holly*, 343 F.3d at 1009-10 (emphasis added by the Ninth Circuit).

21       KinderStart and other search engines are in the Search Market with Google, but also are

22   customers and consumers of advertising services of Google in the Search Ad Market.  Plaintiffs

23   allege harm in their distinct roles as customer (*SAC* ¶ 213) and as competitors (*SAC* ¶ 214).

24   Under the former allegation, customers in the AdSense program (*SAC* ¶ 189) suffer antitrust

25   injury in the market.[12]

26       First as to competition, antitrust injury afflicts the related Search Market.  Both existing

27

28   _____

[12] Google admits to this that "AdSense participants are customers, not competitors, of Google."
*MTD* at 31, n.17.

*and new* search engines suffer from entry barriers created and caused by Google alone with Blockage and retaliatory PageRank Deflation. *SAC* ¶¶ 50-51. PageRank is harmful not only because it is Google's proprietary system for guiding decisions of advertisers and customers, but it also summarily degrades new entrants. The Ninth Circuit accepted a lower court's finding that a monopolist's control of a proprietary supply grading system was an anticompetitive barrier. *Ross-Simmons*, 411 F.3d at 1044. Facing delays and probations in getting indexed, nascent ventures cannot generate new traffic to become viable alternatives to the Engine. *SAC* ¶¶ 154-56. All these devices used by Google harms not just specific companies but competition as a whole. As Class member Websites get Blocked without warning and notice, they *cannot begin to know when and how* to secure alternatives to sustaining site traffic and appeal. *SAC* ¶¶ 155, 158. This obviously undercuts the output, volume, opportunity, flow and use of advertising. In all, competition in search and search advertising for indigenous traffic and native content is stifled.

Second, when AdSense participants are considered as consumers in the Search Ad Market, the antitrust injury is clearly pled. AdSense revenue is suddenly either curtailed indirectly or terminated directly. AdSense payments to customers cease, and valuable site space is left with stale AdSense copy. *SAC* ¶ 62(e). This obviously harms consumers who, on their websites, would otherwise lodge different ads or fresh native content in such space.

Third, the ultimate consumer as Web browser suffers injury from Blockage, PageRank Deflation, and other alleged methods of depressing traffic and revenue to a site. Google's conduct "harms consumers by denying access to key commercial information about alternative and additional products, services and resources offered for purchase, and/or use by competing sources and Websites." *SAC* ¶ 230. Consumers clearly depend on search engines to locate a business or other destination. Once that site stops appearing on search results or disappears from Google's index, users lack any clue as to what befell that business or source of previously viewed information. Therefore, consumers lose key access to content about products and services. This damages the economy of free commerce.[13]

---

[13] Google further argues that no antitrust claim lies because as a media firm it circulates

1    Finally, attempted monopolization does not require success in destroying competition.

2   *See, e.g.*, *United States v. American Airlines*, 743 F.2d 1114 (5th Cir. 1984) (air carrier's

3   solicitation of chief competitor to raise prices was attempted joint monopolization even though

4   offer was rejected). It is enough that Google sought and has market power to destroy

5   competition.

6          **4.      *Google Harbors the Requisite Intent to Monopolize.***

7          Google unquestionably demonstrates intent with its conduct alone.  The Supreme Court

8   in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.39, 105 S. Ct. 2847,

9   86 L. Ed. 2d 467 (1985) stated:

10         Proof of specific intent to engage in predation may be in the form of statements made by
11         officers or agents of the company, evidence that the conduct was used threateningly and
           did not continue when a rival capitulated, or *evidence that the conduct was not related to*
12         *any apparent efficiency*. These matters are not so difficult of proof as to render the test
           overly hard to meet."
13
    (*quoting* R. Bork, The Antitrust Paradox 160 (1978) (emphasis added).
14
    Here, Google's practice of Blocking, PageRank Deflation and other conduct are devoid of
15
    business or economic justification.  *SAC* ¶¶ 62(c), 172.  There must be harm not to just specific
16
    companies but to the overall market.  The specific type of harms emanating from within Google
17
    are pled in great detail.  *SAC* ¶¶ 62(e), 209, 213, 229, 235-36.  Discovery is expected to elicit
18
    further proof of anticompetitive intent.
19
           The last element, a dangerous probability of success, is sufficiently pled as well.  Market
20
    share is the governing factor, where generally 50% is sufficient.  *U.S. Anchor Mfg., Inc. v. Rule*
21
    *Industries, Inc.*, 7 F.3d 986 (11th Cir. 1993), *cert. denied,* 512 U.S. 1221 (1994).  The Ninth
22
    Circuit in *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995), *cert.*
23

24  _____

25  consumer information over the Internet of vital and even constitutional concern.  In the case it
    cites, *Paradise Hills Associates v. Procel*, 235 Cal. App. 3d 1528, 1545 (1991), the California
26  court relies heavily upon the Supreme Court in *Va. Pharmacy Bd.* v. *Va. Consumer Council*
    (1976) 425 U.S. 748, 765, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976), , ("So long as we preserve a
27  predominantly free enterprise economy, the allocation of our resources in large measure will be
    made through numerous private economic decisions. It is a matter of public interest that those
28  decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of
    commercial information is indispensable. [Citations omitted.]").  Blockage of Websites
    intentionally and deeply interrupts and hurts this flow of consumer information.

OPPOSITION TO DEFENDANT'S MOTION TO                         Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

- 13 -

1    *denied*, 117 S. Ct. 515 (1995), held that "market share of 44 percent is sufficient as a matter of

2    law to support a finding of market power, if entry barriers are high and competitors are unable to

3    expand their output in response to supracompetitive pricing."  Google has 60% of the Search

4    Market (*SAC* ¶ 37), and 75% of the Search Ad Market (*SAC* ¶ 39).  Even if these alleged market

5    shares are deemed insufficient, Plaintiffs allege seven separate barriers to entry, some of which

6    have been created or at least reinforced by Google alone.  *SAC* ¶¶ 50-57.  Accepted as true, these

7    market barriers seriously deter or handicap a gainful entry into the market.

8                    **5.    Google's Patent and Copyrights Cannot Shield Liability.**

9            Assertion of patent invalidity is not a requirement to plead anticompetitive conduct that

10    violates federal antitrust or state unfair trade laws.  *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d

11    517, 531-32 (D. N.J. 2004) (plaintiff successfully pled Sherman section 1 violation without

12    alleging patent invalidity); *Ciprofloxacin Hydrochloride Antitrust Litig.*, 166 F. Supp. 2d 740,

13    749 (E.D.N.Y. 2001) (plaintiff allowed to pursue state unfair trade claims).  Here, Google enjoys

14    unfettered use of the PageRank patent from Stanford University until 2011.  *SAC* ¶ 51.  Plaintiffs

15    do not allege that this patent suffers from invalidity.  However, by promoting it as an accurate

16    value of a Website while practicing PageRank Deflation, this is anticompetitive use of the patent

17    against competition.  *SAC* ¶¶ 79, 144, 209.  In addition, Google's assertion of copyrights over

18    Search Results create no immunity from Section 2 liability.[14]  Microsoft argued that its

19    copyrights were valid exercises of its rights, but the judge denied this as a defense against

20    Section 2 liability.  *See United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 41 (D.D.C. 2000)

21    ("a copyright holder is not by reason thereof entitled to employ the perquisites in ways that

22    directly threaten competition [citations omitted]), *affirmed*, 253 F.3d  34 (D.C. Cir. 2001), *cert.*

23    *denied*, 534 U.S. 952 (2001).

24                    **D.    <u>Monopolization, as Pled, Stands Against Google.</u>**

25            In the Ninth Circuit, monopolization has three elements:  (1) possession of monopoly

26    power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal

27

28    ────────────────
[14] Google asserted copyright claims based on Search Results under its Special Motion to Strike
under CCP § 425.16 on file May 2, 2006, Docket #12-1, pp. 12-13.

