DAVID H. KRAMER, State Bar No. 168452
COLLEEN BAL, State Bar No. 167637
LISA A. DAVIS, State Bar No. 179854
BART E. VOLKMER, State Bar No. 223732
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
DKramer@wsgr.com

JONATHAN M. JACOBSON, N.Y. State Bar No. 1350495
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
12 East 49th Street, 30th Floor
New York, NY 10017-8203
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
JJacobson@wsgr.com

Attorneys for Defendant
Google, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KINDERSTART.COM, LLC, a California limited liability company, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE, Inc., a Delaware corporation, <br><br> Defendant. | CASE NO.: C 06-2057 JF <br><br> **DEFENDANT GOOGLE INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** <br><br> Before: Hon. Jeremy Fogel <br> Date: October 27, 2006 <br> Time: 9:00 a.m. <br> Courtroom: 3 |

1

# TABLE OF CONTENTS

2

**Page**

3 INTRODUCTION ............................................................................................................... 1

4 ARGUMENT .................................................................................................................... 1

5 I.    GOOGLE IS IMMUNE FROM LIABILITY FOR ITS SEARCH RESULTS AND
      PAGERANKS ........................................................................................................... 1

6

7      A.    Google's Search Results and PageRanks are Entitled to Full First
            Amendment Protection ................................................................................ 1

8      B.    Google is Immune from Liability for Restricting Access to the KinderStart
            Website Under the Communications Decency Act ..................................... 2

9

10 II.   THE COURT SHOULD DISMISS KINDERSTART'S SHERMAN ACT CLAIMS
      WITH PREJUDICE .................................................................................................. 5

11 III.  THE COURT SHOULD DISMISS KINDERSTART'S FREE SPEECH CLAIMS
      WITH PREJUDICE ................................................................................................ 10

12

13 IV.   THE COURT SHOULD DISMISS KINDERSTART'S DEFAMATION CLAIM
      WITH PREJUDICE ................................................................................................ 13

14      A.    KinderStart Has Failed to Identify a Provably False Statement ............. 13

15      B.    KinderStart Fails to Identify Injury from Actionable Defamation .......... 15

16      C.    KinderStart's Defamation Claim is Barred by the Common Interest and Fair
            Comment Privileges. ................................................................................. 15

17

18 V.    THE COURT SHOULD DISMISS KINDERSTART'S LANHAM ACT CLAIM
      WITH PREJUDICE ................................................................................................ 17

19      A.    Google's Claimed Representations About Search Results ...................... 17

20      B.    Google's Claimed Representations about PageRank .............................. 18

21 VI.   THE COURT SHOULD DISMISS KINDERSTART'S 17200 CLAIM WITH
      PREJUDICE ............................................................................................................ 19

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991).................................. 10

*America Online, Inc. v. GreatDeals.net*, 49 F. Supp. 2d 851 (E.D. Va. 1999).............................. 6

*American Floral Servs, Inc. v. FTD*, 633 F. Supp. 201 (N.D. Ill. 1986)........................................ 7

*American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
    Publ'ns*, 108 F.3d 1147 (9th Cir. 1997) ........................................................................ 7

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ........................................ 6, 9

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ........................................................................ 11

*Ben Ezra, Weinstein & Co. v. America Online Inc.*, 206 F.3d 980 (10th Cir. 2000) ..................... 3

*Blatty v. New York Times Co.*, 42 Cal. 3d 1033 (1986) ............................................................ 2, 14

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) ............................................................... 3

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*,
    531 U.S. 288 (2001) ............................................................................................................. 11

*Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711 (1989) ..................................................................... 16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977).......................................... 9

*Cok v. Cosentino*, 876 F.2d 1 (1st Cir. 1989)............................................................................... 5

*CollegeNet Inc. v. XAP Corp.*, No. 03-CV-1229, 2006 U.S. Dist. LEXIS 49684 (D.
    Or. July 17, 2006).............................................................................................................. 18

*Consolidated Edison Co. of N.Y. Inc. v. Public Serv. Comm'n*, 447 U.S. 530 (1980)................... 3

*F.C.C. v. Pacifica Found.*, 438 U.S. 726 (1978).......................................................................... 1

*Gentry v. EBay, Inc.*, 99 Cal. App. 4th 816 (2002) ...................................................................... 3

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000 (9th Cir. 2003)................................... 9

*Green v. America Online, Inc.*, 318 F.3d 465 (3d Cir. 2003) ....................................................... 3

*Hall v. C.I.A.*, 437 F.3d 94 (D.C. Cir. 2006) ........................................................................ 15, 16

*Hudgens v. NLRB*, 424 U.S. 507 (1975) ................................................................................... 10

*Institute of Athletic Motivation v. Univ. of Ill.*, 114 Cal. App. 3d 1 (1980) ............................... 16

*Irwin v. Mascott*, 112 F. Supp. 2d 937 (N.D. Cal. 2000) ........................................................... 16

*Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003)....................................................................... 11

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ........................................................... 13

*Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181 (S.D. Cal. 2005).......................... 20

*Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002) ...................................................................... 11

*Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018 (9th Cir. 2003) ..................... 8

*Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................... 9

*McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552 (11th Cir. 1992)..................................... 5

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) .................................................. 2

*Morningstar, Inc. v. Superior Court*, 23 Cal. App. 4th 676 (1994) ................................. 13

*Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003),
    *aff'd*, 2004 WL 602711 (4th Cir. 2004) .................................................................... 4

*O'Shea v. Littleton*, 414 U.S. 488 (1974).......................................................................... 8

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) ..................................................................................... 9

*Pfizer Inc. v. Superior Court*, 141 Cal. App. 4th 290 (2006)......................................... 20

*Robins v. Pruneyard Shopping Ctr*, 23 Cal. 39 (1974), *aff'd*, 447 U.S. 74 (1980)...................... 12

*Rodas v. Spiegel*, 87 Cal. App. 4th 513 (2001) ............................................................. 16

*Rutman Wine Co. v. E&J Gallo Winery*, 829 F.2d 729 (9th Cir. 1987)........................... 10

*Sanderson v. Culligan International Co.*, 415 F.3d 620 (7th Cir. 2005) ........................... 7

*Scognamillo v. Credit Suisse First Boston LLC*, No. C03-2061,
    2005 WL 2045807 (N.D. Cal. Aug. 25, 2003)......................................................... 18

*Search King Inc. v. Google Tech., Inc.*, No. CIV-02-1457,
    2003 WL 21464568 (W.D. Okla. May 27, 2003) ................................................. 2, 13

*Stamatakis Indus., Inc. v. King*, 965 F.2d 469 (7th Cir. 1992)......................................... 9

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) ............................................... 6

*Themed Rests., Inc. v. Zagat Survey, LLC*, 4 Misc. 3d 974 (N.Y. 2004),
    *aff'd*, 801 N.Y.S.2d 38 (2005)................................................................................ 2, 18

*Trader Joe's Co. v. Progressive Campaigns, Inc.*, 73 Cal. App. 4th 425 (1999) ........... 12

*Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377 (9th Cir. 1983)...................... 9

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ....................................................................... 4

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)............................................................................................... 7, 9

