EXHIBIT A

Dockets.Justia.com

Gregory J. Yu (State Bar No. 133955)
GLOBAL LAW GROUP
2015 Pioneer Court, Suite P-1
San Mateo, CA  94403
Telephone: (650) 570-4140
Facsimile:  (650) 570-4142
E-mail:  glgroup [at] inreach [dot] com

Attorney for Plaintiffs and Proposed Classes and Subclasses

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| KINDERSTART.COM LLC, a California limited liability company, on behalf of itself and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>GOOGLE, INC., a Delaware corporation,<br><br>        Defendant. | Case No. C 06-2057 JF<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, AND DECLARATORY AND INJUNCTIVE RELIEF BASED ON:<br><br>I.      SHERMAN ACT SECTION 2: ATTEMPTED MONOPOLIZATION;<br>II.     SHERMAN ACT SECTION 2: MONOPOLIZATION;<br>III.    VIOLATION OF LANHAM ACT SECTION 1125(a): FALSE REPRESENTATIONS;<br>IV.    VIOLATION OF RIGHTS OF FREE SPEECH;<br>V.      UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA B & P C CODE SECTION 17200; AND<br>VI.    DEFAMATION AND LIBEL<br><br>JURY TRIAL DEMANDED |

1    Plaintiff KinderStart.com LLC ("KSC"), by and through its attorney, brings this federal

2    class action against Defendant Google, Inc. ("Google") on behalf of KSC itself and all other

3    similarly situated persons, companies and entities ("Class Members") (KSC and Class Members

4    together are sometimes collectively referred to as the "Class" or "Plaintiffs"), requests a trial by

5    jury and alleges in this Second Amended Class Action Complaint as follows:

6                              **INTRODUCTION**

7         1.     This action is brought to challenge and remedy pervasive past and ongoing

8    unlawful practices of Defendant Google to interrupt, suspend and destroy the flow of accurate

9    and valued information, the fair trade conducted through interstate commerce, and the flow of

10   free speech.

11        2.     Defendant Google, with complete mastery over the world's most widely used

12   search engine (the "Engine"), promotes itself as delivering to persons, businesses, organizations

13   and government agencies and officials as public users, unhindered and unblocked objective

14   results emerging out of millions of websites in the United States and worldwide ("Websites").

15        3.     The Engine is publicly and openly accessible in that Google actively promotes and

16   invites anyone with an Internet connection worldwide to perform searches based on key words

17   and other parameters for Websites and Webpages (collectively "Web Content").  The Engine

18   presents on the user's screen a series of pages showing search results ("Search Results").  Search

19   Results list Uniform Resource Locators ("URLs") as Web Content destinations in an order

20   chosen by Defendant.

21        4.     Beginning as early as 1998, Google used its own website, press releases,

22   advertising, public statements and securities disclosure statements to unqualifiedly promise and

23   represent to the public, advertisers and consumers that its Search Results generated from the

24   Engine were and are objective and free of human interference and manipulation.

25        5.     Google Co-Founder Sergey Brin, in the December 23, 2005 issue of *The Financial*

26   *Times*, claimed, "I believe in our mission to make information accessible and I think this is a

27   huge amount of the world's knowledge that's just being hidden right now from peoples' eyes."

28   Defendant's Chief Executive Officer Eric Schmidt, in an interview with *The Wall Street Journal*

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

-2-

on October 18, 2005, declared:  "In order to guide users to the information they're looking for, we copy and index all the Web sites we find.  If we didn't, a useful search engine would be impossible."

6.  PageRank™, based in part upon U.S. Patent No. 6,285,999, filed on January 9, 1998 and issued on September 4, 2001, is a designed and implemented system employed by Google to numerically value Websites on the Internet.  PageRank is published and disseminated to users, consumers, advertisers and the public throughout the United States and worldwide.  On information and belief, the PageRank patent was assigned to Stanford University which then licensed it to a single party, Defendant Google, and to no other parties in the world.

7.  Beginning as early as 2000, Google used its own website, advertising, and public statements to promise and represent to the public, advertisers and consumers that PageRank, as determined by Defendant, is the output of one or more computer algorithms.  Further, it is a figure not simply reflecting an opinion of a solely subjective value of a Website by Google, but an opinion based upon a rigorous, objective calculation using mathematical formulae, parameters and criteria.

8.  Defendant does not directly charge or bill users for their use of the Engine.  While this service is offered by Defendant without direct charge to users, Defendants have developed and implemented a highly profitable online advertising program known as "AdWords."  Surrounding the Search Results are one or more boxes containing "Sponsored Links" having several lines of text.  These Sponsored Links are hyperlinked advertisements of organizations and businesses ("Advertisers") that promote goods, services and information with the program.  Advertisers accrue a fee payable to Google each time a visitor views a Results Page and clicks through to a Sponsored Link.  Each time such a click occurs, the Advertiser owes Defendant as a fee.

9.  Defendant also operates the advertising program known as "AdSense."  This is a worldwide program and integrated network system of digital sponsored links and hyperlinked advertisements ("Advertisements") placed on Websites and Webpages on the Internet.  Google programmatically selects Advertisements and lodges them on receiving Websites.  To participate

1   in AdSense, a website publisher places code on its site that asks Google's server to

2   algorithmically select relevant advertisements.  Google receives fees from AdWords partners,

3   retains a significant but undisclosed portion, and shares a remainder to the AdSense partners that

4   give up key space on their Websites for the Advertisements.

5        10.   Defendant Google exerts its untrammeled right to terminate AdWords and AdSense

6   partners at any time, without notice, for any reason or no reason at all.

7        11.   Contrary to such promises, advertising, and promotions about its Website index and

8   Search Results, Google does not prepare and present Search Results in an objective format and

9   does not faithfully and completely index all Websites on the Internet.  Google achieves these

10  consequences by an ongoing practice of blockage, delisting, de-indexing and censoring of such

11  Websites, collectively referred to herein as "Block", "Blocking" or "Blockage"[1].

12       12.   Google intentionally employs a practice of arbitrarily, indiscriminately, and

13  maliciously assigning to Websites lowered, undeserved PageRanks, in some cases even all the

14  way down to '0' ("PageRank Deflation").

15       13.   The owners and managers of these Websites victimized by Google in one form or

16  another constitute the members of the Classes and Subclasses of aggrieved parties as described

17  and defined below (collectively, the "Class").  Google is principally responsible for conduct,

18  which thereby warrants declaratory and injunctive relief as well as compensatory, trebled, and

19  exemplary damages according to proof under applicable law based on injuries to the Class of

20  Plaintiffs.

21                        **THE PARTIES**

22       14.   Plaintiff KSC is a California limited liability company whose principal offices are

23  located in Norwalk, California.  Members of the Classes and Subclasses as defined in paragraphs

24  187, 189, 191, 193, and 194 below comprise all remaining Plaintiffs in this action.

25

26  _____

27  [1] Internet "Blogs" discussing Google's temporary or permanent blocking of websites have
    variously called Google's act of blocking "sandboxing," "penalizing" and "whacking", and the
    state of limbo for such handicapped sites as "the Google Sin Bin," "Google Purgatory," the

28  "Google Bench" and "Google Jail."

SECOND AMENDED CLASS ACTION COMPLAINT          Case No. C 06-2057 JF

-4-

1      15.   Defendant Google is a Delaware corporation, with its principal place of business

2  located within Santa Clara County, the State of California, at 1600 Amphitheatre Parkway,

3  Mountain View, California  94043.

4                     **JURISDICTION AND VENUE**

5      16.   This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)

6  because this is an action brought by at least one Plaintiff against Defendant in which "the matter

7  in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is

8  between . . . [c]itizens of different States."

9      17.   This Court has original jurisdiction over this action pursuant to the Class Action

10  Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because this is a class action where "any member

11  of a class of plaintiffs is a citizen of a state different from any defendant and the aggregated

12  amount in controversy exceeds $5,000,000, exclusive of interest and costs."

13      18.   This Court has original exclusive jurisdiction over Plaintiffs' "Count One" and

14  "Count Two" under Section 4 of the Clayton Act, 15 U.S.C. § 15(a) in that they seek damages

15  and other relief for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Such jurisdiction

16  lies within 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337(a).

17      19.   This Court has original exclusive jurisdiction over Plaintiffs' "Count Three" for

18  false representations and advertising under the Federal Trademark Act of 1946.  Such

19  jurisdiction lies within 15 U.S.C. § 1125.

20      20.   This Court has original jurisdiction over Plaintiffs' "Count Four" under the First

21  Amendment of the United States Constitution, which guarantees Plaintiffs their constitutional

22  right of free speech.  Such jurisdiction lies within 28 U.S.C. § 1331.

23      21.   This action relates to other counts in this complaint of Plaintiffs which are so

24  related to the First, Second, Third and Fourth Counts in that all such other counts form part of

25  the same case or controversy under Article III of the United States Constitution, as hereinafter

26  more fully presented.  Therefore, this Court has jurisdiction over such state claims pursuant to 28

27  U.S.C. § 1367.

28      22.   This is a class action brought in diversity between the Class of Plaintiffs and

SECOND AMENDED CLASS ACTION COMPLAINT          Case No. C 06-2057 JF

1    Defendant Google, wherein jurisdiction lies under 28 U.S.C. § 1332.

2        23.    Defendant Google, a resident of the State of California, is the principal defendant

3    from whom relief is sought by members of the Class, and whose alleged conduct forms the basis

4    for the claims asserted by the Class.

5        24.    Venue is proper in this District under the provisions of 15 U.S.C. §§ 15, 22, and 26,

6    and 28 U.S.C. § 1391 because:  (i) Google transacts business, committed an act alleged to be

7    unconstitutional, illegal or tortious, and/or is found within this district; and (ii) a substantial

8    portion of the affected interstate trade and commerce described below has been carried out in

9    this district.

10       25.    **Intradistrict Assignment.**  Assignment to the San Jose division of this District is

11   proper pursuant to Local Rule 3-2(c) and (d) because a substantial portion of the events, conduct

12   and omissions giving rise to this action occurred within this District and division.

13                        **INTERSTATE TRADE AND COMMERCE**

14       26.    At all times relevant hereto, Google was engaged in a continuous flow of interstate

15   business with various commercial and profitable operations, including without limitation

16   processing search requests and marketing and publishing advertisements on Search Results

17   pages and on Webpages generally on the Internet and establishing and executing such links

18   among millions of Websites on the Internet.  Google regularly conducts business in this

19   jurisdiction and in other locations of the United States and the world.

20       27.    Google's business activities that are the subject of this complaint were within the

21   flow of and substantially affected interstate and foreign trade and commerce.

22                      **BACKGROUND OF THE CLASS REPRESENTATIVE**

23       28.    At one time, www.kinderstart.com ("KS.com") was one of the choicest Internet

24   destinations for thousands of parents, caregivers, educators, nonprofit and advocacy

25   representatives, and federal, state and local organizations and officials in the United States and

26   worldwide to access health, educational and other vital information about infants and toddlers –

27   basically from prenatal up to age 7.

28       29.    KS.com is a Website providing and linking to information and subjects affecting

SECOND AMENDED CLASS ACTION COMPLAINT                          Case No. C 06-2057 JF

young children, including without limitation child rearing, child care, child development, food and nutrition, and education, under the tagline "Because kids don't come with instructions™".

30.    Since the time in or about May 2000, Plaintiff KSC has operated KS.com with various functions, including without limitation a presentation of its own organic content, a subject directory of information, a topical index, and a search engine.

31.    By 2005, steady, organic growth in visits and page views at KS.com reached approximately 10,000,000 page views by visitors on a monthly basis.

32.    Beginning in 2003, Plaintiff KSC enrolled into Defendant Google's AdSense Program and placed a series of sponsored links for compensation from Google under this program.  Following enrollment into the program by Plaintiff KSC, in or about August 2003, Plaintiff KSC began placement of a series advertisements out of the Google Network onto KS.com and began to receive fee payments from Defendant Google for rendering AdSense services.

## GOOGLE AS THE DEFENDANT

33.    Defendant Google is the dominant actor in the world of searching all forms of text, Web and image content on the Internet.  It operates a search engine, topical directory, an electronic commerce system for referral, electronic payments system, among other tools and functions.

A.  DEFENDANT AS A MONOPOLIST

The Relevant Markets

34.    Defendant Google owns and operates the Engine in the market of search engine design, implementation and usage within the United States (the "Search Market"). Defendant generates and processes search queries of key words that appear within the approximately 10 billion Web pages currently indexed by Defendant Google on its tens of thousands of servers.

35.    Obtaining and seeking data on the Internet is almost completely dependent upon using a search engine.  Browsers encounter an almost unlimited number of URLs that include a variety of trailing suffixes (e.g., .com, .net, .org, .info, etc.).  Given how many sites a browser may visit and wish to return to, the process of bookmarking uniformly and consistently is

SECOND AMENDED CLASS ACTION COMPLAINT                              Case No. C 06-2057 JF

difficult where browsers use multiple access points from office, home, portable, public and borrowed devices.  Therefore, the search engine is a vital means to identify and locate the Website of an organization, business or person without remembering the URL.  Google itself has stated on its Website: "The overwhelming amount of information of the web requires an excellent search service to render that information accessible and useful. Without a powerful search tool, finding a specific website can be as difficult as finding a book in a library that has no card catalogue and a completely random method of storing its books."

36.   On information and belief, as of July 2006, Defendant Google has garnered in excess of 55% market share of all closed and open access search engine use on a combined basis within the Search Market and in excess of 75% market share of all open access search engine use within the Search Market.

37.   Google's CEO has stated about America Online the following:  "AOL has been our longest and in many ways tightest partner for many, many years.  We hope it will be true forever."  In 2005, up to 10% of all of Google's search advertising revenues emanated from AOL sites.  AOL, based on its alliance with and investment from Google, uses the Engine as its Web search engine.  When AOL's market share based on the Engine in the Search Market is combined with Google's native market share derived from its own website, the Engine of Google is used in excess of 60% of all search queries among users within the Search Market in the U.S.

