EXHIBIT C

Dockets.Justia.com



06 CV 4685

GO_Compl.Doc 6/18/06F01

ECM FILING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

CARL E. PERSON,                              :          Index No.

                         Plaintiff,          :

         -against-                           :          **COMPLAINT**

GOOGLE INC.,                                 :          (Jury Demand)

                         Defendant.          :

-------------------------------------------------------x


## COUNT I

**[Violation of Sherman Act, § 2 - Monopolizing, Attempting to Monopolize, and Combining or
Conspiring to Monopolize the Keyword-Targeted Internet Advertising Market]**

Plaintiff, an attorney acting *pro se*, as and for his complaint, respectfully alleges:

### Jurisdiction and Venue

1.     This controversy involves §§ 1-2 of the Sherman Act (15 U.S.C. §§ 1-2); §§ 1, 4, 4B, 12
and 16 of the Clayton Act (15 U.S.C. §§ 12, 15(a), 15b, 22 and 26); and 28 U.S.C. § 1337.

2.     This Court has original jurisdiction over the antitrust claims under 28 U.S.C. § 1337(a)
and 15 U.S.C. § 15(a), and supplemental jurisdiction as to the state claims alleged in Count III through
Count VI, as hereinafter more fully appears. Also, jurisdiction for the state claims exist under 28 U.S.C. §
1332, with diversity of citizenship between the parties, and the amount in controversy exceeding $75,000.

3.     The defendant is doing business (and, alternatively, "transacting business") in New York
State and in the Southern District of New York, which gives this Court personal jurisdiction over the
defendant, and venue in the Southern District of New York is appropriate under 15 U.S.C. §§ 15(a) and 22,
and 28 U.S.C. § 1391(b).

**Plaintiff**

4.      Plaintiff, **Carl E. Person** ("Person" or the "Plaintiff"). is an attorney and businessperson residing in New York, New York, with his offices at 325 W. 45th Street. New York, NY 10036-3803.

5.      Person is over age 65 (a condition for application of New York General Business Law Section 349-c).

6.      Person has used Google's AdWords to (a) market each of three books written and published by Person in 2004: (b) market various websites written and owned by Person. including websites designed to create legal business for Person and to sell books written and published by Person; (c) to create permissive email mailing lists as a marketing medium for the foregoing and other activities by Person: and (d) to market his candidacy for elective office.

7.      Person seeks to be elected as Attorney General of New York State during the elections to be held in November. 2006. On May 20. 2006. Person received 40% of the Green Party nominating convention vote for the Attorney General nomination.

8.      Person's activities as an attorney. businessperson and candidate for statewide public office in New York have made him (since November. 2003) a customer (no. 894-537-6549) of defendant Google Inc. as to Google's "AdWords" advertising services offered by Google in its website, at www.adwords.google.com.

**Defendant**

9.      Defendant. **Google Inc.** ("Google"). is a Delaware corporation incorporated in 2002 with its principal place of business at 1600 Amphitheatre Parkway. Mountain View. California 94043.

10.     Google is doing business in New York. with a place of business in the Southern District of New York at 437 Fifth Avenue - 8th Floor. New York, New York 10016; and. alternatively. Google is "transacting business" in New York State and in the Southern District of New York.

11.    A description of Google's business. as described at page 57 (under "Business -

Overview") in its Form S-1 Registration Statement filed with the Securities and Exchange Commission on

April 29, 2004. follows:

Google is a global technology leader focused on improving the ways people connect with
information. Our innovations in web search and advertising have made our web site a top Internet
destination and our brand one of the most recognized in the world. We maintain the world's largest
online index of web sites and other content. and we make this information freely available to anyone
with an Internet connection. Our automated search technology helps people obtain nearly instant
access to relevant information from our vast online index.

We generate revenue by delivering relevant. cost-effective online advertising. Businesses use our
AdWords program to promote their products and services with targeted advertising. In addition. the
thousands of third-party web sites that comprise our Google Network use our Google AdSense
program to deliver relevant ads that generate revenue and enhance the user experience.

## Summary

12.    Google has created a monopoly in the United States market for keyword-targeted

Internet advertising (with Pay-Per-Click or "PPC" pricing) and is unlawfully using its monopoly power,

through predatory pricing practices, in violation of §§ 1-2 of the Sherman Act. 15 U.S.C.A. §§ 1-2. by

(i) refusing to accept advertising by the Plaintiff and other small-business advertisers unless

they pay usually 5 to 100 times or more per click than monopolizing and other large companies are charged

per click by Google when bidding for use of the same keyword;

(ii) giving special deals to monopolizing and other major advertisers at reduced advertising

rates without announcing or making available any of these special deals to the Plaintiff or other small-

business advertisers (including the use of some of the removed keywords. not available to the Plaintiff or

other small-business advertisers).

(iii) denying the Plaintiff and other small-business advertisers the right to use AdWords as to

advertisements containing wholly lawful copy but not meeting Google's impersonal. automated review

procedure that requires advertisers to rewrite, and often adversely change. their perfectly lawful copy: and

(iv) removing a high percentage of all English words from the list of available keywords to force Plaintiff and other small-business advertisers to compete for and use the higher-cost keywords being used by monopolizing and other large companies: such companies are able to bid higher amounts because of their more profitable use of the per-click lead and their ability through their name and trademarks to obtain a higher clickthrough rate ("CTR").

13.. Google's states that AdWords pricing is derived through an "auction process" [Source: https://adwords.google.com/select/afc/pricing.html under "Bidding" heading] but such description is fraudulent because it fails to tell advertisers that most advertisers with the highest bid per click for a specific keyword are rejected by Google's secret bid system "analyzing your site content. the content of the page displaying your ad. and other relevant factors" with favored advertisers allowed to advertise at substantially lower prices per click than the rejected advertisers were willing to pay.

13A.. Google's evaluation process, according to Google [Source: https://adwords.google.com/select/afc/pricing.html under "Calculating Price" heading] winds up giving the lowest price - of 1 cent per click - to the last ad (herein 5th ad) displayed by Google. even if the Plaintiff or other small business advertiser bid 100 times more than any of the 5 advertisers selected by Google. The result is that Google's "auctions" are a multi-billion dollar fraud being practiced upon advertisers. Google investors. and the public.

13B.. In effect. Google is selling seats on the same Internet bus to hundreds of major corporate advertisers for 1 cent per seat and to the Plaintiff and an estimated one million other small-business advertisers at $1.00 per seat (if willing to sell a ticket at all) - fully aware that the major corporations are to do business at the end of the bus ride 100 times more profitable than the business hoped to be done by the Plaintiff and other small-business advertisers.

14. A 1-cent click for one of Google's college advertisers, for example, could produce revenues to the college of $120.000 (or $30.000 per year for 4 years). whereas a $1.00 click for a small business advertiser selling a $3.00 gasoline tank cap could produce only losses, using Google's discriminatory. predatory. monopolistic pricing system. With 2.700 colleges and universities in the U.S., the

4

annual college advertising potential for Google, when colleges increase their bid for desired keywords, is many multiples of $194,400,000 ($72,000 x 2,700).

## BACKGROUND - ADWORDS AND PAY-PER-CLICK ADVERTISING

15.    Overture Services, Inc., founded in 1997, pioneered "Pay-Per-Click" or "PPC" Internet advertising. Overture was acquired by Yahoo in July, 2003, and in 2005 Overture's name was changed to Yahoo! Search Marketing Solutions. Yahoo's PPC website is at http://searchmarketing.yahoo.com/. Yahoo paid $1.52 billion (after deducting Overture's cash position) for Overture.

16.    As of the Overture acquisition in July, 2003 (closing a few months later), upon information and belief, Yahoo had a 70% or dominant or monopoly interest in the developing United States market and New York submarket for PPC or keyword-targeted Internet advertising.

17.    Google created its initial AdWords service in 2000 (starting off by managing the ad campaigns for its customers) and then added software to allow customers to manage their own campaigns; and in 2005 AdWords extended its advertising to targeted websites.

18.    By 2005, AdWords became very complicated for advertisers to handle directly because of numerous tracking and analytical tools, options and "standards" requirements which caused a substantial number of consultants or advertising agencies to enter the field to manage the AdWords campaigns for AdWords advertisers.

19.    Somewhere along the way, AdWords was able to start overcharging its smaller customers such as Plaintiff by imposing requirements that increased the cost to Plaintiff and other small-business advertisers and made advertising by them unprofitable, while at the same time reducing the cost to high-volume advertisers (generally large corporations) to increase their profitability and use of AdWords.

