**E-Filed 3/16/2007**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| KINDERSTART.COM, LLC, a California limited liability company, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE, INC., a Delaware corporation,<br><br>Defendant. | Case Number C 06-2057 JF (RS)<br><br>ORDER[1] GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT<br><br>[re: docket nos. 16, 49, 51, 52, 54, 59] |

Defendant Google, Inc. ("Google") moves to dismiss the Second Amended Complaint ("SAC") of Plaintiff KinderStart.com, LLC ("KinderStart"), pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[2] Google also moves specially to strike the fourth claim of the SAC pursuant to California's "anti-SLAPP" statute, Cal. Code Civ. Pro. § 425.16. Finally, Google moves to strike the entire SAC for perceived structural insufficiencies

[1] This disposition is not designated for publication and may not be cited.

[2] Unless otherwise indicated, references to Rules hereinafter will refer to the Federal Rules of Civil Procedure.

Dockets.Justia.com

or, alternatively, to strike KinderStart's third claim as improperly filed.[3] KinderStart opposes the motions. The Court heard oral argument on October 27, 2006.

For the reasons set forth below, the Court will grant the motion to dismiss without leave to amend and will deny the "anti-SLAPP" motion. The motion to strike will be denied as moot.

## I. BACKGROUND

### 1. Procedural Background

On March 17, 2006, KinderStart filed the instant action on behalf of itself and others similarly situated. On April 12, 2006, KinderStart filed a First Amended Complaint ("FAC"), alleging nine claims for relief: (1) violation of the right to free speech under the United States and California Constitutions; (2) attempted monopolization in violation of the Sherman Act; (3) monopolization in violation of the Sherman Act; (4) violations of the Communications Act, 47 U.S.C. §§ 201, *et seq*.; (5) unfair competition under California Business and Professions Code §§ 17200, *et seq*.; (6) unfair practices under California Business and Professions Code § 17045; (7) breach of the implied covenant of good faith and fair dealing; (8) defamation and libel; and (9) negligent interference with prospective economic advantage. The Court dismissed the FAC with leave to amend in an order dated July 13, 2006 ("July 13th Order"). KinderStart filed the operative SAC on September 1, 2006, asserting six claims for relief: (1) attempted monopolization in violation of the Sherman Act; (2) monopolization in violation of the Sherman Act; (3) false representations in violation of the Lanham Act; (4) violation of free speech rights under the United States and California Constitutions; (5) unfair competition in violation of California Business and Professions Code §§ 17200 et seq.; and (6) defamation and libel.

### 2. Factual Allegations of the Second Amended Complaint

KinderStart alleges the following facts, which are presumed to be true for the purpose of

---

[3] The Court will refer to the three motions respectively as: "motion to dismiss;" "'anti-SLAPP' motion;" and "motion to strike."

KinderStart has moved for administrative relief relating to a minor delay in the submission of its opposition to the "anti-SLAPP" motion and motion to strike. The Court will grant this relief to the extent that it is not already moot.

the motion to dismiss. KinderStart operates a website, www.KinderStart.com, which is a directory and search engine for links to information and resources on subjects related to young children. At one point, KinderStart was "one of the choicest Internet destinations for thousands of parents, caregivers, educators, nonprofit and advocacy representatives, and federal, state and local organizations and officials in the United States and worldwide to access health, education and other vital information about infants and toddlers." SAC ¶ 28. It launched in May 2000 and monthly page views by visitors "reached approximately 10,000,000 by 2005." *Id.* ¶ 31.

Google is the world's most widely used search engine. *Id.* ¶ 2. It is "the dominant actor in the world of searching all forms of text, Web and image content on the Internet." *Id.* ¶ 33. It "invites anyone with an Internet connection worldwide to perform searches for Websites and Webpages" and presents results of its searches on a results page. *Id.* ¶ 3. It "induces an entire generation of users, the public, and the cyberspace community at large to expect and believe that Search Results generated from a search every single time will be (a) objective and neutral, (b) untrammeled by human intervention or preference and (d) [sic] accompanied by a disclosure of every incidence of removal of Websites from appearing in Search Results." *Id.* ¶ 129. Google states on its "Technology Overview" page: "There is no human involvement or manipulation of results, which is why users have come to trust Google as a source of objective information untainted by paid placement." *Id.* ¶ 116. Google represents on its website "that removal of Websites and Web Content from Google's index is not done except (a) upon request of the webmaster of the website, (b) in the case of 'spamming the index,' or (c) as required by law." *Id.* ¶ 87.

Google offers a system for rating the usefulness of websites known as PageRank. According to the SAC, "[a]t one time, PageRank in its nascent form was an automated, computer algorithm to calculate and measure the extent and nature of hyperlinking within the Internet to a particular Website and its web pages. After PageRank was licensed from Stanford University, Defendant developed a system of converting the actual mathematical result into a whole number score from '1' up to '10'." *Id.* ¶ 142. PageRank now appears on the Google Toolbar that web

users may download for free. *Id.* ¶ 78, 140. Google explains: "'Wondering whether a new website is worth your time? Use the Toolbar's format PageRank™ display to tell you how Google's algorithms assess the importance of the page you're viewing.'" *Id.* ¶ 140. KinderStart alleges that "PageRank is not a mere statement of opinion of the innate value or human appeal of a given Website," but instead is "a mathematically-generated product of measuring and assessing the quantity and depth of all the hyperlinks on the Web that tie into a PageRanked Website, under programmatic determination by Defendant Google." *Id.* ¶ 141. "PageRank as promulgated and propagated by Defendant Google throughout the Internet, is now the *de facto* and prevailing standard for rating Websites throughout the United States." *Id.* ¶ 46.

Google also has commenced programs to make digital copies and archives of university libraries and "with the Library of Congress as financial partner, is creating a digital, searchable archive of published books, larger than nearly any library of written and published materials in the world." *Id.* ¶ 111. "The incremental flow of revenues from Defendant Google shared and split with its library partners as state institutions, allow them to overcome their otherwise adverse shortfalls in funding and revenues." *Id.*¶ 113. "These financial inflows from the Google partnerships make such institutions financially entwined and dependent upon Defendant." *Id.*

KinderStart enrolled in Google's AdSense Program in 2003, and paid for a series of sponsored links from Google. *Id.* ¶ 32. In or about August 2003, KinderStart began placing advertisements from the Google Network onto its site and receiving payments from Google for these placements. *Id.* On March 19, 2005, KinderStart's website "suffered a cataclysmic fall of 70% or more in its monthly page views and traffic." *Id.* ¶ 174. KinderStart eventually "realized that common key word searches on Defendant Google's search engine no longer listed KSC.com as a result with any of its past visibility." *Id.* With this drop in search engine referrals, KinderStart's "monthly AdSense revenue suffered an equally precipitous fall by over 80%." *Id.* ¶ 175. KinderStart's website "was officially, practically and illegally Blocked by Defendant Google." *Id.* ¶ 176. KinderStart was not notified in advance that this would occur and has not been instructed how it can cause Google to cease the "Blockage." *Id.* ¶ 178. To the best of its

knowledge, KinderStart has never violated Google's Web Recommendations and Google has not notified KinderStart of any such violation. *Id.* ¶ 184. KinderStart's website was given a PageRank of "0" until April 7, 2006, after which time it was raised to "7," before being dropped to "0" again on or about July 13, 2006. *Id.* ¶ 186.

Google "artificially manipulates and deflates PageRanks downward of Websites . . . based on events, factors, impression and opinions having no correlation, relation or connection to the parameters, variables and factors that are naturally and normally utilized for the PageRank algorithm as managed and executed solely within the control and management of Defendant." *Id.* ¶ 272. Google engages in the practice of "Blockage" of websites by "delisting, de-indexing and censoring" websites, including the unacknowledged practice of isolating a website from search queries, either permanently or for an unspecified probationary period. *Id.* ¶¶ 11, 154. "Blockage and/or PageRank Deflation [] occur in Search Results or Webpage views based on discriminatory political or religious content or vague and/or overbroad content guidelines." *Id.* ¶ 100.[4] "It has been and continues to be, difficult if not impossible . . . to move [a] Website out of the probationary or permanent Blockage by calling, e-mailing or otherwise notifying Defendant Google, and there is no process to get a report of whether or why a Website might have been penalized and thereby Blocked." *Id.* ¶ 156. Although Google initially denied engaging in "Blockage," it has admitted engaging in the "euphemistically" named practices of "'search quality improvement' or anti-Webspamming." *Id.* ¶ 157. The practice of "Blockage" has been positively correlated with "the failure and/or the reduction in AdWords advertising" on multiple occasions. *Id.* ¶ 170.