1   antitrust injury. *Pacific Express, Inc. v. United Airlines, Inc.,* 959 F.2d 814, 817 (9th Cir. 1992),

2   *cert. denied,* 506 U.S. 1034, 113 S. Ct. 814, 121 L. Ed. 2d 686 (1992),  113 S. Ct. 814, .  The

3   Supreme Court declared that monopoly power exists if the firm has "the power to control prices

4   or exclude competition." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76

5   S. Ct. 994, 100 L. Ed. 1264 (1956), .  A monopolist's market power emerges not as a

6   consequence of a "superior product, business acumen or historical accident"  *U.S. v. Grinnell*

7   *Corp,* 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 1778 (1966).  Market share is the most

8   relevant factor.  *Microsoft Corp.*, 253 F.3d at 56-57.  Google demonstrates both the power to

9   control prices and to exclude competition.  Price control does not require the monopolist to

10  change prices.  *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1020 (6th Cir. 1999), *cert.*

11  *denied*, 535 U.S. 987 (2002) (no dismissal of Section 2 claim where prices remain the same but

12  new competition never surfaces).  For prices in the Search Ad Market, Landing Page Quality

13  ratings for Websites have set extremely high bars as floors for bidding on AdWords links.  *SAC*

14  ¶ 64.  Defendant controls output as search traffic falls to Class members' Websites choked off by

15  Blockage.  *SAC* ¶ 155.  Competition is harmed and excluded among Websites that place and host

16  Google sponsored links.  The drop-off of AdWords by lesser sites means Class members with

17  AdSense can lose demand and eventually cease operations.

18          ***1.      Google Has Refused to Deal with Multitudes of Websites.***

19          The Supreme Court and the Ninth Circuit lay a clear path to Section 2 liability against

20  Google on the alleged facts.  The Supreme Court announced the general rule is that companies

21  have freedom to deal and have no duty to aid competitors.  *United States v. Colgate & Co.*, 250

22  U.S. 300, 307, 29 S. Ct. 465, 63 L. Ed. 992 (1919), , .  The exception to this rule was announced

23  in *Aspen Skiing*, where termination of a voluntary course of dealing does violate Section 2.  In

24  *Verizon Communications Inc., Petitioner v. Law Offices of Curtis V. Trinko, LLP ("Trinko"),*

25  540 U.S. 398, 409, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004), the Court observed:  "*Aspen Skiing*

26  is at or near the outer boundary of § 2 liability."  This statement by itself, however, is no safe

27  harbor for Google here.

28          The *Trinko* Court found three factors leading to liability in *Aspen Skiing*:  (1) The parties

---

OPPOSITION TO DEFENDANT'S MOTION TO                                    Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1    there engaged in a continuing cooperative arrangement that was profitable for both; (2) by

2    refusing to continue joint marketing arrangements, Aspen Skiing gave away a block of its

3    customers and short-term profits to hurt its competitor; and (3) Aspen Skiing offered no "normal

4    business purpose" for its conduct. *Trinko*, 540 U.S. at 409. Google's reliance upon *Trinko*

5    ignores two of these factors. First, the parties in the regulated telecommunications market were

6    already forced to deal because competition protected by the Telecommunications Act as

7    administered by the FCC.[15] Second, Verizon as the alleged monopolist in *Trinko*, did not engage

8    in a sacrifice of short-term benefits and profits by refusing to deal with its competitor.

9    The Ninth Circuit in *MetroNet Servs. Corp. v. Quest Corp.*, 383 F.3d 1124, 1134 (9th

10   Cir. 2004), held that a refusal to deal claim must "entail a sacrifice of short-term profits for long-

11   term gain from the exclusion of competition" to meet the *Aspen Skiing* exception. The Ninth

12   Circuit "determine[s] antitrust liability by asking whether there was a legitimate business

13   justification for the monopolist's conduct." *Oahu Gas Service, Inc. v. Pacific Resources Inc.*,

14   838 F.2d 360, 368 (9th Cir. 1988). A further factor in Section 2 claims is whether the relevant

15   market is regulated. A district court after *Trinko* found Section 2 liability in an unregulated

16   market allowing firms freedom to deal together. *See Nobody in Part. Presents ("NIPP") v.*

17   *Clear Channel Communication*, 311 F. Supp. 2d 1048 (D. Colo. 2004). The court held that

18   *Aspen Skiing* Section 2 liability attached where conduct, without business justification, sacrifices

19   short-term gains for anticompetitive reasons. *NIPP* is particularly relevant here because the

20   defendant "provided NIPP with free promotional support for its concerts in the past" -- clearly a

21   voluntary course of dealing. *NIPP*, 311 F. Supp. 2d at 1061. The subsequent refusal to deal by

22   Clear Channel triggered Section 2 liability based upon *Aspen Skiing*.

23   Google presents a declaration to volunteer possible business justification for its actions.

24   *Cutts Decl.* This pre-discovery effort is premature and fails to overcome the monopolization

25   claim on its face. As another federal circuit determined, "[i]n ruling on a motion to dismiss, the

26

27   [15] One legal commentator acknowledges the limitations of *Trinko*. Marina Lao, "Aspen Skiing
28   20 Years Later: Aspen Skiing and Trinko: Antitrust Intent and 'Sacrifice'," 73 *Anti.L.J.* 171
     (2006) ("As the Court had stressed the pervasive Federal Communications Commission (FCC)
     oversight of the challenged conduct, *Trinko* may well be restricted to the analysis of conduct in
     similar regulatory settings and, therefore, have limited significance.")

1    court must accept the plaintiffs' allegations of adverse effects on competition as true and must

2    consider the defendants' pro-competitive justifications as unproven." *Advanced Health-Care*

3    *Services v. Radford Community Hospital*, 910 F.2d 139, 145 (4th Cir. 1990).[16]

4    　　　Google's pervasive voluntary course of dealing, followed by termination of indexing

5    without clear justification, falls squarely in line with *Aspen Skiing*.  First, the Search Market and

6    Search Ad Market are *unregulated*.  Second, Google's voluntary course of dealing covers both

7    Web indexing of search engines like KinderStart and other Class members (*SAC* ¶¶ 225-26) and

8    sponsored link placement for its AdSense partners (*SAC* ¶ 62(e)).  Google openly solicits to all

9    Websites to be indexed and viewed through the Engine.  *SAC* ¶¶ 149-50.  Google states in its

10   SEC filings, "we are *enthusiastic* about helping sites make money."  *SAC* ¶ 125 (emphasis

11   added).  Google is well aware that it provides "significant traffic to Websites with whom we

12   have no business relationship."[17]  *Id.*  On the technical level, Google indexes and spiders a

13   multitude of Websites on the Internet.  *SAC* ¶ 85.  Google benefits from all of the Web Content

14   of these parties and businesses by indexing and presenting for view by users through the

15   operation of the Engine.  Google secures these relationships with AdSense and AdWords

16   partners within Google's network.  Third, KinderStart lost much more than the 50% profits lost

17   by *Aspen Skiing*'s competitor -- 70% of traffic (*SAC* ¶ 174) and 80% of profits (*SAC* ¶ 175) lost.

18   Conduct as this destroys competition from existing Class I and Class II members and from

19   prospective entrants into the relevant markets.  Fourth, Google engaged in such conduct to

20   sacrifice short-term profits it otherwise would have derived from unhindered Websites and

21   competitors.  *SAC* ¶¶ 172-73.  When traffic and AdSense revenue plummeted for KinderStart,

23   ─────────────────────────

24   [16]  A First Circuit case is most instructive on this point.  *Home Placement Service, Inc. v. The Providence Journal Co.*, 682 F. 2d 274 (1st Cir. 1982), *cert. denied*, 460 U.S. 1028 (1983).  The monopolist local newspaper refused to allow competing home rental agencies to place advertisements in its paper.  After a first advertising candidate was rejected for misleading customers to call, plaintiff as the second candidate was rejected as well, without any justification offered by newspaper.  The court imposed Section 2 liability because the refusal to deal with the advertiser because "was not supported by a legitimate business reason."  This is precisely what Google has done to competitors, Websites and advertisers.