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................. 19

**STATUTES**

42 U.S.C. § 2000a ................................................................................................ 4

47 U.S.C. § 230(b) .............................................................................................. 11

47 U.S.C. § 230(c)(1) ........................................................................................... 3

47 U.S.C. § 230(c)(2) ...................................................................................... *passim*

47 U.S.C. § 230(e) ................................................................................................ 4

Bus. & Prof. Code § 17200 ................................................................................. 19

Bus. & Prof. Code § 17203 ................................................................................. 19

Bus. & Prof. Code § 17204 ................................................................................. 19

Cal. Civ. Code § 47(c) ........................................................................................ 16

Cal. Civ. Code § 48(4)(d) ................................................................................... 15

**MISCELLANEOUS**

*ABA Section of Antitrust Law, Antitrust Law Developments* (5th ed. 2002)................. 10

141 Cong. Rec. H8470 (1995) ............................................................................... 3

1

**INTRODUCTION**

Despite ample time, several iterations of its complaint and multiple briefs, KinderStart has failed to articulate a legally cognizable claim arising from Google's editorial decisions to remove KinderStart's website from its search results and assign it a 0-PR. Accordingly, the Second Amended Complaint ("SAC") should be dismissed, this time with prejudice.

**ARGUMENT**

**I.    GOOGLE IS IMMUNE FROM LIABILITY FOR ITS SEARCH RESULTS AND PAGERANKS**

**A.    Google's Search Results and PageRanks are Entitled to Full First Amendment Protection**

Google's Motion to Dismiss ("MTD") explained that its decisions regarding which websites to include in its search results and the PageRanks it assigns are protected opinions under the First Amendment, and a Court order forcing Google to change its views about KinderStart's website would violate the compelled speech doctrine of the First Amendment. KinderStart responds by arguing that Google's opinion might not be protected by the First Amendment if based on "political, religious, malicious, unfair or anticompetitive agendas." Opposition to Defendant's Motion to Dismiss the Second Amended Complaint ("Opp.") at 2. This argument is misguided for two reasons. First, KinderStart has not alleged that any of these factors played a part in forming Google's opinion about the KinderStart website. Second, an opinion does not lose First Amendment protection because it is guided by political or religious views, is pointed, or is directed to a competitor. The opposite is true: political and religious opinions as well as opinions regarding services in the marketplace are a vital component of the First Amendment. KinderStart's suggestion to the contrary would render the First Amendment meaningless. *See F.C.C. v. Pacifica Found.*, 438 U.S. 726, 745 (1978) ("Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.").

KinderStart also argues that First Amendment protection "would exonerate PageRank as commercial speech even if opinions were based on provably false facts." Opp. at 2. As Google explained, and as it reiterates below with respect to the defamation claim, Google's PageRanks constitute its *opinions* of the importance of websites, and are no less opinions because Google

uses algorithms in the process of arriving at them.  As the *Search King* court noted:  "the numerical representation of relative significance of a particular web site – is fundamentally subjective in nature."  *Search King Inc. v. Google Tech., Inc.*, No. CIV-02-1457, 2003 WL 21464568, at *3 (W.D. Okla. May 27, 2003); *see also Themed Rests., Inc. v. Zagat Survey, LLC*, 4 Misc. 3d 974, 980 (N.Y. 2004), *aff'd*, 801 N.Y.S.2d 38 (2005) ("numerical ratings facially are quintessential opinion, no different than rating a film zero to five out of five stars. Although the complaint attempts to characterize the ratings as objectively 'false' by asserting it portrays plaintiff's establishment as being 'substandard and unworthy of patronage' ... the reviewer assesses subjective qualities, considers his or her own standards, and uses words or scores to describe the experience so that the reader can decide whether to visit the establishment.").  Because Google's views regarding websites are protected opinions, KinderStart could not be entitled to an order forcing Google to change its opinion about the KinderStart website, or to damages based on Google's expression of its opinion.  *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256 (1974) (court order requiring a defendant to publish material "operates as a command in the same sense as a statue or regulation forbidding [defendant] to publish specified matter"); *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1043 (1986) ("limitations rooted in the First Amendment are applicable to all injurious falsehood claims").

### B. Google is Immune from Liability for Restricting Access to the KinderStart Website Under the Communications Decency Act

In its Motion, Google explained that Section 230(c)(2) of the Communications Decency Act immunized it from liability for its actions in removing KinderStart's site from its search results and assigning a 0-PR to the site.  MTD at 5-8.  KinderStart's effort to overcome Google's immunity reveals a misunderstanding of the statute.  Under Section 230(c)(2):

> No provider … of an interactive computer service shall be held liable on account of … any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable, whether or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2).  KinderStart contends that Section 230(c)(2) applies only to statements by third parties, and not to conduct or statements by Google.  But KinderStart's arguments and case

1   authorities concern the wrong statute – a separate immunity for web site hosts provided by

2   *Section 230(c)(1)*.  *See* 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer

3   service shall be treated as the publisher or speaker of any information provided by another

4   information content provider."); *Ben Ezra, Weinstein & Co. v. America Online Inc.*, 206 F.3d

5   980, 984-85 n.4 (10th Cir. 2000) (cited by KinderStart, but applying § 230(c)(1)); *Gentry v.*

6   *EBay, Inc.*, 99 Cal. App. 4th 816, 834 (2002) (same).  Its argument about third party content is

7   inapposite to Section 230(c)(2) as this provision immunizes Google for "any action" taken to

8   restrict access to material that it deems objectionable, whether that action consists of removing

9   sites from its search results, or labeling them unimportant.  *See* MTD at 5-8.  KinderStart offers

10  no discussion at all of the Section 230(c)(2) precedents that Google cited, including *Green*,

11  *GreatDeals* and *Blumenthal*, which demonstrate the applicability of its provisions here.[1]

12          KinderStart also argues that, despite its sweeping language, Section 230(c)(2) does not

13  protect Google from liability for alleged violation of federal antitrust, civil rights or false

14  advertising laws.  But the statute specifically identifies the handful of exceptions to the blanket

15  immunity it affords.  Section 230(e) states that the various immunities of Section 230 do not

16  apply (1) where they would "impair the enforcement of ... Federal criminal statute[s]," (2) to

17  intellectual property claims; (3) to state enforcement of consistent state statutes; and (4) to claims

---

19          [1] In its opposition to Google's anti-SLAPP Motion, KinderStart argues that Google must
20  show that content on KinderStart's site was "indecent" before Google can claim immunity for
    restricting access to the site.  KinderStart's anti-SLAPP Opp. at 10.  That is wrong.  Google's
21  immunity under Section 230(c)(2) applies whenever it deems content objectionable, whether or
    not the content is indecent.  *See, e.g.*, *Green v. Am. Online, Inc.*, 318 F.3d 465, 472 (3d Cir.
22  2003) (immunity extended to blocking spam and objectionable news groups); *Blumenthal v.*
    *Drudge*, 992 F. Supp. 44, 52, n.13 (D.D.C. 1998) (content that is "otherwise objectionable"
23  includes content that is simply defamatory, regardless of whether it is obscene or violent).  The
    complete discretion that the statute affords to service providers to determine what is
24  objectionable is no accident; it was intended to ensure the statute was constitutional by removing
    government from the decision-making process. 141 Cong. Rec. H8470 (1995) (statement of Rep.
25  Wyden) (co-author of legislation, distinguishing his version from Senate's version on grounds
    that Senate's would involve the federal government and therefore require "vast sums of money
26  trying to define elusive terms that are going to lead to a flood of legal challenges"); *Id.*
    (statement of Rep. Cox) (co-author of legislation, stating that bill will avoid "content regulation
27  by the Federal Government of what is on the Internet"); *see also Consol. Edison Co. of N.Y. Inc.*
    *v. Public Serv. Comm'n*, 447 U.S. 530, 538 (1980) (agency order prohibiting inserts in monthly
28  utility bills that discussed "controversial issues of public policy" held unconstitutional on
    grounds that it would provide government the choice of permissible subjects for public debate).