38.   In a market related to the Search Market, Defendant Google operates two online advertising programs known as AdWords and AdSense with the relevant market of the "Search Ad Market."  AdWords enables Websites within the Google Advertising Network to display Sponsored Links on Google's Results Pages presented to users by the Engine operating within the Search Market.  AdSense allows Advertisers with Sponsored Links to have Google programmatically display their ads on the Websites of AdSense Partners which are a part of the Google Advertising Network.  The universe of advertisers who seek and pay for online advertising target and reach Internet browsers and users of search engines.  Therefore, the Search Ad Market is a distinct but related relevant market in which Defendant Google can and does

1    participate, set prices, affect demand and supply of search ads, and impact competitors,

2    competition and consumers.

3        39.  Within the Search Ad Market, Defendant Google carries a market share of at least

4    75% of the relevant market based on total revenues among advertisers in the U.S., in which

5    Google's AdWords and AdSense programs dominate.  Defendant is easily the largest and best

6    recognized online advertising network in the United States for millions of third-party Websites.

7        40.  Defendant Google is ever increasing its market share of the search and search-led

8    advertising markets in certain demographic groups, particularly among those aged 25 and under.

9    Google leverages its branding and appeal among these users who often prefer linked multiple

10   channels and functionality, including e-mail, electronic payments and all other forms of online

11   tools that are cross-branded and cross-sold within this target audience and consumer base.

12       41.  Dangerous probability of success in monopolizing the two relevant and related

13   markets exists because Google' market shares is steadily rising and is in each market upwards of

14   60% or more.

15       42.  Market shares of two major competing firms of Defendant, individually and in the

16   aggregate, in the two relevant markets of search and search ads have fallen since January 2005.

17       43.  Defendant Google derives at least 98% of its total company revenues from search-

18   related advertising, which exceeded $3.1 billion for the year ended December 31, 2004.  Search-

19   related advertising revenues for the industry as a whole during the 2004 fiscal year was

20   approximately $3.9 billion.  For the 2004 fiscal year, Google attained a market share based on

21   revenues alone that exceeds 80% of the search-related advertising revenues.

22       44.  For the fiscal year ended December 31, 2005 according to the Google 2005 10-K,

23   Google online advertising revenues within the United States reached approximately $3.3 billion,

24   while the industry as a whole within the United States is estimated to reach $5 billion in such

25   revenues.  For the 2005 fiscal year, based on search-related advertising revenues Defendant

26   Google enjoyed at comfortable market share in excess of 65% of the Search Ad Market.

27   According to Defendant Google's Form 10-K for the fiscal year ended December 31, 2005 (the

28

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

"Google 2005 10-K"), Defendant Google's total advertising revenues worldwide for the 2005 fiscal year exceeded $6 billion.

45.  Over 90% of search marketers place advertising with Google for their Websites or their clients' Websites.  This near universal dependence on Google further demonstrates that Google holds a monopoly share within the relevant market of search services linked with search-driven advertising.

46.  All Websites of businesses, organization, government entities and persons throughout the United States, once indexed by Defendant Google, are assignable with a PageRank ranging from "0" to "10" by Defendant Google.  PageRank as promulgated and propagated by Defendant Google throughout the Internet, is now the *de facto* and prevailing standard for rating Websites throughout the United States.

Barriers to Entry into the Relevant Markets

47.  On information and belief, there are growing, even insurmountable barriers to entry into the Relevant Markets such that no competitor, new or existing, can challenge the near-complete control of the markets by Defendant.

48.  As to existing competitors of Defendant Google, two of its next largest competitors are losing market share within the Relevant Markets to Google as follows:  (A)  Yahoo! unsuccessfully tried to build a stand-alone index and directory off of the Open Directory Project to free itself of dependence upon Google's index, but has actually lost market share.  Its CEO has conceded that it cannot make any serious gains in market share of search and the company is no longer attempting to ever challenge Google's top position in the relevant market.  (B) Microsoft, while flush with technology, capital and talent, has not made any appreciable gain in its market share in the relevant markets.  Even with its size and reputation, this powerful company has been unable to secure any significant user migration started onto its search engine.

49.  As to smaller competitors together with recent entrants, their aggregate market share in the relevant markets has actually moved downward during the 2006 calendar year.  The causes for their massive handicap are as follows:

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

50. *Defendant's Control of Information*.  Google News is now a major media force, particularly because it can assign priority and immediacy (or the lack thereof) in news and other information tools.  Discovery and identity within any market of any new company or new entrant into the relevant market mandates immediate information access.  Much of news and information about companies is channeled in the United States through search engines.  Google has dominant control of news and information, and can literally Block, sandbox, PageRank deflate or ban any new competing site and search engine emerging out of its shell.  The anticompetitive conduct as alleged below make the task of a new search engine launch to challenge Defendant Google even more daunting.

51. *Use of PageRank as a Legal and Marketing Shield*.  PageRank™ as a U.S. Patent expires in the year 2017.  It has been licensed exclusively to one private company – Defendant Google – until the year 2011.  PageRank is the *de facto* universal, worldwide industry and consumer standard for assessing the value and worth of a Website.  PageRank, claimed by Google to be protected by trade secrets, effectively influences millions of users, businesses and organizations regarding the evaluation and goodwill of millions of Websites across the Internet.  As existing and new competitors attempt to challenge Google in the relevant markets, they are unable to use or license PageRank exclusively reserved for Google through at least the year 2011.  The technology, legal and marketing barriers to develop a competing Website rating tool are plainly insurmountable.  Further, any new or existing Website or competitor that faces the abusive, deliberate and unchecked use of PageRank Deflation by Defendant Google will be challenged and harmed when entering and expanding in the relevant markets.

52. *Importance of the Open Directory Project* ("ODP").  Any new search engine must have access to and index the largest possible and most comprehensive database of Websites, which is the OPD.  New engines should have clear and open access to the OPD.  However, on information and belief Defendant Google exerts a material if not controlling influence on whether a Website can be included in the OPD.  Google's own index of Websites starts with a mirror copy of the OPD.  The inclusion of a site in OPD is a very strong, if not determinative, factor for Google to consider inclusion in its own Web index and ultimately gain visibility and

SECOND AMENDED CLASS ACTION COMPLAINT                           Case No. C 06-2057 JF

user traffic on the Internet.  If a new site and search engine itself is refused by OPD for inclusion, it must wait another full year to be re-considered for inclusion.  This fact alone can delay any rapid entry by a new competitor into the Relevant Markets.

53.  *Massive Investment Requirements.*  Any serious search engine must have a massive computing infrastructure to be able to search the World Wide Web and its perhaps 10 billion-some sites and counting.  Defendant Google is known to have over 150,000 networked servers across the entire United States and worldwide.  This massive database naturally requires active, on-call redundancy and back-up.  The network to support massive search traffic and results must include high-speed, robust Internet bandwidth and pipes that are increasingly limited in supply, even with available capital alone.  An equally vital investment comes from building or and monetizing sustainable advertising revenues from a secure online advertising network of critical mass.  These revenues must be grown and sustained to fund a broad, robust search engine and index in the Search Market.  The ad network itself is unlikely to grow because advertisers when reaching target audiences will turn to secure, established search engines (as in the Engine) that already have a mass following in the Search Market.

54.  *Entrenched Buyer Preferences.*  Any search engine must be free to the user because of past user experience and expectations with search engines and due to the preexisting governmental and technological policy of Internet freedom and Internet neutrality.  Therefore, any new entrant to compete against Google is almost certain to make its use free and without charge.  Therefore, the only way for revenue and survival is to build a critical mass and network of online advertisers.  Further, Defendant Google has differentiated itself from all other search engines and competitors.  It claims it indexes every site it locates on the Internet, and that its Search Results and PageRank are objective and trustworthy, generated solely by computer programs and algorithms.  Further, Defendant has represented within various media and documents that once its Search Results and PageRanks are initially generated by computer, they are not manipulated or further adjusted by human beings.  All these are misrepresentations to the search user population that have flowed through a steady stream of persuasion, advertising, Web content, and securities law disclosures over the past seven years and counting.  Therefore, users

prefer and trust the claimed objectivity of the Engine over all other options. In addition, as Google's gmail has garnered a substantial market share for e-mail accounts particularly among the younger generation, Google as the search engine of choice for new users will prove to be even harder to break.

55. *Secured Relationships with Academia, Libraries, Business and Entertainment.* Google's multiple nationwide library digitization and search contracts and partnerships with academia, schools, and libraries (collectively, "Public Information Sources") mean that any person seeking facts or research are going to be regularly and even automatically steered to Google's Engine by Public Information Sources, and by their respective Websites through hyperlinks, and by their respective staff, educators, and written and electronic informational and promotional materials.

56. *Technical Requirements for Acceptable Search Load Times.* Load times for a search engine and its results are crucial for appeal and user value. On information and belief, the load times for the Engine for a user normally do not exceed one-half of a second. Other search engines have taken upwards of five seconds to load results. This is directly related to the amount of capital and technical investment required for a search engine. If a new search engine's load time is too long for the user, it simply will not be adopted and heavily used. With the established expectation of search engines to load results quickly from massive amounts of Website Content, a competitor in the market faces serious difficulties to enter or grow in the market.

57. *User Tracking Data.* In partnership with AOL, Google has nationwide and worldwide the greatest amount of user behavior and histories. As Google's revenues are 98% based upon advertising, it takes not only a massive technical infrastructure but a massive amount of historical data, all archived, backed up and accessible. As 90% of online advertisers use Google, they expect and demand data on search behavior of their target audiences. Google uses online tracking tools and reports to give advertisers updates on performance of their campaigns in order to make quick changes or refinements. Advertisers in a fast-moving Web-savvy consumer and commercial market cannot afford to await a new entrant to ably provide a mass of

SECOND AMENDED CLASS ACTION COMPLAINT                                      Case No. C 06-2057 JF

-13-

visibility and user traffic and behavioral data.  Accordingly, any new search engine with an online ad program will face extreme difficulty in having advertisers switch from Google.

Species and Impact of Defendant's Anticompetitive Conduct

58.  Defendant is engaged in and continues to engage in anticompetitive and exclusionary practices and conduct as follows:

a)  Selecting target competitors in the Search Market and artificially depressing the PageRanks of Websites of Class members, which would otherwise have received and yielded a higher PageRank under its normal operation but for human intervention and override;

b)  Promoting generally the widespread, worldwide use, value and reliance of PageRank by users and search advertisers over the Internet across the United States;

c)  Publishing and disseminating the deflated PageRanks of competitors worldwide on the Internet;

d)  Choosing in some instances to deflate PageRanks of competitors as Class members in retaliation for certain behavior or actions against Google, including, by way of example, (1) the case where Plaintiff KSC witnessed an unexpected rise of its PageRank to '7' after the filing of the initial Complaint in or about April 4, 2006, only to see a sudden drop in PageRank all the way back down to '0' immediately after the Court's July 13, 2006 Order, and (2) the case where a Website and putative Class member suffering from PageRank Deflation submitted a letter from its attorney to Defendant Google asking for remedial and fair treatment, only to have the Website owner's other Websites suffer from PageRank Deflation within the next month.

59.  Defendant is further engaged in and continues to engage in anticompetitive and exclusionary practices and conduct as follows:

a)  Filing public disclosures during 2004 to 2006 with the Securities and Exchange Commission ("SEC") as required by the Federal securities laws and various state securities regulatory agencies across the United States as required by blue sky laws;

b)  Making misrepresentations of material facts and false and misleading statements within such disclosures for the purpose and effect of falsely differentiating and

labeling Google's search engine results as objective and free from human tampering and bias, when in fact such results are manipulated for gain and advantage of Google and certain third parties;

       c)    Using such publicly sworn statements and misrepresentations to unilaterally distinguish to the investment community, public, search users, and advertisers that the Engine is superior to all other competing Class members because of the Engine's purported objectivity; and

       d)    Failing to make and file with the SEC and state regulatory agencies necessary corrective or amendatory disclosures to rectify and/or eliminate misrepresentations within the original disclosures.

60. Defendant is further engaged in and continues to engage in anticompetitive and exclusionary practices and conduct as follows:

       a)    Selecting target competitors in the Search Market and blocking, banning and/or censoring Websites of Class members, which would otherwise have appeared as organic search results under the Engine's normal operation but for human intervention and override;

       b)    Violating Google's own published and public policy "not to censor search results";

       c)    Breaching Google's own published and public policy where it states: "When we remove search results, . . . we display a notice on our search results";

       d)    Failing to display to users in the United States on Search Results pages that Websites are in fact Blocked or censored from viewing by the user, as opposed to the practice of Google to do so for search results presented through www.google.cn in China to comply with local laws and regulations;

       e)    Failing to provide any advance notice or warning to competitors' sites that are Blocked, banned or censored by Google;

       f)    Failing to provide any meaningful, reasonable, timely and fair means, technical, financial or otherwise, for such competitors' sites to be re-included in Google's index; and

g)     Choosing in some instances to Block, ban or censor Websites of competitors as Class members in retaliation for certain behavior, speech, or actions of such firms deemed to be unfavorable or undesirable by Google in its sole discretion, including, by way of example, (1) the case where a Website of a putative Class member suffering from Blockage, after sending to Google an attorney's letter to request remedial action on its Blocked site, suddenly found a host of its other sites suddenly Blocked, (2) the case where a competing search engine based in Maryland had its site Blocked and continue to be Blocked after publishing content that challenged the operation of the Engine and the inappropriate search practices of Defendant Google and the Engine, and (3) the case where a site carrying certain political content and views suffered from selective, immediate, and arbitrary enforcement and the penalty of Blocking by Google after of one or more of its Web Recommendations (as defined in paragraph 160 below) were violated as alleged and reported by a third party to Google, even though similar Websites with other or alternative content and views were not and are not so identified, targeted, and penalized.

61.     Defendant further engaged in and continues to engage in anticompetitive and exclusionary practices and conduct as follows:

a)     Using its Website to publish and disseminate statements constituting false advertising about the purported objectivity of Google's Search Results; and

b)     Authoring and endorsing statements of the Engine's objectivity which are clearly false, clearly material, clearly likely to induce unreasonable reliance by users and advertisers alike, made to unsophisticated parties who are unskilled in knowing or understanding the difference in search results, continued for long periods of time going back as far as 1999, and not readily or effectively refuted, challenged or cured by competitors in the relevant markets.