20.    Google's main source of revenue comes from its AdWords business, in which Plaintiff and other advertisers are charged on a Pay Per Click (or PPC) basis each time a searcher using the Google search engine (and using in the search term a keyword designated by a Google advertiser) clicks on the ad (hyperlink) and jumps to the advertiser's website.

5

21.    Keyword-targeted Internet advertising was revolutionary for advertisers because it allowed advertisers to wait until potential customers were seeking information on the advertiser's product or service before the advertiser had its advertisement displayed, and further (as to PPC advertising) that the advertiser only paid if the website searcher clicked on the ad and jumped to the advertiser's website. AdWords and Overture/Yahoo enabled advertisers to reach potential customers at the precise moment of their demonstrated interest and charge the advertiser only if the searcher clicked on the advertiser's ad, in comparison to newspaper, radio, television, cable, magazine and billboard advertising in which millions of impressions are made in the hope that 1 out of a 1,000 may be interested enough to respond to the ad.

22..   No other advertising medium provided such a targeted audience, and Yahoo/Overture, soon followed by Google's AdWords became near instant financial successes, with one small college, for example, spending $6,000 per month (or $72,000 per year) with AdWords.

23.    The Google and Yahoo targeted ads (when displayed in the right sidebar) are designated as "sponsored" and consist of the 1st-line heading not exceeding 25 characters (which usually contains a Keyword), the 2nd and 3rd lines of text (not exceeding 70 characters) explaining more about the offered service or product; and the 4th line, which discloses the link to the advertiser's website or "landing page" (built into the 1st-line heading). Clicking on the 1st line of the ad enables the Google or Yahoo searcher to go to the advertiser's website to obtain more information about the offered product or service. The same ad, when appearing above the searcher's displayed results, appears as a 3-line quasi-banner type ad, for which positioning and appearance the advertiser pays a per-click premium.

24.    Google advertised 5 cents as its minimum per-click price, available to the winners of the continuing Google auction for any given keyword, and a $50 per-click maximum price, and during 2005 started advertising the minimum per-click price to be 1 cent and the maximum as $100.

## GOOGLE'S PREDATORY ACTIVITIES - PART I

25.    Upon information and belief, Google has a hidden set of rules and software instructions that deny the Plaintiff and other small-business users the ability to find and use any keywords at the stated

6

minimum price or any price 2, 3, 4 or even 5 times the minimum price. These minimum prices are reserved for Google's favored, high-volume advertisers, such as eBay and the other alleged Co-Conspirators.

26.    Plaintiff has tried without success to advertise using various keywords at the minimum price set by Google and at multiples of 2, 3, 4, 5 and up to 100 times the minimum (1-cent or 5-cent) minimum price.

27.    It is the click on the advertiser's ad by the Google searcher from and at which Google earns its fee from the advertiser through Pay-Per-Click advertising. The advertiser only pays for the clicks, and not for the many more instances (of ad impressions) in which the Google searcher fails to click on the advertiser's ad. It is this per-click method of pricing (instead of charging by the number of impressions) that enables Google to impose discriminatory pricing on the Plaintiff and other small-business advertisers.

28.    Google is requiring Plaintiff and other small-business advertisers to pay as much as 100 times or more per click than the amount per click paid by monopolizing and other large established advertisers who by their established name or trademark are able to get a substantially higher rate of clicks (or "clickthrough rate" or "CTR") for the same number of times their ads are served up to the Google searchers.

29.    Google offers no plan by which Plaintiff or other small-business advertiser can rent or use keywords at a fixed price (e.g. for 1,000 impressions), regardless of the type of business or regardless of the results. In other words, Google is requiring each of its advertisers to be as successful as a monopolist, and charging them substantially more (or denying them use of AdWords) if not.

30.    Google is extending its market monopoly in this way to every aspect of business in the United States and making existing monopolies larger, turning potential monopolies into monopolies, and preventing small and new businesses from competing.

30A.    AdWords has monopoly power for a variety of distinguishing reasons alleged herein, with the result that Yahoo and Microsoft/MSN keyword-targeted Internet advertising are poor, undesirable substitutes for AdWords.

31..   In 2002. Google let AdWords advertisers bid on the price per click they were willing to pay for specific keywords. Later, Google required small-business advertisers to pay more per click than established-business advertisers to be able to place their ads with the selected keywords. Then, in August, 2005, Google created its "Quality" analysis to require Plaintiff and other small businesses to pay often 5, 10, 25 or 100 times more per click than many high-volume advertisers (without any cost justification). Google's incomplete explanation of its Quality requirement is (as of 6/14/06):

**Quality Score**

This is the basis for measuring the quality of your keyword and determining your minimum bid. Quality Score is determined by your keyword's clickthrough rate (CTR) on Google, relevance of your ad text, historical keyword performance on Google, the quality of your ad's landing page, and other relevancy factors.
[https://adwords.google.com/support/bin/answer.py?answer=21388]

[And]

A new addition to the Quality Score

In August, we introduced the Quality Score along with the launch of quality-based minimum bids, letting you know that we evaluate many factors, such as your ad text and clickthrough rate (CTR) to determine the minimum bid for your keyword. Today, we started incorporating a new factor into the Quality Score -- the landing page -- which will look at the content and layout of the pages linked from your ads.

Why are we doing this? Simply stated, we always aim to improve our users' experience so that these users (your potential customers) will continue to trust and value AdWords ads. Have you ever searched on a keyword, found an ad that seemed to be exactly what you wanted, and then clicked on it only to find a site that had little to do with what you were searching for? It's not a great experience.

Incorporating landing page assessment into the Quality Score will help us improve the overall advertising experience for users, advertisers and partners by increasing the quality of the sites we present in our ad results.

Advertisers who are providing robust and relevant content will see little change. However, for those who are providing a less positive user experience, the Quality Score may decrease and in turn increase the minimum bid required for the keyword to run. To help define site quality, we've created a general set of website design tips and guidelines that should help you evaluate and optimize your site.

So, take a look at these guidelines and remember that the more valuable and relevant your site is to your user, the more effective your advertising will be -- and the better your chance of converting a click to a customer.

Posted by Sarah, *Inside AdWords* crew
12/08/2005 02:41:00 PM -

32.    By this 12/08/05 announcement, Google then started to charge Plaintiff and its other small-business advertisers an additional amount per click based on apparent human evaluation of the website "landing page" created by the advertiser and used in the advertiser's AdWords ad, turning Google's pricing scheme into a non-auction pricing bazaar in which there are no standards to be able to determine if any specific advertiser is paying the correct price for the AdWords advertising, and leaving Google free to charge any price it wants according to the pressure that a major advertiser brings to bear upon Google (to suppress competition for desirable keywords): Plaintiff and one millions other small-business advertisers have little sway with Google, which clearly doesn't even want the vast majority of our potential AdWords advertising and has established its predatory pricing scheme to intentionally discourage Plaintiff and other small-business users from using AdWords.

33.    Without consulting Plaintiff or other small-business advertisers. Google turns off most of the ads and labels them as "inactive", having the effect of upsetting the advertiser's AdWords marketing program or refuses to allow ads to be placed for a variety of reasons, with the same discouraging effect.

34..    Several days after Google changed to its "Quality" and "Landing Page" method of determining keyword price, an advertising consultant for small-business Google advertisers posted a complaint, saying:

> Google continue to stun me with their lack of forward focus. The new Adwords system where a keyword is 'active' or 'inactive' is yet another money spinner for them that will send customers fleeing elsewhere.
>
> I understand that they want to ensure that adverts are highly relevant when people type search phrases but they have so got it wrong with what they've set up this time.
>
> The campaigns I run for clients are now swamped with inactive keyword phrases and Google are expecting me to raise the cost per click in line with what THEY think is right. * * *
>
> One client has an advert group of only 4 keywords, all of which refer to the company name or the url, and these are highly visible in the advert that appears. And yet, Google have made them inactive, asking for an extra 1p to make them active. Those keyword phrases have no competitors in Adwords and were previously happy at 4p per click, so why the change? The advert text is highly targeted to those keywords and so there is no excuse for them to be made inactive.
>
> Another example is a client who wanted his company site to appear in an advert when someone types his name - this previously worked fine. However, Google now wants 55p per click for the keyword to be made active, presumably because his name isn't mentioned in the advert text. However, if you search on his name in Google, only two sponsored results appear and they're both for Ebay affiliates and are highly non-relevant. So, EVEN if he was positioned above those, it would have previously have cost 6p per click so why is it that Google now want to charge 55p per click when there is no competition? [Emphasis supplied.]