KinderStart believes that "over 1000 other sites of California and nationwide Websites that participated in AdSense suffered a loss of traffic and referrals as a result of Blockage by

---

[4] Google denies most, if not all, the allegations made against it by KinderStart, but denies with particular vehemence the allegation of its possession of discriminatory political or religious views. These allegations are one subject of a motion for Rule 11 sanctions against KinderStart and its counsel, *see* Motion for Sanctions 5, which motion is addressed in a separate order filed concurrently herewith.

5

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

Defendant Google." *Id.* ¶ 177. KinderStart also claims that Google has interfered with KinderStart's First Amendment rights, *see e.g. id.* ¶ 257, and "has engaged in predatory conduct and anticompetitive conduct directed toward achieving the objective of controlling prices and/or destroying competition." *Id.* ¶ 209. KinderStart asserts that the Google search engine is "an essential facility for the marketing and financial viability of effective competition in creating, offering and delivering services for search over the Internet." *Id.* ¶ 219. Although MSN and Yahoo! also operate in the search engine market, they are losing market share. *Id.* ¶ 48.

## II. LEGAL STANDARD

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star International v. Arizona Corporation Commission*, 720 F.2d 578, 581 (9th Cir. 1983); *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *Beliveau v. Caras*, 873 F.Supp. 1393, 1395 (C.D. Cal. 1995). However, under the "incorporation by reference" doctrine, the Court also may consider documents that are referenced extensively in the complaint and accepted by all parties as authentic, even if they are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999). "Under the 'incorporation by reference' rule of this Circuit, a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).

## III. DISCUSSION

### 1. Motion to Dismiss

#### a. Claim I: Attempted Monopolization in Violation of the Sherman Act

KinderStart's first claim alleges attempted monopolization in two markets under Section 2 of the Sherman Act, 15 U.S.C. § 2. SAC ¶¶ 207-08. KinderStart identifies these two markets as: (1) the "Search Market," which consists of search engine design, implementation, and usage within the United States; SAC ¶ 34; and (2) the "Search Ad Market," which consists of a "universe of advertisers who seek and pay for online advertising [and who] target and reach Internet browsers and users of search engines." SAC ¶ 38. Google allegedly participates in the Search Ad Market through the AdWords and AdSense programs, *id.*, and derives at least ninety-eight percent of its total company revenue from search-related advertising. SAC ¶ 43.

In order to make out a claim for attempted monopolization, a plaintiff must define the relevant market. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997). The relevant market is "the field in which meaningful competition is said to exist." *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). To prevail on such a claim, a plaintiff must demonstrate four elements: (1) specific intent to control prices or destroy competition, (2) predatory or anticompetitive conduct directed toward accomplishing that purpose, (3) a dangerous probability of success and (4) causal antitrust injury. *Forsyth*, 114 F.3d at 1477.

The Court concluded in its July 13th Order that KinderStart had failed to allege facts sufficient to support each of the four elements of an attempted monopolization claim. The Court also noted that KinderStart had not sufficiently described the markets relevant to its claim. The SAC suffers from essentially the same defects. To the extent that the Search Ad Market is severable from the Search Market, KinderStart does not have standing to bring a claim for attempted monopolization of the Search Ad market.

i. Relevant Market

Failure to allege adequately the relevant market is an appropriate ground for dismissal of a Sherman Act claim. *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001). "A 'market' is any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers." *Rebel Oil*

7

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

*Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). The Supreme Court has explained that the relevant market for antitrust purposes is determined by the choices available to consumers. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481-82 (1992). In some instances, one brand of a product can constitute a separate market. *Id.* "The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka*, 252 F.3d at 1063. The allegations of the SAC are insufficient to meet this standard.

KinderStart has failed to allege that the Search Market is a "grouping of sales." It does not claim that Google sells its search services, or that any other search provider does so. Rather, it states conclusorily that "[a]ny search engine must be free to the user because of past user experience and expectations with search engines and due to the preexisting governmental and techological policy of Internet freedom and Internet neutrality." SAC ¶ 54. KinderStart cites no authority indicating that antitrust law concerns itself with competition in the provision of free services. Providing search functionality may lead to revenue from other sources, but KinderStart has not alleged that anyone pays Google to search. Thus, the Search Market is not a "market" for purposes of antitrust law.

Nor has KinderStart alleged adequately that the Search Ad Market is a relevant market. KinderStart argues that the Search Ad Market is distinct from other forms of advertising on the Internet and that it should be considered as such for purposes of antitrust analysis. However, there is no logical basis for distinguishing the Search Ad Market from the larger market for Internet advertising. Because a website may choose to advertise via search-based advertising or by posting advertisements independently of any search, search-based advertising is reasonably interchangeable with other forms of Internet advertising. The Search Ad Market thus is too narrow to constitute a relevant market.

KinderStart might have argued that the Search Market and the Search Ad Market combine to form one market for antitrust purposes. However, such a combined market, even if alleged, would suffer from the same lack of breadth that renders the Search Ad Market

inadequate.

ii. Elements of Attempted Monopolization of the Search Market and the Search Ad Market

Because KinderStart has failed to plead a relevant market, its attempted monopolization claim is subject to dismissal. Its repeated failure to plead a relevant market, *see* July 13th Order 12, n.2, suggests strongly that further leave to amend the complaint would be futile. However, in order to inform the exercise of its discretion, the Court also has assessed the elements of attempted monopolization as currently pled. Based on this assessment, the Court concludes that further leave to amend is not warranted.

(1) Specific Intent to Monopolize

KinderStart argues that Google's conduct alone demonstrates the requisite intent to monopolize, pointing to the Supreme Court's dictum that "evidence that the conduct was not related to any apparent efficiency" can satisfy the requirement that an antitrust Plaintiff show predatory intent. Opposition to Motion to Dismiss 13 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.39 (1985)).[5] KinderStart makes three basic allegations regarding decisions allegedly made by Google that are not related to any apparent efficiency.

First, KinderStart alleges that Google removed from its index sites that it "unfairly and arbitrarily deemed [] in its sole discretion to be spam or marginal viewer content, . . . in order to redirect users and valuable search traffic to sites competing against such Websites." SAC ¶ 63(a). However, it does not allege that Google engaged in this activity with an intent to gain a monopoly. It does not claim that such arbitrary conduct was part of an effort to drive KinderStart, an alleged competitor, out of the Search Market. Instead, KinderStart alleges that such arbitrary conduct pertained to an effort to direct traffic to *third-party* sites that competed with KinderStart. Nothing in the allegation refers to KinderStart's competition with Google.

---

[5] This footnote references an antitrust textbook in which the author discusses situations in which the alleged antitrust violator has "overwhelming market [share], perhaps 80 or 90 percent."

9

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

Second, KinderStart alleges that Google terminated "the AdSense contracts of competitors as Class members relying upon internal and/or disclosed reasons on pretense and not related to economic sense or business justification." SAC ¶ 62(c). It does not allege, however, that Google terminated its AdSense contract. Any injury thus was suffered by unnamed class members, not by KinderStart. Article III requires that a plaintiff identify a concrete injury-in-fact. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1991). If KinderStart can allege no injury to itself, it cannot achieve standing by alleging the injury of unnamed class-members. *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022-23 (9th Cir. 2003). Because KinderStart does not have standing to bring a claim for termination of an AdSense contract, the Court may not consider such alleged contract terminations in determining whether KinderStart has alleged the requisite intent for an attempted monopolization claim.

Third, KinderStart alleges that:

> Google foregoes short-term profits by completely or effectively Blocking traffic out of Blocked sites of members of the Class which host AdSense ads, which thereby reduce Google's revenue from AdSense advertisers which would otherwise pay Google which in turn shares such revenues with AdSense hosting sites. On information and belief, Google is unable to produce any legitimate economic or business justification to unilaterally terminate the course of dealing with members of the Classes which used to be listed in the Google index but was [sic] completely or effectively Blocked. It is contrary to business or economic sense because the inclusion of Websites of such aggrieved Class members would otherwise yield greater search results and user traffic using the Engine, which thereby generates more AdSense revenue for both Websites and for Google.