[17]  Google may claim that its statement of "no business relationship" establishes that no voluntary course of dealing exists for purposes of Section 2 liability.  But this does not necessarily refer to or evidence the absence of a financial or legal relationship or obligation imposed by law, such as the Sherman Act or California's Unfair Competition Law.

OPPOSITION TO DEFENDANT'S MOTION TO                    Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

- 17 -

1    Google lost its own commissions for these ads.  Finally, anticompetitive harm flows directly

2    from Google's Blockage of Websites constituting a widespread refusal to deal following a

3    voluntary course of indexing.  This drastically affects both competing search engines and search

4    advertisers.  Class I and Class II Plaintiffs, many of whom are small businesses, have closed

5    their doors caused by Google's refusal to continue voluntary website indexing, traffic

6    generation, and AdSense revenue flows.  [*SAC* ¶ 228]

7    ### 2.    *Google as an Essential Facility Unreasonably Denies Access.*

8    The essential facility Google controls to eliminate competition is three-fold – the Engine,

9    the PageRank System, and the Advertising Network.  *SAC* ¶¶ 219-21.  Removal from the

10   Engine's index pressures competitors as KinderStart to go out of business.  PageRank is the *de*

11   *facto* standard for ranking sites – no one but Google may use it.  Websites are placed on hold

12   with low PageRanks when entering the Search Market.  *SAC* ¶¶ 6, 46, 220.  PageRanks lead

13   firms to link and do business together.  *SAC* ¶ 81.  For *new* entries into this market, Google can

14   and does delay and obstruct access.  *SAC* ¶¶ 50-52, 223.  In the fast moving search and search ad

15   worlds, delays in launching effectively sever the chance for survival and profitability. Not only

16   are some entrants never seen, but the downstream Websites as competitors give up their

17   businesses altogether.  *SAC* ¶ 229.  Finally, 90% of search marketers join the advertising

18   network of Google.  *SAC* ¶ 45.   Termination of AdWords and AdSense happens regularly

19   against downstream competition. *SAC* ¶¶ 10, 62, 64.  By curtailing AdWords placements as well

20   as AdSense revenues, Google can dismantle these businesses and their revenues..

21   ### E.    <u>False Advertising under the Lanham Act States a Claim.</u>

22   As an initial matter, this new federal claim is based on facts of Blockage and PageRank

23   Deflation appearing in the original Complaint.[18]  Notice pleading here does not prejudice

24   Google.[19]  Leave to amend is liberally granted, unless a restriction is imposed by judicial

25   discretion or the law does not permit a certain amendment.  Under Fed.R.Civ.P. Rule 15(a),

26

27   _____

28   [18] Blockage and PageRank Deflation were alleged in the *Class Action Complaint* ¶¶ 22-24, filed on March 17, 2006.
     [19] Further argument for allowing the Lanham Act claim to remain in the SAC is set forth in the concurrently filed Opposition to Special Motion to Dismiss/Strike Under Rule 8(a).

Plaintiffs were allowed leave to amend all counts in the First Amended Complaint, and were not precluded from a new count based on the same set of facts. In the SAC, Plaintiffs withdrew four of the original nine counts, and added this single federal claim. In fact, it is closely related to the false advertising prong under California Business and Professions Code ("B&PC") §§ 17200 *et seq.*, discussed in Section II.G *infra*. Therefore, it should be allowed under Rule 15(a), and for the reasons below, sustained beyond the MTD.

### 1.    *Plaintiffs Plead Actionable Statements that are False Advertising.*

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides, in relevant part,

(a) Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false of misleading representation of fact, which - - . . . (A) [intentionally omitted]; or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The Ninth Circuit specifies five elements for such a claim: "1) in advertisements, defendant made false statements of fact about its own or another's product; 2) those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience; 3) such deception is material, in that it is likely to influence the purchasing decision; 4) defendant caused its falsely advertised goods to enter interstate commerce; and 5) plaintiff has been or is likely to be injured as the result of the foregoing either by direct diversion of sales from itself to defendant, or by lessening of the goodwill which its products enjoy with the buying public." *Rice v. Fox Broadcasting Co.*, 330 F. 3d 1170, 1180 (9th Cir. 2003) (*citing Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Servs., Inc.,* 911 F.2d 242, 244 (9th Cir. 1990). In the Ninth Circuit, "a false advertising cause of action under the Act is not limited to literal falsehoods; it extends to false representations made by implication or innuendo." *Id.* at 245.

The first set of false statements are the objectivity of search results and PageRank and the truthfulness of a 0-PR for a site. Google advertises on its website of its objective results. *SAC ¶* 118. As a whole, its audience is not simply viewing the results that money is not supposed to

buy.[20]  Objectivity, under any meaningful definition, of search results is lost by Google by means of retaliatory and punitive Blockage so that Websites cannot be viewed through the Engine (*SAC* ¶ 60(e)), sale of top positions in search results for consideration[21] (*SAC* ¶¶ 130-31), and higher or lower results positions for Websites related to their level of AdWords advertising paid to Google (*SAC* ¶ 170).  Beyond all of this sits Defendant counsel's admission on behalf of Google that the Engine's results are actually "subjective" and that the public is aware of this (*SAC* ¶ 69).  This is an attempt to dilute Google's claimed objectivity with a factual assertion to reroute the public's beliefs and understanding of search results.

    As to Google's false statements about PageRank, first comes its lack of objectivity, KinderStart as the Class representative had its PageRank drop seven orders of magnitude on July 13, 2006.  *SAC* ¶ 186.  A fact finder could easily infer a loss of PageRank objectivity and human manipulation when seeing a fall down to a 0-PR in just one day.  Second, as explained in detail herein at section II.H, *infra*, a 0-PR under the PageRank patent as disclosed and initially practiced by Google was and continues to be a mathematical impossibility.  *SAC* ¶ 143.  This actually satisfies the Ninth Circuit case cited by Google.  A Lanham Act did not proceed because the statement in question "was not a specific and measurable claim."  *Coastal Abstract Services v. First American Title Ins. Co.*, 173 F.3d 725, 730 (9th Cir. 1999).  0-PRs value sites is indeed precisely measurable because Google claims that it strives for accuracy.  *SAC* ¶ 153.

---

[20] The MTD now attempts to restrict the normal meaning of "objective" to the absence of money paid within all of Google's promotion of the Engine and the Search Results.  However, Google looks to this disclaimer that appears in its Form S-1 (*MTD* at 30; *SAC* ¶121), which as such is an offering to investors and not to consumers or users.  Securities filings are not advertisements to customers under the Lanham Act.  *Tercica, Inc. v. Insmed Incorporated*, 2006 U.S. Dist. LEXIS 41804 (N.D. Cal. Jun. 6, 2006, at 61-62.)  Plaintiffs allege false advertising of objectivity emerging from Google's own content on its own Website (*SAC* ¶¶ 116-20, 239).

[21] Google complains of a lack of details in the alleged sale of top search results positions, but the SAC is not grounded in alleged fraud requiring application of Fed.R.Civ.P. Rule 9(b).  Additionally, as this action is a putative class action, notice pleading still applies.  Nothing in the SAC alleges that those actions in and of themselves create a separate cause of action against any Listing Parties involved, but that their occurrence brings to question the worldwide promotion of objectivity of the Engine of Google.  When such evidence and witnesses are disclosed in the initial disclosures, Plaintiffs as a class firmly believe that Google will reconsider whether the complaint is properly pled.  Finally, Google's practice of retaliation creates a well-founded fear among websites for Class members to revealing identities at this time.  Google's retaliatory tendencies are demonstrated by an egregious use of PageRank (*SAC* ¶ 186) and by other alleged wrongful methods employed by defendant (*SAC* ¶¶ 60(g), 62(e)).