1   under federal or state wiretapping laws.  47 U.S.C. § 230(e).  By specifying one certain federal

2   liabilities that a service provider may still face, Congress made clear the immunity extended to

3   all other federal claims, including those alleged by KinderStart.  *Noah v. AOL Time Warner, Inc.*,

4   261 F. Supp. 2d 532, 538-39 (E.D. Va. 2003), *aff'd*, 2004 WL 602711 (4th Cir. 2004) (applying

5   identical analysis to conclude that Section 230(c)(1) barred claims against service provider under

6   federal Civil Rights Act, 42 U.S.C. § 2000a.  As the *Noah* court explained in refuting the same

7   argument KinderStart advances here, it cannot "be plausibly argued that § 230 is limited to

8   immunity from state law claims for negligence or defamation.  Such a limitation is flatly

9   contradicted by § 230's exclusion of some specific federal claims."  *Noah*, 261 F. Supp. At 538-

10  39; *see also TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly

11  enumerates certain exceptions to a general prohibition, additional exceptions are not to be

12  implied, in the absence of evidence of a contrary legislative intent.").[2]

13      As a last gasp, KinderStart contends that Section 230(c)(2) is inapplicable because

14  Google did not act in good faith.  But KinderStart points to no allegation in the SAC that

15  suggests Google acted in bad faith in the actions it took regarding KinderStart's site.  Indeed,

16  KinderStart itself establishes Google's good faith, alleging that Google "programmatically"

17  assigns 0-PRs to "punish" sites "that [Google] *believes*" have "Inferior Page Quality."  SAC ¶

18  145 (emphasis added);[3] *see also* SAC ¶ 169 (Google believes it is exercising its own free speech

19

20

21  [2] KinderStart contends Google's immunity should be limited to state law claims because of the language in § 230(e)(3) providing:  "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  But in context (as one of four separate exemptions to Section 230(c)'s immunity), that phrase says nothing about federal claims, and is merely part of the discussion of how state law claims are to be treated.  Again, as the Noah court recognized, it makes no sense for Congress to have exempted specific federal statutes from § 230(c) immunities, if it intended to limit the immunities to state law claims.

24  [3] The fact that KinderStart references the very same Paragraph 145 to suggest an absence of good faith highlights the confusing nature of the SAC.  KinderStart cites to Paragraph 145 for the proposition that Google "knowingly punishes thousands of Websites and Webpages that do not in actuality have Inferior Page Quality."  But as noted, in the immediately preceding sentence of Paragraph 145, KinderStart alleges that Google assigns 0-PRs to sites "that [Google] *believes*" have "Inferior Page Quality."  The juxtaposition of the two sentences, along with KinderStart's placement of the word "knowingly" in the latter, show that it is merely claiming that Google knows it is assigning a 0-PR to a site, not that it is doing so while subjectively believing the rating is unwarranted.  KinderStart simply disagrees with Google's views on site quality.  Further, nothing in Paragraph 145 has anything to do with KinderStart's own site.  Finally, while Paragraph 145 is directed exclusively to Google's assignment of 0-PRs, KinderStart invokes it in its opposition as if it demonstrates the absence of good faith in the removal of sites from Google's

1    rights with respect to the removal of sites from its search results); Original Complaint ¶ 23

2    (Google's decision on which sites to exclude "is presumably based on either stated or unstated

3    'quality guidelines'").  Moreover, KinderStart has submitted (and relied on in its opposition to

4    this motion) a declaration acknowledging that KinderStart's site actually contained

5    "objectionable," "inappropriate" and "unsuitable" content.  *See* Declaration of Randall McCarley

6    ("McCarley Decl.") ¶ 6; Opp. at 34, n.32 (referencing McCarley Decl. in opposition to MTD).

7    KinderStart thus has failed to plead (and plainly cannot plead) facts sufficient to overcome

8    Google's immunity, as it was required to.  *See, e.g.*, *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d

9    1552, 1559 n.2 (11th Cir. 1992) ("the burden falls on [plaintiff] in this case to allege facts

10   sufficient to show that *Noerr-Pennington* immunity did not attach .…"); *Cok v. Cosentino*, 876

11   F.2d 1, 3 (1st Cir. 1989) ("Having determined that the [defendants] possessed quasi-judicial

12   immunity, we hold that [plaintiff's] pleadings fail to show that their actions were taken in clear

13   and complete absence of authority.").  Accordingly, to the extent KinderStart's claims rest on

14   alleged injury from Google's removal of the KinderStart site from its index and the site's 0-PR

15   (and all of its claims do), they are barred as a matter of law by Section 230(c)(2).

16   **II.        THE COURT SHOULD DISMISS KINDERSTART'S SHERMAN ACT CLAIMS
               WITH PREJUDICE**

17

18       This Court's Order of July 13, 2006 ("Order") dismissed the antitrust claims in KinderStart's

19   FAC, finding the allegations inadequate on multiple grounds.  Order at 11-15, 17-18.

20   Specifically, the Court concluded:

21   • "KinderStart has not sufficiently described the markets relevant to its claim." *Id.* at
        12 n.2.

22

23   • "KinderStart has failed to allege facts sufficient to support a claim of anticompetitive
        conduct." *Id.* at 12.

24   • "KinderStart does not identify any specific acts by Google that would evince an intent
        either to control prices in the Search Ad Market or to destroy competition in the
25      Search Engine Market, nor has KinderStart made clear what prices Google allegedly
        is attempting to control." *Id.*

26

27

28   index.  It does not.  *See also infra* at n.11 (discussing allegation regarding the PageRank assigned
     to KinderStart's site after this litigation commenced).

- "KinderStart's allegations that Google removed KinderStart from search results [i.e., alleged "Blockage"] and lowered its PageRank do not suffice to allege predatory conduct as opposed to legitimate competitive actions." *Id.*

- "[B]ecause KinderStart provides no specifics as to how Google creates this pressure [on 'websites to purchase advertising in order to avoid decreased PageRank scores'], this allegation also is insufficient to state a claim ...." *Id.* at 13.

- KinderStart's essential facility claim was insufficient because it did not (and could not) allege that "it or similarly situated class members face elimination as a result of Google's conduct." *Id.* at 14.

As Google explained, the SAC addresses *none* of the deficiencies the Court identified. Nothing in the Opposition suggests otherwise. Google focuses here on the insufficiency of the allegations to demonstrate (a) a relevant product market, (b) exclusionary conduct, and (c) cognizable antitrust injury. Because each is an *essential* element of KinderStart's monopolization claim *and* its attempted monopolization claim, Order at 11, 13; *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990), any one of these failures dooms *both* claims.