62.     Defendant further engaged in and continues to engage in anticompetitive and exclusionary practices and conduct as follows:

a)     Inducing persons and businesses with Websites to enlist in Google's AdSense program and generate traffic and revenues from the placement of Advertisements from the AdWords network onto Google's Search Results pages and onto other online content;

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

-16-

b)      Arbitrarily reducing traffic through Blocking, or PageRank Deflation of competitors as AdSense partners, including without limitation Plaintiff KSC;

c)      Intentionally terminating the AdSense contracts of competitors as Class members relying upon internal and/or disclosed reasons based on pretense and not related to economic sense or business justification, including without limitation:

(1)      pure suspicion or discretion of Defendant Google that the AdSense partner has somehow intentionally or inadvertently allowed click fraud to occur on AdSense advertisements appearing on the partner's site;

(2)      general or specific complaints from AdWords partners about click fraud occurring with their placed Advertisements;

(3)      litigation generally arising from click fraud; and

(4)      business, commercial, or intellectual property disputes, including by way of example Google's trademark challenge to a competing search engine based in Southern California that used an allegedly valid trade name for its engine, only to have its AdSense contract terminated without recourse by Defendant Google under its fear of further confusion by the further appearance of the AdSense Advertisements viewed by site visitors already arriving at the competitor's site, even though (i) such Advertisements are programmatically placed by Google without the AdWords advance knowledge of destination Website of the AdSense partner and (ii) Google states on its Website to AdSense partners that when "Google provides the ads, you have no advertiser relationship to maintain";

d)      Falsely claiming to AdSense partners that there are legitimate business reasons for termination of their AdSense contracts, ceasing payments of AdSense ad fees to such partners, failing to remit accrued ad fees for previously run Advertisements, and failing to promptly or actually disable AdSense ads that continue to appear on the sites and occupy valuable space on such sites of AdSense partners against the will and consent of such partners;

e)      Causing, as a result of one or more of the above events, the sudden reduction or elimination of revenues that are significant and vital to the survival of such AdSense partners and their businesses, which destroys or tends to destroy competition in the relevant markets and

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

-17-

further intimidates and discourages other potential competitors to venture into the relevant markets and engage in competing online ad placement as a business, which may lead to participation in, followed by the sudden termination from, the AdSense network operated and controlled by Defendant Google.

63. Defendant further engaged in and continues to engage in anticompetitive and exclusionary practices and conduct as follows

a) Identifying various Websites unfairly and arbitrarily deemed by Google in its sole discretion to be spam or marginal viewer content, and removing them from Google's index in order to redirect users and valuable search traffic to sites competing against such Websites;

b) Lodging and profiting further from banked AdSense Advertisements onto such sites without the full knowledge of AdSense Partners, by welcoming a stream of search users re-directed from other search engines onto these low-quality sites;

c) Appropriating low-quality sites as a means to unfairly increase the fees paid by AdSense partners to Google for no meaningful absolute gain in uniquely acquired and paid for search traffic;

d) Capturing and retaining such traffic redirected from low-quality sites sent via search results of other major competitors, thereby intentionally degrading the search user experience for these competitors that leads them to migrate to Google as their search engine of choice in the short or long term.

On information and belief, over 50% of sites that have been banned or de-indexed by Google continue to feed in detoured and redirected search user traffic amounting to large amounts of click-through revenue from the AdSense program.

64. Defendant further engaged in and continues to engage in anticompetitive and exclusionary practices and conduct as follows:

a) Establishing pricing system for AdWords advertising services whereby advertisers bid against one another to arrive at a certain unit price per click-through for having its advertisement appear in the margin of a results page generated by a keyword search;

b)    Having secured a dominant share of the Search Ad market through the AdWords program, launching a new system of ranking the Websites and pages of Defendant's competitors known as "Landing Page Quality" ("LPQ");

c)    On information and belief, creating and utilizing LPQs as a device to impose minimum floors for bids for AdWords keywords by advertisers;

d)    Imposing massive, exorbitant and disruptive price increases and price discrimination upon AdWords advertisers running ongoing e-commerce and ad campaigns, based on secretive and arbitrarily determined LPQ ratings for disparate Websites; and

e)    Broadly and maliciously disrupting and harming competition that has depended upon a free flow of information, online promotion and e-commerce by making it difficult if not prohibitive for the market of advertising Websites to preserve a viable cash flow position and sustain and retain their business, success and survival.

B.  DEFENDANT AS AN UNFAIR COMPETITOR

65.    Defendant and Class I Plaintiffs, including KSC, are competitors in the same market of securing, retaining and growing traffic by use of a search engine and directory on their own Websites, and earning revenue based on advertisers who place sponsored links and pay Defendant and the Subclass based on one or more business models, including that which generates pay-per-click fees arising from click-throughs by the search user.

66.    Defendant itself is engaged in broad intrastate, foreign and interstate commerce by profiting from the offer, sale and/or provision of information and the flow of information, e-commerce and advertising facilitated by the Engine and search results.

67.    Defendant misrepresents its own products and services in and through various media, including its own website, that its search results are objective and free of human interference or manipulation, when in fact they are allegedly subjective and subject to human tampering and violate the promises and guarantees made by Defendant itself.

68.    Defendant has made and continues to make untrue statements of material fact to the SEC, and various securities regulatory agencies among one or more of the 50 United States, including without limitation that of the State of California, that its search results are objective.

69.   Defendant through its counsel admitted on June 30, 2006 in a hearing before this Court that Defendant's search results are not objective but indeed subjective and understood by as such by the average person.

70.   Defendant's misrepresentations about objectivity of search results, without human manipulation, deceive or have a tendency to deceive a substantial segment of Defendant's audience, including without limitation (a) persons using the Engine for search and persons who advertise in reliance upon a loyal and trusting search audience and (b) the founder of a competing search engine who states, regarding the Engine, "Google relies 100% on computers."

71.   Defendant's misrepresentations about objectivity of search results are material to, and likely to influence, the decision of Advertisers and other partners that use Defendant's products and services.

72.   Defendant's misrepresentations about objectivity of search results proximately cause Class I and Class III Plaintiffs a loss of sales, a diversion of sales from itself to Defendant and/or its third party beneficiaries for direct or indirect benefit, and a loss of Plaintiffs' goodwill.

73.   Defendant misrepresents its own products and services in and through various media, including its own website, that its Website rating system known as PageRank™ is objective and free of human interference or manipulation, when in fact it is actually subjective and subject to human tampering and actually manipulated by human involvement.

74.   Defendant's misrepresentations are made in a commercial advertising or promotion and they deceive or have a tendency to deceive a substantial segment of Defendant's audience, including persons using the Engine for search and persons who advertise or otherwise do business with competitors in reliance upon the competing Website's PageRank.

75.   Defendant's misrepresentations about objectivity of PageRank are material to, and likely to influence, the decision of Advertisers and other partners that use Defendant's products and services.  Many Websites, businesses and organizations have terminated or refrained from commercial, marketing and financial relationships with Class I, Class II, and Class III Plaintiffs because they carry, either knowingly or unknowingly, '0' PageRanks ("0-PR").

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

76.    Defendant's misrepresentations about objectivity of PageRank proximately cause Class I, Class II, and Class III Plaintiffs a loss of sales, a diversion of sales from itself to Defendant and/or designated beneficiaries for direct or indirect benefit, and a loss of Plaintiffs' goodwill.

77.    Defendant misrepresents the value and worth of the Websites and businesses of the Class I, Class II, and Class III Plaintiffs, including KSC, in and through various media, including its own website, and the Google Toolbar, by artificially and arbitrarily violating the normal operation of PageRank and assessing deflated and even 0-PRs to such competitors' Websites.

78.    Defendant's misrepresentations with manipulated and deflated PageRanks are made throughout the Internet with use of the downloadable Toolbar provided for free by Defendant to thousands of persons and businesses on the Internet.  Further, Webmasters of sites can freely access the Google Directory, www.directory.google.com.  The ODP is accessible through www.dmoz.org which presents PageRank for viewing well.  In contrast to Google's Toolbar PageRank, the scale of PageRank within the ODP does not have a '0' figure but ranges from '1' to '7'.

79.    Defendant's misrepresentations with manipulated and deflated PageRanks deceive or have a tendency to deceive a substantial segment of consumers audience, including persons using the Engine for search, persons who advertise in reliance upon a loyal and trusting search audience, and persons that otherwise engage in business or commercial relationships with Classes of Plaintiffs, including KSC.  The deception is due, in part, to Defendant Google's seven-year promotion and publication to the public that PageRank is protected by a U.S. Patent.

80.    Defendant's alleged misrepresentations are material to, and likely to influence, the decision of Advertisers and other partners that use products and services and the Classes of Plaintiffs, including KSC.

81.    The PageRank of Websites serves as an intrinsic and fundamental reason as to whether parties will engage in business with Classes of Plaintiffs, including KSC.

82.    Defendant's alleged misrepresentations proximately cause the Classes of Plaintiffs a loss of sales, a diversion of sales from itself to Defendant and/or designated beneficiaries for

1    direct or indirect benefit, and a loss of Plaintiffs' goodwill.

2    C.  DEFENDANT AS A STATE ACTOR VIOLATING FREE SPEECH RIGHTS

3         83.   The Engine accepts text-based queries and other search criteria over the Internet
4    from millions of users weekly across the U.S.  These queries cover the widest possible range of
5    topics, expression, and opinions on all facets of society, culture, and human experience,
6    including politics and religion ("Topical Queries").

7         84.   The Engine presents for access, viewing, reading and hearing Websites and Web
8    Content that are associated and linked with Topical Queries ("Speech Content").  Search Results
9    are ordered by the Engine as textual excerpts or snippets release and channel Speech Content out
10   to users across the U.S. up to 150,000 times daily.

11        85.   In both stated purpose and function, Google sets the Engine apart from all other
12   search engines in stating, "In order to guide users to the information they're looking for, we copy
13   and index all the Web sites we find.  If we didn't, a useful search engine would be impossible."
14   Further, Google has made the commitment and practice to invite every possible Website on the
15   Internet containing any form or type of Web Content to be spidered by Googlebot and properly
16   and fully indexed and searchable by the Engine.

17        86.   Google makes it a stated policy that it allows and encourages Topical Queries of
18   any sort to be presented to the Engine and that it places no limit or restriction on Web Content.
19   Google expressly waives any responsibility for Speech Content appearing through the Search
20   Results that may be inaccurate, inappropriate, vulgar or offensive to the listening user.  Google
21   further enjoys near complete immunity and protection afforded by federal law against liability
22   for content that appears through the functioning of Engine over the Internet.

23        87.   Google acknowledges that removal of Web Content from its index can be
24   "inappropriate".  Accordingly, Google's website represents that removal of Websites and Web
25   Content from Google's index is not done except (a) upon request of the webmaster of the
26   Website, (b) in the case of "spamming" the index, or (c) as required by law.

27        88.   Google's practice and policy of unrestricted Speech Content through the Engine as
28   stated in the above paragraphs create an unlimited expectation among millions of public users of

the Engine that, unless there is a knowing or unknowingly operation of filters to restrict the Search Results, all forms of Speech Content are available for access and viewing in the public domain.

89.   Google's practice and policy on unrestricted Speech Content is further reinforced among public users of the Engine when it promises to reveal and disclose when censorship and removal of Speech Content occurs in its statement, "When we remove search results, . . . we display a notice on our search results."  On information and belief, not once has the Engine ever produced Search Results viewed within the U.S. that disclose or notify users that Speech Content, URLs or Websites have been removed from the results.

90.   The Engine, by virtue of its unprecedented and unmatched size, promised inclusiveness and objectivity, and functional mass to index, associate, transfer and link Speech Content of all Websites with and among users in the public domain, operates as and is a public forum for speech on the Internet.

91.   Defendant Google has created and now controls as the sole steward the Engine, which is a public forum for the expression, transfer and flow of information, opinions, ideas and speech among millions of users, Websites and members of the public.  The Engine operates 24-7 to allow any user to perform a search for Websites and Web Content and viewing and receiving speech and information of all forms.  Defendant has confirmed in a written letter in or about March 2006 that the "GOOGLE search engine . . . is available to the general public."  Anyone with Internet access can go to Defendant's own website or any number of thousands of other Websites having a "Google Search Box" as provided by Google to use the Engine without payment or charge.  Further, the Engine is endorsed and lodged for open public use through the platform of thousands of public agency, public educational and public institutional facilities and Websites.  All of these statements, actions, and conditions, among many others, as initiated and effected by Google demonstrate that Google has willfully dedicated the Engine for public use.

92.   Defendant Google is a state actor by its open alliance and partnerships with key public institutions to digitize, index, control and commercialize massive quantities of material under copyright and material in the public domain housed and previously restricted from broad

copying and commercialization.  Defendant Google has commenced a program to digitally copy and archive the complete university libraries of the University of California, Stanford University and the University of Michigan, and portions of the New York City Public Library.  Defendant Google has partnered with the very largest and substantial public university, academic and government funded libraries to formulate an indexible, searchable, federated digital archive the content of all such libraries.  These libraries access and share and exchange digital content with all other public and academic libraries across the entire United States in order to have Defendant Google as the master search engine and digital archive for all such libraries.

93.    Major public universities, government agencies, and public libraries actively and aggressively promote, encourage and support the public use of the Engine as built, managed, controlled and operated by Defendant Google, including, by way of example, University of California - Berkeley which instructs students, faculty and staff to learn to use and rely upon the Engine for research with "Teaching Library Internet Workshops" which states:

> Google is still recognized as the best general web search engine.  Recognizing this, we have decided to update and continue to offer a "Googling to the Max" course in which we teach how to use Google really well, taking advantage of its features and negotiating around its weaknesses. . . . Why Google?  • Google is the <u>BIGGEST</u> search engine database in the world.  • PageRank™ often finds useful pages.  It is one of the <u>defaults</u> that cannot be turned off in Google and is not for sale.