When I started using Adwords the system let us get away with keywords that weren't totally linked to advert text and I accepted that if that keyword didn't have a good enough CTR by 1000 impressions. it would be penalised - I had no problem with that. But now, lets see what happens under the new system ... I have a keyword phrase of 'manual handling rules' that would produce advert text of: "Risk Assessment" – "We help you to assess business risks before they become problems" * * *

So, what do Google do? They instantly make it inactive and want me to pay 11p per click to make it active. If you type 'manual handling rules' into Google you'll see that there is very little competition in sponsored search so how can Google justify me having to pay so much per click?

To me, it's really clear what Google are doing - they want to push everyone towards higher click costs and to destroy those who use niche keyword phrases. I used to have clients that got good leads through niche keyword phrases, purely because no-one else optimised for them but now Google are playing God and deciding on what can and can't be displayed and for what cost.

My opinion? Small businesses won't want to play in this Google sandbox anymore and will either go to other pay per click advertisers, or will instead focus on traditional search engine optimisation - neither of which will be good for Googles profits.

The vast majority of businesses in the world are small businesses and with my clients alone I spend thousands a month on their campaign clicks. I am utterly convinced that one year ahead, Google is going to be in a pretty poor state and its market share significantly reduced.

I used to love Google, now they just make me sick. * * *

[Source: http://www.highrankings.com/forum/index.php?showtopic=16253&hl=]


## Co-Conspirators

35.    Upon information and belief, Google has conspired with the following persons (hereinafter. the "Co-Conspirators") in the creation. maintenance, growth and misuse of Google's monopoly in the United States market for keyword-targeted Internet advertising (with Pay-Per-Click pricing). who are receiving the lowest prices per click for the respective keywords being used by them in their AdWords advertising:

A...    eBay. Inc., which corporation is a competitor of Google in a variety of markets including various advertising markets: upon information and belief. eBay is a monopolist in the market Internet advertising market defined by eBay's online activities (the heart of which is an auction and payment system for owners of property to offer and sell their property in a single vast. organized market): eBay, upon information and belief. is the primary advertiser of last resort for Google's AdWords advertising system, and the advertiser with the lowest price per click and the only apparent advertiser for many of the estimated tens

of thousands of keywords that Google does not make available to the Plaintiff or other small-business advertisers:

        B..    Others, including Schwab & Co.. John Hancock Life Insurance Co.. Lexus. Honda. Travelocity. Orbitz. Priceline. Expedia. Circuit City. Amazon. PriceGrabber. AOLShopping. Toshiba Direct. BestBuy:

        C.    Others (to be identified) having a high volume of AdWords advertising who Google allows to advertise at the lowest available PPC rates: and

        D..    Others not presently known at this time but will be identified as Co-Conspirators during discovery.

        36..    Upon information and belief, starting in 2003 or 2004 and continuing up to the present, Google has initiated communications and negotiations with various major AdWords advertisers, including but not limited to monopolist eBay, to discuss Google's plan to change its AdWords pricing from straight auction to the highest bidder per click to the present structure, as alleged in ¶¶ 12, 13, 13A, 19, 25 and 31-32 above.

        37..    The other predatory practices alleged in ¶¶ 25-34 above and 45-70 below also increased the price per click to the Plaintiff and other small business advertisers.

        38..    Upon information and belief. Google told the major advertisers (directly or by their reading of Google's new 'Quality" and "Landing Page" requirements) that such increase in price to the Plaintiff and other small business advertisers would drive them from the market and create less competition for the keywords being used by the major advertisers, making their advertising more profitable as a result.

        39.    Upon information and belief. Google was seeking to increase its sales to the major advertisers through these tactics. and reduce if not eliminate the profitable use of AdWords by the Plaintiff and other small businesses.

        40.    Upon information and belief. monopolist eBay and other major advertisers agreed to Google's new pricing plan and agreed to hone their own advertising along the lines suggested by Google to obtain a higher clickthrough rate. greater profitability for the major advertiser. and even more use by the major advertisers of Google's AdWords.

## Relevant Period

41.    The relevant period (the "Relevant Period") for the claims alleged herein is:

A. The 4-year period preceding the filing of this complaint (during June, 2006) as to all claims under the Sherman Act, 15 U.S.C.A. §§ 1, et seq.: the Donnelly Act, § 340 of the New York General Business Law; and the California Cartwright Act. Cal. Bus. & Prof. § 16726. et seq.: and

B.    The 3-year period preceding the filing of this complaint as to all claims under §§ 349, 349-c and 350 of the New York General Business Law [CPLR 214(2)].

## The Relevant Product and Geographic Markets

42.    The **relevant geographic market** is the United States, with a relevant geographic submarket consisting of New York State.

43.    **The relevant service market** is "keyword-targeted Internet advertising" in which advertisers pay to have their advertisements displayed (alone or among an ordered group of ads identified as such) near the search results obtained from Internet search engine (such as the search engines of Google and Yahoo) using the keyword(s) selected by the advertiser.

44.    The displayed ads, usually containing one or more of the search terms or keyword(s) in the 1st line of the 4-line ad, are hoped to be of interest to the searcher and that the searcher will want to obtain more information by clicking on one or more of the displayed ads.

## GOOGLE'S PREDATORY ACTIVITIES - PART II

**Google's Price-Per-Click Is Set by the Highest Price**
**a Successful Business Is Willing to Pay for a Click**

45.    Google charges the advertiser only when a user clicks on the ad, which means that the advertiser does not pay directly for the times that a searcher fails to click on the advertiser's ad.

46.    Google, on the other hand, increases the Pay-Per-Click price to advertisers, such as the Plaintiff and other small-business advertisers, by adding to the per-click price demanded by Google for each time a searcher fails to click on the advertiser's ad.

47.    The effect is that large, well known companies with strong brands are able to obtain a higher percentage of clicks because of their dominant, often monopolistic, market position, whereas the Plaintiff and other small-business advertisers start off being unable to obtain the same high percentage of clicks, and find that Google then denies them the opportunity to use the keyword in any Google AdWords advertising unless the Plaintiff or the other small-business advertiser agrees to pay 5, 10, 50,  or even 100 times or more than the per-click price paid being the well-known, large corporate advertiser for the same keyword.

48.    A successful business (sometimes being or becoming a monopoly) is able to obtain a higher percentage of clicks per 1,000 opportunities (i.e., advertising impressions) than a new, unknown business trying to establish itself or a new product or service. Google requires the unknown business to produce as much income for all of the displayed ads (ad impressions) as the successful business pays Google for the clicks its obtains from the 1,000 impressions. This is accomplished by requiring the small business or Plaintiff to pay many times more per click than the per-click price paid by the large, well-known successful advertiser, and makes it unprofitable for the Plaintiff or the other small-business advertisers to use AdWords.

49.    The effect is that AdWords has become an advertising boon for the large, successful, monopolizing companies, without having to compete significantly with smaller competitors. The vast majority of smaller competitors is unable to use AdWords economically, because of Google's above-described pricing policy, as well as for other illegal practices of Google, to be described under various subheadings below.

50.    This pricing scheme of Google makes it impossible for the Plaintiff and an estimated 1 million other small-business advertisers to use AdWords at all, or profitably, because the cost of the click far exceeds the value of such click to the Plaintiff or other small-business advertiser.

51.. Upon information and belief, one million small business owners find themselves in the same position as the Plaintiff, unable to make profitable use of AdWords because of the various restrictions imposed upon them and the Plaintiff, including a substantial increase in the per-click cost over and above the per-click cost to the large corporate advertisers favored by Google.

52. Google is forcing the Plaintiff and other small-business advertisers to be as profitable as Google's monopolizing and other large corporate customers, or pay an extremely large penalty per click if they want to use this new advertising medium in competition with the major corporations using AdWords.

53. This activity of Google constitutes unlawful, predatory pricing in violation of Sections 1-2 of the Sherman Act, 15 U.S.C.A. §§ 1-2.

**Google Refuses to Let Plaintiff and Others Small Businesses Use Keywords
Having Little or No Demand by the Large, Monopolizing Advertisers**

54. The Plaintiff, through trial and error, found about 25 English words that when used in a Google search had no Google ads appearing.

55. Plaintiff then immediately tried to use those words as keywords for Plaintiff's advertising. but was advised by software response that the words were not available for keyword use.

56. Plaintiff's purpose of finding unwanted words was to be able to avoid having to enter into an auction with anyone for keywords. Plaintiff was willing to use almost any keywords as long as the Plaintiff could obtain their use for the minimum stated Google fee of 5 cents (later 1 cent) per click.