SAC ¶ 172. This allegation does not establish predatory intent because, as the Court explained in its July 13th Order, "KinderStart's allegations that Google removed KinderStart from search results and lowered its PageRank do not suffice to allege predatory conduct as opposed to legitimate competitive actions." July 13th Order 12.

Even assuming that KinderStart has alleged arbitrary actions that are unrelated to business efficiency, the alleged actions do not demonstrate Google's intent to monopolize the Search Market or the Search Ad Market. This pleading deficiency has persisted despite the specific direction given by the Court in its July 13th Order.

(2) Anti-Competitive Conduct

KinderStart makes extensive allegations in the SAC that it identifies as relating to "anticompetitive and exclusionary practices and conduct." *See* SAC ¶¶ 58-64. KinderStart also includes a section in the SAC entitled "Defendant as an Unfair Competitor," in which it makes a series of further allegations. SAC ¶¶ 65-82. KinderStart summarizes these allegations as follows:

> Defendant Google has engaged in predatory conduct and anticompetitive conduct directed toward achieving the objective of controlling prices and/or destroying competition in the relevant markets of the Search Market and the Search Ad Market, including the following: (a) PageRank Deflation of competitors' Websites; (b) filing misleading statements with the SEC and state securities regulatory agencies about Search Results being produced and presented for viewing; (c) Blockage of competitors' Websites; (d) unfair and uncompetitive use of the PageRank patent in promoting and practicing it as the *de facto* standard on the Internet to degrade competitors' Websites, and/or failure to practice the PageRank patent in the disclosed preferred embodiment in a lawful manner; (e) claiming disclosure of PageRank processes and calculations as a trade secret to further advance its integrity and reliability when in fact its use and publication serves in certain instances as a weapon and pretense for unfair conduct and practices; (f) false advertising about the purported objectivity of Search Results with the Engine; (g) willful termination and reduction of Search Engine referrals and revenues to competitors' Websites by means of PageRank Deflation or termination of AdSense contracts without business justification; and (h) sudden, sharp price escalation of AdWords Advertisements with the use of LPQ [Landing Page Quality] and price discrimination among AdWords partners with the use of LPQ.

SAC ¶ 209. The Court concludes that these allegations do not state a claim for actionable exclusionary or anti-competitive conduct, either individually or collectively.

(a) PageRank Deflation and Blockage of Competitors' Websites

The Court previously has explained that "KinderStart's allegations that Google removed KinderStart from search results and lowered its PageRank do not suffice to allege predatory conduct as opposed to legitimate competitive actions." July 13th Order 12. KinderStart has not articulated a reason for the Court to alter this decision.

(b) Filing Misleading Statements with the SEC and False Advertising About the Objectivity of Search Results

KinderStart asserts that allegations of false advertising and false statements to the SEC

establish a claim of anticompetitive or exclusionary conduct. However, it cites no authority indicating that the statements made to the SEC have special relevance to the antitrust inquiry. Accordingly, the Court assesses Google's alleged misrepresentations to the SEC in conjunction with KinderStart's allegations of false advertising as to the objectivity of Google's search engine, search results, and PageRanks.

The parties agree that KinderStart must allege facts that would overcome the presumption that any misrepresentation had a *de minimus* effect on competition. *See American Prof'l Testing Service, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'n, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). To meet this pleading burden, KinderStart must allege that the representations were (1) clearly false; (2) clearly material; (3) clearly likely to induce reasonable reliance; (4) made to buyers without knowledge of the subject matter; (5) continued for prolonged periods; and (6) not readily susceptible to neutralization or other offset by rivals. *Id.* The SAC fails to meet at least two of these requirements. Principally, KinderStart fails to allege adequately that Google's representations are "clearly false." A statement by Google to the effect that its results are objective almost by definition cannot be "clearly false." Although Google has published information about manual manipulation of search results, *see* SAC ¶ 153, a reasonable person could understand that such a statement is not in conflict with the limited, manual removal of what Google considers bad links, or other such practices. In fact, Google's statements about objectivity are more reasonably understood to pertain to Google's stated refusal to alter search results for compensation. *See* SAC ¶ 121 (citing Google's S-1 Form, filed on April 29, 2004). In addition, KinderStart has not sufficiently alleged that Google deprived it of the ability to neutralize such statements or that it was otherwise unable to do so.[6]

Even viewing KinderStart's allegations in the light most favorable to KinderStart, any anticompetitive effect of Google's alleged false representations thus was *de minimus*. Moreover, KinderStart's allegations about false advertising lack the specificity and detail necessary to

---

[6] The Court expresses no opinion as to the adequacy of KinderStart's pleading of the other four requirements for overcoming the *de minimus* presumption.

12

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

support a claim of anticompetitive or exclusionary conduct.

(c) Unfair and Uncompetitive Use of the PageRank Patent

KinderStart argues that Google's patent and copyrights cannot shield it from liability. Opposition to Motion to Dismiss 14. However, it alleges no facts indicating that Google used its patent in an anticompetitive manner. Instead, it merely restates its prior conclusory assertions that Google has behaved in an anti-competitive manner. As discussed above, these assertions are insufficient to state a claim for attempted monopolization.

(d) Claiming PageRank Processes and Calculations as a Trade Secret

KinderStart cites no authority holding that a company's claim of trade secret protection for the processes and calculations of a central aspect of the service it provides may constitute anticompetitive or exclusionary behavior. KinderStart does not argue this point in its opposition to the motion to dismiss.

(e) Termination of Search Engine Referrals and Revenues

KinderStart alleges conclusorily that Google willfully terminated and reduced Search Engine referrals and revenues to competitors' Websites by means of PageRank Deflation or termination of AdSense contracts without business justification. SAC ¶ 209(g). It does not allege, however, that Google breached its AdSense contract *with KinderStart*. For the reasons discussed in the July 13th Order, PageRank Deflation does not amount to anticompetitive or exclusionary conduct. *See* July 13th Order 12. Because it does not allege a breach of its own contract with Google, KinderStart lacks standing to bring the latter claim.

(f) Price Manipulation

KinderStart claims that Google uses its LPQ website ranking system to charge exorbitant prices and also to discriminate among purchasers. This assertion is insufficient to support a claim of anticompetitive or exclusionary conduct for at least four reasons. First, because it does not allege an injury to itself as a result of the alleged conduct, KinderStart lacks standing to assert this claim. Second, charging high prices, by itself, does not constitute anticompetitive or

exclusionary behavior. *See Verizon Communications, Inc. v. Trinko*, 540 U.S. 398, 407 (2004). Third, absent predatory pricing, discriminatory pricing does not threaten competition. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). Finally, KinderStart fails to allege the nature of Google's anticompetitive conduct with any specificity.[7]

For the foregoing reasons, each of KinderStart's allegations is insufficient to establish anticompetitive or exclusionary conduct. The Court noted in order dismissing the FAC that KinderStart had failed to "allege facts sufficient to support a claim of anti-competitive conduct, such as denial of access to an essential facility or refusal-to-deal." July 13th Order 12. Despite the Court's clear direction in the July 13th Order, KinderStart still has failed to allege an adequate factual basis for its claim.[8]

(3) Dangerous Probability of Achievement of Monopoly Power in the Relevant Market

KinderStart alleges that Google has a dominant market share in both the Search Market and the Search Ad Market:

> [A]s of July 2006, Defendant Google has garnered in excess of 55% market share of all closed and open access search engine use on a combined basis within the Search Market and in excess of 75% market share of all open access search engine use within the Search Market.

SAC ¶ 36.

> Within the Search Ad Market, Defendant Google carries a market share of at least 75% of the relevant market based on total revenues among advertisers in the U.S., in which Google's AdWords and AdSense programs dominate.

SAC ¶ 39.

> In each of the Search Market and the Search Ad Market, Defendant Google has established and retains no less than 50% market share of the relevant markets. Such market shares demonstrate that Google has a dangerous probability of

---

[7] The only specific allegation about Google's pricing policy or conduct relates to its creation of an auction system to allow advertisers to bid to place their advertisements. SAC ¶ 64(a).

[8] KinderStart makes conclusory allegations that Google has denied access to an essential facility, SAC ¶¶ 219-21, and has refused to deal, SAC ¶ 227, but it makes insufficient factual allegations to support such claims.

14

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

> success in monopolization of such markets.