1    The other set of false statements is assuredly disputed by Google – its promise to disclose

2  in search results when Websites are removed.  *SAC* ¶¶ 136, 147.  Removal can be the result of

3  local "policies", which are nowhere defined in Google's website, and can be open to creation

4  and interpretation.  When Google deliberately applies and enforces Webmaster guidelines, they

5  are indeed policies here in the U.S.  Google's guidelines contain a broad catch-all reason to

6  remove a site.  *SAC* ¶ 153.  The effect is plain – Google's policy in the U.S. is removal for *any*

7  reason.  As such, Google freely censors by unearthing and dissecting content (technical or

8  otherwise and even years old) from any target site leading to banning and Blockage.  *SAC* ¶ 99.

9  Just one example of Google's arbitrary use of its guidelines to censor was the Blockage of a

10  politically charged site.  *SAC* ¶ 60(g)(3).

11             **2.      *Plaintiffs as a Putative Class Incurred Competitive Injury.***

12    Competitive injury is traced from search traffic to the ultimate advertiser.  The Engine,

13  with the top position in market share, attracts users who do not pay a fee but will view

14  advertisements placed by advertisers on the host Websites.  Users view Google AdWords

15  advertisements appearing on Google's own Search Results pages and on host sites who become

16  AdSense participants.  AdSense Websites can be competitors of Google both as a competing

17  search engine (Class I Plaintiffs) and as a competing online host of advertising (Class II

18  Plaintiffs).  As Website hosts and publishers, Class II Plaintiffs yield space on their site for

19  advertising dollars, just as Google does.  These sites happen to use, as one choice, AdSense from

20  Google's Advertising Network to gain advertising revenues.  *SAC* ¶ 9.  AdSense participants

21  compete against Google in the same market.  *SAC* ¶ 62(a-c).

22     False advertising of Google against the designated Classes of Plaintiffs need not be in

23  the exact same business.  Class I has standing because they are engaged in the same business as

24  Defendant – operating a search engine and directory and earning revenues based on

25  advertisements appearing on their site.  *SAC* ¶ 65.  Google objects to Class II Plaintiffs as having

26  standing because they are customers of Google.  *MTD* at 31, n.17.  However, there is "no

27  requirement that the [p]laintiff and the [d]efendant be in exactly the same type of business or be

28

OPPOSITION TO DEFENDANT'S MOTION TO                          Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1   run for profit." *National Services Group, Inc. v. Painting & Decorating Contractors of America,*

2   *Inc.* 2006 U.S. Dist. LEXIS 52205 (S.D. Cal. Jul. 17, 2006), p. 9.

3           **3.    *Search Objectivity and PageRank are Commercial Promotions.***

4         Google's false statements are published to promote the Engine and advertising services

5   (*SAC* ¶¶ 239, 244) and encourage greater user traffic.  This translates into more revenue for

6   Google (*SAC* ¶¶ 70, 72).  Furthermore, the statements lead advertisers to put more money into

7   the Google Advertising Network and move away Google's competitors.  *SAC* ¶ 74.

8         Google may contend that even if falsity about its search results or PageRank deceives

9   search users, no promotion is made for goods or services as Google sells nothing to such

10  audience.  However, a federal court in this district recently held that deception of a non-paying

11  Web audience can be federal false advertising against a competitor.  *CollegeNet Inc. v. XAP*

12  *Corporation*, 2006 U.S. Dist. LEXIS 49684 (Jul. 17, 2006) (jury verdict for plaintiff on Lanham

13  Act claim, Oct. 5, 2006).  An online college application site falsely represented to students that a

14  privacy policy was in force.  The court refused to dismiss the Lanham Act claim even though

15  false advertising deceived students, and *not* defendant's paying sponsors.  This is precisely the

16  case here.  As targeted users are misled about results objectivity, site ranking, and site removal,

17  Google harms competitors.  Also, the deception behind 0-PRs spreads to advertisers as

18  purchasers of Google's services.  *SAC* ¶ 75.  Thus, under *CollegeNet*, the audience deceived by

19  false advertising need not be competitors of the Lanham Act defendant.  *Id.* at 23.

20        The other essential elements of a false advertising claim are present.  The statements tend

21  to deceive both the Engine's users and Websites as advertisers. These are material to their

22  advertising decisions about Google.  *SAC* ¶¶ 240, 245.  Google's services entered interstate

23  commerce.  *SAC* ¶ 26.  Finally, as result of deception of both users and advertisers, Plaintiffs as a

24  class of advertisers and Websites lost business (*SAC* ¶ 75), benefits and goodwill, and had traffic

25  and revenues diverted away (*SAC* ¶¶ 241, 246).

26      **F.    Free Speech Violations as Claimed are Sustainable.**

27          ***1.    The Engine is a Public Speech Forum.***

28        The Supreme Court has ruled that First Amendment rights in a private-owned physical

OPPOSITION TO DEFENDANT'S MOTION TO                                    Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1    property depend on its size, appearance and function.  This analysis applies to the Engine as a

2    public forum.  In the seminal case of *Marsh v. Alabama*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed.

3    265 (1946), a company's exercise of municipal-like functions within a space the size of a

4    comparable public town led to First Amendment protection.  Then, in *Lloyd Corp. v. Tanner*,

5    407 U.S. 551, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972), the Court introduced the notion that free

6    speech in the space depends on the owner's primary, dedicated purpose, which in that case was

7    to promote shopping rather than to express speech.  *Id.* at 564-65.  The *Lloyd* majority made two

8    important distinctions from the two cases where First Amendment rights were protected in

9    *Marsh* and *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S. Ct.

10   1601, 20 L. Ed. 2d 603 (1968).  First, the size of the forum mattered – the company town in

11   *Marsh* was like any other town, but in *Lloyd* the speakers were in a shopping mall.  Second, in

12   *Logan Valley*, the picketers lacked other "reasonable opportunities" to speak.

13       In this case, the Internet is the locus of the speech forum.  The Supreme Court clearly

14   recognizes the Internet as a public speech forum, i.e., a "metaphysical" public forum.

15   *Rosenberger v. Rector and Visitors of the Univ. of Va.*, *515 U.S. 819, 830,* 115 S. Ct. 2510, 132

16   L. Ed. 2d 700 (1995).  In a subsequent First Amendment case, the Court observed, "The Internet

17   . . . offers a forum for a true diversity of political discourse, unique opportunities for cultural

18   development, and myriad avenues for intellectual activities."  *Ashcroft v. ACLU*, 535 U.S. 564,

19   566, 122 S. Ct. 1700, 152 L. Ed. 2d 771, (2002) (*quoting* 47 U.S.C. § 230 (a)(3) (1994 ed.)).

20   Nonetheless, free speech rights on the Internet require careful delineation.  Writing for the

21   majority, Justice Breyer stated, "we would hesitate to import 'the public forum doctrine . . .

22   wholesale' in the context of the Internet."  *Denver Area Ed. Telecommunications Consortium*

23   *Inc. v. FCC*, 518 U.S. 727, 749, 116 S. Ct. 2374,135 L.Ed.2d 888 (1996).  Plaintiffs urge that the

24   Engine has indeed become a public forum for speech.

25       First, access to speech content on the Internet warrants treatment of the Engine as a

26   public forum.  Without an exact Uniform Resource Locator address, web content is reached by

27   two principal options: trying to guess the domain name or seeking the assistance of an Internet

28   "search engine."  *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 180 (W.D.N.Y.

1   2000) (*citing Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036,

2   1044 (9th Cir. 1999). The Ninth Circuit observed, "[u]se of a 'search engine' can turn up

3   hundreds of web sites, and there is nothing equivalent to a phone book or directory assistance on

4   the Internet." *Panavision International, L.P. v. Dennis Toeppen, Network Solutions, Inc.*, 141 F.