     **A.**    ***Market definition.***  To withstand a motion to dismiss, a complaint must set forth at least some allegations that the scope of product market asserted is not too narrow, and that other products are not reasonable substitutes. *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001). In this case, as Google pointed out, MTD at 9-10, the purported "Search Ad" market fails because the SAC alleges *no* facts to suggest that advertising through other media – and, in particular, advertising on *other web sites* – is not reasonably interchangeable with search engine advertising. *See Am. Online, Inc. v. GreatDeals.net*, 49 F. Supp. 2d 851, 857-58 (E.D. Va. 1999); Opp. at 5-7. KinderStart's attempt to cure this deficiency by finding support in the SAC's allegations, Opp. at 5-7, fails. Of the four paragraphs cited, three (SAC ¶¶ 3, 8, and 53) do nothing more than describe what a search engine does. The other, ¶ 38, actually refutes KinderStart's supposed market, acknowledging that web site advertising generally, not just search engines, is one means of reaching consumers. *See* Opp. at 6 ("advertisers 'target and reach *Internet browsers and* users of search engines.'") (quoting SAC ¶ 38) (emphasis added).

     KinderStart's response to the *GreatDeals* decision is equally unpersuasive. It does not even address that court's holding that the relevant market includes all forms of advertising.

1    Instead, KinderStart retreats to the position that the court's opinion there "does not bind this

2    court." Opp. at 6-7. The inability to respond to the *GreatDeals*' court's logic is telling.

3        **B.    *Exclusionary conduct.*** KinderStart's Opposition raises six categories of conduct

4    which it claims are anticompetitive or exclusionary under Sherman Act § 2. Whether considered

5    individually or in combination, these allegations fail as a matter of law.[4]

6        1.    "*PageRank Deflation and Blockage.*" The Court has already held that

7    "KinderStart's allegations that Google removed KinderStart from search results [i.e.,

8    "Blockage"] and lowered its PageRank do not suffice to allege predatory conduct as opposed to

9    legitimate competitive actions." Order at 12. The Opposition does not address the Court's

10   analysis. It does not explain how, following the decision in *Verizon Communications, Inc. v.*

11   *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-10 (2004), imposition of a duty on

12   Google to aid (rather than compete against) its rivals would promote competition. The

13   Opposition, instead, ignores the Court's ruling altogether.

14       2. & 3. *Alleged "False Statements" – Generally and "to the SEC."* KinderStart's

15   irresponsible allegations of "false statements" do not advance its case. As Google's MTD

16   explained, at 11-13, if false statements by one competitor about another are *ever* actionable under

17   the Sherman Act, *compare Sanderson v. Culligan International Co*., 415 F.3d 620, 623 (7th Cir.

18   2005) *with American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal &*

19   *Professional Publications*, 108 F.3d 1147, 1152 (9th Cir. 1997) (dictum), the statements must at

20   least be (1) clearly false; (2) clearly material; (3) clearly likely to induce reasonable reliance; (4)

21   continued for prolonged periods; and (5) not readily susceptible of neutralization or other offset

22   by rivals. *Am. Prof'l Testing*, 108 F.3d at 1152.

23       The statements challenged here are that KinderStart's PageRank was zero and that

24   Google's search engine results are objective. The zero PageRank statement is not false at all, let

25

26       [4]  In an effort to make something out of nothing at all, KinderStart relies on "the composite
     or synergistic impact of all the elements upon competition." Opp. at 7-8. But as one court
27   explained, "it requires no sophistication in mathematical theory to recognize that zero plus zero
     plus zero still equals zero.… If no incident has probative value, all incidents taken together have
28   no probative value." *Am. Floral Servs, Inc. v. FTD*, 633 F. Supp. 201, 215 n.23 (N.D. Ill. 1986).

1    alone clearly false.  Google assigned KinderStart's site a PageRank of zero and, consequently,

2    the statement that the PageRank is zero was true.  And even assuming materiality and reliance,

3    (neither of which KinderStart has pled), the zero PageRank statement is certainly subject to

4    neutralization.  Nothing prevents KinderStart from telling everyone that its PageRank should be

5    higher than zero (or that its site is important) on its own website, on other sites, or in other

6    media.

7         Neither is there anything false in Google's statements (including those in SEC filings)

8    about the manner in which its search results are reported.  As Google explained, there is nothing

9    about the use of algorithms that implies the absence of human editorial judgment in the

10   generation of results.  MTD at 25.  That Google's statements are not false is underscored by

11   KinderStart's own allegations in which it notes the prominent disclosure by Google of various

12   circumstances in which a "page may [be] manually removed from [Google's] index."  FAC ¶¶

13   44-45.  Moreover, as before, KinderStart can freely respond to Google's supposed

14   misstatements.

15        4.    "*Cutting Traffic and Revenue Derived from AdSense*."  KinderStart advances two

16   arguments about AdSense, one for itself, the other for unnamed others.  Neither advances its

17   cause.  To the extent its allegations are based on the reduction of its own AdSense revenues as a

18   result of its removal from Google's search results and PageRank "devaluation," the Court has

19   already concluded that those aspects of Google's conduct are not exclusionary.  Order at 12.

20   Again, KinderStart ignores the Court's ruling.  Even if Google terminated the AdSense contracts

21   of others, this is irrelevant:  "[I]n class actions, the named representatives must allege and show

22   that they personally have been injured, not that injury has been suffered by other, unidentified

23   members of the class to which they belong and which they purport to represent."  *Lierboe v. State

24   Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (citations omitted); *accord, e.g.*,

25   *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).  KinderStart must establish its own claims, and

26   cannot use the potential claims of strangers as its own.  KinderStart does not and cannot allege

27   that Google terminated KinderStart's AdSense agreement.  That is the end of the matter.

28

1    5.    *Removing links to spam.*  KinderStart complains that there are "various Websites

2    unfairly and arbitrarily deemed by Google in its sole discretion to be spam or marginal viewer

3    content," and that Google removes them "from Google's index in order to redirect users and

4    valuable search traffic to sites competing against such Websites."  SAC ¶ 63; *see* Opp. at 10.

5    The idea that it is *anti*competitive for Google to improve the quality of its search engine by

6    removing spam from its results is untenable on its face.  Competition to enhance product quality

7    is precisely what the antitrust laws are designed to encourage, not prevent.  *See Olympia Equip.*

8    *Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 378 (7th Cir. 1986); *Transamerica Computer*

9    *Co. v. IBM Corp.*, 698 F.2d 1377, 1382-83 (9th Cir. 1983).

10    6.    *Price increases.*  KinderStart ignores the points made by Google about

11    KinderStart's pricing allegations.  Put simply, price increases are not exclusionary conduct

12    actionable by competitors under Sherman Act § 2.  *Trinko*, 540 U.S. at 407 ("The mere

13    possession of monopoly power, and the concomitant charging of monopoly prices, is not only

14    not unlawful; it is an important element of the free-market system. The opportunity to charge

15    monopoly prices – at least for a short period – is what attracts 'business acumen' in the first

16    place; it induces risk taking that produces innovation and economic growth."); *Atl. Richfield*, 495

17    U.S. at 337; *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986)

18    ("charg[ing] higher than competitive prices … could not injure respondents:  as petitioners'

19    competitors, respondents stand to gain from any conspiracy to raise the market price").