(Emphasis in original.)  This course and other similar courses on Google Engine usage are taught around the United States at publicly owned and/or funded universities using publicly funded staff and facilities.

94.    Defendant Google has a library division and business development team which promotes the use of the Engine and other information services built and operated by Google, including, the Library Links program with U.S. public and private libraries, Librarian Center, Book Search, and Google Scholar.  Google has effectively imbedded its brand and the Engine inside the sites at such universities, making it the #1 Web search and search engine tool used and relied upon at public universities and colleges throughout the United States.

95.    Public Information Sources freely offer facilities, Internet access to patrons and members of the public, whom, when using the Engine, view Advertisements and engage in e-

commerce from and through the Engine.  Defendant Google derives material and profitable traffic and audiences from the public use of the Internet and the Engine from Public Information Sources, which do not restrict the use of the Internet or the Engine other than to comply with the Child Online Protection Act and similar laws that mandate software filters against material unsuitable for children as a condition for government funding.

96.     Defendant Google has provided, without charge, a steady stream and diet of resources, benefits, technical expertise, consultants to library and information science programs of a vast number of public universities and colleges throughout the United States.  This facilitates the massive endorsement of the Engine and its related features, tools, and functions by such public educational institutions to their staff, faculty and students.

97.     Through its ongoing exhaustive campaign in the educational and commercial markets, the Engine of Google has become the dominant information source for teens and students.  In a recent survey conducted among teens in 2005, 78 percent of teens rate search engines as an information resource as somewhat or very favorable, with over 50 percent considering search engines as the perfect information source.  The Engine is the largest of these search engines.

98.     College and research libraries currently face increasing budget pressures in 2005, with libraries of municipalities, public educational facilities and large public universities ("Public Information Sources") reporting a tighter financial pressure than private institutions with healthy endowments.  Accordingly, a reduction and shut-down of services and facilities and staff lay-offs has been pervasive among Public Information Sources in the United States, forcing them to increasingly rely upon consortia and collaborations to maintain services while controlling costs.

99.     The wholesale linkage and endorsement by Public Information Sources, including U.S. public universities, to the Engine of Defendant Google has been effectuated and activated without sufficient disclosure by Google of the practice and propensity of censorship, Blockage and/or PageRank Deflation to occur in Search Results or Webpage views based on

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

-25-

1  discriminatory political or religious content or vague and/or overbroad content guidelines known

2  as Web Recommendations (as defined in paragraph 160 below).

3      100.   Public Information Sources have not performed sufficient due diligence to

4  determine the nature, risk and spread of censorship, Blockage, and/or PageRank Deflation of

5  Websites throughout the United States and the world.  In addition, a sizable number of Public

6  Information Sources are aware of censorship and Blockage of Websites by Google with the

7  Engine but have not taken any effective steps to request or demand that Defendant Google

8  release the new content of such Websites or resume the open circulation of such preexisting

9  Website content.  Specifically, Webmasters employed at or servicing Public Information Sources

10  are aware of Blockage by Defendant Google.

11      101.   Two of the largest public universities in the world, the University of California

12  campuses, and the University of Michigan, have established partnerships with Defendant Google

13  to digitize all printed content within such university libraries, both that under copyright and that

14  outside of copyright ("Google Copied Library") under comprehensive cooperative agreements

15  with Google.  By way of example only, the Cooperative Agreement between Defendant Google

16  and the Regents of the University of Michigan / University Library, provides in relevant part:

17      (a) Google is to make two digital copies, one for itself (Google Digital Copy) and

18          one for U-M (U of M Digital Copy), and will have the right under the Agreement

19          to make unlimited copies of the Google Copied Library for provision, licensing

20          and sale of such content to any third party, in its sole discretion.

21      (b) Google and U-M have jointly agreed to a "Distribution Price" which the per-page

22          amount is charged by Google to the general public for distribution to the general

23          public.  Google sets this amount based on the price used for other similar content

24          and if none exists, Google and U-M will jointly agree on the price.

25      (c) As Google and U-M both acknowledge the possibility of copyright infringement

26          suits against either or both from alleged violations of the Copyright Act, each will

27          indemnify the other party for damages, legal costs and other consequences of

28          such violations.

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

102. On information and belief, Google gains profits from the Google Copied Library by appropriating digital content from the Google Copy onto its own website to attract visitors and generate greater advertising revenues. This constitutes commercial use of the copyrighted material within the Google Copied Library and amounts to a material financial benefit to Google from its unlimited and unchecked use of public, copyrighted material surrendered by the Public Information Sources.

103. Since 2004, Google has already digitized massive amounts of copyrighted material held within the Public Information Sources which allegedly violates on a massive, unprecedented scale, the copyrights of owners, authors, publishers and other aggrieved parties. Portions of this content are already viewable by the public through Google Book Search. Both Google and Public Information Sources fully acknowledge that copyright infringement cases (collectively the "Library Lawsuit") are being filed and litigated, creating a serious risk of financial damages and/or injunctive relief against both sets of actors.

104. On information and belief, the receipt of content from Google out of the Google Copied Library and subsequent copy and distribution of such content under unexpired copyrights constitutes contributory and willful copyright infringement by Public Information Sources, for which Google plans to fully indemnify its library partners for damages and costs. On U-M's Website, it states, "The [Library] [L]awsuit was disappointing, but not unexpected." Such compensatory and exemplary damages, if imposed upon Public Information Sources, will be material and adversely detrimental to the viability of such libraries lacking sufficient coverage which may be either non-existent or insufficient for willful copyright infringement. In such cases, Public Information Sources is almost solely dependent upon Google to cover such losses.

105. On information and belief, Defendant Google has the access to and resources to the software or technology infrastructure to design, control or manage the indexing and search functions of the digitized public content within the Google Copied Library. None of the public educational institutions are providing this core infrastructure. Google is responsible for handling the interface for both searching and a display of search results at no cost to end users. Therefore, Public Information Sources are completely dependent upon Google for access, use, benefits and

SECOND AMENDED CLASS ACTION COMPLAINT

Case No. C 06-2057 JF

1  revenues in connection with the Google Copied Library.

2      106.   Google library partnerships do not publicly disclose the exact nature and amounts

3  of revenue sharing from commercialization of the Google Copied Library by both Defendant

4  Google and Public Information Sources.  Google has not disclosed the exact fee sharing terms to

5  the public.  The library partnerships allow both partners in each case to make unlimited copies of

6  the Google Copied Library for commercial licensing and sublicensing for profit.  While touting

7  the benefits of increasing the knowledge base of students and the public at large, Public

8  Information Sources have actively budgeted for financial benefits from Google Copied Library.

9      107.   The Google Copied Library delivers to Public Information Sources and the

10  universities themselves large enough economic benefits to make the program indispensable to

11  the financial viability of such functions and operations within these institutions.  For example,

12  University of Michigan Provost Paul Courant confirms that the Google library relationship is

13  worth "hundreds of millions" of dollars to the university.  This is a material and significant

14  portion of the entire General Fund Revenues of the entire university for fiscal 2006 amounting to

15  just over $1.2 billion.

16      108.   Google has also established as a library partner the entire University of California

17  (U-C) libraries, which constitute the largest research/academic library in the world.  As to this

18  partnership, one of Google's Vice Presidents stated, "We're thrilled to begin working with the

19  University of California libraries to include their incredible collection in Google Book Search."

20  Further, U-C executive vice president and Provost Wyatt R. Hume proclaimed, "The Google

21  partnership promises enormous benefits to the University of California and the communities it

22  serves."  On information and belief, the revenue derived from and commercializing of

23  copyrighted content will be promoted and shared between U-C and Defendant Google on terms

24  similar to the U-M partnership.

25      109.   On information and belief, for each library partnership, the following terms and

26  conditions apply:  (a) the libraries are ceding complete control and authority to digitize the

27  content in such libraries to Defendant Google; (b) the indexing, archiving, access, and search

28  control functions will be designed and managed under the discretion of Defendant Google; (c)

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

the libraries and Defendant Google will share revenues and fees earned for search or and access to the content; and (d) no other search engine will have access to the system or the content.

110.   The open surrender to Defendant Google by Public Information Sources of massive amounts of copyrighted materials under their trust is worth perhaps billions of dollars to their respective owners, and worth equal or equivalent value now being rendered to Defendant Google.  The methodical transfer to Defendant Google of the intrinsic and commercial value of the entire contents of all such Public Information Sources protected under colorable copyrights constitutes a joint venture, joint action and entanglement in misappropriating intellectual property rights of unprecedented proportion and deliberation.

111.   Defendant Google, with the Library of Congress as financial partner, is creating a digital, searchable archive of published books, larger than nearly any library of written and published materials in the world.  The maintenance, control, publication, copying and use of the archive by Defendant Google is being used to challenge and secure Google's purported rights against the existing ownership and copyright rights held by publishers and authors of such books.

112.   In 2005, Defendant Google donated significant amounts of money, expertise, hardware and software to such libraries, including the sum of $3 million to the U.S. Library of Congress to begin the World Digital Library.  Defendant Google has agreed to work with the Library of Congress on developing standards for indexing the digital collections and by providing computer equipment.  Google Co-Founder and President of Technology Sergey Brin has stated, "Google supports the World Digital Library because we share a common mission of making the world's information universally accessible and useful. To create a global digital library is a historic opportunity, and we want to help the Library of Congress in this effort."

113.   The incremental flow of revenues from Defendant Google shared and split with its library partners as state institutions, allow them to overcome their otherwise adverse shortfalls in funding and revenues.  The publicity and goodwill raised from all of these partnerships further enhance the influence and role of Google in search and information creation and delivery within the educational and public domain.  The increasing budgetary constraints upon public

SECOND AMENDED CLASS ACTION COMPLAINT

Case No. C 06-2057 JF

1  universities and public libraries to fund, preserve and expand content, facilities, and operations

2  are forcing these public institutions to monetize all their content by surrendering copyrighted and

3  non-copyrighted material to Defendant Google for mutual commercial gain.  These financial

4  inflows from the Google partnerships make such institutions financially entwined and dependent

5  upon Defendant.

6       114.   As Defendant Google makes such institutions dependent upon Google for the

7  access and release of information on educational, academic and all topical content, the tools for

8  censorship, bias and Blocking are already built in and imbedded inside filtering software for

9  search functions.  On information and belief, this same or similar Blocking and filtering

10  technology affecting the Engine's search and indexing in form and function is being installed

11  and used in and by such public institutions.  On information and belief, Defendant Google has

12  failed to make any binding guarantees to such institutions that it will not so censor and Block

13  digitized content static and dynamic sources inside such libraries, which is being practiced upon

14  Websites as challenged in this action.  On information and belief, Defendant Google has not

15  furnished such institutions the means to disable Blocking or filtering software, nor has it

16  furnished to such institutions a master list and database of Websites and Web Content that has

17  suffered Blockage, censorship, de-indexing or PageRank Deflation.  The nearly unqualified

18  adoption and endorsement of the Engine and import and incorporation of key features into the

19  functionality in operation at such public institutions make Defendant Google a state actor that

20  violates free speech rights of Class III Plaintiffs and of California Subclass II Plaintiffs.

21       115.   The foregoing partnerships with libraries and Public Information Sources allow

22  Defendant Google to even further dominate, censor and block the accessibility of Web Content,

23  Websites, data, images and information in the entire United States, to the detriment of the free

24  flow of speech, information and commerce.

25  **REPRESENTATIONS AND PROMISES OF DEFENDANT**

26       116.   On its Website under "Corporate Information" / "Company Overview" /

27  "Technology Overview", Defendant Google states:  "There is no human involvement or

28

SECOND AMENDED CLASS ACTION COMPLAINT        Case No. C 06-2057 JF

manipulation of results, *which is why users have come to trust Google as a source of objective information* untainted by paid placement." (Emphasis added.)

117.    On its Website under "Google Terms of Service for Your Personal Use", "The search results that appear from Google's indices are indexed by Google's automated machinery and computers, and Google cannot and does not screen the sites before including them in the indices from which such automated search results are gathered."

118.    On its Website http://www.google.com/technology/ "Our Technology" / "Why Use Google" / "Integrity", Defendant Google states:  "Google does not sell placement within the results themselves. . . . A Google search is an easy, honest and objective way to find high-quality websites with information relevant to your search."

119.    On its Website under "Web Search Help Center" / "Information in Our Search Results" / "How Google finds and ranks pages" / Defendant Google states the following:

> Sites' positions in our search results are determined *automatically* based on a number of factors. . . . We don't manually assign keywords to sites, nor do we manipulate the ranking of any site in our search results.

120.    Under the "Google Terms of Service for Your Personal Use" that viewable by to every single user of the Engine, Google states:  "The search results that appear from Google's indices are indexed by Google's automated machinery and computers, and Google cannot and does not screen the sites before including them in the indices from which such automated search results are gathered."

121.    Defendant Google's Form S-1 as filed on April 29, 2004 and later amended with the SEC, prior to its initial public offering of stock, states**:**

> *Objectivity.*    We believe it is very important that the results users get from Google are produced with only their interests in mind. We do not accept money for search result ranking or inclusion. We do accept fees for advertising, but it does not influence how we generate our search results.

122.    The Google 2005 10-K, in Part 1, Item 1, Business, on file with the SEC as of March 16, 2006 states:

> We maintain the largest, most comprehensive index of web sites and other content, and we make this information *freely available to anyone with an Internet connection*.

SECOND AMENDED CLASS ACTION COMPLAINT                          Case No. C 06-2057 JF

-31-

(Emphasis added.)

123.   Defendant Google's Form 10-K (the "Google 2004 10-K"), in Part 1, for the fiscal year ended December 31, 2004 on file with the SEC states:

> Our dedication to putting users first is reflected in three key commitments we have made to our users:
>
> -     We will do our best to provide the most relevant and useful search results possible, independent of financial incentives. <u>Our search results will be objective</u>, and we will not accept payment for inclusion or ranking in them.
> -     We will do our best to provide the most relevant and useful advertising. If any element on a result page is influenced by payment to us, we will make it clear to our users. Advertisements should not be an annoying interruption.
> -     We will never stop working to improve our user experience, our search technology and other important areas of information organization.