57. Plaintiff found out that Google's stated minimum fee in its auction pricing system does not apply when only one person seeks to use a given keyword. Instead of letting the Plaintiff use the unwanted keyword for 5 cents ( or 1 cent) per click, Google stated that the Plaintiff could not use the word at all, and forced the Plaintiff back into an auction with major corporations for the use of keywords of interest to them. with the resulting 5 to 100 times the cost per click that Google forces Plaintiff and other small businesses to pay.

58. This practice of pulling perfectly good English words off of the keywords market to require the Plaintiff and other small businesses to bid for the keywords wanted by the large corporate. high-

volume AdWords advertisers is another predatory practice by Google. and misuse of its monopoly of the market for keyword-targeted Internet advertising.

**Google Has Special Deals and Special Pricing with Monopolists and Other**
**Major Advertisers But Does Not Notify Plaintiff or Other Small Businesses**
**About Such Special Deals or Permit the Plaintiff to Participate in Such Deals**

59.    The Plaintiff noticed that some keywords with no use (beyond 1-2 advertisers) had a surprising presence of one advertiser. eBay. owner of another advertising monopoly.  Upon information and belief. this can only be explained by a special deal to make eBay the Google advertiser of last resort (at a bargain price per click, without auction) when Google's discriminatory system (dedicated to chasing away small business advertisers) apparently failed to produce any advertisers (or more than one bona fide advertiser) interested in bidding for the keywords.

60.    Google is favoring advertiser eBay by letting eBay have bargain per-click rates. and to do so for keywords where Google has suppressed the competition by not making the keywords available to the Plaintiff or other small-business advertisers.

61.    This practice of rigging the auction market (by not letting Plaintiff and other small businesses bid for the relatively unwanted keywords) but giving them to favored advertiser and monopolist eBay for an assumed price per click as low as 1 cent (Google's advertised lowest price per click, or even lower) is another predatory practice by Google. and misuse of its monopoly of the market for keyword-targeted Internet advertising.

**Google Prevents Plaintiff and Others from Using Keywords Profitably**
**by Not Allowing Them to Use Lawful Advertising Copy Written by**
**the Plaintiff/Others, and Instead to Use Copy Dictated by Google**

62.    Google places a series of copy restrictions on advertisers that prevent the Plaintiff and other small-business advertisers from using lawful copy written by them and forces the Plaintiff and others to use the changes required by Google.

63.    These copy requirements by Google are destructive of the efforts by the Plaintiff and other small businesses to effectively use AdWords. eliminating much of the work done to create AdWords

campaigns. and slow down the start of the campaigns. and ultimately (when taken together with the other predatory practices by Google) deter the Plaintiff and other small businesses from even thinking about using AdWords. with all of its pricing schemes, prohibitions. putting campaigns on hold, demand for higher prices per click.

      64.    The effect is to reduce AdWords competition for major advertisers. make their ads more profitable. and jack up the AdWords per-click prices charged to Plaintiff and other small-business advertisers.

**Google Stops the AdWords Campaigns of the Plaintiff and Other Small Business and Notifies Them They Have to Pay More to Google to Resume Their Advertising Campaigns**

      65.    Increasingly after adoption of its "Quality" and "Landing Page" programs during 2005-2006. Google has arbitrarily halted the AdWords campaigns of the Plaintiff and other small-business advertisers and demanded a higher price per click to permit the advertising to resume. AdWords never provides any analysis of the competition's per-click price or clickthrough rate in purported justification for Google's actions. enabling the Plaintiff to conclude and allege that part of Google's pricing increases go beyond any stated intention to require Plaintiff and other small business advertisers to pay. in effect. the same price per impression as being paid. in effect. by the higher-volume advertisers.

      66..    Under this new pricing structure. Google started to charge the Plaintiff and other small businesses a substantially higher price per click than was being paid by Google`s largest customers. such as monopolist eBay. The new price per click to the Plaintiff and other small businesses was raised so that the price for the number of clicks obtained by the Plaintiff or other small business advertisers was equal to the price paid by a major advertiser who for the same keyword obtained, say. 10 times the number of clicks. This raised the per click price to the Plaintiff and other small business advertisers to 1.000% of the existing price per click. without changing the per-click price to Google`s major advertisers.

**Google Has Decided to Maximize Its Profits by Catering to Large, Successful,
Monopolizing Corporations and, through Predatory Pricing Practices, by
Discouraging Plaintiff and Other Small Businesses from Using AdWords**

67..    Upon information and belief, Google has decided to target. and is targeting. its AdWords

services to large. successful and/or monopolizing corporations to maximize Google's revenue and profits:

and as a by-product to actively discourage the Plaintiff and other small businesses from using AdWords by a

variety of predatory practices, as alleged.  This is a major part of Google's scheme to use its monopoly of

the keyword-targeted Internet advertising market to participate in the profits of major corporations and

monopolies and for Google to help them obtain monopoly or increased monopoly status, and increased

profits and monopoly profits.

68..    The willingness by major corporations to stop servicing their smaller business customers

(independent wholesales. jobbers and retailers) and charge substantially higher, if not confiscatory prices to

their small business customers is not new. The toy and game industry in the 1970's stopped sending

salespersons to its smaller retail customers. and instead instructed them to telephone in any orders they

wished to place: the tire industry is charging its smaller retailers and wholesalers two or three times as much

per tire as they charge to the major retailer competitors with the result that an ever-increasing percentage of

tires is being sold by fewer and fewer retailers; the auto-parts manufacturers in the United States are being

driven into bankruptcy (37 since January 1. 2004) by giving below-cost pricing to major auto-parts retailers

and charging twice as much to the smaller. independent auto-parts wholesalers.  There was only one such

filing by and auto-parts manufacturer during 2003. [Source: *Business Week*, 10/10/05, p. 40]

69.. When discriminatory pricing is charged by a manufacturer in a competitive industry. the

disfavored customer still has choices. But in the instant market. for keyword-targeted Internet advertising

there is not much choice. Google has a monopoly, and controls pricing, terms, and whether the Plaintiff and

other small businesses are able to make any use of AdWords to compete with AdWords large corporate

customers.

17

70.. The practices of Google as alleged in ¶¶ 12. 13. 13A. 19. 25-34 and 45-70 above are predatory and are in violation of Sections 1-2 of the Sherman Act. 15 U.S.C.A. Sections 1-2.

## ADDITIONAL FACTS SUPPORTING ALLEGATION OF GOOGLE'S MONOPOLY

71. In addition to the facts alleged in ¶¶ 23-70 above. the following facts support Plaintiff's allegation of Google's monopoly:

A.. Google has a technical team with its secret know-how that enables Google to increase its market share over the only two present competitors (Yahoo and Microsoft/MSN).

B.. Microsoft/MSN's dedicated effort, huge cash reserves and other resources. up to this moment, have not been able to purchase or develop any team capable of effectively competing with Google's search-engine business and related AdWords keyword-targeted Internet advertising business. Until May 2006. Microsoft/MSN partnered with Yahoo. but in May 2006 MSN began offering its own keyword-targeted Internet advertising.

C.. Yahoo until recently was a licensee of Google's search engine and has now switched to licensing an inferior engine (created years earlier by Inktomi). which means that Yahoo won't be able to compete with Google unless it solves the problem faced by Microsoft (of creating a team able to compete with Google's team).

D.. Google has the fastest search engine of all competing search engines with indexes, algorithms. software and systems to deliver the search results (and accompanying AdWords ads) substantially faster than any other search website can locate and display its search results:

E.. Google has 46.3% of all internet searches conducted at more than 60 search sites [source: http://searchenginewatch.com/reports/article.php/2156451];

F.. Google has the world's largest and most comprehensive collection of information online - 8.1 billion pages, compared to Microsoft's 5.0 billion pages. Yahoo's estimated 4.2 billion pages and Ask Jeeves' or Ask's 2.5 billion pages [Source: http://blog.searchenginewatch.com/blog/041111-084221].

Plaintiff's 6/16/06 Yahoo search for "movie cameras" found 26.200.000 pages, whereas Plaintiff's 6/16/06 Google search using the same phrase found 86,800,000 pages or more than 3 times as many pages:

G..    Overture created the keyword-targeted Internet advertising market but lost its initial domination of the market to Google, because of superiority of Google's databases and software development and other factors:

H..    Google`s income is derived mainly from its AdWords business and is more than 71% (2004) and more than 75% (2005) of all income obtained from keyword-targeted Internet advertising of all competitors (based on the figures set forth in the next 2 paragraphs):

I..    Google's revenues from sale of keyword-targeted Internet advertising amounted to $3.189 billion during 2004 and $6.139 billion during 2005 (without adjustment for the small percentage of income derived from Google's CPM (cost per 1.000 impressions) sales of AdSense advertising), in comparison to Yahoo's sale of keyword-targeted Internet advertising amounting to an estimated $1.3 billion during 2004 and an estimated $1.97 billion during 2005. [Estimate assumed 50% of Yahoo's total sales excluding "traffic acquisition cost" or "TAC".]