SAC ¶ 211.[9] However, "[a] mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme. The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *American Professional Testing Service,* 108 F.3d at 1154. KinderStart alleges that Google's two largest competitors, Yahoo and Microsoft, are losing share of the relevant markets; SAC ¶ 48; that massive investment requirements and entrenched buyer preferences create significant barriers to entry to the relevant markets; SAC ¶ 53-54; and that Google's wealth of user data gives them great advantages over any new online advertising program or search engine. SAC ¶ 57. Given these allegations, the Court concludes that, were KinderStart able to identify a relevant market for antitrust purposes, it might be able to allege a dangerous probability of achievement of monopoly power. However, because KinderStart is unable to allege other essential elements of its claim, the Court need not resolve this question.

(4) Causal Antitrust Injury

Because KinderStart brings suit under Section 4 of the Clayton Act, 15 U.S.C. § 15, it must allege causal antitrust injury. *Rebel Oil Co*, 51 F.3d at 1433. The *Rebel Oil* court explained:

> Under Section 4, private plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent. To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition. If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se.*

---

[9] *See also* SAC ¶ 37 ("When AOL's market share based on the Engine in the Search Market is combined with Google's native market share derived from its own website, the Engine of Google is used in excess of 60% of all search queries among users within the Search Market in the U.S."); SAC ¶ 41 ("Dangerous probability of success in monopolizing the two relevant and related markets exists because Google' [sic] market shares is steadily rising and is in each market upward of 60% or more.").

*Id.* (citations omitted) (citing *Atlantic Richfield Co. v. USA Petroleum, Inc.*, 495 U.S. 328, 334 (1990)). The court added: "Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare." *Id.* This Court concludes, as it did in dismissing the FAC, *see* July 13th Order 12, that KinderStart still has not alleged a sufficient connection between the harms allegedly done to it by Google through PageRank and Blockage[10] and any harm to competition or consumers.

Because KinderStart has failed, despite several opportunities to do so and specific direction from the Court, to identify a relevant market for antitrust purposes, or to allege specific intent to monopolize, anticompetitive conduct, or causal antitrust injury, the Court concludes that further leave to amend the complaint would be futile. Accordingly, the attempted monopolization claim will be dismissed without leave to amend.

b. Claim II: Monopolization in Violation of the Sherman Act

KinderStart next asserts a claim for monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, the elements of which are: (1) possession of monopoly power in the relevant sub-market, (2) willful acquisition or maintenance of that power, and (3) causal antitrust injury. *Forsyth*, 114 F.3d at 1475. As with attempted monopolization, a plaintiff claiming monopolization first must define the relevant market. *Id.* KinderStart alleges monopolization of two markets: the Search Market and the Search Ad Market. As discussed above, KinderStart would not have standing to assert a claim for monopolization of the Search Ad Market, even if it could distinguish that market from the Search Market.

i. Relevant Market

KinderStart alleges the same relevant markets as it did in its claim for attempted monopolization. For the reasons discussed previously, the Court concludes that KinderStart has failed to allege a relevant market for the purposes of its monopolization claim. As discussed above, KinderStart's repeated failure to allege a relevant market supports dismissal without leave

---

[10] In contrast, KinderStart does not have standing to complain of harms done to third parties.

to amend. In the interest of completeness, the Court nonetheless will address the adequacy of KinderStart's pleading with respect to the remaining elements of the monopolization claim.

ii. Elements of a Monopolization Claim

(1) Possession of Monopoly Power

KinderStart alleges that Google has monopoly power over the Search Market and the Search Ad Market, of which it controls 50% and 65%, respectively. SAC ¶¶ 216-17. The Supreme Court has explained that monopoly power exists where a company has the power to control prices or exclude competition. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Although it argues in its opposition brief that Google has such power, Opposition to Motion to Dismiss 15, KinderStart does not identify any allegations to that effect in the SAC.

KinderStart does allege that Google has control over an essential facility within the market. SAC ¶ 219-21. The Court explained in the July 13th Order that a facility is "essential" only if control of the facility carries with it the power to eliminate competition in the downstream market. July 13th Order 14 (citing *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991); *see also id.* at 546 ("When a firm's power to exclude rivals from a facility gives the firm the power to eliminate competition in a market downstream from the facility, and the firm excludes at least some of its competitors, the danger that the firm will monopolize the downstream market is clear. In this circumstance, a finding of monopolization, or at least attempted monopolization, is appropriate, and there is little need to engage in the usual lengthy analysis of factors such as intent."). However, while KinderStart claims in its opposition brief that Google has the power to eliminate competition in the downstream market, it does not allege facts supporting its argument in the SAC.[11]

---

[11] The most relevant allegation in the SAC asserts: "Defendant, through the maintenance, exercise and abuse of monopoly power, have [sic] forced Class I and Class II Plaintiffs to either surrender their business or to expend time and resources to find another means to secure Web traffic and reach and serve consumers." SAC ¶ 229. To the extent that Plaintiffs may still "expend time and resources to find another means to secure Web traffic and reach and serve consumers," Google does not have the power to eliminate downstream competition. Google has

KinderStart also argues that Google has violated Section 2 under the "refusal to deal" doctrine as set forth in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).[12] The Court rejected this argument in its dismissal of the FAC, and KinderStart has made no additional factual allegations that would affect the Court's analysis. July 13th Order 14-15.

(2) Willful Acquisition or Maintenance of that Power

KinderStart alleges that Google willfully acquired and maintained its monopoly power. SAC ¶¶ 218, 223-24, 232-33. Google does not argue the insufficiency of these allegations in its motion or reply.

(3) Causal Antitrust Injury

KinderStart's pleading burden with respect to a causal antitrust injury in a monopolization claim is the same as it is with respect to an attempted monopolization claim. As discussed above, the Court concludes that even if KinderStart could allege a relevant market, its showing of antitrust injury is insufficient.

c. Claim III: False Representations in Violation of the Lanham Act

KinderStart next asserts a claim for false representations in violation of the Lanham Act. Google moves to strike this claim on the ground that it is beyond the scope of amendments permitted by the July 13th Order. Motion to Strike 6-8.[13] The July 13th Order neither expressly permitted or prohibited KinderStart from adding claims arising from the facts alleged in the FAC. While it would have been better practice for KinderStart to seek leave to add such additional claims, the Court is not required to strike such claims out of hand. Instead, the Court will exercise its discretion and assess the strength of the claim as it currently stands, in order to

---

no obligation to aid its alleged competitors, and the Court cannot relieve these alleged competitors of the effort required to compete in an apparently lucrative market.

[12] KinderStart makes this argument following its discussion of Google's alleged monopoly power. To the extent that it contributes to KinderStart's overall claims for attempted monopolization and monopolization, it provides no support for other parts of KinderStart's argument, such as its argument that Google engaged in exclusionary conduct.

[13] The Court addresses Google's motion to strike the entire SAC below.

determine whether it should permit further amendment of the SAC.

The relevant section of the Lanham Act provides as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> . . .
>
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Google argues that KinderStart lacks standing to bring an action under the Lanham Act on the basis of Google's alleged misrepresentations about the objectivity of its search results. To establish standing pursuant to the false advertising prong of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), a plaintiff must show: "(1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant." *Jack Russell Terrier Network of Northern Ca. v. American Kennel Club*, 407 F.3d 1027, 1037 (9th Cir. 2005). KinderStart does not allege an injury to itself from the misrepresentation as such; rather it alleges that is has been injured by Google's alleged manipulation of its allegedly objective search results. KinderStart thus lacks standing to bring a "blockage" claim under the false advertising prong of the Lanham Act.