5   3d 1316, 1327 (9th Cir. 1998). Therefore, the Engine is now the dominant source for locating

6   Internet content for millions of speakers, including Plaintiffs. The Engine holds in excess of a

7   60% search share. *SAC* ¶ 37.

8        Second, First Amendment protection depends on the goal of specific access sought by

9   speakers which comprise the Class III Plaintiffs. The Supreme Court opined:

> 10   Although . . . a speaker must seek access to public property or to private property
>    dedicated to public use to evoke First Amendment concerns, forum analysis is not
> 11   completed merely by identifying the government property at issue. Rather, in defining
>    the forum we have focused on the access sought by the speaker. When speakers seek
> 12   general access to public property, the forum encompasses that property. [Citation
>    omitted.] In cases in which limited access is sought, our cases have taken a more tailored
> 13   approach to ascertaining the perimeters of a forum within the confines of the government
>    property. . . Here, . . . respondents seek access to a particular means of communication.

14

15   *Cornelius v. NAACP*, 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). The Ninth

16   Circuit follows this analytic framework by focusing on not merely the "nature and function" of

17   the system or fora, but also the specific "access sought by the speaker". *Currier v. Potter,* 379

18   F.3d 716, 727 (9th Cir. 2004). Plaintiffs seek not control of the Engine but merely resumed

19   exposure of their speech that once flowed through to listeners.

20        Third, according to *National A-1 Advertising, Inc. v. Network Solutions, Inc.*, 121

21   F.Supp.2d 156, 179 (D. N.H. 2000), third party speech emanates through the return of a "hit" by

22   a search engine. Class III Plaintiffs have already been granted by Google open exposure and

23   expression through the Engine to users as listeners. Reliance upon this channel was built and

24   encouraged through the promises and conduct of Defendant that all sites would be indexed. *SAC*

25   ¶¶ 5, 120. Google unquestionably invites sites in public to develop and post Web content for

26   searching and viewing. Blockage of Websites is a penalty from Google. *SAC* ¶ 163. The

27   resulting loss of this speech channel is specific, measurable and direct. *SAC* ¶ 159. For

28   KinderStart, 70% of its traffic vanished. *SAC* ¶ 174. First Amendment rights are violated when

OPPOSITION TO DEFENDANT'S MOTION TO                      Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1   a vibrant and viable channel is summarily and arbitrarily cut off by Google.

2         The Engine is now a speech forum.  Under the CDA, Congress made this broad statutory

3   finding:  "The Internet and other *interactive computer services* offer a forum for a true diversity

4   of political discourse, unique opportunities for cultural development, and myriad avenues for

5   intellectual activity."  47 U.S.C. § 230(a)(3) (emphasis added).  Google is an 'interactive

6   computer service' (ICS) and not an 'information content provider.'"  *Parker v. Google, Inc.*, 422

7   F. Supp. 2d 492 (E.D. Pa. 2006).  Moreover, Google itself agrees that as a search engine it is

8   such.  *MTD* at 6, n.2.  The entire crux of the CDA is to immunize ICS providers from *third party*

9   content so they do *not* block speech.  Accordingly, a legal commentator urges that an Internet

10  service provider (ISP) should allow access to all Internet speech in this public forum. Gey,

11  Steven G., "Reopening the Public Forum – From Sidewalks to Cyberspace," 58 Ohio St. L. J.

12  1539, 1619 (1998) (emphasis added).  As ICSs and ISPs are similar, this applies to Google.

13            **2.**     **Google is a State Actor due to Deep Entwinement.**

14        In the Ninth Circuit, passing one of four disjunctive tests – public function, joint action,

15  coercion/compulsion, and symbiotic relationship – leads to state action, absent countervailing

16  factors.  *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).  As explained earlier, the Engine is for

17  public use.  The Engine is "freely available" to anyone with an Internet connection.  *SAC* ¶ 122.

18  Google states the Engine is available to the general public.  *SAC* ¶ 91.  Furthermore, the Engine

19  is widely endorsed and lodged for public use throughout public institutions, libraries and

20  Websites.  *SAC* ¶ 91, 93-96.  Google's Co-Founder shares the mission the Library of Congress of

21  universal information access.  *SAC* ¶ 112.  Google stands *alone* as claiming to indexes all Web

22  content (*SAC* ¶¶ 54, 85) and as partnering with the major libraries of the U.S.  Google invites all

23  sites to be indexed by Googlebot.  *SAC* ¶ 85.  It places no limit or restriction on Web content.

24  *SAC* ¶ 86.  It is unmistakable -- the Engine is for public use.

25        The Supreme Court issued the overarching test of "entwinement" for state action in

26  *Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 121 S. Ct.

27  924, 148 L. Ed. 2d 807 (2001).  "[E]ntwinement will support a conclusion that an ostensibly

28  private organization ought to be charged with a public character to the degree shown here

OPPOSITION TO DEFENDANT'S MOTION TO              Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1    requires." *Id.* at 302. "When . . . the relevant facts show pervasive entwinement . . . , the

2    implication of state action is *not affected* by pointing out that the facts might not loom large

3    under a different test." *Id.* at 304 (emphasis added).[22] Furthermore, entwinement is not negated

4    if other tests fail: "It avails the [defendant] Association nothing to stress that the State neither

5    coerced nor encouraged the actions complained of. 'Coercion' and 'encouragement' are like

6    'entwinement' in referring to kinds of facts that can justify characterizing an ostensibly private

7    action as public instead." *Id.* at 302. Thus, state action does not require that the government

8    endorse or benefit from the underlying censorship by the private party.[23]

9        Plaintiffs allege facts to meet the "symbiotic relationship" test. After *Brentwood*, the

10   Ninth Circuit declared "if a private entity . . . confers significant financial benefits indispensable

11   to the government's "financial success," then a symbiotic relationship may exist." *Brunette v.*

12   *Humane Society*, 294 F.3d 1205, 1213 (9th Cir. 2002), *cert. denied*, 537 U.S. 1112, 123 S. Ct.

13   902, 154 L. Ed. 2d 786 (2003). Further, where the government has "so far insinuated itself into a

14   position of *interdependence* (with a private entity) that it must be recognized as a joint

15   participant in the challenged activity" (*quoting Burton v. Wilmington Parking Authority et al.*,

16   365 U.S. 715, 725, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961)). *Id.* (emphasis added).

17       The interdependence and profit-sharing between Google and two major public

18   universities and their libraries is staggering and unprecedented in history. Libraries serve to

19   "facilitate research, learning and recreational pursuits by furnishing materials of requisite and

20   appropriate quality." *United States v. American Library Association, Inc.*, 539 U.S. 194, 205-06,

21   123 S. Ct. 2297, 156 L. Ed. 2d 221 (2003). Functioning libraries must maximize content

22   availability. Here, the two very largest public universities, University of California (U-C) and

23

24   ────────────────────

[22] The Second Circuit recognized that "*Brentwood Academy* effectively broadened the state
25   action test to include "entwinement" for the first time." *Tancredi v. Metro. Life Ins. Co.*, 378
     F.3d 220, 230 (2nd Cir. 2004).
26   [23] A recent federal case in this circuit exemplifies a symbiotic relationship. *Kuba v. Six Flags*
     *Theme Parks Inc. et al.*, 2006 U.S. Dist. 33566 (E.D. Cal. May 17, 2006). The theme park
27   sufficiently entangled itself by virtue a local government agency sharing profits and ceding
     management of the property to the private owner. This closely entwined partnership led to a
28   finding of state action. The court thereby granted a preliminary injunction because the owner
     did not promulgate and apply reasonable restrictions on the time, place and manner of protected
     speech around the park.