20    **C.    *Antitrust injury.*  Even if KinderStart had otherwise established the market

21    definition and exclusionary conduct elements of its claims for actual and attempted

22    monopolization under Sherman Act § 2, its claims should still be dismissed for lack of antitrust

23    injury.  KinderStart has alleged that Google's conduct harmed it as a competitor.  But that is not

24    enough.  KinderStart must *also* allege that its injuries reflect the assertedly anticompetitive aspects

25    of the challenged conduct – that the claimed injuries to KinderStart reflect an actual or probable

26    increase in price, restriction of output, or deterioration of quality in the alleged relevant markets as

27    a whole.  *See, e.g.*, *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) ("The

28    antitrust injury doctrine … 'requires every plaintiff to show that its loss comes from acts that

1    reduce output or raise prices to consumers.'") (citations omitted); *see Atl. Richfield*, 495 U.S. at

2    338-42; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977); *see also Glen*

3    *Holly Entm't, Inc. v. Tektronix, Inc*., 343 F.3d 1000, 1010 (9th Cir. 2003) (antitrust injury present

4    where customer was injured by "the unlawful removal of a competitive product from the market.")

5    (cited in Opp. at 11).  There are no allegations to that effect in KinderStart's SAC.

6        KinderStart evades the issue in its Opposition.  It does not even mention *Atlantic Richfield*

7    or *Brunswick*.  It argues instead that it has suffered antitrust injury because it alleges that it

8    participates in the affected markets both as a competitor and as a consumer.  Opp. at 11-12.  That

9    argument addresses a different question, however – whether a plaintiff's injury is too remote to

10   confer standing – which is not in issue here.  *See ABA Section of Antitrust Law, Antitrust Law*

11   *Developments*, 845-51, 861-67 (5th ed. 2002) (explaining distinction between antitrust injury and

12   remoteness).  KinderStart alleges no facts, and presents no theory, under which the injury to

13   KinderStart – "Blockage" and PageRank "devaluation" – could possibly give rise to consumer

14   harm in the "Search Ad market" or any other market that might be alleged.  It is inconceivable that

15   even the total elimination of this one rival – should it ever come to that – will have any material

16   impact on competition the "Search Ad Market" as a whole.  *See, e.g.*, *Rutman Wine Co. v. E&J*

17   *Gallo Winery*, 829 F.2d 729, 734-35 (9th Cir. 1987).  That flaw, as well, is fatal, and warrants

18   dismissal of all KinderStart's claims under Sherman Act § 2.[5]

19   **III.    THE COURT SHOULD DISMISS KINDERSTART'S FREE SPEECH CLAIMS
         WITH PREJUDICE**

20

21       KinderStart cites no new relevant cases in support of its argument that Google's search

22   engine must accommodate First Amendment rights because it is a "public speech forum."

23   *Compare* Opp. to Google's MTD the First Amended Complaint ("FAC") at 3-13 (Doc. No. 26)

24   *with* Opp. at 22-30.  Its argument remains legally and factually unsound.  Legally, after *Hudgens*,

25   ───────────────

26       [5] In continuing to assert an "essential facilities" claim to support allegations of actual
     monopolization under Section 2, KinderStart's opposition disregards reality. As this Court
     pointed out in dismissing this claim in its Order at 14, KinderStart cannot allege any facts to
27   satisfy the requirement of *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th
     Cir. 1991), that "[a] facility that is controlled by a single firm will be considered 'essential' only
28   if control of the facility carries with it the power to *eliminate* competition in the downstream
     market."  KinderStart's only response to this point is to ignore it.

1    a private property owner does not owe a duty to safeguard First Amendment protections.

2    *Hudgens v. NLRB*, 424 U.S. 507 (1975).  Factually, Google has not opened its search engine for

3    public speech.  Rather, Google alone speaks through its search results and has complete

4    dominion over them.  The search results are themselves are not a public forum; like a newspaper,

5    they can merely be *viewed* by the public.

6        KinderStart argues that Google's search results should be subject to First Amendment

7    scrutiny because many individuals use Google to find information on the Internet and because of

8    "promises and conduct … that all sites would be indexed."  Opp. at 24.  On the first point, a

9    website does not become an extension of the government because it is successful.  Rather, a

10   private company can only be deemed a state actor if the service it provides is "both traditionally

11   and exclusively governmental."  *Lee v. Katz*, 276 F.3d 550, 555 (9th Cir. 2002).  Search engines

12   are nothing of the sort.  The second point is fabricated.  Google never promised that every one of

13   the billions of websites in the world would appear in its results.  *See, e.g.*, SAC ¶ 153 (Google

14   makes clear that "your page may have been manually removed from our index if it didn't

15   conform with the quality standards necessary to assign accurate PageRank. We won't comment

16   on the individual reasons a page was removed, and we don't offer an exhaustive list of practices

17   that can cause removal.").  Finally, KinderStart argues that "the entire crux of the CDA is to

18   immunize interactive service providers from third party content so they do not block speech."

19   Opp. at 25.  KinderStart has it backwards.  "The … reason for enacting § 230(c) was to

20   encourage interactive computer services and users of such services to self-police the Internet...."

21   *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003); *see* 47 U.S.C. § 230(b) (stating

22   Congressional policy to keep service providers unfettered by federal or state regulation).  That is

23   why, as discussed *supra*, Section I.B, the CDA explicitly shields interactive computer services

24   like Google from liability for blocking content they consider objectionable, even if that content is

25   "*constitutionally protected speech*."  47 U.S.C. § 230(c)(2); *see also supra*, at 3, n.1.

26       KinderStart also engages in an unfocused discussion of Google's connections with the

27   government in an attempt to show entanglement under *Brentwood Academy v. Tennessee*

28   *Secondary School Athletic Association*, 531 U.S. 288, 295 (2001).  However, KinderStart ignores

1   the relevant test, which requires "a close nexus between the State and the *challenged action* that

2   the seemingly private behavior may be fairly treated as that of the State itself."  *Kirtley v. Rainey*,

3   326 F.3d 1088, 1094-95 (9th Cir. 2003) (citation omitted) (emphasis added).  KinderStart has

4   failed to demonstrate any such nexus, just as it failed in its FAC.  Rather, KinderStart pleads the

5   existence of contracts between Google and two state-run university libraries which have nothing

6   to do with Google's removal of the KinderStart website from Google's search results or its

7   assignment of a 0-PR for the KinderStart website.  Although not clear, KinderStart also seems to

8   be arguing state action under the "symbiotic relationship" test.  KinderStart, however, could not

9   possibly plead facts suggesting that Google confers financial benefits indispensable to the

10  government's fiscal health as required by this Court's previous order dismissing the FAC.  No

11  symbiotic relationship is present here.

12       Finally, KinderStart's claim under the California constitution fares no better.  While

13  Google strongly disagrees with any notion that the *sui generis* ruling in *Pruneyard* should be

14  extended to the Internet (and plaintiff has not cited any cases supporting such a notion), the claim

15  is easily resolved because Google's search results are not open to the public.  Again, Google

16  alone speaks through them and they are merely made available to the public at large for viewing.