(Emphasis added.)

124.   The Google 2004 10-K, in Part 2, also states[2]:

> Some of the key benefits we offer to users include:
>     *Pertinent, Useful Commercial Information.* The search for information often involves an interest in commercial information – researching a purchase, comparing products and services or actively shopping. We help people find commercial information through our search services and advertising products. Among our search services, we offer Froogle, a search engine for finding products for sale online.

Therefore, it is the express intent and practice of Defendant Google to channel information and communication on a 24-7 basis to any and all cyberspace visitors from the public for obtaining and viewing Web Content and information, data and images.

125.   The Google 2004 10-K, in Part 2, for the same year also states[3]:

> Google indexes a huge amount of information in order to provide relevant results to our users. Our users do searches and are directed to relevant web sites. Google provides a significant amount of traffic to web sites with which we have no business relationship. Many web sites are able to generate revenue from that

---

[2] These statements and representations are essentially repeated verbatim in Google's 2005 Form 10-K, on file with the SEC.
[3] See footnote 2 above.

traffic, but others have difficulty doing so. We are enthusiastic about helping sites make money and thereby facilitating the creation of better content to search. If there is better content on the web, people are likely to do more searches, and we expect that will be good for our business and for users. To address this opportunity, we created Google AdSense. Our Google AdSense program enables the web sites – large and small – that make up the Google Network to deliver AdWords ads that are relevant to the search results or content on their pages. We share most of the revenue generated from ads shown by a member of the Google Network with that member – creating an additional revenue stream for them.

126.   On information and belief, no other search engine or search directory in the United States makes a promise, guarantee, and statement in public that its results are objective, free of human manipulation or free of financial influence or payment.

127.   Search users, members of the investment community, and the public at large, place reasonable reliance on the representations of Defendant Google appearing within its website at all relevant times and in the publicly sworn disclosure statements as filed with the SEC from time to time.

128.   Defendant Google, and no other party, has independent control and management as to whether search results emanating from the Engine are objectively derived by computer algorithms alone or instead arbitrarily and subjectively adjusted and modified by human intervention and tampering.

129.   Defendant Google is aware that its representations cause users and the public to place greater trust and increase their use of Defendant Google's search engine and viewing of Search Results and all sponsored advertisements and links generated by Google thereby. Accordingly, Defendant Google thereby induces an entire generation of users, the public, and the cyberspace community at large to expect and believe that Search Results generated from a search every single time will be (a) objective and neutral, (b) untrammeled by human intervention or preference and (d) accompanied by a disclosure of every incidence of removal of Websites from appearing in Search Results.

**VIOLATIONS OF DEFENDANTS' OWN REPRESENTATIONS**

130.   The statements on Defendant's Website and the publicly sworn statements of its officers in Google's public securities filings with the SEC are inaccurate, false and misleading in at least three respects: (a) Defendant's search results are not objective and not based solely on a

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

1   computer algorithm, as confirmed and admitted to by Defendant's legal counsel on June 30,

2   2006 before this Court; (b) Defendant has intentionally offered and delivered top positions in

3   search results on Google's Search Results to companies, firms, advertisers and advertising

4   agencies ("Listing Parties") in exchange for certain conditions and consideration as accepted by

5   Google; and (c) Defendant fails to disclose to the public and to search users that search elements

6   on Search Results are influenced by delivery of various benefits and consideration to Google.

7        131.   In cooperation and in concert with Listing Parties, Google has as early as 2002,

8   accepted various forms of consideration to reserve the number one top position on Search

9   Results based on key words to various parties and advertisers.  This unnatural skewing and

10   offering of the top Search Results position denied the Engine of any claim of objectivity or

11   absence of human intervention.

12        132.   On information and belief, Google seized this advantage given marketing surveys

13   that about 40% of users who click through on any designated listings appearing on search results

14   actually click on the top number one listing appearing on such pages.

15        133.   On information and belief, the financial and strategic partnership and alliance

16   between Google and AOL has led to a loss of objectivity in the search results generated and

17   presented by the Engine.  On information and belief, such search results are similar, if not

18   identical between those generated and presented by the Engine and those of AOL's search

19   engine powered by Google.

20        134.   Defendant has made and continues to make untrue statements of material fact to

21   the SEC, and various securities regulatory agencies among one or more of the 50 United States,

22   including without limitation that of the State of California, that its search results are objective.

23        135.   On information and belief, never in a single instance has Defendant Google

24   disclosed on its Search Results or on its Website that search results actually appeared in a

25   position because various benefits and consideration was tendered to and received by Google

26   from Listing Parties and their agents in fact.

27        136.   Defendant further has committed and commits a violation of its own

28   representations from its Website that it will display a notice on Search Results if any Websites

SECOND AMENDED CLASS ACTION COMPLAINT            Case No. C 06-2057 JF

1   are removed from the index and from view by users. On information and belief, thousands of

2   users and consumers have been denied and are being denied full disclosure and Google's

3   promised notice of Website and Web Content removal in every instance ("Undisclosed Website

4   Removal") when they view and rely upon millions of page views of Search Results displayed by

5   the Engine.

6      137.   In September 2002, the Federal Trade Commission issued an "FTC Consumer

7   Alert" about search engine ranking practices to warn search users and consumers of search

8   engines that fail to truthfully distinguish and separate Website listings between search results

9   that are paid listings and advertisements and those that are unpaid listings based on relevance or

10  other criteria chosen by the engine.

11     138.   In misplacing their faith and belief in the purported objectivity of Defendant's

12  Engine and its Search Results, users in the search market have intentionally preferred and chosen

13  Google in performing searches and, on those grounds, have declined to use other search engines,

14  and have been prevented or restricted in viewing Websites or content and advertising that might

15  otherwise appear in Search Results.

16     139.   To date, Defendant Google has intentionally and deliberately avoided filing any

17  amendments to its filings under the Securities Act of 1933 and the Securities Exchange Act of

18  1934 that would set forth any correction or restatement of the false and misleading statements

19  referred to in foregoing allegations.

20                    **ABUSE OF PAGERANK BY DEFENDANT**

21     140.   Defendant Google states under "Toolbar Features" IE Version 3 under "PageRank

22  Display" the following: "Wondering whether a new website is worth your time? Use the

23  Toolbar's PageRank™ display to tell you how Google's algorithms assess the importance of the

24  page you're viewing."

25     141.   Under PageRank, in a simplified sense, if there are more third-party hyperlinks

26  into a Website's web page, greater mathematical weight is awarded to such a page. This process

27  is analogous to a means to quantify the cross-citations among all scientific periodicals ever

28  published and indexed for this purpose. Therefore, PageRank is not a mere statement of opinion

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

of the innate value or human appeal of a given Website and its Web Content. Instead, it is a mathematically-generated product of measuring and assessing the quantity and depth of all the hyperlinks on the Web that tie into a PageRanked Website, under programmatic determination by Defendant Google.

142.   At one time, PageRank in its nascent form was an automated, computer algorithm to calculate and measure the extent and nature of hyperlinking within the Internet to a particular Website and its web pages. After PageRank was licensed from Stanford University, Defendant developed a system of converting the actual mathematical result into a whole number score from '1' up to "10".

143.   The normal mathematical result of a PageRank calculation generates an extended decimal figure above the absolute figure of '0'. This is not generally known by the general public, users, or consumers, and nor is it qualified or explained by Defendant Google when a viewer sees a 0-PR for Websites or Web Content.

144.   In or around 2001, Defendant launched a new program to deflate and punish Websites of its own choosing all the way down to a 0-PR. One purported purpose behind this program offered by Defendant was to punish Websites for carrying content of questionable or irrelevant quality in Google's absolute and internal discretion ("Inferior Page Quality" ("IPQ")).

145.   On information and belief, Defendant uses and executes the operation of a software filter to programmatically punish a Website with a 0-PR it believes to have IPQ. However, in so doing, Defendant knowingly punishes thousands of Websites and Webpages that do not in actuality have IPQ.

146.   On information and belief, to isolate and punish unsuspecting Websites, Google has an employee identifying himself as the "GoogleGuy," who repeatedly advises webmasters to avoid "linking to bad neighborhoods." The pressure to avoid bad neighborhoods is extreme and instant because the penalty to any Website for linking to an IPQ-determined or 0-PR site is to suffer the very same or similar penalty. PageRank Deflation upon any given site causes hundreds perhaps thousands of other Websites to immediately terminate links to the penalized site. These other sites simply check for a 0-PR assigned by Defendant. The adverse effect is

both immediate and viral to an entire network of Websites on the Internet.

## PRACTICE OF BLOCKAGE BY DEFENDANT

147.   Defendant Google also states that "[i]t is Google's policy not to censor search results.  However, ... [w]hen we remove search results ... we display a notice on our search Results."

148.   On information and belief, Defendant Google tracks, captures, quantifies, stores and analyzes all of the traffic, click-throughs, and referrals made from any given key word search using its search engine to destination sites visited by the search user.  By doing so, Google understands and knows that it is creating a substantial amount of traffic for such destination sites, which can result in a gain in goodwill and revenues for such sites.  This database of Website and search behavior allows and facilities the selection by Defendant Google to Block Websites of its own choosing.

149.   Defendant Google induces and encourages ongoing reliance of Websites to expect to receive and monetize referred traffic from key word searches using Google's search engine, and massively publicizes this promise and benefit through its public disclosures made to Federal and state securities regulatory agencies and through publicly disseminated Website content and information circulated to the media.

150.   Defendant Google presents on its website the Webmaster Help Center, which is an open invitation and solicitation to all any and all sites to be indexed, whether through site submission or automatically.  This has created a regular course of service, dealing and cooperation, by which Google demands and warns Websites to comply with Google's Webmaster Guidelines and Web Recommendations.  Google's course of dealing with members of the Class of Plaintiffs began as early as 2000, as in the case of Plaintiff KSC.

151.   Defendant Google states in its Website under "Google Information for Webmasters" the following unqualified representation:

> We're committed to providing thorough and unbiased search results for our users. We stop indexing pages of a site **only at the request of the webmaster who's responsible for those pages**, when it's spamming our index, or as required by law.  This policy is necessary to ensure that pages aren't inappropriately removed from our index.

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

(Emphasis in original.)  On information and belief, Defendant Google stops indexing pages of a Website for illicit, anticompetitive and discriminatory reasons outside of those listed above, and the removal of Website and its pages of Class members from Google's index is indeed performed on an ongoing basis by Defendant Google.

152.   Defendant Google is vested with a public trust in that the only reasonable means of the public to identify and access millions Websites across the worldwide web is to utilize a search engine that purportedly offers and delivers the most relevant and useful search results.

153.   Defendant Google states in on its Website page "Google Information for Webmasters" the following:

> [Y]our page may have been manually removed from our index if it didn't conform with the quality standards necessary to assign accurate PageRank. We won't comment on the individual reasons a page was removed, and we don't offer an exhaustive list of practices that can cause removal. However, certain actions such as cloaking, writing text that can be seen by search engines but not by users, or setting up pages/links with the sole purpose of fooling search engines may result in permanent removal from our index. You may want to review our Quality Guidelines for more guidance. If you think your site may fall into this category, you might try "cleaning up" the page and contacting us with a re-inclusion request. We don't make any guarantees about if or when we'll re-include your site.

154.   Defendant Google is directly responsible for launching and using the practice of Blockage of independently owned and managed Websites.  One purported description of this process is that a Website is catalogued and isolated from open search queries until, under Defendant's sole and absolute discretion, such site has served sufficient time in probation inside the "Sandbox" before release by Defendant Google.  On information and belief, Google does not explain why some Websites remain in a probationary period for a short period while others in a longer period.  Furthermore, Google as a corporation does not formally acknowledge this probationary period generally or with respect to any specific Website and Google does not provide an explicit justification of these actions.

155.   Defendant Google exercised Blockage upon unknowing members of the Class that effectively choked off search-driven traffic into the multitude of Websites owned and managed by such Class members.  On information and belief, Blockage may occur at any time during the

1  life of a Website that previously was receiving referrals through the otherwise normal, objective

2  and/or programmatic operation of the Google Engine.

3    156. It has been and continues to be, difficult if not impossible for a Class member to

4  move its Website out of the probationary or permanent Blockage by calling, e-mailing or

5  otherwise notifying Defendant Google, and there is no process to get a report of whether or why

6  a Website might have been penalized and thereby Blocked.

7    157. Although Google initially denied the existence of Blockage, at pertinent times

8  including at a public technology conference in San Jose in August 2005, an employee of

9  Defendant Google acknowledged that Google indeed practiced Blockage.  Defendant's

10  employees now euphemistically label this practice of Blocking Websites as "search quality

11  improvement" or anti-Webspamming.

12    158. Although Defendant claims that it engages in "search quality improvement" to

13  remove undesirable content, Google recently identified a fairly significant number of Websites

14  with content it assessed to be "good" that had been Blocked without notification of any kind.

15  Some of these Websites might still not know that they are being Blocked.  On information and

16  belief, the number of Websites in the initial identification and assessment by Defendant Google

17  approximated 100 in number.

18    159. On information and belief, Defendant negligently, willfully and/or intentionally

19  interposed and continues to interpose one or more filters as Blockage upon a multitude of

20  Websites of the Class, including that of Plaintiff KSC.  There was and is no notice or

21  understanding from the public, the cyberspace community or webmasters at large as to (a) which

22  sites are Blocked, (b) how and why they are Blocked, and (c) when, if ever, they can ever be

23  unblocked or have the filter lifted.  On information and belief, Defendant Google has embarked

24  on a program of communication to either refrain from further disclosure altogether or engage in

25  active denial, misinformation or disinformation concerning the role of Blockage in Defendant's

26  processing of over 200 million key word search requests each day

27    160. Defendant Google makes generalized and specific guidelines and

28  recommendations, through various media including informal blogs, on how to design and

SECOND AMENDED CLASS ACTION COMPLAINT      Case No. C 06-2057 JF

-39-

maintain Websites ("Web Recommendations").  Web Recommendations purport to improve the quality of Search Results, but those guidelines appearing on Google's own site serve in reality as mere tools to facilitate arbitrarily chosen punishment on Websites.