J.    Prior to and during 2004-2005. Microsoft/MSN had no independent revenues from keyword-targeted Internet advertising. so that a substantial part of Microsoft/MSN's revenues are included in Yahoo's revenues.

K..    Google`s capitalization during late 2005 was $126.7 billion ($428/share) in comparison to Yahoo's capitalization. of $59.7 billion ($42/share). making Google more than twice as valuable as Yahoo.

L..    Google states in its S-1 Registration Statement filed April 29. 2004 that Google is the largest of the companies in that market; and that the only other company known to Google is Yahoo (with its purchased Overture search business):

M..    The only company publicly stating that it is going to try to challenge Google (and not even mentioning Yahoo) is one of the largest monopolists. Microsoft. showing that there is a need for huge amounts of capital to challenge Google with only 2 challengers for control of Internet.

N..    Google states in its S-1 Registration Statement that it has a variety of intellectual properties upon which its AdWords technology is based, including patents, trademarks, copyrights, know-how, backed by numerous secrecy agreements: this also includes the know-how in finding, indexing and storing web pages and using hundreds of thousands of servers to speed up information processing and distribution by simultaneous use of many interconnected computers for a single search.

O..    Google is using predatory practices (described in ¶¶ 12, 13, 13A, 19, 25-34 and 45-70 above) whereas its strongest competitor, Yahoo, and new competitor, Microsoft/MSN, do not appear to be using such predatory practices;

P..    Yahoo attempted to compete with eBay recently and found that it could not, and gave up its eBay-type Internet activities, suggesting that Yahoo will not be able to continue its competition with Google.

Q..    Google admits that it has not advertised its AdWords service to any significant extent, and was able to build this monopoly by reason of its existing search business:

R..    eBay, a major competitor or potential competitor in other product/service markets, is one of Google's top customers for AdWords advertising services;

S-1..    Google is practicing price discrimination that makes some purchasers (such as the Plaintiff) pay more than other purchasers (large companies) because of the lack of any alternative market: Google is to increase its per-click price for Plaintiff and a million other small-business AdWords customers 2, 10, 25, 50 even 100 times the price per click Google is charging its most-favored customers. But the profitability to an advertiser is in the click, and it is unreasonable and unconscionable to charge small business advertisers 2, 10, 25, 50 or 100 times the price per click when their expectations for profit is substantially less than the profit being obtained by the high-volume advertiser from one click for the same keyword.

S-2.    Online advertising is causing U.S. daily newspapers to lose advertising revenue and threatening traditional U.S. daily newspapers with extinction ["Online Publishing Insider", 6/8/06]: newspapers are attempting to re-create themselves as online newspapers: and in the UK, online advertising

revenues already exceed newspaper advertising revenues [Source: http://news.stepforth.com/2006-news/May31-06.html].

**Additional Facts (from New York Times Article of 6/8/06):**

      T. Building a computing center in The Dalles, Oregon as big as two football fields, with twin cooling plants protruding four stories into the sky which, according to The New York Times, is Google's "weapon in its quest to dominate the next generation of Internet computing"

      U. Such new plant "heralds a substantial expansion of a worldwide computing network handling billions of search queries a day and a growing repertory of other Internet services"

      V. The new plant " is the backdrop for a multibillion-dollar face-off among Google, Microsoft and Yahoo that will determine dominance in the online world in the years ahead"

      W. Microsoft and Yahoo have announced that they are building big data centers upstream in Wenatchee and Quincy, Wash., 130 miles to the north. But it is a race in which they are playing catch-up. Google remains far ahead in the global data-center race, and the scale of its complex here is evidence of its extraordinary ambition

      X. Even before the Oregon center comes online …. "Google has constructed the biggest computer in the world, and it's a hidden asset."

      Y. Microsoft stunned analysts last quarter when it announced that it would spend an unanticipated $2 billion next year, much of it in an effort to catch up with Google.

      Z. Google is known to the world as a search engine, but in many ways it is foremost an effort to build a network of supercomputers, using the latest academic research, that can process more data — faster and cheaper — than its rivals.

      AA.    "Google wants to raise the barriers to entry by competitors by making the baseline service very expensive,"

      BB.    In March 2001, when the company was serving about 70 million Web pages daily, it had 8,000 computers…. By 2003 the number had grown to 100,000.

      CC.    Today … [t]he best guess is that Google now has more than 450,000 servers spread over at least 25 locations around the world.

      DD.    Microsoft's Internet computing effort is currently based on 200,000 servers, and the company expects that number to grow to 800,000 by 2011 under its most aggressive forecast, according to a company document.

      EE.    Yet it is the way in which Google has built its globally distributed network that illustrates the daunting task of its competitors in catching up.

      FF.    [S]aid Milo Medin, a computer networking expert … I know of no other carrier or enterprise that distributes applications on top of their computing resource as effectively as Google."

**The Need of Independent Candidates and Minority Political Parties to Use AdWords to Compete with the 2 Main Parties and Their Candidates**

72.. Starting in December, 2005, the Plaintiff decided to run for statewide office in New York, to seek the elected office of New York Attorney General.

73.. The Plaintiff already had more than two years of working with AdWords, on and off, experiencing various anticompetitive activities imposed by Google on use of AdWords by the Plaintiff and other small-business advertisers.

74.. Independent candidates and minority parties have a difficult time trying to get their message across to voters because the main media (television, newspapers, magazines) do not give much or any publicity to anyone other than the two leading parties and their competing candidacies. The Plaintiff decided that it is necessary to create a new type of medium for independent candidates and minority parties to reach voters and party members if the candidates and parties are to be able to compete and win any elections.

75.. The Plaintiff was familiar with the earlier successes of MoveOn.Org in the raising of campaign funds for a national political candidate, which success preceded the advent of AdWords, and caused the Plaintiff to develop a program to finance an election campaign based on use of AdWords, assuming that a user could select and use Keywords for 5 cents (or 1 cent) a click, as publicized widely by Google in its AdWords website and by tens of thousands of emails, blogs, websites and other communications purporting to explain AdWords and its pricing.

76.. The plan as developed by the Plaintiff required the building of email lists of the "permissive" type, in which the persons on the email list give their written approval to receive emails from the list owner, with the opportunity of each person on the list to easily (through a single click) notify the list owner (i.e., the Plaintiff) that he/she wishes to be taken off of the list.

77.. Person's plan was to use the list to educate the list owners with a continuing series of e-mailings as to problems that could be cured or alleviated if they supported and/or voted for the Plaintiff or the Green Party.

78..   Prevailing thought among the leading authors of election campaign books and articles was that money could be raised from email lists for a cost of about 5% of the money being raised when the list is in existence. The cost to create an email list using traditional (non-Internet) advertising media was too expensive.

79..   Plaintiff's plan using AdWords was to create a list at a cost of 5 cents (or 1 cent) or slightly higher per name. by using the lowest cost words and offering substantial inducements for searchers to click onto Plaintiff's website (costing Plaintiff 1 cent or 5 cents for the click), subscribing to Plaintiff's email list (an "RSS" or "Really Simple Syndication" feature of Internet). and receiving by email a free PDF copy of one or more of Plaintiff's three full-length books.

80..   At this rate, Plaintiff calculated. the Plaintiff could build a list of 1,000,000 persons (with their email addresses and ZIP codes) at a cost of only $10,000 to $50,000. and give Plaintiff the effect of a newspaper or magazine having a similar circulation. The value of the "common stockholders equity" in *The New York Times*. for example, with a comparable circulation. was $1.5 billion on December 25. 2005. according to the newspaper's financial statements. See http://www.nytco.com/pdf-reports/2005-ar10K/selected-financial-data.pdf

81..  A permissive email list of 1,000,000 members could. according to the Plaintiff's plan. finance his election as Attorney General in New York and could be available for various business activities during the same period and after.

82..   Pursuant to his plan, the Plaintiff wrote a series of websites, from January to May. 2006. for the purpose of using AdWords to create a variety of permissive email lists. These websites include: www.americanjobsparty.com (to interest persons in subscribing to follow economic and political issues of interest to them): www.carlperson4NYAG.com (to participate in Plaintiff's campaign for New York Attorney General): and www.lawmall.com/latefees (to provide a service of email notification to subscribers to notify them in advance of dates at which payment must be made on credit cards, leases. mortgages and the like to avoid imposition of late fees; which would enable the Plaintiff to send his various

23

requests for volunteers, contributions, attendance or other help each time the Plaintiff sent a notice to one of the subscribers).