Moreover, KinderStart has no cognizable claim relating to PageRank, because any misrepresentations made through PageRank are not made "in commercial advertising and promotion." The Ninth Circuit has held that "[w]hile the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations [] must be disseminated sufficiently to the relevant purchasing public to constituted 'advertising' or 'promotion' within that industry." *Coastal Abstract Serv., Inc. v.*

19

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

*First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999).[14] PageRank is neither a "classic advertising campaign," nor a "more informal type[] of promotion." Even if Google had attempted "to dilute Google's claimed objectivity with a factual assertion to reroute the public's beliefs and understanding of search results," Opposition to Motion to Dismiss 20, such an attempt would not satisfy the standard articulated by the Ninth Circuit.

d. Claim IV: Violation of Free Speech Rights Under the United States and California Constitutions

i. Free Speech Rights Under the United States Constitution

KinderStart alleges that Google has violated its rights under the Free Speech Clause of the First Amendment to the United States Constitution. *See* U.S. Const. amend. I. (providing that "Congress shall make no law . . . abridging the freedom of speech."). Demonstration of state action is "a necessary threshold" that a plaintiff must cross before a Court can consider whether a plaintiff's First Amendment rights have been infringed. *George v. Furlough*, 91 F.3d 1227, 1230 (9th Cir. 1996). In the case of private-party defendants, a plaintiff must show that "the private parties' infringement somehow constitutes state action." *Id.* at 1229 (citing *Dworkin v. Hustler Magazine*, 867 F.2d 1188, 1200 (9th Cir. 1989)). The Supreme Court has articulated four different approaches by which to identify state action in different contexts: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1230-32 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)). The Ninth Circuit also has applied the "symbiotic relationship" test to identify state action. *See, e.g., Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1213 (9th Cir. 2002) (citing *Burton v. Wilmington*, 365 U.S. 715 (1961)). "Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (citations omitted).

KinderStart argues that First Amendment protections apply in the instant action because

---

[14] The Ninth Circuit cited *Gordon & Breach Science Publishers v. American Inst. of Physics*, 859 F.Supp. 1521 (S.D.N.Y.1994), adopted the test it set forth, and applied it to the case before it.

(1) there is a close nexus between or entwinement of Google and state agencies; (2) a symbiotic relationship exists between Google and state agencies; and (3) Google's search engine is a public forum.[15] For the reasons discussed below, the Court concludes that KinderStart has not sufficiently alleged state action under any of these theories.[16]

(1) Nexus/Entwinement

"[T]he nexus test asks whether 'there is a such a close nexus between the State and the *challenged action* that the seemingly private behavior may be fairly treated as that of the State itself.'" *Kirtley*, 326 F.3d at 1094-95 (citing *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001)) (emphasis added). The actions that form the basis of the SAC relate to the alleged manipulation of search results and PageRanks. *See, e.g.*, SAC ¶¶ 11-12, 174, 179. The actions alleged by KinderStart as a basis for a finding of state action relate to Google's digital library projects. *See, e.g.*, *id.* ¶¶ 254-55. These two sets of actions are distinct. KinderStart cannot establish state action on the basis of actions that are peripheral to the claims articulated in the SAC. KinderStart has alleged no facts suggesting that a close nexus existed between Google and any state entity in the creation or execution of Google's alleged policy of favoring some websites over others in the results of a web search.[17] Accordingly, the

---

[15] KinderStart does not explain how its discussion of Google as a public forum connects with its state actor argument. *See* Opposition to Motion to Dismiss 22-25. KinderStart provides no authority indicating that success on its public forum arguments would render the state action inquiry unnecessary. Accordingly, the Court will consider the arguments regarding the public forum to the extent that they contribute to the dispositive issue in this claim: the presence of state action.

[16] The Court explained in the July 13th Order that KinderStart had not met the public function, joint action or governmental compulsion/coercion tests. KinderStart has added no allegations in the SAC that would allow the Court to find state action on any of these bases. To the extent that KinderStart reasserts facts in the SAC that pertain to the public function, joint action, or government coercion/compulsion tests for state action, *see* SAC ¶¶ 110, 253, 255, the Court reaffirms its earlier conclusion that KinderStart's pleading is insufficient to meet any of the applicable tests.

[17] Moreover, even if KinderStart had complained of actions associated with Google's relationship with state universities, the level of entwinement might not be sufficient to establish state action. In *Brentwood*, eighty-four percent of an ostensibly private association's members

nexus or entwinement test does not support a finding of state action in the present case.

(2) Symbiotic Relationship

"[I]f a private entity . . . confers significant financial benefits indispensable to the government's 'financial success,' then a symbiotic relationship may exist." *Brunette*, 294 F.3d at 1213. Such a relationship may be sufficient to establish state action. *Id*. "In a symbiotic relationship the government has 'so far insinuated itself into a position of interdependence (with a private entity) that it must be recognized as a joint participant in the *challenged activity*.'" *Id.* (citing *Burton*, 365 U.S. at 725) (emphasis added). Here, Kinderstart does not allege the existence of a symbiotic relationship between Google and a government *with respect to the activities that form the basis of the SAC*. KinderStart only alleges that a symbiotic relationship exists with respect to Google's digital library projects. *See* SAC ¶¶ 254-55.

(3) Public Forum

KinderStart argues that the Google search engine "is now a public forum." Opposition to Motion to Dismiss 25. KinderStart alleges in the SAC that:

> Anyone with Internet access can go to Defendant's own website or any number of thousands of other Websites having a 'Google Search Box' as provided by Google to use the Engine without payment or charge. . . . Google has willfully dedicated the Engine for public use.

SAC ¶ 91.

> Defendant Google created and now manages, with the largest search engine in history, a freely accessible, nationwide public forum for the exchange and flow of Speech Content by virtue of the Engine. Defendant Google has intentionally, willfully and openly dedicated the Engine for public use and public benefit. Defendant Google, by and through the Engine, is a speech intermediary.

SAC ¶ 251.

---

were public schools which "largely provided for the Association's financial support" and whose officials, acting in their official capacity, "overwhelmingly perform[ed] all but the purely ministerial acts by which the Association exist[ed] and function[ed] in practical terms." *Brentwood*, 531 U.S. at 299. In addition, the state appointed members to the association's governing body, and association employees participated in the state retirement system. *Id.* at 300. KinderStart's allegations fall far short of the level of "entwinement" with respect to finances, organization and personnel described in *Brentwood*.

These allegations repeat much of what the Court found insufficient in dismissing the FAC. *See* July 13th Order 8-9. For example, KinderStart alleged in the FAC that Google is a "speech intermediary." FAC ¶ 104. KinderStart now argues that access to speech content on the Internet through the Google search engine warrants treatment of the search engine as a public forum, that KinderStart's goal of gaining further exposure of its speech requires as much, and that Google's search engine also should be treated as a public forum because *third-party* speech emanates from the return of search results. None of these arguments has merit.

KinderStart cites no authority suggesting that a search engine is a public forum for speech simply because it allows consumers to find speech on the Internet. The principal case upon which KinderStart relies, *Cornelius v. NAACP*, 473 U.S. 788, 800 (1985), does not hold that a private space may be transformed into a public forum merely because it is used for speech. Rather, the Supreme Court explained that the manner in which a forum is used is relevant to the classification of that forum for First Amendment purposes. Nor does KinderStart's argument find support in *Currier v. Porter*, 379 F.3d 716, 722 (9th Cir. 2004) (concluding that the general delivery service, not the mail system as whole, is the forum at issue in a case where it was "axiomatic" that the First Amendment was implicated). Finally, KinderStart provides little argument or authority suggesting that the emanation of third-party speech from a search engine somehow transforms that privately-owned entity into a public forum.[18]

KinderStart also has failed to address the contradiction in its pleadings noted by the Court in the July 13th Order. As the Court observed,

> KinderStart's argument that "[t]he sole function and purpose of the [Google] search engine is to promote and realize 24-7 speech and communication, openly and freely"' is inconsistent with its allegation that "Defendant Google derives at least 98% of its total company revenues from [] *search-driven* advertising, which

---

[18] KinderStart cites *National A-1 Advertising, Inc. v. Network Solutions, Inc.*, 121 F.Supp.2d 156, 179 (D. N.H. 2000), for the proposition that "third party speech emanates through the return of a 'hit' by a search engine." This appears to be a restatement of its first argument that a search engine is a public forum for speech because it allows web-users to access speech. However, *National A-1 Advertising* provides minimal support for KinderStart's argument. The case pertains to the registration of domain names and does not address the issues presented in this case.

exceeded $3.1 billion for the year ended December 31, 2004.