OPPOSITION TO DEFENDANT'S MOTION TO                                    Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1    University of Michigan (U-M) have completely emptied out their copyrighted contents for

2    Google's massive duplication program.  *SAC* ¶ 92.  The technology and software platform

3    infrastructure are furnished by Google.  *SAC* ¶ 105. Financially, the Google library project with

4    U-M is creating an estimated 20-30% boost in overall revenues for the *entire University* by

5    selling off digitized copyrighted materials of authors.  The same is true of the U-C partnership

6    with Google.  *SAC* ¶ 107-08.   By contract with Google, U-C and U-M  are generating, sharing,

7    and price-fixing *all* digital copyrighted material for mutual gain.  *SAC* ¶¶ 101(b), 102, 106.  This

8    intentional violation of copyrights can deprive the original owners billions of dollars of value.

9    *SAC* ¶ 110.  Google's partnership with the Library of Congress is equally effectual.  *SAC* ¶ 112.

10   None of these factors showing entwinement are disputed or even acknowledged in the *MTD*.

11          Entwinement is further demonstrated by Google's total indemnification of the university

12   from intellectual property infringement damages (e.g. copyright infringement.  Google alone

13   assumes this massive burden that should be borne by U-C and U-M has stewards of the original

14   materials.  *SAC* ¶ 102(c).  Already, there is a class action copyright infringement suit pending in

15   the Southern District of New York.[24]  As a whole, the Google deals, both on the upside and

16   downside, make it "indispensable" to both U-C and U-M and their libraries for their legal and

17   financial standing.  *SAC* ¶ 106.  Copyright infringement poses an immense liability, but for

18   indemnification with *Google's deep pockets*.  The amplitude of gain or loss is almost beyond

19   measure, making the ties with Google indispensable for these universities and their budgets.  The

20   interdependence of *Burton* exists here between Google and the universities.

21          The search, indexing, and technical functionality for the U-C and U-M are reality

22   because of Google.  The digitized content of 100% of the printed materials within the

23   Universities has value only because of Google.  *SAC* ¶¶ 109, 114.  The Engine in its current form

24   is endorsed and utilized throughout the Universities (*SAC* ¶¶ 93-94), even though Blockage of

25   Websites and Speech Content happens (*SAC* ¶ 100).  Further, the search functions with

26

27   _____
     [24] In a simultaneous filing, plaintiffs request notice of the federal action, *The Authors Guild, et
     al. v. Google, Inc.*, Case 1:05-cv-08136-JES, filed Sept. 20, 2005 pending in the Southern

28   District of New York.  The putative class of plaintiffs asks for injunctive and declaratory relief
     as well as "an award of statutory damages, plaintiffs' actual damages, and/or defendant's
     profits."

1  imbedded filters of the Engine are in use in Google's digitized libraries shared with U-C and U-

2  M  *Brentwood* does not require them to coerce or to profit from free speech abridgement

3  wrought by the Engine.

### 3.    The Engine Should Protect Both Users and Listeners.

5      The Supreme Court has held, "By protecting those who wish to enter the marketplace of

6  ideas from government attack, the First Amendment protects the public's interest in *receiving*

7  information."  *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S.

8  1, 8, 106 S. Ct. 903, 89 L. Ed. 2d 1 (1986) (emphasis added).  Users actively seek out concurrent

9  speakers from multiple Websites through the search engine.  Users have vital First Amendment

10  rights to solicit and receive speech from a multitude of Websites.  This publicly accessible

11  search engine for soliciting and receiving speech from Websites should remain open.

### 4.    The California Constitution Protects Plaintiffs' Speech.

13      The Ninth Circuit recently reaffirmed that, "the California Constitution is 'more

14  protective, definitive and inclusive of rights to expression and speech' that the First Amendment

15  to the United States Constitution.  *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908, 910,

16  153 Cal. Rptr. 854, 592 P.2d 341 (1979), *aff'd*, 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035

17  (1980)."  *Glendale Associates, Ltd., v. N.L.R.B.*, 347 F.3d 1145 (9th Cir. 2003).  The California

18  Supreme Court in *Golden Gateway Center v. Golden Gateway Tenants Association*, 26 Cal.4th

19  1013, 1025-31, 29 P.3d 797, 111 Cal.Rptr.2d 336 (2001) held that "the actions of a private

20  property owner constitute state action for purposes of California's free speech clause only if the

21  property is *freely and openly accessible to the public*." (Emphasis added.)  Thus, "private

22  property must be public in character before California's free speech clause may apply."  *Id.* at

23  1033.  As explained in the section F.2 *supra*¸ the Engine is dedicated to the general public.[25]

24      One California Court of Appeal noted that *Golden Gate* asks courts to determine if the

25  situs of speech is 'the functional equivalent of a traditional public forum.'  *Albertson's, Inc. v.*

---

27  [25] A Federal court sitting in California confirmed that California law deems the Internet a public
forum.  *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1107-08 (C.D. Cal. 2004) ("the

28  contention that the internet is not a public forum is a peculiar contention that is difficult to take
seriously. *Barrett v. Rosenthal*, 114 Cal. App. 4th 1379, 9 Cal. Rptr. 3d 142 (2004), *review
granted on other grounds* (2006).

*Young*, 107 Cal.App.4th 106, 117-18 (3rd App. Dist. 2003), *review denied*, 2003 Cal. LEXIS

3975 (Cal., June 18, 2003).  Google uses specific language from the *Albertson's* opinion, but the

court's reasoning acknowledged California Supreme Court precedent as follows:

> We are satisfied *In re Lane* [71 Cal.2d 872, 79 Cal. Rptr. 729, 457 P.2d 561 (1969)]
> simply stands for the proposition that private property rights in a store open to the
> public are not absolute *but are subject to a balancing process in determining the right
> of access.* (*Union of Needletrades, etc. Employees v. Superior Court* (1997) 56
> Cal.App.4th 996, 1010, fn. 4 [65 Cal. Rptr. 2d 838].) *The fact the expressive activity
> was specifically related to the business use of the property in that case tipped the
> balance in favor of expressive access.*

(Emphasis added.)  Search indexing and search results are indeed expressive access.  That the

Engine is not physical does not diminish the need to preserve the free speech protection and

function here.  Google is now an arbiter and moderator for the Internet as a massive bulletin

board whereby it aims to index *all* sites.[26]  The Engine matches speakers and sites to listeners on

the Web.  One federal district court confirms that expression does emanate through a search

engine.  *See National A-1 Advertising, Inc., supra.*  In California, once open public access is

established, a balancing of interests is required:

> [*Robins, supra*] establishes that there is a state constitutional right to exercise free speech
> and petitioning activity on private property. . . . [T]he court instructs us to *balance the
> competing interests of the property owner and of the society with respect to
> the particular property or type of property at issue* to determine whether there is a state
> constitutional right . . . .

*Costco Companies, Inc. v. Gallant*, 96 Cal. App. 4th 740, 754-55, 117 Cal. Rptr. 2d 344 ( 2002)

(emphasis added).  This court specifically noted that *Golden Gate*'s outcome turned on the fact

that the complex was "not open to the general public."  *Id.* at 747.[27]  Given that *Costco*'s store

---

[26] A California Court of Appeal considers the Internet as a massive public forum for speech.  "In
a sense, the Web, as a whole, can be analogized to a public bulletin board. A public bulletin
board does not lose its character as a public forum simply because each statement posted there
expresses only the views of the person writing that statement. It is public because it posts
statements that can be read by anyone who is interested, and because others who choose to do
so, can post a message through the same medium that interested persons can read." *Wilbanks v.
Wolf*, 121 Cal. App. 4th 883, 897, 17 Cal. Rptr. 3d 497 (1st App. Dist. 2004).  Additionally, it
held that an author's website and most newspapers "are not public forums in and of themselves."
Id.  Plaintiffs urge that the Engine, with its mission to index all the Internet's Websites and make
this information accessible to anyone in the public, has become a public forum.