17  Google's search engine is not the functional equivalent of a town square as required under

18  *Pruneyard* and its progeny, and Google is not a proxy for the entire Internet.  *Robins v.*

19  *Pruneyard Shopping Ctr.*, 23 Cal. 39 899 (1974), *aff'd*, 447 U.S. 74 (1980).  Moreover,

20  "balanc[ing] the competing interests of the property owner and of the society with respect to the

21  particular property or type of property at issue." as the Court must, leads to the inescapable

22  conclusion that Google's search engine should not be subject to free speech claims.  *Trader Joe's*

23  *Co. v. Progressive Campaigns, Inc.*, 73 Cal. App. 4th 425, 433 (1999).  Google has built a

24  successful company because users value its recommendations of sites likely to be relevant to

25  them. Any societal interest here lies in encouraging private parties to use their property to share

26  such valuable opinions, not in supplanting them with opinions arrived at through litigation.

27

28

IV.    **THE COURT SHOULD DISMISS KINDERSTART'S DEFAMATION CLAIM WITH PREJUDICE**

A.    **KinderStart Has Failed to Identify a Provably False Statement**

The allegedly false statement on which KinderStart rests its defamation claim has been an elusive target.  In its Motion, Google established that no claim could be based on what it perceived to be the statements at issue.  MTD at 23-25.  KinderStart abandons those statements in its Opposition.  In their place, KinderStart now argues that the 0-PR for its site is defamatory because it should be reported as some decimal higher than zero and a 0-PR is "algorithmically impossible."  Opp. at 32-33.  While actionable defamation could not possibly arise from what appears to be a trifling allegation about rounding, the Court need not address the issue because KinderStart's own allegations refute its claim.  According to KinderStart:  "[while] the normal mathematical result of a Page Rank calculation generates an extended decimal figure above the absolute figure of '0', [t]*his is not generally known by the general public, users or consumers*." SAC ¶ 143 (emphasis added).  KinderStart thus makes clear that to the average reader, a 0-PR would not be understood to convey some provably false statement of fact.  *See Morningstar, Inc. v. Superior Court*, 23 Cal. App. 4th 676, 688 (1994) ("the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.").[6]  For good measure, KinderStart also refutes its assertion that a 0-PR is algorithmically impossible, alleging in Paragraph 145 of the SAC that Google uses algorithms to assign 0-PRs for sites that it believes

---

[6] That a PageRank is an opinion and does not convey a provably false statement of fact is further established by the context in which PageRanks are displayed.  *See Knievel v. ESPN*, 393 F.3d 1068, 1075 (9th Cir. 2005) ("The context in which the statement appears is paramount in our analysis, and in some cases it can be dispositive.").  The only message accompanying a PageRank display is:  "PageRank is Google's measure of the importance of [a] page" along with a rating of 0-10.  Original Compl. ¶ 20.  Google purports to be rating a site's "importance," an inherently subjective determination, and does not claim to be representing any facts at all.  Moreover, by making clear that PageRank is Google's own assessment, Google's clearly casts PageRank as opinion, allowing for the likelihood that others will have their own view.  Indeed, since a site's PageRank is only visible to users when they are actually visiting that site, users immediately form their own opinion of the site's importance.  Whether users agree or disagree with Google's view, they cannot help but recognize it as opinion.  *See* MTD at 6-8 (citing authorities holding that ratings are protected opinions).

1  to be of inferior quality.  SAC ¶ 145 ("defendant uses and executes the operation of a *software*

2  *filter* to *programmatically* punish a website with a 0-PR it believes to have IPQ").[7]

3       At bottom, KinderStart seems to believe that Google must use its patented link-evaluation

4  algorithm (apparently as it existed in 1998), and nothing else, in accessing a site's importance,

5  and then report the output of that particular algorithm (to multiple decimal places), without

6  modification, as its opinion.  But Google nowhere represents that the PageRanks it assigns to

7  sites are simply the output of that single algorithm.  To the contrary, Google tells users that a

8  PageRank is "the importance Google assigns to a page based on which other web pages are

9  linked to it *and many other variables*."  Declaration of Bart E. Volkmer ("Volkmer Decl."), Ex.

10  A.[8]  KinderStart itself acknowledges that the PageRank rating that Google displays is not simply

11  the output of a single algorithm, but is based on "mathematical formulae, parameters and

12  criteria."  SAC ¶ 7.  It has further admitted that Google is continuously assessing the quality of

13  sites using stated and unstated "quality guidelines" in assigning PageRanks.  FAC ¶ 61.  As

14  Google has said all along, the PageRank ratings it assigns represent its opinion of the importance

15  of the sites.  *See* SAC ¶ 276 (KinderStart admitting that Google "holds out in public PageRank as

16

_____

17       [7] KinderStart's allegation in Paragraph 145 is an admission that Google's subjective views
are present in the PageRank process, even though that process is algorithmic.  Put simply, human

18  beings make judgments about what constitutes "inferior page quality" and then write algorithms
to implement those judgments.  *See* SAC ¶ 145; MTD at 24-25; *Search King*, 2003 WL

19  21464568, at *4-5. ("PageRanks are opinions" and "do not contain provably false connotations.
… Other search engines express different opinions, as each search engine's method of

20  determining relative significance is unique.").  The use of algorithms does not make the resulting
opinion any more true or false.

21       [8] KinderStart's contention is akin to that advanced by *Blatty* who claimed the NY Times
"computer-processed" best sellers list was defamatory for failing to include his book.  The

22  California Supreme Court rejected *Blatty's* contention:

23       Blatty's claims also fail to effectively allege falsehood.  Contrary to Blatty's allegation,
the Times did *not* make the crucial false representation of which he complains - viz., that

24       the list was an accurate compilation of actual book sales.  This is so because the Times
never made such a representation, whether true or false.  The legend of the list ... declared

25       merely that "The listings above are *based on* computer-processed sales figures from
about 2,000 bookstores in every region of the United States."  To the extent that Blatty

26       may mean to argue that the compound adjective "computer-processed" implies, in the
words of the amended complaint, an "objective, unbiased and accurate compilation of

27       actual sales," he is unpersuasive: the legend plainly implies that the list represents a
general ranking of books based on sales figures from a *sample* of bookstores.

28  *Blatty*, 42 Cal. 3d at 1047 n.2.

1    an opinion of the value of a given [w]ebsite."). The fact that Google uses algorithms in the

2    process of reaching its opinions (as it must given the number of web pages to be rated), does not

3    render the opinions provably false, or less subject to First Amendment protection.