161.   Google fails to exercise any consistency or fairness in what Web Recommendations are necessary or appropriate, whether changes in them are made, when they are made, how they are made.

162.   Google repeatedly uses, interprets, reinterprets, and violates basic application of Web Recommendations as a pretext to inflict Blockage upon Websites of the Class.  In many instances such consequences visit Websites without any advance, concurrent or subsequent notice to Class members as to what Web Recommendations, if any, were ever not followed.

163.   On information and belief, a certain task force within Defendant Google known as the "Google Help Team" receives complaints and information received from and about websites owned and operated by Class members.  The so-called search quality group of Defendant then methodically and intentionally assesses "low penalties" or "high penalties" against such sites. Defendant Google intentionally and surreptitiously imposes these penalties on such sites with no recourse, notice or recovery available or offered by Defendant.  Google does not explain or justify to Websites the cause of "low penalties" or "high penalties".

164.   On information and belief, the existence of Web Recommendations of Google purport to improve or protect the quality of search results, but actually provide no material gain, relevance or importance of Web Content for users.

165.   Defendant Google practices and executes permanent removal of Websites from its index, leaving such sites with no ability, channel, or commercial means to ever become visible through the Engine.

166.   On information and belief, Defendant Google willfully and arbitrarily enforces its Web Recommendations against a multitude of Class members to use Blocking to depress and suppress their Websites based on discriminatory political reasons that are not otherwise disclosed in public or on Defendant's Website.

167.   On information and belief, Defendant Google willfully and arbitrarily enforces its

SECOND AMENDED CLASS ACTION COMPLAINT

Case No. C 06-2057 JF

Web Recommendations against a multitude of Class members to use Blocking to depress and suppress their Websites based on discriminatory religious reasons that are not otherwise disclosed in public or on Defendant's Website.

168.   On information and belief, when Websites of Class members are punished and penalized, Defendant Google will falsely communicate to owners and managers of such sites the reasons for such consequences and intentionally under false pretenses.

169.   It is the belief and practice maintained by Defendant Google that it exercises a so-called speech right to interrupt, suspend, or terminate indefinitely the referral, listing or indexing of any Website on the Internet, subject to applicable laws, regulations, contracts, and court orders, when in fact such right is limited by and subject to lawful free speech rights of such Websites.

170.   Defendant Google claims under its Webmaster Guidelines that "Advertising with Google [with AdWords] neither helps nor hurts a site's rankings in Google," but in multiple instances for Websites the failure and/or the reduction in AdWords advertising has directly correlated with the change in a loss in rankings or listings for their sites on the Search Results for various key word searches.

171.   Search traffic otherwise freely flowing to Blocked sites is re-channeled to sites that gain such traffic but (a) do not compete against Google for traffic as a search engine and directory and (b) pay Google higher-paying advertising premiums for AdSense participation.

172.   Google foregoes short-term profits by completely or effectively Blocking traffic out of Blocked sites of members of the Class which host AdSense ads, which thereby reduce Google's revenue from AdSense advertisers which would otherwise pay Google which in turn shares such revenues with AdSense hosting sites.  On information and belief, Google is unable to produce any legitimate economic or business justification to unilaterally terminate the course of dealing with members of the Classes which used to be listed in the Google index but was completely or effectively Blocked.  It is contrary to business or economic sense because the inclusion of Websites of such aggrieved Class members would otherwise yield greater search

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

-41-

1   results and user traffic using the Engine, which thereby generates more AdSense revenue for

2   both Websites and for Google.

3        173.   Google further foregoes short-term profits by completely or effectively Blocking

4   traffic out of Blocked sites of members of the Classes that pay Google for sponsored links

5   through the AdWords program participation.

6                   **SPECIFIC HARMS TO THE CLASS REPRESENTATIVE**

7        174.   On March 19, 2005, Plaintiff KSC's Website KinderStart.com suffered a

8   cataclysmic fall of 70% or more in its monthly page views and traffic.  Thereafter, KS.com's

9   monthly average of page views for the last 11 calendar months through February 2006 was a

10   meager 30% of monthly levels prior to March 2005.  Initially, KSC did not know why its Web

11   traffic had dropped so dramatically.  It had not been provided any notices from Defendant

12   Google, and certainly no advance notices, whether or why its Web traffic might decrease.

13   Eventually, KSC realized that common key word searches on Defendant Google's search engine

14   no longer listed KSC.com as a result with any of its past visibility.

15        175.   By April 2005, Plaintiff KSC's monthly AdSense revenue suffered an equally

16   precipitous fall by over 80%.  With the sharp fall-off in search engine referrals from

17   www.google.com, quite naturally and automatically click-throughs for the sponsored ads on

18   KS.com dropped proportionately with the actual key word search traffic sent from Defendant

19   Google.

20        176.   In March 2005, the top referring site for KS.com was Defendant Google

21   (www.google.com).  In April 2005 and for every single month since, www.google.com no

22   longer even made the top 10 URL referrers.  Since that time, the percentage of referrals from

23   Defendant Google as to KS.com has fallen to less than 0.01%.  The KS.com site was officially,

24   practically and illegally Blocked by Defendant Google.

25        177.   On information and belief, over 1000 other sites of California and nationwide

26   Websites that participated in AdSense suffered a loss of traffic and referrals as a result of

27   Blockage by Defendant Google.

28        178.   Plaintiff KSC has never been notified by telephone, mail or in person of the fact

SECOND AMENDED CLASS ACTION COMPLAINT           Case No. C 06-2057 JF

that Defendant Google Blocked KS.com, or why this occurred to KS.com.  Further, Plaintiff KSC never received any notice or instruction on what method or procedure, if any, could or should be used by Plaintiff KSC to cause Defendant Google or the Google Engine to cease the Blockage of KS.com.

179.   On information and belief, hundreds and hundreds of Websites as owned and operated by the Class II Plaintiffs suffer an identical malady – Blockage for a duration of anywhere from several days to 18 months or more, with absolutely no notice or warning whatsoever from Defendant Google.

180.   At all pertinent times since the launch of KS.com, never has Defendant Google notified that Plaintiff KSC or KS.com was in violation of any guidelines or rules of Defendant as to Website content or management or advertising that may have been in effect or disseminated from time to time among and throughout the Google Network.

181.   Never has Plaintiff KSC hired or utilized any services for search engine optimization that actually and effectively increased visits or views at KS.com.  Never has Plaintiff KSC taken any steps or actions to remove Website Content of KS.com from Defendant Google's index.

182.   To the best of Plaintiff KSC's knowledge, never has any Web Content or links, whether sponsored or not, of KS.com violated the AdSense Program Policies of Defendant Google on Site Content.

183.   Since its inception in 2000, KS.com has never carried any hidden text pages that could ever constitute Web spam under any proper, objective definition.

184.   To the best of Plaintiff KSC's knowledge, KSC has never violated Defendant Google's Web Recommendations as to KS.com and Google has not notified KSC of any such violation.

185.   Never has Defendant Google notified Plaintiff KSC of any possible or actual violation by KSC of the terms or conditions set forth in the AdSense Program Agreement.

186.   As a result of the conditions alleged above, the PageRank for Plaintiff KSC's website was at all pertinent times determined to be, and presented and disseminated over the

Internet worldwide as '0' by Defendant Google up until on or about April 7, 2006, after which it was raised temporarily to '7'. Then, on or about July 13, 2006, the PageRank of Plaintiff KSC was dropped again all the way down to '0'. No explanation or notice has been furnished or publicized by Google to KSC.

## CLASS ACTION ALLEGATIONS

187.   Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiff KSC bring this action on behalf of itself and the following Class of similarly situated persons defined as "Class I" plaintiffs:

> All persons, companies or other entities that operate a search engine, directory, and/or directory on or after January 1, 2001 that suffered one or more of the following: (a) delisting or Blockage of its Website from Defendant Google's Search Results and/or index, (b) assignment to its Website, either manually or programmatically, a PageRank of 0 after having a PageRank of 2 or more, (c) penalization or other placement of its Website to a lower priority on Google's Search Results in connection with alleged failure to meet written or unwritten quality guidelines or Web Recommendations.

188.   Class I seeks certification of claims for compensatory and exemplary and punitive damages as well as declaratory relief and injunctive relief for violations of Sherman Act section 2 and of Lanham Act section 1125.

189.   Plaintiff KSC also brings certain of the claims, identified, on behalf of itself and certain parties described as "Class II" plaintiffs:

> All persons, companies or other entities that participated in the AdSense program, on or after January 1, 2001 that suffered a loss or termination of AdSense revenue by means of one or more of the following: (a) delisting or Blockage of its Website from Defendant Google's Search Results and/or index; (b) PageRank Deflation of its Website; (c) or arbitrary termination from the program based reasons that are unfair, unfounded or under pretense that did not knowingly participate in any click fraud or other legitimate business reason that could colorably be presented by Defendant Google.

190.   Class II seeks certification of claims for compensatory and exemplary and punitive damages as well as declaratory relief and injunctive relief for violations of Sherman Act section 2 and of Lanham Action section 1125.

191.   Plaintiff KSC also brings certain of the claims, identified, on behalf of itself and certain parties described as "Class III" plaintiffs:

SECOND AMENDED CLASS ACTION COMPLAINT                                    Case No. C 06-2057 JF

All persons, companies or other entities owning Websites or Web pages on or after January 1, 2001 that suffered one or more of the following: (a) delisting or Blockage of its Website from Defendant Google's Search Results and/or index; (b) assignment to its Website, either manually or programmatically, a PageRank of 0 after having a PageRank of 2 or more; (c) penalization or other placement of its Website to a lower priority on Google's Search Results in connection with alleged failure to meet written or unwritten quality guidelines or Web Recommendations; or (d) placement of its Website to a lower priority on Google's Search Results using one or filters based on discriminatory political or religious or other content-driven criteria incompletely disclosed in each such instance to the foregoing persons, companies or other entities.

192.  Class III seeks certification of claims for declaratory relief and injunctive relief for violations of the First Amendment to the United States Constitution.

193.  Plaintiff KSC also brings certain of the claims, identified, on behalf of itself and a portion of the Class described as "California Subclass I" as follows:

All persons, companies or other entities residing within the State of California owning Websites or Web pages on or after January 1, 2001 that suffered one or more of the following: (a) delisting or Blockage of its Website from Defendant Google's Search Results and/or index; (b) assignment to its Website, either manually or programmatically, a PageRank of 0 immediately after having a PageRank of 2 or more; (c) penalization or other placement to a lower priority on Google's Search Results in connection with alleged failure to meet written or unwritten quality guidelines or Web Recommendations; or (d) placement of its Website to a lower priority on Google's Search Results using one or filters based on discriminatory political or religious reasons, or other content-driven incompletely disclosed in each such instance to the foregoing persons, companies or other entities.

194.  Plaintiff KSC also brings certain of the claims, identified, on behalf of itself and a portion of the Class described as "California Subclass II" as follows:

All members of California Subclass I that participated in Google's AdSense Program on or after January 1, 2001 and experienced a loss in AdSense revenue at all pertinent times as a result of suffering any of the events listed in paragraph 62 above.

195.  California Subclass I seeks certification of claims against Defendant Google for declaratory and injunctive relief pursuant to California Constitution article 1, § 2, and California Subclass II seeks certification of claims against Defendant for declaratory and injunctive relief and for restitution pursuant to the Unfair Competition Law (California Business and Professions

1    Code ("B&P C") §§ 17200 *et seq.*

2       196.  Excluded from the Classes and California Subclasses are the officers, directors,

3    and employees of Defendant Google, its subsidiaries or its affiliates, and their respective legal

4    representatives, heirs, successors and assigns.

5       197.  This action is brought as a class action and may properly be so maintained

6    pursuant to the provisions of Federal Rule of Civil Procedure 23.  Plaintiff reserves the right to

7    modify the Class and the California Subclass definitions and the class period pursuant to

8    discovery that is conducted hereafter.

9       198.  **Numerosity of the Classes and the California Subclasses:**  Members of each of

10   the Classes and the California Subclasses are so numerous that their individual joinder is

11   impractical.  The precise identities, numbers and addresses of members of the Classes and the

12   California Subclasses are unknown to the Plaintiffs, but may and should be known with proper

13   and full discovery of Defendant, third parties, and their respective records.  For each Class and

14   Subclass, the number of members exceeds 100 in number.

15      199.  **Existence of Common Questions of Fact and Law**.  There is a well-defined

16   commonality and community of interest in the questions of fact and law involved affecting the

17   members of the Classes and the California Subclasses.  The common questions of fact and law

18   include:

19          a)     Whether and to what extent Defendant's practices and conduct with respect to

20   the Blockage of referrals to Websites of members of the Class Defendant violated the First

21   Amendment right of free speech enjoyed by members of Class III, or is currently doing so;

22          b)     Whether Defendant holding monopoly power in one or more relevant markets

23   unlawfully restrained trade by refusing to deal with members of Class I or Class II and use or

24   override its Search Engine to Block referrals of users to Websites owned by such members in

25   violation of Section 2 of the Sherman Act, or is currently doing so;

26          c)     Whether Defendant attempted to create a monopoly in one or more relevant

27   markets as demonstrated by its intent, conduct, and behavior, with the natural result of causing

28   anticompetitive effect and harming consumers;

SECOND AMENDED CLASS ACTION COMPLAINT                          Case No. C 06-2057 JF

d)      Whether Defendant violated the Lanham Act in a manner and with the effect of causing loss and harm to members of Class I or Class II;

e)      Whether and to what extent Defendant's practices and conduct with respect to the Blockage of referrals to Websites of members of California Subclass I violated the California constitutional right of free speech enjoyed by members of California Subclass I, or is currently doing so;

f)      Whether Defendant's practices and conduct with respect to the Blockage of referrals to Websites of members of California Subclass II constitute unfair, unlawful, and/or fraudulent business practices in violation of California's Unfair Competition Law;

g)      Whether Defendant's practices, conduct and statements with respect to the Blockage of referrals to Websites or the assignment of PageRank values to such Websites of members of Class III constitute defamation or slander;

h)      Whether Plaintiff KSC and California Subclass II members are entitled to restitution, disgorgement of profits, injunctive relief or other equitable relief to remedy Defendant's unfair, unlawful and/or fraudulent business practices;

i)      Whether Plaintiff KSC and Class and California Subclass members are entitled to recover compensatory, exemplary, trebled, statutory or punitive damages based on Defendant's fraudulent, illegal, monopolistic, anticompetitive, unfair, defamatory conduct or practices and/or otherwise; and

j)      Whether Plaintiff KSC and Class and California Subclass members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

200.   **Typicality**:  Plaintiff KSC's claims are typical of the claims of the members of the Classes and the California Subclasses because Plaintiff KSC is or was engaged in lawful commerce in connection with their Websites and properly exercising their rights of free speech and the recipient of the unhindered flow of referrals through the normal operation of the Engine. Plaintiff KSC and all members of the Classes and of the California Subclasses have similarly suffered harm arising from Defendant's violations of law as alleged herein.