83.. AdWords, however, never planned to have any keywords available at the low, advertised rate of 1 cent or 5 cents per click, and it became apparent to the Plaintiff that he would be facing costs of 2 to 100 or more times the 1-cent or 5-cent anticipated cost for the planned list development, making the list development impractical.

84.. As a result, Google is preventing independent candidates and minority parties from exercising their right to assemble, vote and speak freely about economic, social and political matters in the United States, through Google's predatory pricing practices with its AdWords monopoly.

85.. When discriminatory pricing is charged by a manufacturer in a competitive industry, the disfavored customer still has choices. But in the instant market, for keyword-targeted Internet advertising there is not much choice. Google has a monopoly, and controls pricing, terms, and whether the Plaintiff and other small businesses are able to make any use of AdWords to compete with AdWords large corporate customers.

## SECTION 2 VIOLATIONS BY GOOGLE

**Monopolization by Google**

86.. By its actions as alleged, Google demonstrates that it has the power to control prices in the  relevant geographic markets for keyword-targeted Internet advertising with advertisers such as Plaintiff having to either pay the demanded high price per click often 25 times more than the per-click price paid by major advertisers using the same keywords, or a per-click price often 50 times higher than Google's 1 cent minimum per-click price for keywords that nobody but Plaintiff is seeking to use.

87.. Google created the monopoly with its superior product and business acumen but started to misuse its monopoly through setting up an automated pricing scheme that favored large corporate advertisers (with low per-click prices) and requiring Plaintiff and other small-business advertisers to pay sometimes 50 or 100 times as much per click, a price designed and intended to make it unprofitable for

small advertisers to compete for the use of keywords used by the favored advertisers. and to deny any use at all of keywords not wanted by major advertisers (thereby forcing Plaintiff and other small-business advertisers to stop using AdWords).

88.. The activities of Google adversely effect competition in the market for keyword-targeted Internet advertising (as well as the product and service markets in which any competitors use AdWords) and are lessening competition. tending to monopolize, and injuring consumers and competition in such markets.

89.. Through its activities as alleged. Google is intentionally monopolizing the relevant geographic market for keyword-targeted Internet advertising in violation of Section 2 of the Sherman Act. 15 U.S.C.A. Section 2.

**Attempted Monopolization by Google (Alternative Allegation)**

90.. Alternatively. by its actions as alleged. Google demonstrates that it has a dangerous probability of achieving monopoly power (to control prices and exclude competition) in the market for keyword-targeted Internet advertising in the United States and in New York State.

91.. The only two challengers to Google's AdWords business are Yahoo and Microsoft/MSN. but neither has a database of search pages, or a number of daily searches. or the dollar amount of advertising revenue or profits to be able to stop Google's growth and ever-increasing power in the relevant market.

92.. Google is engaging in predatory and anticompetitive activities as alleged in ¶¶ 12. 13. 13A. 19. 25-34 and 45-70 above.

93.. The barriers to entry are so high that there appear to be only two actual or potential competitors (Yahoo and Microsoft/MSN), but without any demonstrated ability to put together a team with the know-how to compete effectively against Google. Google's team consists of Google's founders and controlling shareholders of Google. people who cannot be purchased with Microsoft's billions in unused cash reserves. Nobody has the databases to compete with Google and even if they did they may not have the money to purchase and manage 450.000 servers to be able to produce search results in a fraction of a second.

94..    Alternatively, through its activities as alleged, Google is attempting to monopolize the relevant geographic market for keyword-targeted Internet advertising in violation of Section 2 of the Sherman Act, 15 U.S.C.A. Section 2 and during the relevant period actually acquired power over the market.

**Conspiracy to Monopolize by Google**

95..    Google, in conspiracy with the Co-Conspirators (consisting of various large corporate, high-volume advertisers such as eBay, Schwab) to monopolize the relevant geographic market for keyword-targeted Internet advertising by Google's practices of destroying competition for the keywords being used by the major advertisers and profiting from the higher profitability that these major advertisers can obtain from such non-competitive use of their selected keywords. Google is able to charge higher prices (through its per-click system of pricing) to successful users of Google's keywords, especially when it drives Plaintiff and other small-business purchasers from the market by demanding per-click prices 50 or 100 times as high as those being paid by the high-volume, favored advertisers.

96..    Through its activities as alleged, Google is conspiring with the Co-Conspirators to monopolize the relevant geographic market for keyword-targeted Internet advertising in violation of Section 2 of the Sherman Act, 15 U.S.C.A. Section 2.

PLAINTIFF'S DAMAGES

97..    By reason of Google's activities as alleged, the Plaintiff has suffered the following damages and antitrust injury:

A..    Moneys paid to Google by the Plaintiff as an AdWords advertiser;

B..    Moneys paid by the Plaintiff to develop various websites to be marketed using AdWords;

C..    Value of Plaintiff's non-legal time in developing and marketing his products, services, and websites and loss of the opportunity to spend the time needed to find a market satisfactory to Google

before Google imposes its prohibitive pricing scheme on the Plaintiff and one million other small businesses seeking to develop new products, services and markets;

        D..    Amount spent in promoting Plaintiff's candidacy for New York Attorney General;

        E..    Loss of income that would have been obtained if Plaintiff won the November, 2006 election for New York Attorney General;

        F.    Irreparable loss of the opportunity to be elected as New York Attorney General during the November, 2006 elections;

        G..    Loss of sales of Plaintiff's 3 books and resulting loss of profits;

        H..    Loss of income as attorney from new clients; and

        I..    Loss of the value of the permissive email list of 1,000,000 members that could have been built by Plaintiff under his business plan (described in ¶¶ 75-82 above) to use Google keywords not in demand, at a cost of 1 cent to 5 cents per click, but for the illegal activities of Google.

        98..    Upon information and belief, the total provable damages suffered by Plaintiff amount to more than $10,000,000, and will be proven with certainty at the time of trial.

## PRELIMINARY AND PERMANENT INJUNCTION

        99..    The activities of the defendant are continuing and threaten to prevent Plaintiff from being elected as the New York Attorney General during the November 2006 elections.

        100..    This year (2006) is a year of political upheaval with a good chance for an independent candidate to get elected in New York as Attorney General, but this opportunity cannot be realized without the use of AdWords at the low rate of 1 cent or 5 cents per click to create a permissive mailing list for Plaintiff to use to obtain volunteers, votes, arrange parties, and obtain and solicit contributions.

        101..    If the Plaintiff is not able to enjoin Google from its predatory pricing activities, as alleged, the Plaintiff will suffer irreparable injury by not being able to compete for (or win) the election for New York Attorney General.

102.. Plaintiff is entitled to (i) a preliminary injunction to enjoin Google from its alleged predatory practices during the pendency of this litigation; and (ii) a permanent injunction to enjoin Google from the same predatory practices, as part of the relief in the final judgment in this action. Specifically, without limiting the injunctive relief being sought, Plaintiff seeks an injunction or mandatory injunction

A.. Requiring Google to let Plaintiff and other advertisers pay the lowest available price per click as determined by Google's auction process without any adjustment of the price by Google to reflect "quality". "landing page". clickthrough rate of the advertiser or any other advertisers using the same or similar keyword:

B.. Requiring Google to charge the same price or same position price (either per-click price or price per 1.000 impressions) to all advertisers seeking to use a specific keyword:

C.. Requiring Google to let advertisers use any English words (other than illegal words due to obscenity, copyright. trademark, secrecy or similar laws):

D.. Requiring Google to list in its website all words not available to any AdWords advertiser

E.. Requiring Google to permit all advertisers to use any abbreviations or combination of words in their advertisements allowed by law:

F.. Requiring Google to set up a third-party dispute resolution procedure. at Google's expense. for advertisers to challenge any alleged or actual failure by Google to abide by any of the foregoing injunctive terms:

G.. Requiring Google to comply with the requirements of the Sarbanes-Oxley Act regarding Google's AdWords pricing practices (to determine and report the extent to which Google's income and profits have been. and are being. derived from Google activities in violation of Sections 1-2 of the Sherman Act: and

H. Requiring Google to notify each AdWords advertiser by email in 3 separate mailings, separated by one month each. about this action and the terms of any preliminary injunction or permanent injunction awarded to the Plaintiff.

28

## OTHER RELIEF SOUGHT

103.. The Plaintiff is entitled to an award of treble damages.

104.. The Plaintiff is entitled to an award of attorneys' fees.