July 13th Order 9 (citations omitted). KinderStart nonetheless continues to allege that Google received 98% of its revenues in 2004 from search-driven advertising. To the extent that KinderStart has amended its allegations with respect to Google's commercial purpose, it has de-emphasized speech, stating: "The Engine operates 24-7 to allow any user to perform a search for Websites and Web Content and viewing and receiving speech and information of all forms." SAC ¶ 91. KinderStart has not alleged facts tending to show that Google has dedicated its search engine for public use as a forum for *speech.*

ii. Free Speech Rights Under the California Constitution

The California Supreme Court has held that a "protective provision more definitive and inclusive than the First Amendment is contained in [California's] constitutional guarantee of the right of free speech and press." *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908 (1979) (citation omitted), *aff'd sub. nom*. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 78 (1980). "[S]ections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Pruneyard Shopping Ctr.*, 23 Cal.3d at 910. In *Trader Joe's Co. v. Progressive Campaigns,* 73 Cal.App.4th 425 (Cal. Ct. App. 1999), the California Court of Appeal, applying *Pruneyard*, held that a trial court did not abuse its discretion by concluding that a stand-alone grocery store had the right to exclude petitioners. The *Trader Joe's* court explained that

> [*Pruneyard*] did not hold that the free speech and petitioning activity can be exercised only at large shopping centers. Nor did it hold that such activities can be exercised on any property except for individual residences and modest retail establishments. Rather, in resolving the specific dispute before it, the court developed a balancing test which can be applied to other situations. *Pruneyard* instructs us to balance the competing interests of the property owner and of the society with respect to the particular property or type of property at issue to determine whether there is a state constitutional right to engage in the challenged activity.

*Id*. at 433. The court held that because Trader Joe's, unlike the shopping center in *Pruneyard*, neither invited nor provided facilities for the public to meet friends, eat, rest, be entertained or otherwise congregate, it revealed a stronger interest in maintaining exclusive control, and that the "single structure, single-use store" was "not a public meeting place and society has no special

24

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

interest in using it as such." *Id*.

A three-justice plurality of the California Supreme Court subsequently clarified the relationship between California's free speech clause and private property in ruling that the California Constitution did not guarantee petitioners access to an urban apartment complex:

> [W]e conclude that the actions of a private property owner constitute state action for purposes of California's free speech clause only if the property is freely and openly accessible to the public. By establishing this threshold requirement for establishing state action, we largely follow the Court of Appeal decisions construing [*Pruneyard*]. For example, our Courts of Appeal have consistently held that privately owned medical centers and their parking lots are not functionally equivalent to a traditional public forum for purposes of California's free speech clause because, among other things, they are not freely open to the public.

*Golden Gateway Ctr. v. Golden Gateway Tenants Assn.*, 26 Cal.4th 1013, 1033 (2001) (plurality opinion). Two years later, the California Court of Appeal considered the question of what constituted a public forum (though not the question of state action) in light of *Golden Gateway*:

> Nothing in Golden Gateway can be interpreted to support the conclusion that any large business establishment is a public forum for expressive activity simply because it is 'freely and openly accessible to the public.' . . .
> Rather, the test appears to remain whether, considering the nature and circumstances of the private property, it has become the 'functional equivalent of a traditional public forum.'

*Albertson's, Inc. v. Young*, 107 Cal.App.4th 106, 117-18 (Cal. Ct. App. 2003) (holding that the privately-owned sidewalk outside a grocery store at a shopping center was not a public forum).

This Court explained in its July 13th Order that KinderStart had not alleged sufficiently that users' freedom to use the Google search engine extends to the realm of speech. July 13th Order 10. The Court noted that "[n]owhere does KinderStart allege that Google has invited the public to speak through Google's search engine, either by enabling public editing of results/rankings or by promising that every website created by the public will be indexed, ranked, and displayed." *Id.* KinderStart alleges that Google "claims that it indexes every site it locates on the Internet," SAC ¶ 54, but it also alleges that Google publicly acknowledges that it stops indexing pages in some circumstances. SAC ¶ 151. As in the FAC, KinderStart does not suggest that *the public* has the ability to edit rankings or search results. Thus, KinderStart fails to allege facts tending to show that Google's search engine, encompassing its index, web search form,

Results Pages and PageRank scores, is the "functional equivalent of a traditional public forum." *See Albertson's*, 107 Cal.App.4th at 117-18.

e. Claim V: Unfair Competition in Violation of California Business and Professions Code §§ 17200 et seq.

KinderStart next claims that Google has violated California Business and Professions Code § 17200, which prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. According to KinderStart, "Defendant Google has engaged in, and continues to engage in, [] unfair competition. Defendant's acts and practices are wrongful, arbitrary, without reasonable business or commercial justification, unethical, oppressive, and have caused substantial harm and injury to Plaintiff KSC . . . ." SAC ¶ 264. KinderStart alleges that Google's unlawful business practices include PageRank deflation of competitors' websites, filing misleading statements with the SEC, blockage of competitors' websites, unfair and uncompetitive use of the PageRank patent, claiming PageRank processes as a trade secret, false advertising about the purported objectivity of the search engine, wilful termination and reduction of referrals to competitor sites, and sudden, sharp price escalation. *Id.* ¶ 266. KinderStart alleges that it "has suffered irreparable injury in fact and have [sic] lost money, property, value, business opportunities as a result of Defendant Google's actions and practices and bring this cause of action on behalf of itself and on behalf of all other similarly situated and injured [class members]." *Id.* ¶ 268. KinderStart also alleges that the AdSense agreement deceives the public into expecting that it can benefit by participating in the program. *Id.* ¶ 265.

The Court dismissed the Section 17200 claim in the FAC on the grounds that KinderStart had alleged no facts to support its conclusory allegations and that KinderStart had not adequately pled a violation of the antitrust laws. July 13th Order 17. Both inadequacies remain in the SAC.

First, Kinderstart still fails to identify specific terms of the AdSense agreement that are deceptive and does not indicate how the agreement as a whole is deceptive. Nor has KinderStart alleged facts in the SAC suggesting that the public would expect that participation in the program would prevent a participant's removal from Results Pages or devaluation of a participant's

PageRank. Accordingly, KinderStart has failed to allege a deceptive business practice.

Second, as the Court explained in its July 13th Order, "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy of spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999). In light of the insufficiency of KinderStart's claims for attempted monopolization and monopolization, these claims cannot form the basis of a Section 17200 claim.

Because Kinderstart has failed to plead sufficient facts to allege a deceptive business practice, and because the Court will dismiss the antitrust claims in the SAC without leave to amend, the Court also will dismiss the Section 17200 claim without leave to amend. In light of this disposition, the Court does not reach Google's alternative argument that KinderStart has failed to identify a redressable injury that would confer standing under Article III or California's Proposition 64. *See* Motion to Dismiss 33-35.

f. Claim VI: Defamation and Libel

KinderStart asserts a claim for defamation and libel against Google based on Google's public presentation of a PageRank of '0' for KinderStart.com. "The tort of defamation exists whenever a false and unprivileged statement which has a natural tendency to injure or which causes special damage is communicated to one or more persons who understand its defamatory meaning and its application to the injured party." *Jackson v. Paramount Pictures Corp.*, 68 Cal.App.4th 10, 26 (Cal. Ct. App. 1998) (citation omitted). To prevail on these claims, KinderStart must allege a provably false statement. *See Edwards v. Hall*, 234 Cal.App.3d 886, 901-03 (Cal. Ct. App. 1991).

The Court dismissed the defamation and libel claim in the FAC on the basis that KinderStart had failed to explain how Google caused injury to it by a provably false statement about the output of Google's algorithm regarding KinderStart.com, as distinguished from an unfavorable opinion about KinderStart.com's importance. The Court noted that the FAC

included only the conclusory assertion that Google's actions have "cause[d] irreparable harm and damage to the goodwill, value and revenue-generating capabilities of KinderStart KSC's Website . . . ." July 13th Order 22 (citing FAC ¶ 170).

KinderStart now alleges:

> 275. The statements of PageRank are false because Plaintiff's site KS.com and those sites of members of Class III, in spite of Defendant Google's wrongful conduct, retain Website Content and remain hyperlinked to other sites throughout the Internet, and continue to have relevance to users. Further, a 0-PR for any Website is mathematically impossible within the normal operation of the algorithm within the Engine.
> 276. Defendant Google holds out in public PageRank as an opinion of the value of a given Website of Class III members but the user reliably and reasonably believes that the numerical figure presented with PageRank is based on the application and embodiment of an issued U.S. patent and determined by objective methods, with one or more computer algorithms.
> . . .
> 278. Defendant Google has failed to disclose to the user and the public the methodology, operation and basis for a PageRank figure of a Website and has repeatedly overridden and substituted the normal, computer-determined PageRank figures with its standard methodology with a human-determined value below the calculated figure produced by the computer algorithm, in some cases all the way down to 0-PR.
> . . .
> 281. Defendant Google's defamatory and libelous statements using PageRank Deflation of KS.com and those sites of members of Class III to artificially low figures placed them from time to time temporarily and permanently inside Google-designated "bad neighborhoods" and directly and proximately caused a loss of business and revenues whereby prospective and actual business partners and viewers of such deranked sites stop or refrain from doing business or from visiting and engaging with such sites.