[27] The Court's order of July 13, 2006 at 13 notes facts were not alleged "tending to show that
Google has dedicated the operations of its search engine to public use."  In both *Trader Joe's
Co. v. Progressive Campaigns, Inc.*, 73 Cal. App. 4th 425, 86 Cal. Rptr. 2d 442 (1999) and

1    site (*not* a shopping center) was open to the public, free speech protection limited the owner to

2    reasonable restrictions to avoid disruption of its business operations.[28]

3    　　　　Impairment requires balancing as a fact issue and is not a complete defense in the MTD.

4    In contesting certain speech, Google must establish its "basic incompatibility." *International*

5    *Society for Krishna Consciousness v. City of L.A.*, 966 F. Supp. 956, 964 (C.D. Cal. 1997).

6    Google asserts that it has the largest index of web sites and other content to be made freely

7    available to any connected user. *SAC* ¶¶ 90, 122.  With 150,000 networked servers, Google

8    shows its intent and capability to index everything on the Web. *SAC* ¶ 51.  Indexing or

9    reindexing a single site could not possibly impair Google's commercial operations.

10   　　　　Google's use of its engine harms free speech.  Certain political and religious subjects and

11   their Web Content appear face extraordinary scrutiny by Google. *SAC* ¶¶ 166-67.  One putative

12   Class member with highly charged political content seemed to earn arbitrary punishment. *SAC* ¶

13   60(e).  Google fails to impose only reasonable restrictions on time, place and manner of

14   expression that (1) are content neutral, (2) are narrowly tailored to serve a significant interest,

15   and (3) leave open ample alternatives. *Kuba v. 1A Agricultural Ass'n*, 387 F.3d 850, 858 (9th

16   Cir. 2004) (*citing Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed.

17   2d 661 (1989)).  Google indeed censors content by its examination and analysis of Websites

18   against vague and overbroad Webmaster guidelines.  Speakers and speech through the Engine

19   are thereby discouraged and even suppressed. *SAC* ¶¶ 160-64, 256.

20   　　　　**G.　　Unfair Competition Law ("UCL") Violations are Properly Pled.**

21   　　　　KinderStart as the Class representative seeks relief against Google for "any unlawful,

22   unfair or fraudulent business practice or act and unfair, deceptive, untrue or misleading

23   

---

24   *Costco, supra,* the public was invited to the stores solely for the purpose of purchasing goods
     and services. *Id.* at 755.  Likewise, in *Albertson's* the court examine the primary purpose of the

25   private property.  These Courts of Appeal did not assess whether the forum's operations were
     dedicated for public use.  Instead, given that the property was open to the public, the query turns

26   on its primary purpose, whether shopping, expression or otherwise.  Google's search engine is
     not primarily for shopping but primarily for information to be found, accessed and displayed.

27   [28] An ancillary issue is Google's role in allowing speech to flow through its engine.  Like the
     retail stores and their patrons, Google's property is used and occupied by speakers and listeners.

28   If Google uses certain methodology to freely locate and link Websites to users, this should be
     immaterial to its status as a public speech forum.  This would be no different than a store using
     ground rules on how and where speakers may deliver messages to store patrons.

1   advertising.  B&PC §§ 17200 *et seq.*[29]  Plaintiff does have standing to proceed because

2   redressable relief includes injunctive relief under the UCL.    KinderStart may do so on behalf of

3   the Class.  *SAC ¶¶ 174-77.  See ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.,* 14 Cal.

4   4th 1247, 1257, 1271, 61 Cal. Rptr. 2d 112, 931 P.2d 290 (1997).

5         Under the UCL, the test of whether Google's business practices are unfair requires "an

6   examination of [that practice's] impact on its alleged victim, balanced against the reasons,

7   justifications and motives of the alleged wrongdoer. . . .  the court must weigh the utility of the

8   defendant's conduct against the gravity of the harm to the alleged victim. . . . [Citations

9   omitted.]"  *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980).  The California

10  Supreme Court admonishes courts to deal with the innumerable "'new schemes which the

11  fertility of man's invention would contrive."  *American Philatelic Soc.* v. *Claibourne,* 3 Cal.2d

12  689, 698 (1935).  No case precedent is required to deem a new type of practice unfair under

13  section 17200.  *Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432, 249 Cal. Rptr.

14  872 (1988).

15        First, the AdSense program of Google, while not facially deceptive or contractually in

16  breach, is unfair as to its practice.  This includes using Blocking and PageRank Deflation to

17  depress traffic and revenue for no apparent reason at all as well as arbitrary termination of the

18  contract but allowing ad copy to remain on the participant's host site.  *SAC ¶ 62(b-d).*  Second,

19  untrue and misleading advertising about search results, PageRank and their supposed objectivity

20  pervades both Google's SEC filings and its Website.  *SAC ¶¶ 121, 130-31, 133-35.*  Broad,

21  irresponsible, and intentional use of 0-PRs is both deceptive to the public and false advertising

22  because it affects advertisers who use Google's services.  *SAC ¶¶ 77-81.*  Third, as section 17200

23  covers incipient antitrust violations, plaintiffs allege pervasive harm to competition cause by

24  Google's practices.  *SAC ¶¶ 58-64.  Cel-Tech Communications Inc. v. Los Angeles Cellular*

25

26  ───────────────

[29] Even if KinderStart as a class representative for the UCL action for some reason is not an

27  appropriate class representative, the Court under California law should allow the substitution of
    a qualifying lead plaintiff in a further amended class action complaint.  *La Sala v. American Sav.*

28  *& Loan Ass'n*, 5 C.3d 864, 97 Cal. Rptr. 849, 489 P.2d 1113 (1971) (trial court abused its
    discretion when denying plaintiffs opportunity to amend their pleadings to correct defect of the
    lack of representative plaintiff in class action suit).

OPPOSITION TO DEFENDANT'S MOTION TO                        Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1    *Phone Co.*, 20 Cal. 4th 163, 187, 973 P.2d 527, 83 Cal. Rptr. 2d 548 (1999).

2         The scope of these unfair practices by Google harms its competitors.  Plaintiff

3    KinderStart is a search engine and index, as is Google.  *SAC* ¶¶ 30, 33.  California Subclass II

4    members are competitors in that such Websites are generating revenue from online ads as does

5    Google.  *SAC* ¶¶ 38, 194.  Causal injury against competitors is pled as well.  *SAC* ¶¶ 71-76, 79-

6    81.  Blockage strikes against non-deserving and good Websites.  *SAC* ¶158.  Both the AdWords

7    program as practiced by Google causes harm to Websites (*SAC* ¶ 170) as does the AdSense

8    program (*SAC* ¶ 63).

9         **H.    Defamation and Libel Properly State a Claim for Relief.**

10            **1.    *PageRanks of '0' Are False and Falsely-Based Opinion.***

11        Google insists that a 0-PR is not a false statement because it merely states a PageRank

12   value it assigned.  This misses the fundamental point.  PageRank, as created and used by Google

13   since 1998, is the result of algorithms that generate an absolute figure *above* '0'.  The MTD

14   cannot contest that the "normal mathematical result of a PageRank calculation generates an

15   extended decimal figure above the absolute figure of '0'."  *SAC* ¶ 143.  On that basis, Google

16   had previously never displayed a '0' PageRank (*SAC* ¶ 142), because it was mathematically

17   impossible to generate a 0-PR.  However, Google dropped the lowest value to '0' to punish

18   Websites.  *SAC* ¶ 144.  A 0-PR simply should not be rendered because it is not the true value.[30]

19   As Google has complete control over computed and displayed PageRanks (*SAC* ¶ 145), stating a

20   0-PR is literally false.  A fact finder could deduce *Google itself* overrides the normal output of

21   the *patented* PageRank algorithm with a 0-PR (*SAC* ¶ 278).

22        Next, Defendant believes that a 0-PR is merely an opinion that the subject site is

23   "relatively irrelevant or unappealing to users."  *MTD* at 23.  Google argues that if Plaintiffs

24   admit that Google "holds out PageRank as an opinion of value" (*SAC* ¶ 276), that conclusively

25   deems PageRank, as a matter of law, as a mere opinion free of any defamatory potential.