**B.    KinderStart Fails to Identify Injury from Actionable Defamation**

5        In its Opposition, as in its SAC, KinderStart makes clear that the injury it claims in its

6    defamation count arises from the 0-PR rating that Google assigned to the KinderStart site, and

7    not from the impact of supposedly false statements about the manner in which the rating was

8    determined. *See* Opp. at 34; SAC ¶¶ 281-282. KinderStart has thus demonstrated that it cannot

9    overcome the pleading deficiency the Court identified in dismissing the claim the last time

10   around. *See* Order at 21-22 (KinderStart "does not explain how it is a false statement about the

11   output of Google's algorithm regarding KinderStart.com, as distinguished from an unfavorable

12   opinion about KinderStart.com's importance, that has caused injury to KinderStart."). For this

13   reason as well, the defamation claim should again be dismissed.[9]

**C.    KinderStart's Defamation Claim is Barred by the Common Interest and Fair Comment Privileges.**

16       Google established in its Motion that it is shielded from liability for assigning a 0-PR to

17   KinderStart's site under both the common interest and fair comment privileges. MTD at 26-28.

18   KinderStart contends that these privileges are inapplicable because it has alleged that Google

19   acted with "malice" towards it. *See* Cal. Civ. Code § 48(4)(d) ("malice" defined as "that state of

20   mind arising from hatred or ill will toward the plaintiff.") But the SAC paragraphs that

21   KinderStart references as supposedly alleging malice do not support its argument. The

22   allegations in Paragraphs 143-145 make no mention at all of KinderStart, and certainly do not

23   show Google acted with hatred or ill will towards KinderStart in assigning its site a 0-PR. *See*

24   *supra*, at 4 n.3. While Paragraph 58(d) of the SAC mentions KinderStart, it likewise fails to

25   contain facts showing Google acted with malice towards it, and is improperly predicated on

26

27   _____

28       [9] KinderStart offers no defense at all for its failure to plead "special damages." *See* MTD at 26, n.12. This infirmity also warrants dismissal of the claim.

1   events take place after this litigation commenced.[10]  In short, KinderStart has not pled facts

2   showing that Google acted with malice towards KinderStart in assigning its site a 0-PR.

3          Given the absence of allegations of malice, the privileges that Google invoked plainly

4   apply.  While KinderStart offers a case stating that the common interest privilege does not

5   safeguard "excessive publication," it makes no effort to show why that has relevance here.

6   Google has not engaged in "excessive publication," as it displays the 0-PR for KinderStart's site

7   only to those of its toolbar users who specifically request the information.  *See* MTD at 27-28;

8   Cal. Civ. Code § 47(c) (common interest privilege applies to statements made to persons who

9   request and are interested in the information supplied).[11]  KinderStart also argues that the fair

10  comment privilege applies only to statements on "matters of public concern."  Opp. at 35.  But

11  the lone case KinderStart cites does not so hold.  In truth, the fair comment privilege applies to

12  any allegedly defamatory statement concerning "public officials, scientists, artists, composers,

13  performers, authors, and other persons who place themselves or their work in the public eye."

14  *Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711, 732 (1989); *Inst. of Athletic Motivation v. Univ. of*

15  *Ill.*, 114 Cal. App. 3d 1, 8-9, n.4 (1980).  KinderStart's own allegations about its site's popularity

16  satisfy that requirement here.  SAC ¶¶ 28, 31; *see generally* Google's Special Motion to Strike

17

18  _____

19  [10] In Paragraph 58(d) of the SAC, KinderStart alleges that some time after it filed suit
    complaining about the 0-PR its site had been assigned since March 2005, its PageRank changed to

20  7, and that some time after the Court dismissed its FAC with leave to amend, the 0-PR rating
    returned.  But even crediting the conspiracy it seems to imply, KinderStart's allegation says

21  nothing at all about whether Google acted with malice when it assigned a 0-PR to KinderStart's
    site in March 2005 which is the alleged defamation at issue in its case.  Moreover, KinderStart's

22  theory has it backwards.  If Google was using PageRanks to "retaliate" against KinderStart, it
    would have lowered the PageRank when suit was filed.  Instead, KinderStart theorizes that
    Google raised the KinderStart PageRank in response to this suit, hardly a step evidencing malice.

23  In any event, KinderStart has neither sought nor obtained leave to file a supplemental pleading
    under Rule 15(d) to cover allegations post-dating its filing of this lawsuit.  *Hall v. C.I.A.*, 437 F.3d
    94, 100 (D.C. Cir. 2006) (where requester's proposed new complaint sought to add claim based on

24  FOIA request that requester submitted to CIA after commencement of earlier FOIA action,
    revision was supplemental pleading for which leave of court was required).

25  [11] KinderStart badly mischaracterizes *Irwin v. Mascott*, 112 F. Supp. 2d 937 (N.D. Cal. 2000).
    *See* Opp. at 34-35.  In a single sentence, the court correctly rejected a defense claim that Civil

26  Code § 47(c) created a general "creditor's privilege" for threatening letters sent by collection
    agencies to debtors.  *Irwin*, 112 F. Supp. 2d at 963.  The court did not state that the common

27  interest privilege applies only in employment relationships as KinderStart claims.  *Id.*  While
    statements in an employee reference context are certainly "included" in the ambit of Section
    47(c), the statute is by no means limited to such contexts.  *See* Cal. Civ. Code § 47(c); *Rodas v.*

28  *Spiegel*, 87 Cal. App. 4th 513, 519 (2001) (applying section 47(c) to preparation of building
    inspection report).

1 (showing "public interest" requirement is satisfied in any event).  Accordingly, both privileges

2 immunize Google from liability for assigning a 0-PR to its KinderStart's site.

3 **V.      THE COURT SHOULD DISMISS KINDERSTART'S LANHAM ACT CLAIM
           WITH PREJUDICE**

4

5       As Google explains in its Motion to Dismiss/Strike, KinderStart's newly-added Lanham

6 Act claim should be dismissed as unauthorized and prejudicial.  But even if KinderStart had been

7 granted leave to assert a Lanham Act claim, it has not met the requirements for pleading one.

8       **A.      Google's Claimed Representations About Search Results**

9       Google pointed out in its opening brief that KinderStart lacks standing to pursue a claim

10 based on statements Google allegedly made concerning the objectivity of its search results,

11 because KinderStart has failed to plead that any such statements actually harmed KinderStart.

12 MTD at 29.  The SAC makes clear that KinderStart traces the harm about which it complains not

13 to any alleged statements by Google, but rather to Google's exclusion of the KinderStart.com

14 website from its search results, conduct for which Google is protected from liability by the First

15 Amendment and § 230(c)(2).  *Id*.; *see supra*, at 1-5.  KinderStart's opposition nowhere addresses

16 this fatal lack of standing.  For this reason alone, the claim should go no further.

17       KinderStart also fails to identify any false statement by Google.  As Google previously

18 explained, its references to "objectivity" regarding its search results are not a representation that

19 there is no human judgment involved in creating them, as KinderStart suggests.  Indeed,

20 KinderStart *admits* that Google explicitly states there is human judgment involved, as Google

21 constantly evaluates sites for compliance with its subjective quality guidelines, and removes

22 noncompliant sites.  *See, e.g.*, FAC ¶¶ 44-45; SAC ¶ 153.  When it refers to its results as

23 objective, Google is merely ensuring the public understands that it does not accept payment for

24 placement in the results, which is made clear by the fact that *every* Google reference to objective

25 results in the SAC appears in that context.[12]  As KinderStart recognizes, the FTC years ago

26

27

28       [12] *See* SAC ¶¶ 116 ("which is why users have come to trust Google as a source of objective
information untainted by paid placement"), 118 ("Google does not sell placement within the
results themselves …"), 119 (providing embedded link to statement in ¶ 118), 121 ("We do not

1    warned search engines and consumers to distinguish between search results in which sites had

2    paid to be ranked highly, and those "based on relevance or other criteria chosen by the engine."