201.   **Adequacy**:  Plaintiff KSC is an adequate representative of the Classes and the

California Subclasses because its interests do not conflict with the interests of the members of the classes it seeks to represent.  Plaintiff KSC has retained competent counsel for this class action and Plaintiff KSC intends to prosecute this action vigorously.  Plaintiff KSC and its counsel will fairly and adequately protect the interests of the members of the Classes and the California Subclasses.

202.   This suit may also be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because Plaintiff KSC and the Classes and the California Subclasses seek declaratory and injunctive relief, and all of the above factors of numerosity, common questions of fact and law, typicality and adequacy are present.  Moreover, Defendant has acted on grounds generally applicable to Plaintiff KSC and the Classes and the California Subclasses as a whole, thereby making declaratory and/or injunctive relief proper and suitable as remedies.

203.   **Predominance and Superiority**.  This suit may also be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Classes and the California Subclasses predominate over the questions affecting only individual members of the classes and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual class member may disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendant's conduct and practices.  Additionally, effective redress for each and every class member against Defendant may be limited or even impossible where serial, duplicitous, or concurrent litigation occurs on these disputes.  Even if individual class members could afford or justify the prosecution of their separate claims, the court system may not be up to the task.  Individualized litigation may lead to incongruous and conflicting judgments against Defendant.  To the contrary, a class action procedure involving all class members, Defendant and the court present fewer management difficulties, and provide the benefit of a single adjudication, economy of scale, and judicial efficiency and fairness.

**COUNT ONE**

**<u>SHERMAN ACT SECTION 2:  ATTEMPTED MONOPOLIZATION</u>**

204.   Plaintiffs reallege and incorporate herein by reference each and every allegation

1  contained in paragraphs 1 through 203, inclusive.

2      205.   Plaintiff KSC and one or more of the Class I members compete against Defendant

3  Google in the relevant market described as the Search Market within the United States.

4      206.   Plaintiff KSC and one or more of the Class II members compete against Defendant

5  Google in the relevant market described as the Search Ad Market within the United States.

6      207.   By virtue of its statements, behavior, conduct, acts and omissions, Defendant

7  Google harbors and evinces specific intent to destroy competition in each of the Search Market

8  and the Search Ad Market.

9      208.   By virtue of its statements, behavior, conduct, acts and omissions, Defendant

10  Google harbors and evinces specific intent to control prices in the Search Ad Market, including

11  without limitation the use of the LPQ program for pricing advertisements.

12      209.   Defendant Google has engaged in predatory conduct and anticompetitive conduct

13  directed toward achieving the objective of controlling prices and/or destroying competition in

14  the relevant markets of the Search Market and the Search Ad Market, including the following:

15  (a) PageRank Deflation of competitors' Websites; (b) filing misleading statements with the SEC

16  and state securities regulatory agencies about Search Results of the Engine being produced and

17  presented for viewing; (c) Blockage of competitors' Websites; (d) unfair and anticompetitive use

18  of the PageRank patent in promoting and practicing it as the *de facto* standard on the Internet to

19  degrade competitors' Websites, and/or failure to practice the PageRank patent in the disclosed

20  preferred embodiment in a lawful manner; (e) claiming disclosure of PageRank processes and

21  calculations as a trade secret to further advance its integrity and reliability when in fact its use

22  and publication serves in certain instances as a weapon and pretense for unfair conduct and

23  practices; (f) false advertising about the purported objectivity of Search Results with the Engine;

24  (g) willful termination and reduction of Search Engine referrals and revenues to competitors'

25  Websites by means of PageRank Deflation or termination of AdSense contracts without business

26  justification; and (h) sudden, sharp price escalation of AdWords Advertisements with the use of

27  LPQ and price discrimination among AdWords partners with the use of LPQ.

28      210.   Defendant Google has sufficient intent, power, and resources to create a dangerous

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

1  probability that it will succeed in monopolization of the above relevant markets.

2      211.   In each of the Search Market and the Search Ad Market, Defendant Google has

3  established and retains no less than 50% market share of the relevant markets.  Such market

4  shares demonstrate that Google has a dangerous probability of success in monopolization of

5  such markets.

6      212.   Defendant Google has violated and continues to violate Section 2 of the Sherman

7  Act, 15 U.S.C. § 2.

8      213.   Defendant Google's unlawful conduct of PageRank Deflation and Website

9  Blockage has caused, and continues to cause, the decline and loss of revenue, returning and new

10  traffic and goodwill of one or more of the respective Websites owned and operated by Plaintiff

11  KSC and each and every member of the Classes engaged in lawful, interstate commerce.

12      214.    Defendant Google's unlawful conduct of PageRank Deflation and Website

13  Blockage has caused, and continues to cause, the decline and loss of revenue, returning and new

14  traffic and goodwill of one or more of the respective Websites owned and operated by Plaintiff

15  KSC and each and every member of Class I Plaintiffs and Class II Plaintiffs as competitors of

16  Defendant Google in one or both of the above relevant markets.

17  **COUNT TWO**

18  **<u>SHERMAN ACT SECTION 2:  MONOPOLIZATION</u>**

19      215.   Plaintiffs reallege and incorporate herein by reference each and every allegation

20  contained in paragraphs 1 through 214, inclusive.

21      216.   Defendant Google possesses monopoly power demonstrated by holding a market

22  share in excess of 50% in the relevant market referred as the Search Market in the relevant

23  geographic market of the entire United States.

24      217.   Defendant possesses monopoly power holding in excess of a 65% market share of

25  the search advertising market for advertisers and Websites in the relevant geographic market of

26  the entire United States.

27      218.   Defendant Google has willfully acquired or maintained its monopoly power in the

28  Search Market by means and tools other than as a consequence of a superior product, business

SECOND AMENDED CLASS ACTION COMPLAINT         Case No. C 06-2057 JF

1    acumen or historical accident.

2         219.   Defendant controls the Engine which is an essential facility for the marketing and

3    financial viability of effective competition in creating, offering and delivering services for search

4    over the Internet.

5         220.   By virtue of its exclusive license and operation of PageRank to rank Websites,

6    Defendant also controls an essential facility for either validating or negating the goodwill,

7    quality, security and reputation of Websites of competitors in the Search Market as a relevant

8    market.

9         221.   By virtue of its control of search services over the Internet and its control over the

10   nationwide and worldwide Google Advertising Network, Defendant also controls an essential

11   facility for the marketing and financial viability of effective competition in the provision and

12   sale of search-related advertising of Websites and advertisers within the Search Ad Market as a

13   relevant market.

14        222.   Duplication of the essential facilities within the relevant markets controlled by

15   Defendant would not have been, and continues not to be, a practical or economically feasible

16   alternative, in light of costs, legal restrictions, economies of scale, and other impediments.

17        223.   Defendant attained and maintained monopoly power over the provision of search

18   services by unreasonably refusing or removing access by Class I and Class II Plaintiffs to

19   Defendant's index of Websites, over which Google exercises complete control.

20        224.   Defendant further attained and maintained monopoly power over the provision of

21   search services by unreasonably exercising PageRank Deflation by Class I and Class II

22   Plaintiffs, over which Google exercises complete control.

23        225.   Defendant has built up a massive, open course of regular dealing with the Class I

24   and Class II Plaintiffs based on the Googlebot crawler that indexes and analyzes each and every

25   Website and Webpage of the Classes.  Millions of sites, including those of the Classes, have an

26   ongoing expectation to be indexed freely and continuously, which expectation is aggressively,

27   profitably and actively met by Defendant on an ongoing basis.

28        226.   Rather than claim or prevent the existence of free-riding of Defendant Google's

search-generated traffic for sites, Google instead actively encourages the leveraging, promoting profiting and reliance upon user traffic sent by the Engine to build and sustain businesses and ventures around all Websites on the Internet, including those of Class I and Class II Plaintiffs.

227.   The act of Blocking a multitude of Websites of Class members constitutes an unlawful refusal to deal by Defendant as a monopolist and is without business justification, where such content is not barred by various congressional laws, including the Child Online Protection Act and similar laws against content deemed to be inappropriate for minors.

228.   The growing list of Web Recommendations that purport to improve or protect the quality of Search Results or to guard against Web "spam" are in a material way issued and released under pretense by Google, providing very limited or no increase or gain in relevance for users and overall lack sufficient offsetting business or technical justification.

229.   Defendant, through the maintenance, exercise and abuse of monopoly power, have forced Class I and Class II Plaintiffs to either surrender their business or to expend time and resources to find another means to secure Web traffic and reach and serve consumers.

230.   The act of Blocking sites and Website Content harms consumers by denying access to key commercial information about alternative and additional products, services and resources offered for purchase, and/or use by competing sources and Websites.

231.   The conduct of Defendant described in this Count constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

232.   Defendant Google has willfully acquired or maintained its monopoly power in the Search Ad Market by means and tools other than as a consequence of a superior product, business acumen or historical accident by inducing Advertisers to rely upon and value the robust, trusting traffic from users gained by falsely representing to users about the objectivity, integrity and promised full disclosure about Website removal behind the Engine.

233.   One effective means employed by Defendant Google to acquire and/or maintain its monopoly power in the Search Ad Market is to exert pressure on search engine marketers and Webmasters to purchase or purchase increased AdWords placements on Search Results in order to avoid deleterious impact on one or more of the following:  (a) PageRank Deflation; (b)

1  temporary, extended or permanent Blockage of Websites; and (c) delisting or de-indexing of

2  Websites.

3       234.   The conduct, acts and omissions of Defendant Google constituting monopolization

4  of one or more of the relevant markets identified above caused detriment and harm to Plaintiff

5  KSC and other members of Class I and Class II and to competition in the relevant markets.

6       235.   Defendant Google's anticompetitive behavior and conduct, including without

7  limitation its denial of access or other benefit of essential facilities to Websites within one or

8  both relevant markets is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

9       236.   Defendant Google, intent or a lack of intent notwithstanding, used its monopoly

10 power in one or more of the above relevant markets to destroy competition in the above relevant

11 markets.

**COUNT THREE**

**LANHAM ACT SECTION 1125(a) FALSE REPRESENTATIONS**

14      237.   Plaintiffs reallege and incorporate herein by reference each and every allegation

15 contained in paragraphs 1 through 236, inclusive.

16      238.   Defendant Google has misrepresented the nature, characteristics and qualities of

17 Search Results constituting its services and commercial activities by claiming that they are

18 objective and free of human manipulation and disclose any all incidents of Website removal.

19      239.   The misrepresentations about Search Results were used in commercial advertising

20 or promotion and disseminated worldwide through Defendant's Website and other forms of

21 media.

22      240.   The misrepresentations about Search Results actually deceived and had a tendency

23 to deceive a substantial segment of Defendant's audience and such deception is material in that it

24 likely influences the user, consumer and purchaser decisions.

25      241.   Class I and Class II Plaintiffs are competitors of Defendant Google in the same

26 markets, and have been or are likely to be injured as the result of the misrepresentations of

27 Defendant by unfairly enhancing the image and goodwill of Defendant's Engine and Search

28 Results and by directing Web traffic, users, and advertising revenues to other destinations.

SECOND AMENDED CLASS ACTION COMPLAINT          Case No. C 06-2057 JF

242.   Defendant Google has misrepresented the qualities, value, and importance of Websites, Web Content and other services offered to the public and consumers by Class I Plaintiffs by massively practicing PageRank Deflation and assigning 0-PRs to such Websites and Webpages.

243.   Defendant Google further has misrepresented the full disclosure guarantee of Website Removal as promised that users and consumers receive notice whenever a single Website is removed from view in Search Results by such persons.

244.   The misrepresentations with PageRank Deflation and Undisclosed Website Removal were used in commercial advertising or promotion and disseminated worldwide through Defendant's Website and other forms of media.

245.   The misrepresentations with Page Rank Deflation and Undisclosed Website Removal actually deceived and have a tendency to deceive a substantial segment of Defendant's audience and such deception is material in that it likely influences and impedes user, consumer and purchaser decisions.

246.   Class I and Class II Plaintiffs are competitors of Defendant Google in the same markets, and have been or is likely to be injured as the result of the misrepresentations of Defendant by unfairly harming the image and goodwill of the Websites and services of the Class and by directing and diverting Web traffic, users, and advertising revenues to Defendant and/or its preferred beneficiaries instead.

247.   The foregoing acts and conduct by Defendant constitute multiple and repeated instances of violating the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

## COUNT FOUR

### VIOLATION OF FREE SPEECH RIGHTS UNDER THE U.S. CONSTITUTION AND THE CALIFORNIA CONSTITUTION

248.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 247, inclusive.

249.   The First Amendment to the United States Constitution, in relevant part, states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech."

SECOND AMENDED CLASS ACTION COMPLAINT

Case No. C 06-2057 JF

250.   Article I, Section 2 of the California Constitution states:  "Every person may freely speak, write and publish his or her sentiments on all subjects."