105. Plaintiff is entitled to a judgment as to liability against Google for violation of § 2 of the Sherman Act by reason of the facts alleged in ¶¶ 1 through 104 above.

### Continuing Violation of the Sarbanes-Oxley Act

106. Upon information and belief, more than 50% of Google's income and profits is attributable to its violation of Section 2 of the Sherman Act, as alleged, and Google's failure to report this fact in its S-1 Registration Statement is a continuing violation of the Sarbanes-Oxley Act and a major reason for Google's ability to continue violating the statute without any enforcement activities by government or by class action lawsuits for recovery of treble damages on behalf of each of the injured small businesses.

107. Plaintiff is injured by Google's continuing violation of the Sarbanes-Oxley Act, requiring the Plaintiff to spend time and money to obtain judicial relief as to Google's predatory pricing, which activities would have been unnecessary if Google had reported in its SEC filings that more than 50% of Google's income results from its violation of Section 2 of the Sherman Act.

108. Plaintiff is entitled to a permanent injunction requiring Google to make the disclosures required by the Sarbanes-Oxley Act, as alleged above.

### Possible Class Action Allegations by Amendment

109.. The Plaintiff hereby provides notice that he or appropriate counsel may amend this pleading to convert this action into a class action to establish Google's liability to a defined class of small-business AdWords advertisers under Sections 1-2 of the Sherman Act.

## COUNT II

### [Violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1 – Conspiracy to Fix Prices and Unreasonably Restrain Trade]

110..  Plaintiff alleges and realleges each of the allegations set forth in  ¶¶ 1-109 above. and further allege that the activities of Google and the Co-Conspirators. as alleged in ¶¶ 35-40 above. amount to a violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1 as an illegal price-fixing conspiracy and an unreasonable restraint in trade.

111.  The pricing and other practices of Google as alleged in ¶¶ 12, 13, 13A. 19, 25-34 and 45-70 above are the published and unpublished Google rules under which more than an estimated one million keyword-targeted Internet advertisers. including each of the Co-Conspirators. place many millions of targeted ads each day with Google.

112.  The structured market is pursuant to an agreement. combination and conspiracy in which competitors purchase their keyword-targeted Internet advertising from Google, knowing that the less successful advertisers (i.e.. the advertisers with a lower percentage of clickthroughs and website landing pages or products and services that are less successful) wind up paying many more times per click than the most successful advertisers, including all of the Co-Conspirators.

113.  Plaintiff is a competitor with law firms and law-related organizations bidding for use of the keyword (or term) "commercial litigator" (including Mitchell Law Offices, FindLaw.com, Legal Match.com. Small Business Law Firms.com - a national directory of lawyers , and Bosco Law Office) where the per click price is getting near Google's stated maximum of $50 or $100 per click, upon information and belief, a price that can be afforded by the type of client or customer normally obtained by such advertisers, but wholly non-affordable for the Plaintiff with his individual practice representing small businesses. Plaintiff is also a competitor of major publishers in the advertising of books using AdWords: and a competitor of various better-financed Attorney General candidates using AdWords (i.e.. Richard Brodsky-

Democrat: Denise O'Donnell-Democratic: Jeanine Pirro-Republican) using AdWords to promote their respective candidacies for New York Attorney General.

114. Also, Google is a competitor of eBay, one of Google's largest and most favored AdWords advertiser.

115. The purpose of the agreement. combination and conspiracy is (i) to provide low per-click prices to the high-volume users of AdWords. (ii) discourage lower-volume users from bidding for use of the keywords being used by the high-volume users by increasing the per-click price to unprofitably high levels for such low-volume advertisers such as the Plaintiff; removing keywords not wanted by high-volume advertisers to prevent low-volume advertisers such as Plaintiff from having a low-cost alternative: and ultimately allowing Google to participate in the monopolistic profits of the monopolizing users of AdWords and helping their monopolies grow. while trying to put low-volume users out of business or require them to pay unprofitably high per-click rates until they are driven out of business by the excessive charges for AdWords advertising.

116. High-volume advertisers are able to figure this out for themselves, but as beneficiaries of Google's pricing scheme they have no incentive to remove themselves from the agreement. combination and conspiracy.

117. The AdWords advertising placed by any advertiser goes to each state of the United States. unless the advertiser opts to have the advertising placed with searchers whose email addresses appear to be from specific geographic areas of the country. The Plaintiff has not made use of this feature. and upon information and belief less than 10% of Google's advertisers make use of such feature (mostly local businesses not trying for website sales and state or local candidates).

118. The agreement. combination and conspiracy is for the unlawful purpose and objective of providing low per-click prices to the high-volume users. and eliminating competition for their keywords from low-volume advertisers such as Plaintiff by setting up a series of unworkable rules resulting in inordinately high per-click prices to discourage Plaintiff and other low-volume users from competing (and thereby bidding up the prices) for the keywords being used by the high-volume advertisers.

119. Also, in return for providing the preceding benefit to the high-volume advertisers. Google is able to participate in their profitable use of the protected keywords immediately and. as to the future. by helping the high-volume advertisers become monopolists in their respective markets, if they are not monopolists already.

120. The arrangement with Google makes it impossible for any of the high-volume advertisers to be acting independently. Google's software ties everyone in by the Google-written software instructions that result in very low per-click prices for the high-volume users and per-click prices perhaps 50 times or more as high (but averaging perhaps 10 to 25 times as high) for low-volume advertisers such as the Plaintiff.

121. The per-click prices for the Plaintiff resulting from Google's auctions in November 2003 through mid-summer 2004 were substantially lower than the per-click prices needed to be incurred after Google changed its pricing scheme to adjust for "Quality" and "Landing Page".

122. Plaintiff has been injured by the activities of Google by being required to pay excessive per-click prices that are unprofitable for the Plaintiff to incur if the Plaintiff is to be able to use Google's AdWords monopoly. or not use the monopoly advertising service at all. In either case Plaintiff has been sustaining losses, both as to excessively high per-click advertising costs or the sunk costs of trying to prepare websites. products and services for marketing through AdWords. when AdWords cannot be used profitably by Plaintiff or most other small businesses.

123. Each of the Co-Conspirators joined the agreement. combination and conspiracy with the intent and purpose of unreasonably restraining trade. knowing that it would be obtaining unlawfully low per-click prices at the expense of low-volume users such as the Plaintiff.

124.. These activities by Google in concert with monopolist eBay and the other Co-Conspirators alleged in ¶¶ 35-40 above amount to a per se conspiracy to fix prices and a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act. 15 U.S.C.A. Section 1.

**Plaintiff's Damages**

125.. By reason of Google's activities as alleged. the Plaintiff has suffered the damages described in ¶¶ 97-99 above.

**Preliminary and Permanent Injunction**

126.. The activities of the defendant are continuing and threaten to prevent Plaintiff from being elected as the New York Attorney General during the November 2006 elections.

127.. Plaintiff realleges the allegations set forth in ¶¶ 99-101 and subparagraphs A through H of ¶ 102.

**Other Relief Sought**

128.. The Plaintiff is entitled to an award of treble damages.

129.. The Plaintiff is entitled to an award of attorneys' fees.

## COUNT III

**[Violation of § 340 of the New York General Business Law, Known as the Donnelly Act - Monopolizing, Attempting to Monopolize, and Combining or Conspiring to Monopolize the Keyword-Targeted Internet Advertising Market in New York; Price-Fixing and Unreasonable Restraint of Trade]**

130. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-129 above. and further alleges that the activities of Google and the Co-Conspirators amount to a violation of § 340 of the New York General Business Law (also known as the New York Donnelly Act).

131. The Plaintiff has suffered damages as alleged in ¶¶ 97-99 above.

132. The Plaintiff is entitled to an award of treble damages under the Donnelly Act. [Cox v. Microsoft. 1st AD. 2002]

133. The Plaintiff is entitled to an award of attorneys' fees.

134.  The Plaintiff is threatened with irreparable damages to his candidacy for New York Attorney General. as alleged in ¶¶ 72-84 and 99-102 above.

135.  The Plaintiff is entitled to a preliminary injunction and permanent injunction as alleged in ¶¶ 99-102 above.

## COUNT IV

**[Violation of §§ 349 and 349-c of the New York General Business Law – Deceptive Acts and Practices in Conduct of Google's Business in New York; Additional Penalty for Elderly-Person Fraud]**

136.  Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-135 above, including ¶¶ 13 and 13A. and further alleges that the activities of Google amount to a violation of §§ 349 and 349-c of the New York General Business Law, as a series of deceptive acts and practices directed against consumers. including consumers such as Plaintiff over the age of 65.