SAC ¶ 275-76, 278, 281. The core of these allegations seems to be that KinderStart was harmed as a result of a false statement by Google that Google had determined objectively that the KinderStart website was not worth visiting, when in fact Google objectively had determined the opposite. However, the allegations are vague and ambiguous, and KinderStart makes only general claims as to the type of injury it allegedly suffered. While the defect conceivably could be cured by amendment, in this instance further leave to amend is inappropriate because materials properly before the Court under the incorporation-by-reference doctrine, *see In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999), establish that Google in fact does not represent that PageRank is a purely objective process free from human involvement. In addition, KinderStart still has failed to identify a provably false statement, and

Google is entitled to immunity under the common interest privilege.

KinderStart alleges that the public reasonably interprets PageRank as an objective statement. SAC ¶ 276. According to KinderStart, PageRanks "are presented as objective facts or opinions based on provably true or false facts, and are reasonably understood by those to whom publications are made as objective facts and opinions based on provably true or false facts." SAC ¶ 279. KinderStart asserts that Google has made a series of statements about the objectivity of its search results and the absence of human manipulation from these search results. SAC ¶ 116-29. KinderStart also alleges that Google represents that in order to provide users with "thorough and unbiased search results," it will stop indexing pages "**only at the request of the webmaster who's responsible for the pages,** when it's spamming our index, or as required by law." SAC ¶ 151 (emphasis in original). KinderStart does not allege that Google has made specific statements about the objectivity of its PageRank tool, other than to say that Google describes PageRank as explaining "how Google's algorithms assess the importance of the page [a web user is] viewing." SAC ¶ 140. It alleges that PageRank "is a mathematically-generated product of measuring and assessing the quantity and depth of all the hyperlinks on the Web that tie into a PageRanked Website, under programmatic determination by Defendant Google." SAC ¶ 141. It also represents that Google has stated that it will remove a website from its index if "it didn't conform with the quality standards necessary to assign accurate PageRank." SAC ¶ 153.

These factual allegations do not tend to prove that Google ever has represented that PageRank is objective and free from human manipulation. Google's discussion of objectivity in its April 29, 2004, S-1 form, which properly may be incorporated by reference here, indicates that the objectivity to which Google refers is the absence of paid influence in its search results. *See* SAC ¶ 121 ("*Objectivity*. We believe it is very important that the results users get from Google are produced with only their interests in mind. We do not accept money for search result ranking or inclusion. We do accept fees for advertising, but it does not influence how we generate our search results."). KinderStart's allegation that PageRank is subject to "programmatic determination" actually undermines its claim that Google represents PageRank as free from human manipulation. The term "programmatic determination" necessarily implies

human inputs that define the parameters of the program. KinderStart's own allegations are inconsistent with a claim that PageRank is an independently-discoverable value free from programmatic manipulation. Moreover, KinderStart itself alleges that Google represents that it will remove a website from its index "if it didn't conform with the quality standards necessary to assign accurate PageRank." SAC ¶ 153. KinderStart does not seriously dispute that such a statement is equivalent to a statement that Google will assign a PageRank of zero if a website does not meet Google's quality guidelines.

KinderStart's argument that it is mathematically impossible to assign a PageRank of zero presumes that Google in some way has represented that PageRank is a purely objective measure. As discussed above, PageRank is a creature of Google's invention and does not constitute an independently-discoverable value. In fact, Google might choose to assign PageRanks randomly, whether as whole numbers or with many decimal places, but this would not create "incorrect" PageRanks.

The Court noted in the July 13th Order that the question of whether a reasonable person might consider PageRank a matter of opinion or a statement of fact might not be resolvable at the pleading stage. July 13th Order 21. The Court noted that KinderStart's position would be bolstered by evidence that Google actually had represented that PageRank is "objective." *Id.* Despite this express direction from the Court, KinderStart has not alleged any additional facts sufficient to support its assertions. To the contrary, KinderStart has alleged that "Google holds out in public PageRank as an opinion of the value of a given Website," and that *users* reasonably believe that PageRank is objectively determined. SAC ¶ 276. KinderStart's apparent acknowledgment that *Google itself* holds out PageRank as an opinion undermines any claim that Google has made a *provably false* statement concerning KinderStart's PageRank.

Google also asserts correctly that KinderStart fails to allege malice and that any statement by Google, even if provably false, thus is subject to California's common interest privilege and right of fair comment. Motion to Dismiss 26. KinderStart argues that its pleading gives Google fair notice that malice is claimed. Opposition to Motion to Dismiss 33. However, because the SAC does not indicate which specific actions by Google demonstrate malice toward KinderStart,

KinderStart has not alleged malice sufficiently. Although malice may be proved by legitimate inferences, *Burnett v. National Enquirer, Inc.*, 144 Cal.App.3d 991, 1007-08 (Cal. Ct. App. 1993), it still must be alleged in a discernible manner. The two sets of allegations identified by KinderStart as bases for inferring malice are inadequate. *See* Opposition to Motion to Dismiss 34 (citing SAC ¶ 58(d); SAC ¶¶ 144-45).[19] Neither alleges facts with the required degree of specificity. One does not even appear among the allegations pertaining to defamation, *see* SAC ¶ 58(d) (anticompetitive behavior), and the other does not refer to KinderStart. *See* SAC ¶¶ 144-45. Because it concludes that the common interest privilege bars the instant defamation action, the Court need not decide whether the right of fair comment also applies.

Cal. Civil Code § 47(c) provides that a communication is privileged when made

> [i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.

Google argues that any statement it makes through the PageRank feature of its toolbar is privileged as a communication by a person "who is requested by the person interested to give the information." Motion to Dismiss 27-28. On September 22, 2006, Google provided the Court with a printout explaining the proactive steps that a user must take to solicit a PageRank. Volker Decl. Exh. B[20]. In order to receive PageRank information, a user must download and install the toolbar, activate the PageRank feature, navigate to a particular website, and then rest the cursor over the PR icon on the toolbar. *Id.* The Court concludes that such actions constitute a request for information within the meaning of Cal. Civ. Code § 47(c). The Court also concludes that KinderStart has not alleged actions that amount to "excessive publication, [] a publication of defamatory matter for an improper purpose, or [defamation] beyond the group interest." *Brewer*

---

[19] The term "malice" does not appear in the SAC.

[20] Google requests judicial notice of this printout and other web-page printouts. The Court will grant this request.

31

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

*v. Second Baptist Church*, 32 Cal.2d 791, 797 (1948).[21] The *Brewer* limitations on the scope of publication do not apply in the instant action, in which the publication is limited to the PageRank shown when an individual user visits the website.

g. Google's Assertion of Immunity from Suit

Google argues that it is immune from all claims asserted by KinderStart in the SAC both under general First Amendment principles and under the Communications Decency Act, 47 U.S.C. § 230(c)(2)(A). However, because the Court will grant the motion to dismiss on other grounds, the Court need not address these arguments.

**2. Special Motion Pursuant to the California "Anti-SLAPP" Statute**

Google has filed a special motion to strike pursuant to California's "anti-SLAPP" Statute, Cal. Code Civ. Proc. § 425.16. In particular, Google moves to strike Count Four of the SAC, which alleges that Google has infringed KinderStart's freedom of speech under the United States and California Constitutions. Google also moves to strike Count Nine of the FAC, which alleges Google's negligent interference with KinderStart's prospective economic advantage.[22] Google seeks attorney's fees pursuant to the statute.

The "anti-SLAPP" staute provides that:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States of California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff will prevail on the claim.

Cal. Code Civ. Proc. § 425.16(b)(1). Actions that qualify for the remedy afforded by this statute

---

[21] "For this conditional privilege extends to false statements of fact, although the occasion may be abused and the protection of the privilege lost, by the publisher's lack of belief, or of reasonable grounds for belief, in the truth of the defamatory matter, by excessive publication, by a publication of defamatory matter for an improper purpose, or if the defamation goes beyond the group interest. Thus the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff, or by any cause other than the desire to protect the interest for the protection of which the privilege is given." *Id.* (citations omitted).