26

27   ───────────────

28   [30]  The potential for PageRank abuse is analogous to SAT scores or credit ratings, which range
     from 200-800 and 350-850, respectively.  If the scoring system plummets to '0' for inept
     students or bill payers, a '0' score may be literally false if of *any* correct answers or *any* bills
     timely paid.  A 0-PR appears clearly false for a site with *any* inbound links.

1   However, the test is not Google's own label or characterization, but how the public reasonably

2   perceives a 0-PR.  In fact, Plaintiffs allege that it is "an opinion based upon a rigorous, objective

3   calculation *using mathematical formulae, parameters and criteria*."  *SAC* ¶ 7 (emphasis added).

4          Within the Ninth Circuit, opinions that are *based upon* a provably false fact are

5   actionable for defamation.  Even though Google labels its conduct as opinions, the Ninth

6   Circuits disallows this very approach to evade defamation liability.  *Partington*, 56 F.3d at 1153-

7   54.  Methodology and foundation behind opinions are open for scrutiny.  In *Suzuki Motor*

8   *Corporation v. Consumers Union*, 330 F.3d 1110 (9th Cir. 2003), *cert. denied*, 540 U.S. 983,

9   157 L. Ed. 2d 373, 124 S. Ct. 468 (2003), defamation charges arose when defendant's

10  performance rating system to yield a "Not Acceptable" rating based on testing and research

11  performed under defendant's very own control. These testing practices were challenged and later

12  found to lack scientific basis.  *Id.* at 1130.  Google's 0-PR ratings lack a mathematical basis as

13  algorithms never truly yield a '0'.

14              **2.    *Defamation as Alleged is Grounded in Malice.***

15         Google contends malice is required for defamation here.  Malice is a required element

16  only if the subject is a "public figure" or "limited purpose" public figure. *Lorain Journal Co. v.*

17  *Milkovich*, 474 U.S. 953, 963-64 (1985) ("a court must focus on the 'nature and extent of an

18  individual's participation in the particular controversy giving rise to the defamation.'").  *Copp v.*

19  *Paxton*, 45 Cal.App.4th 829, 845-846, 52 Cal. Rptr. 2d 831 (1996) outlines three elements for a

20  limited purpose public figure.  First, there must be a public controversy where the issue was

21  debated publicly and would affect third parties.  Second, plaintiff must have voluntarily acted to

22  influence the issue and "thrust" itself into the public eye. Third, the alleged defamation must be

23  germane to the plaintiff's participation in the controversy.  None of these elements fit

24  KinderStart.  While KinderStart's website is publicly viewable, nothing it has done (other than

25  filing this action) suggests that joined in the fray of a controversy.  Nor did inject itself into

26  issues about Google's conduct.  Malice is therefore not required of Plaintiffs.

27         Even if KinderStart were somehow deemed a limited purpose public figure, defendant

28  has fair notice that malice is pled.  Malice in fact "may be proved . . . by direct evidence of the

OPPOSITION TO DEFENDANT'S MOTION TO                          Case No. C 06-2057 JF
DISMISS SECOND AMENDED COMPLAINT

1    evil motive and intent, or by legitimate inferences to be drawn from other facts and

2    circumstances in evidence."  *Burnett v. National Enquirer, Inc.* 144 Cal.App.3d 991, 1007-08,

3    193 Cal. Rptr. 206 (1993).  As one example, Plaintiffs allege:

> In or around 2001, Defendant launched a new program to deflate and punish Websites of
> its own choosing all the way down to a 0-PR [and] to punish Websites for carrying
> content of questionable or irrelevant quality in Google's absolute and internal discretion
> ("Inferior Page Quality" ("IPQ")).  "However, in so doing, Defendant _knowingly_
> _punishes_ thousands of Websites and Webpages that _do not in actuality have IPQ_.

4

5

6

7    *SAC* ¶¶ 144-45 (emphasis added).  Defendant chose "in some instances to deflate PageRanks of

8    competitors as Class members in retaliation[31] for certain behavior or actions against Google."

9    *SAC* ¶ 58(d).  Google's retaliation against Websites points to a strong inference of malice.

10   Further, Defendant's Co-Founder, as sole author of PageRank, must know about the

11   mathematical impossibility of a 0-PR, but the public does not generally know.  *SAC* ¶ 143.

12   Google lowered the floor to punish Websites with 0-PRs.  *SAC* ¶¶ 143, 144.  With all this, a fact

13   finder has ample bases to infer malice by Google.

14               **3.      PageRank Deflation Caused Injury to Plaintiffs.**

15          The expected impact of a lowered or deflated PageRank is that the viewer understands

16   that there is absolutely no "relevance" according to Google.  However, Google established "bad

17   neighborhoods" to taint a chain of punished sites already linking and doing business together.

18   *SAC* ¶ 146.  Google brands these sites as ones *not to do business with or link to*, because it could

19   precipitate punishment to the related site.[32]  Degrading and falsely tainting these sites causes

20   direct harm to reputation, loss of business and loss of revenues of the Class.  *SAC* ¶¶ 281-82.

21               **4.      California Privileges Do Not Cover False "0-PRs."**

22          The common interest privilege under California Civil Code § 47(c)(3) applies only if the

23   interest is truly common.  In reading this statute carefully, the court in *Irwin v. Mascott*, 112 F.

24   Supp. 2d 937, 962-63 (N.D. Cal. 2000), *aff'd on other grounds*, 2006 U.S.App.LEXIS 18984,

25

---

26   [31]  A synonym for "malice" includes "vengefulness" and a synonym for "retaliate" is "take
     revenge."  *Roget's New Millennium™ Thesaurus,* First Edition (v 1.3.1) Copyright © 2006 by

27   Lexico Publishing Group, LLC.  Retaliation is in effect "malice" within the SAC where
     Defendant  employs 0-PRs to take revenge against targeted Websites for certain events.

28   [32]  Other causes for 0-PRs are explained in Declaration of Randall McCarley attached as Exhibit
     1 to Plaintiffs' Opposition to Defendant's Motion to Dismiss/Strike.

1  flatly rejected defendant's attempt to expand the privilege outside of employment relationships.

2  Google claims a common interest with users as to PageRank.  The privilege fails to materialize

3  not only because of alleged malice but "by excessive publication, by a publication of defamatory

4  matter for an improper purpose, or if the defamation goes beyond the group interest." *Brewer v.*

5  *Second Baptist Church,* 32 Cal. 2d 791, 797, 197 P.2d 713 (1948).  Publication of 0-PRs all over

6  the Internet means that thousands of PageRank viewers and Google may have diverging

7  purposes and motives.  As for Google's attempt to seek the fair comment privilege, the

8  comments must be confined to "matters of public concern" directed to persons.  *Brown v. Kelly*

9  *Broadcasting Co.*, 48 Cal. 3d 711, 732, 771 P.2d 406; 257 Cal. Rptr. 708 (1989).  KinderStart's

10  content is displayed, but its site quality and ranking are not public issues.  Even if either of these

11  privileges appear to apply, they are each lost because malice by Google is alleged.

12  **III.  <u>CONCLUSION</u>.**

13     Based on the foregoing and the entire file herein, Plaintiff urges that this Motion to

14  Dismiss under Fed.R.Civ.P. 12(b)(1 and (b)(6) be denied in its entirety.  Plaintiffs further request

15  that any established pleading deficiencies curable with amendment be permitted under

16  Fed.R.Civ.P. 15.

17  Dated:  October 13, 2006     GLOBAL LAW GROUP

18              By:_____/s/ Gregory J. Yu_____

19                Gregory J. Yu, Esq.

20              Attorney for Plaintiff KinderStart.com LLC and
              for the proposed Class and Subclasses

21

22

23

24

25

26

27

28