3    SAC ¶ 137.  Accordingly, Google has ample reason to differentiate itself from other search

4    engines by truthfully stating that its results are not influenced by payments and are thus

5    objective.[13]

6          The only other "false statement" that KinderStart identifies is Google's supposed promise

7    to disclose every instance in which it removes a website.  Opp. at 21.  As Google demonstrated

8    in its opening brief, that statement was manufactured by KinderStart by distorting, through the

9    use of ellipses, Google's actual representation.  Volkmer Decl., Ex. A.

10          **B.      Google's Claimed Representations about PageRank**

11          KinderStart argues that a 0-PR is an actionable, false statement of fact because, as a

12    numeric value, it is "measurable."  Opp. at 20.  But the fact that PageRank is given as a number

13    does not make it provably false.  *See Themed Rests.*, 4 Misc. 3d 974 at 980 (holding that numeric

14    restaurant rating is constitutionally-protected opinion).  To the contrary, because it is Google's

15    *opinion* of website's importance, it is not actionable under the Lanham Act.  MTD at 3-5, 23-24,

16    31; *see also*, *supra*, at 1-2, 12-14.  Google's assignment of a 0-PR is not actionable for the

17    further reason that it does not constitute "commercial advertising or promotion."  MTD at 31-32.

18    KinderStart nowhere addresses this deficiency, and its failure to do so constitutes a concession

19    that Google's argument is meritorious.  *See, e.g.*, *Scognamillo v. Credit Suisse First Boston LLC*,

20    No. C03-2061, 2005 WL 2045807, at *7 (N.D. Cal. Aug. 25, 2003).[14]

21

22    _____

     accept money for search result ranking or inclusion."), 123 ("Our search results will be objective,
23    and we will not accept payment for inclusion or ranking in them.").

       [13] As Google explained in its Motion, KinderStart's allegations about Google accepting
24    payments and removing sites for religious, political or retaliatory reasons are frivolous.  *See*
     Google's Motion for Rule 11 Sanctions filed 10/20/06 (Doc. No. 60).  Regardless, such
25    allegations have nothing to do with KinderStart.

       [14] Nearly all of the allegedly false statements regarding the objectivity of Google's search
26    results that KinderStart identifies are found in Google's WebMaster Guidelines.  As such they are
     neither "commercial speech" nor made "for the purpose of influencing consumers to buy goods or
27    services" from Google.  They are simply directions to webmasters about how and when Google
     will include their sites in its index.  Accordingly, even if false, such statements would not be
28    actionable under the Lanham Act because they do not constitute "commercial advertising or
     promotion."  *See* MTD at 31-32.  In that same vein, KinderStart's citation to *CollegeNet Inc. v.*
     *XAP Corp.*, No. 03-CV-1229, 2006 U.S. Dist. LEXIS 49684 (D. Or. July 17, 2006) for the

1    **VI.    THE COURT SHOULD DISMISS KINDERSTART'S 17200 CLAIM WITH**
     **PREJUDICE**

2

3        KinderStart purports to bring a Section 17200 claim "as the class representative." Opp. at

4    30. However, KinderStart must state a claim on its own behalf before its status as a putative

5    class representative has any bearing on this case. That is, KinderStart must plead facts, which if

6    accepted as true, demonstrate a substantive violation of Section 17200 and that KinderStart has

7    been *injured in fact* and lost money or property *as a result of* such alleged violation. *See* Bus. &

8    Prof. Code § 17204 (Section 17200 claim may only be brought by a plaintiff "who has suffered

9    injury in fact and has lost money or property as a result of such unfair competition"); *id.* § 17203

10   (plaintiff seeking to bring a representative action under Section 17200 must meet standing

11   requirements of Section 17204 and class certification requirements). Additionally, to bring a

12   claim in federal court, KinderStart must demonstrate that injury "'fairly can be traced to the

13   challenged action'" and "'is likely to be redressed by a favorable decision.'" *Whitmore v.*

14   *Arkansas*, 495 U.S. 149, 155 (1990) (citations omitted). KinderStart's SAC and its opposition

15   demonstrate nothing of the kind. KinderStart has not pled facts giving rise to a Section 17200

16   violation and does not have standing under Proposition 64 or Article III to maintain its claim.

17       First, KinderStart argues that Google's AdSense program violates Section 17200. While

18   KinderStart admits that AdSense is not deceptive and that Google is not in breach of any

19   AdSense agreement, it cryptically accuses Google of "Blocking" and "PageRank Deflation" in

20   connection with AdSense "as well as arbitrary termination of the contract but allowing ad copy

21   to remain on the participant's host site." Opp. at 31. The first allegation is unintelligible.

22   KinderStart has not pled any nexus between "Blocking" and "PageRank Deflation" and the

23   AdSense agreement. *See* Order at 17 (Dismissing Section 17200 claim where KinderStart failed

24   to plead facts that AdSense program participation would "prevent a participant's removal from

25   Results Pages or devaluation of PageRank"). The second allegation is purely hypothetical:

26   KinderStart has not alleged that Google terminated *KinderStart's* AdSense agreement.

27   _____

28   proposition that a "promotion" may be made even to a non-paying audience misses the point,
     since PageRank is not a promotion in the first place. *See* Opp. at 22.

1    Moreover, the notion that "arbitrary" termination of an AdSense agreement constitutes a

2    violation of Section 17200 is contradicted by the actual terms of the AdSense Agreement, which

3    permit either party to terminate the agreement at any time for any reason, with or without cause.

4    Declaration of Bart E. Volkmer Decl. ISO Google's Motion to Dismiss KinderStart's First

5    Amended Complaint, Ex. A ¶ 6 (Docket No. 13).  As the Court previously found, Google's

6    operation of its AdSense program does not constitute a violation of Section 17200.

7        Second, KinderStart vaguely points to "untrue and misleading advertising about search

8    results, PageRank and their supposed objectivity" as the basis for a Section 17200 claim because

9    "it affects advertisers who use Google's services."  Opp. at 31-32.  While the statements on

10   Google's website and SEC filings are not untrue or misleading (and KinderStart's Opposition

11   does not identify any that are), this claim need not be belabored.  KinderStart has not pled, in any

12   fashion, that *it* has suffered injury in fact and lost money *as a result of* any allegedly untrue or

13   deceptive advertising.  Google raised this point in its moving papers and KinderStart failed to

14   join the issue.  Under Proposition 64 and Article III, KinderStart lacks standing to pursue a false

15   advertising claim against Google.  *See Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1194

16   (S.D. Cal. 2005); *Pfizer Inc. v. Superior Court*, 141 Cal. App. 4th 290, 306 (2006).

17       Finally, KinderStart argues that Google's actions are unfair because they threaten an

18   incipient violation of the antitrust laws.  As explained above, KinderStart has not pled any viable

19   antitrust violation.  KinderStart's Section 17200 claim should be dismissed with prejudice.

20                                  *   *   *

21       For the foregoing reasons, Google Inc. respectfully requests that the Court dismiss

22   KinderStart's SAC in its entirety with prejudice.

23

24   Dated:  October 20, 2006                WILSON SONSINI GOODRICH & ROSATI
                                             Professional Corporation
25

26                                           By: /s/ David H. Kramer
                                                 David H. Kramer
27
                                             Attorneys for Defendant
28                                           GOOGLE INC.