251.   Defendant Google created and now manages, with the largest search engine in history, a freely accessible, nationwide public forum for the exchange and flow of Speech Content by virtue of the Engine.  Defendant Google has intentionally, willfully and openly dedicated the Engine for public use and public benefit.  Defendant Google, by and through the Engine, is a speech intermediary.

252.   The essential purpose of the Engine is to index all Web Content found on the Internet by Google or else, in Google's own words, the Engine "would not be useful".  Google's website encourages and solicits Websites at large to be indexed inside Google for search accessibility and presentation by the Engine to users.

253.   Defendant Google is a state actor that actively performs a variety of government, state-like functions including without limitation the creation, management and stewardship of a universal, public search engine reaching a dynamic archive and repository of the world's Website content on all essential topics and subject matter for viewing and use by members of the general public.

254.   Defendant Google is entangled and entwined with a multitude of state and public institutions including without limitation government libraries, public universities, and public university libraries so as to be acting in concert with such public institutions and sharing of revenues, benefits, information and data on Website visits and search behavior.  This conduct includes without limitation the wholesale use and commercializing of copyrighted materials of the entire contents of major public libraries in the U.S.  The financial and other benefits provided means of Defendant's actions are material to such institutions and make them essential to the ongoing viability and value of such institutions and their services to the public in the public domain.

255.   Defendant Google is further entwined and jointly related and acting with public and university libraries by massively violating copyrights and misappropriating the copyright value of millions of materials in such institutions and is jointly and independently

commercializing such copyrighted materials and mutually indemnifying each other by contract to cover liabilities arising from their mutual conduct and ongoing pending litigation against Google to protect such copyrights.

256.   Defendant Google enjoys and exercise complete and arbitrary discretion on the form, content, and application of the its Web Recommendations as to the finding, indexing and ranking of Websites on the Internet, including those of Class III and California Subclass I members.  At all relevant times, such recommendations are applied, enforced and exercised by Defendant Google in an inconsistent, arbitrary and discriminatory manner, and such actions are undertaken by entities, persons and individuals under the employ and/or direction of Defendant Google who are from time to time influenced or directed by outside third parties.  These practices are vague and overbroad regulations of free speech.

257.   Defendant Google regularly, intentionally and repeatedly Blocks, based on discriminatory political and religious content and/or other criteria, Engine results showing Website Content and Speech Content of Plaintiff KSC and other Class III and California Subclass I members that should otherwise automatically or programmatically emerge from Topical Queries submitted by members of the public that solicit information on all forms of political and nonpolitical subjects ("Solicitors").  In so doing, Defendant Google has violated and continues to violate constitutionally protected rights of Plaintiffs to exercise their rights of free speech.

258.   As an indirect and direct result of Defendant Google's actions and practices, Plaintiffs as a class of aggrieved persons and entities suffer irreparable harm in the suppression of Speech Content comprised of their thoughts, facts, opinions, information and communications that should have otherwise been accessed, heard and received by Solicitors.

259.   Defendant Google, in operating the Engine as a public forum over the Internet is a state actor, and has failed to exercise any reasonable regulations of time, place or manner of restriction as to the exercise of free speech by Class III Plaintiffs and California Subclass I Plaintiffs, and instead have imposed a completely arbitrary and unconstitutional prior restraint on free speech as protected by the federal and California constitutions.

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

-56-

260.   There is a strong likelihood that Defendant is now engaging in and will continue to engage in the above-described violations of Plaintiff KSC's and Class III and California Subclass I members' constitutional rights, and that likelihood constitutes an credible threat of immediate or imminent harm to those rights, which warrants both preliminary and permanent injunctive relief against Defendant.

261.   There is a case or controversy constituting grounds for declaratory relief on the exercise of free speech rights of Plaintiffs and Defendant because Defendant Google has asserted, and on information and belief intends to assert, its free speech rights in the publication of PageRank of Websites, Blockage of Websites on the Internet, and other policies and practices Defendant has engaged in.  Unless the court issues an appropriate declaration of rights, the parties will not know whether Defendant Google's publication of deflated PageRanks or Blockage of Websites comply with the law, and there will continue to be disputes and controversies surrounding such conduct.

## COUNT FIVE

### UNFAIR COMPETITION - CALIFORNIA BUS. & PROF. CODE §§ 17200 *et seq.*

262.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 261, inclusive.

263.   By engaging in the above-described practices and actions, Defendant Google has committed one or more acts of unfair competition within the meaning of California B & P C §§ 17200 *et seq.*  As used in this Complaint, and in B & P C § 17200, "unfair competition" means (1) an unlawful, unfair or fraudulent business act or practice; (2) unfair, deceptive, untrue or misleading advertising; and/or (3) an act prohibited by Chapter 1 (commencing with B & P C § 17500) of Part 3 of Division 7 of the B & P C.  This conduct as alleged is actionable pursuant to B & P C §§ 17200 and 17203.

264.   Beginning on a date unknown to Plaintiffs and continuing to the present, Defendant Google has engaged in, and continues to engage in, such unfair competition.  Defendant's acts and practices are wrongful, arbitrary, without reasonable business or commercial justification, unethical, oppressive, and have caused substantial harm and injury to

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

-57-

1  Plaintiff KSC and other members of California Subclass II.

2      265.   Members of the public are likely to be deceived by Defendant Google's AdSense

3  Program Agreement in believing and anticipating that through their Website they can realize

4  adequate value and financial benefit by posting linked advertisements as offered by Defendant

5  Google under the program.

6      266.   Defendant Google's conduct, as described above, is unlawful, unfair, and

7  deceptive, and violate B & P C §§ 17200 *et seq.* as a result of the following unlawful and unfair

8  business acts and practices: (a) PageRank Deflation of competitors' Websites; (b) filing

9  misleading statements with the SEC and state securities regulatory agencies about Search

10  Results of the Engine being produced and presented for viewing; (c) Blockage of competitors'

11  Websites; (d) unfair and anticompetitive use of the PageRank patent in promoting and practicing

12  it as the *de facto* standard on the Internet to degrade competitors' Websites, and/or failure to

13  practice the PageRank patent in the disclosed preferred embodiment in a lawful manner; (e)

14  claiming disclosure of PageRank processes and calculations as a trade secret to further advance

15  its integrity and reliability when in fact its use and publication serves in certain instances as a

16  weapon and pretense for unfair conduct and practices; (f) false advertising about the purported

17  objectivity of Search Results with the Engine and related to Undisclosed Website Removal; (g)

18  willful termination and reduction of Search Engine referrals and revenues to competitors'

19  Websites by means of PageRank Deflation or termination of AdSense contracts without business

20  justification; and (h) sudden, sharp price escalation of floor pricing AdWords Advertisements

21  and price discrimination among AdWords partners with the use of LPQ.

22      267.   Plaintiff KSC and members of California Subclass II have been injured by

23  Defendant Google's conduct as to the subclass's owned and operated Websites, by way of

24  PageRank Deflation and massive reductions in search engine referrals and accompanying site

25  visits and page views and other conduct alleged in the preceding paragraph.

26      268.   Plaintiff KSC has suffered irreparable injury in fact and have lost money, property,

27  value, business opportunities as a result of Defendant Google's actions and practices and bring

28  this cause of action on behalf of itself and on behalf of all other similarly situated and injured

SECOND AMENDED CLASS ACTION COMPLAINT             Case No. C 06-2057 JF

1  California Subclass II members, pursuant to B & P C §§ 17200 *et seq.*

2    269.  Defendant Google maintains its headquarters and principal place of business in

3  California, and its unfair, unlawful and fraudulent business actions and practices against

4  California Subclass II as alleged above occur, originate and emanate from within Google's

5  offices in California.

6                                    **COUNT SIX**

7                            **DEFAMATION AND LIBEL**

8    270.  Plaintiffs reallege and incorporate herein by reference each and every allegation

9  contained in paragraphs 1 through 269, inclusive.

10    271.  Defendant Google has for nearly one continuous year, and at all other pertinent

11  times, determined and presented for public viewing a 0-PR even though the Website KS.com of

12  Plaintiff KSC is linked and present on the Internet and continues to have relevance to users.

13    272.  Defendant Google artificially manipulates and deflates PageRanks downward of

14  Websites of Class III members based on events, factors, impressions and opinions having no

15  correlation, relation or connection to the parameters, variables and factors that are naturally and

16  normally utilized for the PageRank algorithm as managed and executed solely within the control

17  and management of Defendant.

18    273.  Defendant Google has determined and presented for public viewing artificially

19  depressed PageRanks for members of Class III.

20    274.  Defendant Google, and not Plaintiff KSC or any other member of the Class III, has

21  independent and complete control over the determination and presentation of a PageRank for

22  any given Website, including that of Plaintiff KSC and members of Class III.

23    275.  The statements of PageRank are false because Plaintiff's site KS.com and those

24  sites of members of Class III, in spite of Defendant Google's wrongful conduct, retain Website

25  Content and remain hyperlinked to other sites throughout the Internet, and continue to have

26  relevance to users.  Further, a 0-PR for any Website is mathematically impossible within the

27  normal operation of the algorithm within the Engine.

28    276.  Defendant Google holds out in public PageRank as an opinion of the value of a

given Website of Class III members but the user reliably and reasonably believes that the numerical figure presented with PageRank is based on the application and embodiment of an issued U.S. patent and determined by objective methods, with one or more computer algorithms.

277.   The statements and representations about PageRank by Defendant are likely to mislead the Engine's users, members of the public, and consumers at large.

278.   Defendant Google has failed to disclose to the user and the public the methodology, operation and basis for a PageRank figure of a Website and has repeatedly overridden and substituted the normal, computer-determined PageRank figures with its standard methodology with a human-determined value below the calculated figure produced by the computer algorithm, in some cases all the way down to 0-PR.

279.   Defendant's defamatory and libelous statements using PageRank Deflation of Plaintiff KSC's Website KS.com and those sites of members of Class III are not privileged or protected by the First Amendment, are presented as objective facts or opinions based on provably true or false facts, and are reasonably understood by those to whom publications are made as objective facts or opinions based on provably true or false facts.

280.   Defendant's defamatory and libelous statements using PageRank Deflation of Plaintiff KSC's Website KS.com and those sites of members of Class III are openly displayed and disseminated over the Internet and are publicly viewable by anyone with Internet access.

281.   Defendant Google's defamatory and libelous statements using PageRank Deflation of KS.com and those sites of members of Class III to artificially low figures placed them from time to time temporarily and permanently inside Google-designated "bad neighborhoods" and directly and proximately caused a loss of business and revenues whereby prospective and actual business partners and viewers of such deranked sites stop or refrain from doing business or from visiting and engaging with such sites.

282.   Defendant Google's defamatory and libelous statements using PageRank Deflation of Plaintiff KSC's Website KS.com and those sites of members of Class III have a tendency to cause, and have caused, injury and disparage the goodwill, business reputation, credit or property of such Websites and their respective owners and managers, including and conduct

have caused and continue to cause irreparable harm and financial damages to such Websites and members of Class III.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff KSC and each member of the Class pray that the Court:

1.  Certify the proposed Classes and California Subclasses herein and appointing Plaintiff KSC and the undersigned counsel of record to represent the each class;

2.  Assess damages as well as trebled damages to Plaintiff KSC and Class I members against Defendant Google under Section 4 of the Clayton Act, 15, U.S.C. § 15, arising from and in connection with the harm they have sustained and will have sustained as a result of the federal antitrust violations by Defendant under Section 2 of the Sherman Act, 15 U.S.C. § 2.

3.  Award injunctive relief against threatened loss or damage by ongoing and future violations of the antitrust laws by Defendant in attempting to secure a monopoly and to engage in unlawful acts and conduct as a monopolist, as provided for by 15 U.S.C. § 26;

4.  Assess damages as well as trebled damages to Plaintiff KSC and Class II members against Defendant Google under the Lanham Act, 15, U.S.C. § 1125, arising from and in connection with the harm they have sustained and will have sustained as a result of the federal unfair competition and advertising violations by Defendant under the Lanham Act.

5.  Award injunctive relief against threatened loss or damage by ongoing and future violations of the unfair competition laws by Defendant as provided by the Lanham Act;

6.  Declare that Defendant Google's practices and actions do indeed violate the free speech rights of Plaintiff KSC and all other Class III members under the United States Constitution and the free speech rights of Plaintiff KSC and all other California Subclass I members under the California constitution as to

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

their Websites and impose suitable and equitable injunctive relief for all members of such classes;

7.  Declare that the rights and relief under the AdSense Program be properly and fairly established for Plaintiff KSC and all California Subclass II members;

8.  Award compensatory damages to Plaintiff KSC and each member of the Classes the full restitution value of all benefits and enrichment Defendant Google has obtained and continued to obtain through its actions and practices;

9.  Award to Plaintiff and members of Class I, members of Class II, and members of California Subclass II exemplary damages for unfair competition practices and for unfair actions;

10. Award to Plaintiff and members of Class III for compensatory and exemplary damages for defamatory and libelous statements by Defendant Google;

11. Award restitution, disgorgement, injunctive relief and all other relief allowed under B & P C §§ 17200 *et seq.* and for conduct and/or omissions to Plaintiff KSC and members of California Subclass II;

12. Assess prejudgment interest on the damages so awarded and computed above;

13. Award to Plaintiffs their attorneys' fees, costs of suit as provided under applicable law; and

14. Grant such further relief as the parties may fashion and agree to or as the Court may deem just and proper.

Dated: September 1, 2006                   GLOBAL LAW GROUP


                                           By:    ____/s/ Gregory J. Yu_____
                                                  Gregory J. Yu, Esq.

                                           Attorney for Plaintiff KinderStart.com LLC and
                                                  for the proposed Class and Subclasses

\\
\\
\\

SECOND AMENDED CLASS ACTION COMPLAINT                    Case No. C 06-2057 JF

-62-

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  September 1, 2006                     GLOBAL LAW GROUP

                                             By:    ____/s/ Gregory J. Yu_____
                                                    Gregory J. Yu, Esq.

                                             Attorney for Plaintiff KinderStart.com LLC and
                                                    for the proposed Classes and Subclasses