137.  The Plaintiff accepted Google's offered price of 1 cent or 5 cents per click and proceeded to build various AdWords campaigns based on such advertised minimum auction prices.  By reason of Google's advertised auction system and advertised minimum price. the Plaintiff was entitled to pay the minimum price for keywords selected by the Plaintiff that were not being sought at the same time by any other bidder (other than eBay. as apparent purchaser of a substantial number of keywords having little or no demand).

138.  Within days after starting to advertise at 5 cents or 1 cent per click with keywords selected by the Plaintiff. Google terminated the Plaintiff's advertising for most selected keywords and informed the Plaintiff that he would have to pay substantially more per click than the 5 cents or 1 cent agreed to.

139.  Plaintiff in some instances agreed to increase the price per click from 5 cents or 1 cent to 50 cents or more. and proceeded with some of the originally selected keywords.

140.  Then, Google advised the Plaintiff through automated messages that the Plaintiff's advertising was stopped by Google. and that the Plaintiff had to figure out some way to make his advertising

more appealing to Google searchers so that Plaintiff would obtain a higher percentage of clickthroughs as to the number of searches receiving the Plaintiff's ads.

141. Google was demanding something that the Plaintiff could not reasonably create or obtain and Plaintiff was forced to terminate his advertising and lose the value of his investment of money and time in the AdWords advertising projects. This occurred about 5-6 times during the relevant period (during the period from November, 2003 to the present).

142. The Plaintiff has suffered damages as alleged in ¶¶ 97-99 above.

143. The Plaintiff is entitled to an award of treble damages under Section 349(h) (up to $1,000).

144. The Plaintiff is entitled to an injunction under New York General Business Law § 349(h) prohibiting Google from engaging in the conduct described in ¶ 144 above.

145. The Plaintiff is entitled to an award of attorneys' fees under Section 349(h).

146. Google acted willfully, and maliciously, with near criminal indifference to its civil obligations, for the purpose of injuring the Plaintiff and an estimated one million other small businesses that spent time and effort to use AdWords, only to be rejected by Google through substantially higher prices than originally promised, or by complete rejection of the advertisers' advertising.

147. Google's activities in increasing the offered price to its more than 1,000,000 advertisers through an automated system not enabling customers to obtain an explanation from a human being before Google applied its predatory practices, involved a high degree of moral turpitude and demonstrated such wanton dishonesty as to strongly imply a criminal indifference by Google to its civil obligations to the Plaintiff and one million other small-business advertisers, including advertisers over 65 years of age.

148. The Plaintiff is entitled to punitive damages against Google in an amount to be determined by the trier of fact. [*Latiuk v. Faber*, 4th Dept. 2000]

149. From its marketing studies, Google was fully aware that its activities adversely affected an estimated 50,000 consumers over the age of 65, including the Plaintiff; Google's database includes the

age of the Plaintiff as well as the age of the other AdWords advertisers over the age of 65, and that Google's conduct was in willful disregard of the rights of the Plaintiff and the other advertisers over the age of 65.

150.   Google's conduct deprived such persons over the age of 65 of the money they intended to use to sustain themselves during the remainder of their lifetime and for most of whom work was not available or possible to replace the money taken unlawfully by Google.

151.   The Plaintiff is entitled to an additional civil penalty of $10,000, under subsection 2 (entitled "Supplemental civil penalty") of § 349-c of the New York General Business Law.


## COUNT V
### [Violation of §§ 350 and 350-e of the New York General Business Law – False Advertising; Bait and Switch Advertising]

152.   Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-151 above, and further alleges that the activities of Google and the Co-Conspirators amount to a violation of §§ 350 and 350-e of the New York General Business Law, as false advertising, including bait and switch advertising, victimizing an individual consumer.

153.   The Plaintiff has suffered damages as alleged in ¶¶ 97-99 above.

154.   The Plaintiff is entitled to an award of treble damages under § 350-e of the New York General Business Law (up to $1.000).

155.   The Plaintiff is entitled, under Section 350-e of the New York General Business Law, to an injunction prohibiting Google from engaging in the conduct described in ¶¶ 12, 13-13A, 19, 25-34, 45-70 and 152 above.

156.   The Plaintiff is entitled to an award of reasonable attorneys' fees (under Section 350-e).

157.   Google acted willfully, and maliciously, with near criminal indifference to its civil obligations, for the purpose of injuring the Plaintiff and one million other small businesses that spent time and effort to use AdWords, only to be rejected by Google through substantially higher prices than originally promised, or by complete rejection of the advertisers' advertising.

158.  The Plaintiff is entitled to punitive damages against Google in an amount to be determined by the trier of fact.

## COUNT VI

### [Violation of § 16720 of the California Cartwright Act  - Monopolizing, Conspiracy to Fix Prices, and Discriminatory Pricing in Google's Keyword-Targeted Internet Advertising]

159.  Plaintiff alleges and realleges each of the allegations set forth in  ¶¶ 1-158 above, and further alleges that the activities of Google and the Co-Conspirators amount to a violation of various subparagraphs of § 16720 of the California Business & Professions Code (part of the Cartwright Act).

160.  The Plaintiff has suffered damages as alleged in ¶¶ 97-99 above, and is authorized to sue under § 16750 of the California Cartwright Act.

161.  The activities of Google are prohibited restrictions in trade or commerce (subparagraph a of § 16720): limit or reduce the productions, or increase the price of merchandise or of any commodity (subparagraph b): prevent competition in the sale or purchase of merchandise, produce or any commodity (subparagraph c); price fixing (subparagraph d): are contracts, obligations or agreements not to sell below a standard figure (subparagraph e-1): and to keep the price fixed or higher (subparagraph e-2): setting prices to preclude free and unrestricted competition in articles or commodities (subparagraph4-3): and pooling interests to affect price (subparagraph e-4).

162.  Plaintiff's AdWords advertising was distributed by Google to searchers in California and Google was required to obey California law as to such advertising. but failed to do so, causing injury to the Plaintiff.

163.  The Plaintiff is entitled to an award of treble damages under § 16750.

164.  The Plaintiff is entitled to an award of attorneys' fees under § 16750.

165.  The Plaintiff is entitled to a preliminary and permanent injunction under § 16750.

## PRAYER

**WHEREFORE**, the Plaintiff demands judgment against Google, as follows:

1.    As to Count I, that it be adjudged and decreed that the activities of Google constitute a violation of § 2 of the Sherman Act;

2.    As to Count II, that it be adjudged and decreed that the activities of Google constitute a violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1 (as an illegal *per se* conspiracy to fix prices and a conspiracy in unreasonable restraint of trade);

3.    As to Count III, that it be adjudged and decreed that the activities of Google constitute a violation of § 340 of the New York General Business Law (also known as the New York Donnelly Act);

4.    As to Count IV, that it be adjudged and decreed that the activities of Google constitute a violation of Sections 349 and 349-c of the New York General Business Law (deceptive acts and practices directed against New York consumers; with an additional penalty for defrauding elderly persons);

5.    As to Count V, that it be adjudged and decreed that the activities of Google constitute a violation of Section 350 of the New York General Business Law (false advertising, including bait and switch advertising, victimizing an individual consumer);

6.    As to Count VI, that it be adjudged and decreed that the activities of Google constitute a violation of subparagraphs "a" through "e" and "e-1" through "e-4" of § 16720 the California Cartwright Act;

7.    Awarding damages in favor of the Plaintiff, in an amount of $10,000,000 or more, which will be proved with certainty at the time of trial;

8.    Awarding trebled damages to the Plaintiff as to each of Counts I through VI (with limitations as to Counts IV and V).

38

9.    Awarding attorneys' fees to the Plaintiff as to each of Counts I through VI;

10.    Enjoining Google and its Co-Conspirators, preliminarily and permanently, as to each of the predatory practices described in ¶¶ 12, 13, 13A, 19, 25-34 and 45-70 above and requiring Google to notify each AdWords advertiser by email in 3 separate mailings, separated by one month each, about this action and the terms of any preliminary injunction or permanent injunction awarded to the Plaintiff;

11.    Assessing interest against Google (as to Counts IV and V), costs and disbursements; and

12.    Granting the Plaintiff such other and further relief as this Court may deem just and proper.

**Jury Demand**

Plaintiff hereby demands a trial by jury of all issues properly triable to a jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**Dated:    New York, New York**
**June 19, 2006**

**Carl E. Person   (CP  7637)**
**Plaintiff, *Pro Se***
**325 W. 45th Street - Suite 201**
**New York, New York 10036-3803**
**(212) 307-4444**