[22] Google cites no authority indicating that the Court may strike a claim from a superseded complaint. The Court need not address its power to do so because it will deny all aspects of the motion on other grounds.

32

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

include:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Code Civ. Proc. § 425.16(e). Perceiving abuse of this section, the California legislature passed Cal. Code Civ. Proc. § 425.17, which provides generally that the "anti-SLAPP" law may not be used against actions brought solely in the public interest. Section 425.17 also provides that the "anti-SLAPP" law does not apply to certain commercial lawsuits, although this is not true of lawsuits against a person or entity engaged in the creation, dissemination, exhibition, advertisement, or other promotion of literary work.

Google argues that it meets the threshold requirement of Section 425.16 that its speech be protected by the United States or California Constitutions. "Anti-SLAPP" Motion 5-6. It asserts that it "speaks" in the form of PageRanks and search results, *id.*, and that it is a corporation engaged in the creation of a literary work. *Id.* at 13-14. However, the Court concludes that even if Google's characterizations of its speech are accurate, the actions that form the basis of KinderStart's claims against Google are not of public interest. *See* Cal. Code Civ. Proc. § 425.16(e)(3)-(4).

"The definition of 'public interest' within the meaning of the "anti-SLAPP" statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." *Damon v. Ocean Hills Journalism Club*, 85 Cal.App.4th 468, 479 (Cal. Ct. App. 2000). The boundaries of 'public interest' have not been precisely defined, but the cases that have found that a party's speech to be of 'public interest' involve matters in the public eye, conduct that could directly effect a large number of people beyond the direct participants, or a topic of widespread public discussion. *Rivero v. American Federation of State, County, and Municipal Employees*, 105 Cal.App.4th 913, 924 (Cal. Ct. App. 2003). The conduct at issue here

does not meet these criteria. Although the instant lawsuit received media coverage after it was filed, there is no indication that a significant number of customers became aware of KinderStart's low PageRank or Google's removal of KinderStart from Google's search results prior to the filing of the lawsuit. Nor is there any indication that any debate or discussion arose over these matters, except between Google and KinderStart. Tellingly, KinderStart has yet to identify the similarly situated websites that it alleges suffered similar treatment at the hands of Google.[23] The Court finds it implausible that the fate or content of these websites could have been of public interest when an interested party apparently cannot identify them.[24]

Google argues that the Court should follow *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090 (C.D.Cal. 2004), and find public interest in the conduct at issue in this case. The *New.Net* court described the dispute in that case as follows:

> This case presents a dispute between two downloadable software providers, New.net whose software, NewDotNet, is downloaded onto individual computers often without the knowledge or request of the computer owner, and Lavasoft whose software, Ad-aware, is purposefully downloaded by the computer user to detect and remove programs like the one written by New.net. New.net complains that the injuries caused by Ad-aware's inclusion of NewDotNet in its database are actionable under both state and federal law.

*New.Net*, 356 F.Supp.2d at 1095-96. The court explained that "Lavasoft had its genesis in a project to notify the public that unwanted software applications were being downloaded to personal computers without the user's knowledge or consent." *Id.* at 1105. Lavasoft programmed its software "relying primarily on submissions from the public." *Id.* The court

---

[23] KinderStart has filed the declaration of Daniel D. Savage ("Savage"), a manager of TradeComet.com LLC. Savage asserts that a sudden increase in minimum bids for keywords under AdWords caused a dramatic drop in TradeComet.com's revenue. This single declaration of one other company does not transform the conduct in this case into a matter of public interest.

[24] The Court is unpersuaded by Google's reference to the large traffic counts claimed by KinderStart in its SAC. The Court has explained elsewhere that the "anti-SLAPP" statute covers statements made in connection with a public issue, not statements that could have an impact on the public. Order Den. Special Mot. to Strike and Den. Req. for Att. Fees, *Sherwood v. Wavecrest Corp.*, C 05-02354 (N.D.Cal., Nov. 1, 2005). The alleged volume of traffic that moved to other sites as a result of the conduct in question may indicate impact on the public, but it does not indicate that the conduct itself was a public issue.

described Ad-aware as "a service akin to Consumer Reports and other consumer information, databases, but in a new form," and analogized it to a "newspaper, magazine, or other material that addresses a matter of public importance." *Id.* at 1106. The court emphasized the importance of evidence of an ongoing public debate about Internet privacy and the threats posed by software like NewDotNet: "[this evidence] confirm[s] that there is indeed a community concerned with internet privacy, that the subject is a matter of public discussion, and that [New.net's] surreptitious downloads are a topic of discussion and concern in that context." *Id.* The court further noted that much of the speech with which New.Net took issue was not in fact Lavasoft's speech, but rather "speech engaged in by numerous others in the internet community including individual computer users." *Id.* The court concluded:

> Because the issue of public awareness of, and protection from, the unknown are at the heart of the public information service Defendant provides and because that service is of public significance, speech in this area should not be chilled by litigation brought by Plaintiff who seeks to stifle speech to enhance its profits.

*Id.*

*New.Net* is distinguishable from the instant case in at least three ways. First, while the NewDotNet software was a subject of discussion, there is no evidence that there has been any public debate about the contents of the KinderStart website or that Google was contributing to such debate. Second, while the relief sought by New.Net would have stifled speech by many parties beyond the lawsuit, including other companies and members of the public, there is no risk of such a sweeping effect on speech in this case. Third, the search services Google provides do not have "the issue of public awareness of, and protection from, the unknown" at their heart.

Alternatively, the Court concludes that, even if the conduct at issue is of public interest, the interest is limited. "[W]here the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging participation in matters of public significance." *Du Charme v. International Broth. of Elec. Workers, Local 45*, 110 Cal.App.4th 107, 119 (Cal. Ct. App. 2003). The *Du Charme* court contrasted such limited public interest with "widespread public interest,"

citing cases which involved the construction of a mall, domestic violence, a religious institution with extensive media coverage, a television show that created significant debate, and child molestation in youth sports. *Id.* at 117. In contrast, it is difficult to see how KinderStart's low PageRank and the exclusion of KinderStart from Google's search results are matters of public significance that merit protection by a "statute that embodies the public policy of encouraging participation in matters of public significance."

**3. Motion to Strike**

Finally, Google moves to strike the SAC in its entirety. Google asserts that the SAC contains structural deficiencies, irrelevant allegations, and a misleading and improper use of ellipses. Google also moves to strike KinderStart's Lanham Act claim on the basis that the Court did not grant KinderStart leave to include additional claims in the SAC. In light of the foregoing discussion, the motion to strike is moot.

Having concluded that it should grant the motion to dismiss, the Court must consider whether to grant leave to amend the complaint. Leave to amend may be denied for reasons including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In its July 13th Order, the Court gave KinderStart explicit, detailed direction that KinderStart largely failed to follow in the SAC. Instead, KinderStart reasserted the same deficient allegations identified in the July 13th Order. The instant case has been intensively litigated for more than eleven months. Under these circumstances, the Court concludes that there is no reasonable likelihood that KinderStart will cure the defects in the SAC by further amendment. Accordingly, the motion to dismiss will be granted without leave to amend.

## IV. ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED THAT:

36

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)

(1) The Motion to Dismiss is GRANTED without leave to amend.[25]

(2) The Special Motion Pursuant to Cal. Civ. Code § 425.16 is DENIED.

(3) The Motion to Strike is DENIED as moot.

DATED: March 16, 2007

JEREMY FOGEL
United States District Judge

[25] KinderStart's pending motion for a preliminary injunction, filed on May 26, 2006, is denied as moot.

This Order has been served upon the following persons:

| | |
|---|---|
| Colleen Bal | cbal@wsgr.com, eminjarez@wsgr.com |
| David H. Kramer | dkramer@wsgr.com, dgrubbs@wsgr.com |
| Bart Edward Volkmer , Esq | bvolkmer@wsgr.com |
| Gregory John Yu | glgroup@inreach.com, gjy@abcye.com |

38

Case No. C 06-2057 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND, DENYING SPECIAL MOTION PURSUANT TO CAL. CIV. CODE § 425.16, AND DENYING MOTION TO STRIKE AS MOOT
(JFLC1)